DET047117

MIED (Rev 1/31/05) Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus

**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF**

**HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

| United States District Court | | Case:2:12-cv-14013 |
|---|---|---|
| | D | Judge: Tarnow, Arthur J. |
| **Name** (under which you were convicted): | | MJ: Grand, David R. |
| LINDA KAY STERMER | | Filed: 09-11-2012 At 10:18 AM |
| | | HC Stermer v. Warren (tam) |

| Place of Confinement: HURON VALLEY WOMEN'S | Prisoner No.: 757152 |
|---|---|

| Petitioner (include the name under which you were convicted) | Respondent (authorized person having custody of petitioner) |
|---|---|
| LINDA KAY STERMER | v. WARDEN M. WARREN |

The Attorney General of the State of  MICHIGAN

**PETITION**

1. (a) Name and location of court that entered the judgment of conviction you are challenging: _____
   VAN BUREN COUNTY CIRCUIT COURT
   212 PAW PAW STREET, PAW PAW MI 49079

   (b) Criminal docket or case number (if you know): 09-016654 FC

2. (a) Date of the judgment of conviction (if you know): JANUARY 13, 2010

   (b) Date of sentencing: FEBRUARY 8, 2010

3. Length of sentence: LIFE WITHOUT PAROLE

4. In this case, were you convicted on more than one count or of more than one crime?

   ☐ Yes          ☒ No

5. Identify all crimes of which you were convicted and sentenced in this case: _____
   FELONY MURDER IN VIOLATION OF MCLA 750.316(1)(b)

6. (a) What was your plea? (Check one)

   ☒ Not guilty          ☐ Nolo contendere (no contest)

   ☐ Guilty          ☐ Insanity plea

   (b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge,
   what did you plead guilty to and what did you plead not guilty to?_____

1

MIED (Rev. 1/31/05) Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus

(c) If you went to trial, what kind of trial did you have? (Check one)

☒ Jury          ☐ Judge only

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☐ Yes          ☒ No

8. Did you appeal from the judgment of conviction?

☒ Yes          ☐ No

9. If you did appeal, answer the following:

(a) Name of court: __COURT OF APPEALS__

(b) Docket or case number (if you know): __297057__

(c) Result: __AFFIRMED__

(d) Date of result (if you know): __JUNE 23, 2011__

(e) Citation to the case (if you know): _____

(f) Grounds raised: _____

I.   MAGISTRATE ABUSED HIS DISCRETION IN BINDING OVER FOR TRIAL

II.   TRIAL COURT ERRED IN DENYING THE MOTION FOR A DIRECTED VERDICT

III.   THE TRIAL COURT ABUSED ITS DISCRETION DENYING A MOTION FOR A NEW TRIAL

(g) Did you seek further review by a higher state court?     ☒ Yes          ☐ No

If yes, answer the following:

(1) Name of court: __MICHIGAN SUPREME COURT__

(2) Docket or case number (if you know): __143546__

(3) Result: __DENIED__

(4) Date of result (if you know): __NOVEMBER 11, 2011__

(5) Citation to the case (if you know): _____

(6) Grounds raised: __SAME__

(h) Did you file a petition for certiorari in the United States Supreme Court?

☐ Yes          ☒ No

If yes, answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

2

MIED (Rev 1/31/05) Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions for relief from judgment pursuant to Subchapter 6.500 of the Michigan Court Rules concerning this judgment of conviction in any state court?   ☐ Yes   ☒ No

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?   ☐ Yes   ☐ No

(7) Result: _____

(8) Date of result (if you know): _____

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?   ☐ Yes   ☐ No

(7) Result: _____

(8) Date of result (if you know): _____

3

MIED (Rev. 1/31/05) Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or

motion?         □ Yes        □ No

(7) Result: _____

(8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition,

application, or motion?

(1)  First petition:        □ Yes        □ No

(2)  Second petition:     □ Yes        □ No

(3)  Third petition:       □ Yes        □ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____

_____

_____

12. For this petition, state every ground on which you claim that you are being held in violation of the
Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four
grounds.  State the <u>facts</u> supporting each ground.

<u>CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available
state-court remedies on each ground on which you request action by the federal court.  Also, if you fail
to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a
later date.</u>

**GROUND ONE:**   VIOLATION OF FOURTH AMENDMENT RIGHT AS NO PROBABLE CAUSE EXISTS
IN THIS CASE TO BELIEVE LINDA STERMER INTENTIONALLY STARTED A FIRE.

_____

MIED (Rev 1/31/05) Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):
[1] NO PROOF FIRE WAS INTENTIONALLY SET BY LINDA, [2] GAS ON TODD'S CLOTHING,
(NEIGHBORS THAT COVERED TODD), [3] TODD SET PREVIOUS FIRES, [4] HOUSE WAS
UNDER CONSTRUCTIONS, (SPEED OF FIRE), [5] TODD - DRUGS, (NO DRUGS IN TODD'S
BLOOD, ONLY IN URINE, HE COULD HAVE INGESTED THEM DAYS PREVIOUS TO THE FIRE).
AND, [6] THERE WAS NO PROOF THAT THE FIRE WAS INTENTIONALLY STARTED.

(b) If you did not exhaust your state remedies on Ground One, explain why: _____

(c) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

x : Yes     : No

(2) If you did **not** raise this issue in your direct appeal, explain why: _____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.500 of the
Michigan Court Rules?          : Yes          : No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

(3) Did you receive a hearing on your motion or petition?          : Yes          : No

(4) Did you appeal from the denial of your motion or petition?          : Yes          : No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

: Yes          : No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

Docket or case number (if you know): _____

Date of the court's decision: _____

5

MIED (Rev. 1/31/05) Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this

issue: _____

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies,

etc.) that you have used to exhaust your state remedies on Ground One: _____

_____

_____

**GROUND TWO:** VIOLATION OF CONSTITUTIONAL AMENDMENT XIV, TRIAL COURT
ERRONEOUSLY DENIED MOTION FOR DIRECTED VERDICT.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

[1] ALL EVIDENCE WAS MISCHARACTERIZED BY THE PROSECUTION, [2]
IT WAS ALL CIRCUMSTANTIAL, [3] THERE IS NO EVIDENCE THAT LINDA
STERMER INTENTIONALLY STARTED THE FIRE.

I. THE EVIDENCE IS INSUFFICIENT TO FIND BEYOND A REASONABLE DOUBT THAT
THAT THE FIRE WAS CAUSED BY ARSON, i.e. A DELIBERATE FIRE, II. THE
EVIDENCE IS INSUFFICIENT TO FIND BEYOND A REASONABLE DOUBT THAT IT WAS
DEFENDANT WHO CAUSED THE FIRE.
(b) If you did not exhaust your state remedies on Ground Two, explain why: _____

_____

_____

_____

(c) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes X        No

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.500 of the

Michigan Court Rules?        :   Yes           :   No  X

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

6

MIED (Rev 1/31/05) Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?

   : Yes     : No

(4) Did you appeal from the denial of your motion or petition?

   : Yes     : No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

   : Yes     : No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: _____

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: _____

_____

_____

_____

**GROUND THREE:** VIOLATION OF CONSTITUTIONAL AMENDMENT XIV, THE VERDICT WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

[1] NOT ONE WITNESS SAW DEFENDANT START THE FIRE, [2] NO GASOLINE ON HER CLOTHING, [3] GASOLINE ON TODD'S CLOTHING, [4] TODD'S BLOOD WAS ONLY ON THE LEADING EDGES OF THE VAN UNDERCARRIAGE, [5] THE FAMILY REGULARLY FILLED UP GAS CANS, [6] THE GAS ON TODD'S CLOTHING COULD HAVE SET THE FIRE OFF IN THE ROOM FROM THE OIL LAMP OR FIRE PLACE, [7] DOCTRINE OF CHANCES, AND [8] THE QUALITY OF THE EVIDENCE.

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

MIED (Rev. 1/31/05) Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

: Yes X : No

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.5000 of the

Michigan Court Rules? : Yes : No X

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?

: Yes : No

(4) Did you appeal from the denial of your motion or petition?

: Yes : No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

: Yes : No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this

issue: _____

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies,

etc.) that you have used to exhaust your state remedies on Ground Three: _____

_____

8

MIED (Rev 1/31/05) Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus

15. Do you have any petition or appeal <u>now pending</u> (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?          :  Yes          :  No   x

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. _____

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: JEFFREY S. GETTING (P43227)   707 ACADEMY STREET KALAMAZOO, MI 49007 – (269) 345-4127

(b) At arraignment and plea: SAME

(c) At trial: SAME

(d) At sentencing: SAME

(e) On appeal: MARY A. OWENS (P33896), 124 E. FULTON, STE. 100, GRAND RAPIDS, MI 49503, (616) 742-0431

(f) In any post-conviction proceeding: _____

(g) On appeal from any ruling against you in a post-conviction proceeding: _____

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?          :  Yes          :  No   x

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

_____

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?          :  Yes          :  No

11

MIED (Rev. 1/31/05) Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus

Therefore, petitioner asks that the Court grant the following relief: _____

PLAINTIFF PRAYS THAT THIS HONORABLE COURT WILL VACATE HER CONVICTION

AS SHE IS INNOCENT OF FELONY MURDER,

or any other relief to which petitioner may be entitled.


_____
Signature of Attorney (if any)

_____
Address

_____

_____
Telephone Number


I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on _____ (month, date, year).

Executed (signed) on _____ (date).


_____
Signature of Petitioner


If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition. _____

_____

_____


* * * * *

# Order

**Michigan Supreme Court**
**Lansing, Michigan**

November 21, 2011

Robert P. Young, Jr.,
Chief Justice

143546

Michael F. Cavanagh
Marilyn Kelly
Stephen J. Markman
Diane M. Hathaway
Mary Beth Kelly
Brian K. Zahra,
Justices

PEOPLE OF THE STATE OF MICHIGAN,
      Plaintiff-Appellee,

v

LINDA KAY STERMER,
      Defendant-Appellant.

SC: 143546
COA: 297057
Van Buren CC: 09-016654-FC

_____/

      On order of the Court, the application for leave to appeal the June 23, 2011 judgment of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

November 21, 2011

_____
      Clerk

h1114

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

LINDA KAY STERMER,
      Petitioner,

                                      CIVIL ACTION NO.

V

                                      HONORABLE:

WARDEN MILLICENT WARREN,
           Respondent.
_____/

## PETITION FOR WRIT OF HABEAS CORPUS

    **NOW COMES**, Linda Kay Stermer, in Pro Se requesting that this Honorable Court grant/issue this Petition for a Writ of Habeas Corpus.

    Linda Kay Stermer, respectfully states:

    1) Linda Kay Stermer is a United States Citizen, is currently imprisoned at Huron Valley Facility, 3201 Bemis Road, Ypsilanti, MI 48197.

    2) Petitioner is currently unconstitutionally detained and imprisoned by Respondent, Warden Millicent Warren, Huron Valley Facility, serving a Life Sentence.

    3) Petitioner has exhausted all state remedies available to her with regards to the following issues:

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff/Appellee,

v

LINDA STERMER,

     Defendant/Appellant.

COA Docket No. 297057

Van Buren County Circuit Court
No. 09-16654

Hon. William C. Buhl

---

Van Buren County Prosecutor
Attorney for Plaintiff
212 Paw Paw St.
Paw Paw, Michigan 49079

Mary A. Owens (P33896)
Attorney for Defendant
124 E. Fulton, Ste. 100
Grand Rapids, Michigan 49503
(616) 742-0431

## DEFENDANT/APPELLANT'S BRIEF ON APPEAL

## ORAL ARGUMENT REQUESTED

M:\WPDOCS\STERMER\1794U18abriefonappeal

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION          3

INDEX OF AUTHORITIES          4

STATEMENT OF QUESTIONS PRESENTED          6

STATEMENT OF FACTS AND PROCEEDINGS          7

ARGUMENT          18

     I.      THE DISTRICT COURT ABUSED ITS DISCRETION IN BINDING OVER TO CIRCUIT COURT AND THE CIRCUIT COURT ERRED REFUSING TO QUASH THE BINDOVER.      18

     II.      THE TRIAL COURT ERRED IN DENYING THE MOTION FOR A DIRECTED VERDICT. DEFENDANT'S CONVICTIONS FOR FIRST DEGREE MURDER AND FELONY MURDER MUST THEREFORE BE VACATED BECAUSE THE EVIDENCE IS INSUFFICIENT TO SUPPORT A FINDING OF GUILT BEYOND A REASONABLE DOUBT THAT (1) THE HOUSE FIRE WAS CAUSED BY ARSON, I.E. A DELIBERATELY SET FIRE OR (2) THAT IT WAS DEFENDANT WHO STARTED THE FIRE.      24

     III.      THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE MOTION FOR A NEW TRIAL BECAUSE THE VERDICT IS AGAINST THE GREAT WEIGHT OF THE EVIDENCE.      34

RELIEF REQUESTED          41

## STATEMENT OF JURISDICTION

Defendant was convicted after a six-day jury trial of first degree premeditated murder and felony murder, MCL 750.316-B.  She was sentenced on February 8, 2010 to a term of life in prison.  She requested the appointment of appellate counsel on February 8, 2010, and undersigned counsel was appointed on March 10, 2010.  This is therefore an appeal of right under MCR 6.425(F)(3) and MCR 7.204A(2).

# INDEX OF AUTHORITIES

## Cases

*Bridwell v Segel*, 362 Mich 102, 105 (1960)    35

*Brown v. Palmer*, 441 F.3d 347, 352 (6th Cir.2006)    33

*Fuller v. Anderson*, 662 F.2d 420, 423-24 (6th Cir.1981)    33

*Hopson v. Foltz*, 818 F.2d 866 (6th Cir 1987)    33

*In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970)    24

*Jackson v Virginia*, 443 US 307; 99 S Ct 2781; 61 L Ed 560 (1979)    24, 25, 34, 35

*Parker v. Renico*, 506 F.3d 444, 452 (6th Cir.2007)    33

*People v. Abraham*, 234 Mich.App 640, 656; 599 NW2d 736 (1999)    26

*People v. Anderson*, 209 Mich.App 527, 537; 531 NW2d 780 (1995)    26

*People v Brown*, 239 Mich App 735 (2000)    35

*People v. Crawford*, 458 Mich. 376, 582 N.W.2d 785 (1998)    37

*People v. Hamblin*, 224 Mich.App. 87, 91, 568 N.W.2d 339 (1997)    19

*People v Hampton*, 407 Mich 354, 366; 285 NW2d 284 (1979)    24, 25, 34, 35

*People v. Herbert*, 444 Mich. 466, 475; 511 NW2d 654 (1993)    34, 35

*People v Hudson*, 241 Mich App 268 (2000)    19

*People v. Justice (After Remand)*, 454 Mich. 334, 344; 562 N.W.2d 652 (1997)    21

*People v Kurazawa*, 202 Mich App 462, 467 (1993)    41

*People v. Lee*, 231 Mich. 607, 204 N.W. 742 (1925)    23

*People v. Lemmon*, 456 Mich. 625, 627; 576 NW2d 129 (1998)    34-36, 41

*People v. Lindsey* 268 N.W.2d 41, 83 Mich.App. 354 (1978)    23, 27, 29, 32

*People v. Mardlin*, --- N.W.2d ----, 2010 WL 3037770 (July 31, 2010)    37-39

*People v. Neal*, 201 Mich.App. 650, 654, 506 N.W.2d 618 (1993) — 19

*People v Olson,* 13 Mich App 324, 330 (1968) — 41

*People v Patterson*, 428 Mich 502 , 514 (1987) — 24

*People v. Reigle*, 223 Mich.App. 34, 36, 566 N.W.2d 21 (1997) — 19

*People v. Unger*, 278 Mich.App 210, 232; 749 NW2d 272 (2008) — 34

*People v. Taylor*, 275 Mich.App 177, 179; 737 NW2d 790 (2007) — 26

*People v. Williams*, 114 Mich.App. 186, 318 N.W.2d 671 (1982) — 23, 27

*United States v Pierce*, 62 F3d 818, 825-826 (CA 6, 1995) — 35

## Constitution, Statutes and Court Rules

US Const, Ams V, VI, XIV; Const 1963, art 1, §17, 20 — 24

MCL 750.316-B — 7, 25

MCL 766.13 — 21

MCR 2.611(A)(1)(e) — 34

MCR 6.431 — 34

MCL 770.1 — 34

MCR 6.425(F)(3) — 3

MCR 6.419(B) — 24

MCR 7.204A(2) — 3

MRE 404(b) — 37, 38

M:\WPDOCS\STERMER\1794U18abriefonappeal

## STATEMENT OF QUESTIONS PRESENTED

I.     WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION IN BINDING OVER TO CIRCUIT COURT AND THE CIRCUIT COURT ERRED REFUSING TO QUASH THE BINDOVER.

Plaintiff-Appellee says, "No."

Defendant-Appellant says, "Yes."

The trial court says, "No."

II.     WHETHER THE TRIAL COURT ERRED IN DENYING THE MOTION FOR A DIRECTED VERDICT. WHETHER DEFENDANT'S CONVICTIONS FOR FIRST DEGREE MURDER AND FELONY MURDER MUST THEREFORE BE VACATED BECAUSE THE EVIDENCE IS INSUFFICIENT TO SUPPORT A FINDING OF GUILT BEYOND A REASONABLE DOUBT THAT (1) THE HOUSE FIRE WAS CAUSED BY ARSON, I.E. A DELIBERATELY SET FIRE OR (2) THAT IT WAS DEFENDANT WHO STARTED THE FIRE.

Plaintiff-Appellee states "No."

Defendant-Appellant states "Yes."

The Trial Court states "No."

III.     WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE MOTION FOR A NEW TRIAL BECAUSE THE VERDICT IS AGAINST THE GREAT WEIGHT OF THE EVIDENCE.

Plaintiff-Appellee states "No."

Defendant-Appellant states "Yes."

The Trial Court states "No."

## STATEMENT OF FACTS AND PROCEEDINGS

### Introduction

Defendant was convicted after a six-day jury trial of felony murder, MCL 750.316-B. She was sentenced on February 8, 2010 to a term of life in prison. This case arises from a house fire in which Defendant's husband, Todd Stermer, was killed. The prosecution theory was that Defendant, having an affair with a co-worker, drugged her husband, poured gasoline on him, and set fire to him. The defense theory was that it was Todd Stermer who accidentally or intentionally set the fire.

### Facts

On January 7, 2007, the Van Buren County sheriff's department responded to a house fire in Lawrence Township at 3:30 p.m. (Tr II, 2-3). The house was located about 250 yards from the road, down a long driveway which sloped downwards at the back of the house. (Tr II, 4, 11, 28, 56). The long driveway continued to the back of the house, where it was simply a sort of pathway that had been repeatedly driven over, so that the grass had been worn away. (Tr II, 68-69; Tr III, 98). The back area was described as "real sandy" or muddy and unpaved, so that the Stermers had to back up their van to get a "running start" to get back up the slope to the driveway, thence to the street. (Tr II, 215-216, 220-221, 256; Tr V, 8-9, 20). The house itself was still under construction although the Stermers were living there. (Tr I, 267; Tr IV, 109-110, 148; Tr V, 9, 78). For example, the ceilings in the living room and basement were unfinished and the rafters were exposed. (Tr IV, 110; Tr V, 78). It was not uncommon for gas cans to be placed in the front yard. (Tr V, 9, 76-77).

It took the officer about 7 minutes to arrive at the home, by which time the house was fully involved, and the smoke was traveling upwards, but did not obscure the scene. (Tr II, 3-4, 12). A fuel tank was located at the north side of the house. (Tr II, 7-8).

When the police arrived, there were 5 people on the north side of the lot, and Todd Stermer was lying on the grass, badly burned and with lacerations, but still alive. (Tr II, 12-13, 24-25, 37, 79-80, 155; Tr III, 43-44). There were articles of clothing placed on Todd (including clothing belonging to Defendant), but the only article of clothing he was wearing was a gray pair of sweat pants pulled down to his ankles and socks. (Tr II, 14, 35-36, 51, 61, 79; Tr III, 45-46, 90-91 183). The sweat pants were seized at the scene. (Tr III, 91). The clothing and blankets covering his body were taken by the police at the autopsy, "placed in silver type paint cans"[1] and turned over to the fire marshal. (Tr III, 47-49, 182-183). Each paint can contained one item taken from Todd at the autopsy. (Tr III, 74). All of these items had been put in one evidence bag together and given to Deputy Evans at the scene. (Tr III, 95-97). The sweat pants emanated a noticeable odor of petroleum accelerants. (Tr III, 183-185).

The sweat pants later tested positive for the presence of gasoline, as did Todd's socks, underwear and a shirt. (Tr III, 139-140, 142). A red gasoline can that had been found in the front yard also tested positive for gasoline (Tr III, 140, 187-188, 212). The tan coat, a red sweatshirt, brown shirt, blue shirt and towel that had been laid on top of Todd were negative for the presence of "ignitible liquids." (Tr III, 140-142). The clothing worn by Defendant – her sweater, pants and socks – tested negative for the presence of "ignitable liquids." (Tr III, 141, 148).

Blood had pooled under Todd's head (Tr II, 14-15, 29; Tr III, 43, 52-54) and what appeared to be blood was located on the front lower section of the bumper of the van. (Tr II, 20-21, 33-34; Tr III, 50, 52-54, 60-61, 80-81, 90). The forensic crime scene analyst David Hayhurst confirmed that the red stains on the van were indeed blood. (Tr III, 115-ff). There were six specific

---

[1] The significance of the "paint cans" for the preservation of evidence was – to the best of counsel's ability to infer – apparently explained as being used in "fire debris analysis." (Tr III, 138).

areas on the undercarriage of the van that tested positive for blood, running from under the driver's front bumper, the driver's front tire, the driver's side "swing arm" (which supports the tire), a metallic box beneath and behind the driver's side, driver's side running board, rear driver's side axle, and on the spare tire mounted on the rear of the van itself. (Tr III, 120-126, 132). The stains were on the "leading edge" of the surfaces, consistent with the van being driven forward as it ran over an individual. (Tr III, 127, 133-134). The blood stains belonged to Todd. (Tr III, 128129).

Tire tracks "going in reverse direction" "appeared to be coming from a direction where Mr. Stermer's body had been found...or moving in that direction." (Tr III, 51, 98-99). These tire tracks were marked at the scene with flags. (Tr III, 55-56). Testimony showed that the area where Todd was located was somewhat muddy and watery. (Tr III, 77-78). However, no ruts or splattered mud (in the wheel wells) caused by spinning tires were found. (Tr III, 64, 73). (Dried mud or dirt was found on the tires and the undercarriage, however -- Tr III, 84, 89). Defendant's pocketbook, Todd's wallet and some sort of a business ledger were found on the front passenger floor. (Tr III, 65, 68-69, 70, 84, 99-101).

The witnesses on scene described Defendant as laying on top of Todd, screaming his name over and over, hysterical. (Tr II, 22, 28-29, 37-38, 63, 81, 111-112, 120). Todd was bleeding from his head, had a laceration, and trauma to his back. Officer Evans and the others put Todd onto a sled and pulled the sled away from the house and the oil tank and began first aid. (Tr II, 16-17, 19, 30-32, 52-53, 117). However, he died before other medical responders arrived without making a statement. (Tr II, 20, 32, 35).

Neighbor Mike Matheny and Connie Calhoun were leaving to go bowling at about 3:30 p.m. As they passed the Stermer house they noticed smoke and went up the driveway to see if

9

help was needed. (Tr II, 43-44, 55, 71-72). As they were driving up the driveway, Matheny saw the

van moving in reverse, then forward again, to an area behind the house. As he got closer, he could

see Defendant driving the van. (Tr II, 45-49, 56). Calhoun said that the van was pointing down the

driveway "like it was heading out," but then "ends up moving and going back behind the house."

(Tr II, 74-75, 84-85). Calhoun said she believed Defendant knew they were there because "we made

eye contact." (Tr II, 76). Defendant then got out of the van and was "hysterical." (Tr II, 49, 59-61,

87-88). Matheny and Calhoun kept asking where the boys and Todd were, and when he went back

towards the van, he saw Todd lying on the ground close to the fuel tank. He passed by several times

before he saw Todd on the ground. (Tr II, 49-50, 57-58, 65, 77-78). Defendant said "I don't know"

to the questions about the children and Todd, then said, "here he is." (Tr II, 78). Matheny then got

some clothes from his own car and put them over Todd. (Tr II, 51-52, 64). Defendant was

"hugging" Todd so that Matheny and others had to physically move her off him in order to perform

first aid. (Tr II, 63). Later, Defendant told Calhoun that she was downstairs doing laundry and Todd

was upstairs watching TV when she heard him scream. (Tr II, 82-83, 90-93).

Dr. Moussali and his sons were doing chores outside and noticed smoke. They drove

down the driveway, where he saw the Methenys and Defendant standing, and one person on the

ground. (Tr II, 99-100). Dr. Moussali checked his breathing and tried to get a pulse. Todd did not

seem to be conscious. He noticed that Todd's tongue was bruised, but did not notice any lacerations

or bleeding. (Tr II, 101-104). Defendant was "wailing" and crying. (Tr II, 106). Dr. Moussali

looked up and saw the fuel tank, so they moved him away. (Tr II, 102-103, 105-106).

Fire Chief Leach stated that he lived on the same street as the Stermers and was the

first emergency responder there that day. He saw a lot of heavy black smoke, indicative of a fast

moving fire or a fire that had been burning for a long time. (Tr II, 110-111, 116, 122). When Leach

performed a medical assessment, Todd was breathing and had a pulse, but there was a lot of blood

in his mouth. (Tr II, 113, 117, ).  CPR was performed for about 30 minutes. (Tr II, 156-157).

Defendant and Todd had been married for 14 years. (Tr I, 266). They had been living

at their home for 6 years, along with their three sons. (Tr I, 267-268). A couple of days after the fire,

Defendant told her mother-in-law that she had gone to the basement when she heard Todd "holler".

There was too much smoke for her to go upstairs, so she went out through the basement slider, got

in the van and began to leave when she saw Todd lying on the ground.  She covered him with a

blanket. (Tr I, 271-272, 279-280). A day or two later, Defendant told others that she had come all

the way up the stairs, saw the fire, and ran out the front door. (Tr I, 272).

Defendant told Deputy Gruss that she was downstairs doing laundry and that she

heard yelling, but could not go upstairs due to the smoke and flames, so she left through the front

door. She did not know whether or how Todd had managed to escape, so she got in the van to try

to get him help.  She saw him again, and he had torn off his clothes. (Tr II, 147-148, 158-160).

A forensic chemist, Craig Balliet, testified.  (Tr II, 164-ff).  He had been sent

materials by fire investigator James Shinsky, including carpet pad from the Stermer home, to test for

the presence of ignitible liquid residue. (Tr II, 167-170, 235-236, 238-239, 258).  He found

turpentine residue, which would not necessarily indicate deliberate ignition, but could be the result

of "natural contamination" from the burning of wood products such as a fireplace log.  (Tr II, 173,

184). A red towel taken from the washer was also tested.  It showed the presence of gasoline (Tr

II, 175-176, 179-180) but he could not say when or how the gasoline got on the towel or how long

it had been there (Tr II, 182-183, 191).   A towel taken from the dryer did not test positive for

gasoline. (Tr II, 177, 258). Nothing else in the house tested positive for accelerants except the towels. (Tr II, 258-259).

Defendant was interviewed both on the scene, and two days later. (Tr IV, 28, 71, 74). She told Detective Gabrielle Rought that Todd had gotten up at 10:00 a.m. and was not feeling well. She did not mention having gone to the gas station (Tr IV, 31-32) and denied having put gas into a gas can (Tr IV, 66). She said she made breakfast and argued with Todd about having used a debit card. (Tr IV, 32-33, 76-77). Because she did not want the children to hear any arguing, she sent them to the mall. (Tr IV, 34, 102-104, 111-112). She said there was no more arguing after the boys left. She did not mention that there was any discussion of a divorce or moving out of the house. Then, Todd began watching hunting shows while she went into the bedroom to read literature for her son's medication. (Tr IV, 36, 77). A fire was going in the fireplace in the living room. She fell asleep but woke up when Todd asked her for some juice. She got him the juice then went to do laundry downstairs. (Tr IV, 36-37). Next, she heard Todd scream and she ran upstairs where she saw a lot of smoke and fire. She fled the house and was about to go to Mike Matheny's house for help. (Tr IV, 38-39). Todd made no threats of suicide or killing her. (Tr IV, 69). She got in the van and tried to turn around. She saw Todd in the side yard on fire. She tried to turn the van around, then she didn't see Todd. She got out of the van and saw him laying in the yard with the neighbors there. (Tr Iv, 38-39, 78-80, 93-94). She told Rought that the house was heated with fuel oil, there was no kerosene, but a couple of oil lamps. (Tr IV, 41-42, 77-78).

On January 9 and 10, she was interviewed by James Shinsky, a private fire investigator who had been hired to determine the cause and origin of the fire. (Tr II, 194-ff). Exhibit 13, the transcript of the interview, was admitted into evidence by stipulation and portions of it were read to the jury by the witness. (Tr II, 202-205). She was also examined under oath by the

insurance company on February 27, 2007. The transcripts of that interview, Exhibits 58 and 59, were also admitted into evidence by stipulation. (Tr IV, 44-45).

The three boys had gotten up that day and been told by Defendant to go to the mall in Kalamazoo to avoid hearing their parents argue. (Tr IV, 102-107, 122, 144-145). Todd and Defendant had been arguing the night before and the boys had figured out that their parents would be separating. (Tr IV, 102 -103, 112, 129-130, 146-147, 157). According to Cory, Todd accused Defendant of "cheating on him" and wanted a divorce. Cory did not hear any discussion about who would be moving out of the house. (Tr IV, 147-148, 157). Cory overheard them argue about a secret cell phone that Defendant had. (Tr IV, 154-155).

Todd was lying on the couch in the living room when they left. Both Cory and Trenton said Defendant gave them money for the movies and sent them to the mall after they got up. Trenton did not see his father that morning and Cory saw only his leg on the couch. (Tr IV, 125-126, 132, 144-151). Todd had recently obtained a prescription for an ear infection. The medication made him feel "sleepy" and affected his balance. (Tr I, 275-277; Tr IV, 132, 158-159). There was no breakfast cooking when the boys left. (Tr IV, 152). Trevor said he smelled gasoline in the house before they left. (Tr IV, 118-119). The boys were in a movie when they were called on a report that their house was on fire. (Tr IV, 107, 127, 152). She told the boys she was in the basement when the fire started and that is how she got out, through the sliders. (Tr IV, 117-118, 127, 131, 153).

Fire Marshal Scott Leroy seized Todd's gray sweat pants on the day of the fire. (Tr III, 182-184). He noticed that there was a "noticeable odor" of accelerants coming from the sweat pants. (Id.). The next day he returned to continue his investigation. (Tr III, 185). He began by comparing the area of most damage to the area of least damage, on the theory that "the longer fire

burns, the more damage it's going to create and the ...longer it burns, is where the fire starts." (Tr III, 186, 216). He determined that the fire originated towards the west side of the home, where a portion of the second story had collapsed in. (Tr III, 189). There was less damage on the east side of the home (the front) and the north (where the driveway was). (Tr III, 189-190, 214-215). Not much fire came out of the back (west) side basement of the home.   Leroy stood in the basement slider doors and was able to look up at the sky; the upper level, including the roof, was totally burned away. (Tr III, 191).

He determined that the fire did not start in the area of the fireplace, because there was still some intact structural lumber around the fireplace. (Tr III, 192).[2]  He determined that the fire began in the center of the living room (Tr III, 193-194, 197, 216). "The area consumed the most is the living room, the floor and the roof of the main floor living room because there was also no roof deck, rafters, joists or shingles that remained. (Tr III, 216). He concluded that it was an intentionally set arson fire on the basis of the speed and intensity of the fire. (Tr III, 197-199, 208).

He could not ascertain the presence of accelerants on the first floor because the "floor does not' exist anymore. It's totally burned up." (Tr III, 197).  But, because Todd was "part of the fire debris" and there were petroleum products on him, he knew "that there is in this case gasoline in the area of origin." (Tr III, 198, 205).  A canine search conducted the next day did not find any ignitable accelerants (except for a small amount of fuel oil).  He concluded that Todd was in the middle of an intense fire for a short period of time.  (Tr III, 200-201, 204-205).  On cross-examination, Leroy admitted that it is the vapors (not the liquid gasoline) which ignite, and that if gasoline gets on one's hands or clothes, the vapors emanating from those areas may ignite. (Tr III,

---

[2] "So being the fact that it's unburned and there is still a lot of it there, I know that that's not my area of origin in the area of the fireplace. So that tells me that the fire didn't start because of the fireplace. It wasn't a chimney fire or improper installation or something like that." (Tr III, 192).

225).

An autopsy performed on Todd revealed burn injuries on most of his body, as well as blunt force injuries and lacerations on his head and upper back area, several rib fractures (both front and rear) shallow depressed skull fractures and linear abrasions consistent with being run over by a car. (Tr III, 6-7, 12-13, 23-24, 28-30).   Additionally, there was soil and plant material in his nasal cavities. (Tr III, 26).   The socks and underwear he had been wearing at the time of his death were taken with him to Dr. Markey's in the body bag. (Tr III, 25). However, the sweat pants did not go to Dr. Markey's. (Tr III, 75).

The cause of death was "thermal injuries" (burns) and smoke inhalation, although the amount of soot in his airways was not large. (Tr III, 13, 20-22, 32-33). The lacerations and blunt force injuries did not contribute to his death. (Tr III, 14). Because the lacerations were in four different parts of the scalp, Dr. Markey opined that his head had hit something, such as having been struck in the head multiple times, hitting the ground, a table or a vehicle, but indicative of more than one impact. (Tr III, 14-15). Dr. Markey could not say that the lacerations were caused by being hit by a frying pan or a car, and he could not say whether the lacerations occurred before or after death. (Tr III, 16-18). He did say the injuries were consistent with Todd being "on fire" himself rather than simply being present in a fire (such as simply being in a burning house.) (Id., 21-22). Blood and urine specimens taken from Todd showed no controlled substances or prescription drugs in his blood, but Vicodin was found in his urine. (Id., 31-32). The significance of finding drugs in his urine but not his blood is that it means that 1) he took the medication hours or days earlier or 2) the amount taken was so small as to be undetectable. (Id., 34). Dr. Markey concluded that the manner of death was classified as "undetermined" rather than homicide. (Tr III, 33).

Two witnesses who had been lodged with Defendant at the Van Buren County jail

testified. Veronica Tracy was at the Jail in June-July 2009. She was at chapel one day in the jail when she heard "her say – apologize and I did hear her say she didn't mean what happened, okay." (Tr II, 126-128). She appeared to testify that she heard Defendant mumbling for forgiveness for having hit her husband with a frying pan. (Tr II, 130). But on cross-examination, she was not sure whether or not it was even Defendant who was talking in the chapel. (Tr II, 138-139). Dardeda Gordon knew Defendant in the jail. (Tr III, 153, 156). According to Gordon, Defendant said that she was not at home at the time of the fire. (Tr III, 158-159). Later, she said that she had had a fight with Todd, that she had given him medication, that "she started the fire in the home" while he was sleeping, that she had hit him with an object and that she had a boyfriend. She did not remember Defendant saying she used a frying pan. (Tr III, 159-163, 174-175, 177-178

Cynthia DeLoach worked as a store clerk at the Lawrence Marathon. On January 7, 2007, She saw Defendant pumping gas at about 9:03 a.m. through the back of the truck (not into the tank) but could not see if she was pumping it into a container. (Tr IV, 4-5, 7-12, 22-23, 24). Because the register receipt was for $11.01, Cynthia agreed that Defendant also must have purchased gas for the truck. (Tr IV, 23). She also bought bread and eggs. (Tr IV, 14-15). It was not uncommon for the Stermers to purchase gas in gas cans for their equipment at home. (Tr IV, 16, 113, 159).

Kate Fox, Defendant's co-worker and car-pooler, was contacted by the police in May 2007. (Tr IV, 162-168, 190-191). Towards the end of 2006, Defendant had told her that Todd was abusive, that she wanted a divorce and had contacted an attorney to begin divorce proceedings. (Tr IV, 168-170). Defendant talked frequently about her boyfriend from Chem Link, Chris Williams, who she was seeing. (Tr IV, 172-174). She called him on the phone every day on the way home from work, and kept a cell phone at Fox's house. She also had a post office box that she asked Fox

to close for her to avoid Todd's suspicion. (Tr IV, 174-176, 199). Around Thanksgiving 2006, Defendant called Fox, hysterical, and said "she had a shotgun and that she wanted me to give her one reason not to shoot him." (Tr IV, 171, 191-193). She told Fox that she had "spent years thinking about ways to get rid of him" and had thought about running over him with her car. (Tr IV, 178). She told Fox that she was in the basement when the fire started, and that she had run over Todd with her car because she couldn't see him due to the smoke. (Tr IV, 180-181, 198). After the fire, Fox testified that Defendant called her and asked her to retrieve a coffee cup that she had put tranquilizer in that she needed to find before the fire investigators came. (Tr IV, 181-182). She told Fox that she had not actually given the tranquilizer to Todd because he had already taken some. (Tr IV, 181-182).

Fox's credibility was seriously questioned because of her animosity against Defendant. First, Fox and Defendant had a falling out in on July 31, 2007 when Fox discovered that Defendant was not repaying the July 2006 bank note for $5000 that Fox had taken out for her. Second, Defendant had changed her work shift without consulting with Fox, contrary to an earlier agreement that the two of them had that they would only change shifts together, so as to continue car-pooling. (Tr IV, 184-187, 188-189, 195-197, 200-201). The day after Fox argued with Defendant about not repaying the $5000 loan, Fox contacted Detective Rought with information pertaining to the fire. (Tr IV, 189, 203). Finally, Fox herself had been admitted twice to psychiatric hospitals and was being treated for depression.

Chris Williams testified that he and Defendant became romantically involved in the summer of 2006, Defendant pursued Williams. (Tr IV, 207-211). Their relationship continued after the fire. Williams asked her if she had killed Todd and she denied it. (Tr IV, 216).

At the beginning of Day five of trial, the prosecution rested and the defense made a motion for a directed verdict, which was denied. (Tr V, 2-5). The defense then presented its witnesses.

Cassandra Grigg, Tonya Stevens, Julie McCray, Christine Sillars, Sheri Macomber, Stephen Benny and Ashley Gibson had known Defendant for many years. They described Defendant as a peaceful, honest and nonviolent person incapable of intentionally killing her husband. (Tr V, 10-11, 16-17, 21-22, 26-27, 49-50, 64-65, 72-73, 95). Ashley Gibson was Defendant's daughter. She testified that the second cell phone and the post office box were not kept a secret from Todd. (Tr V, 81, 88-89, 91, 93).

Several jail inmates housed with Defendant, testified that Defendant never talked about her case, never spoke with Dardeda Gordon, and that Dardeda Gordon was not a truthful person. (Tr V, 32-35, 47, 55, 68-69).

The jury was instructed and returned a verdict of guilty on first degree premeditated murder and felony murder. A post-trial motion for a new trial and/or for a directed verdict of acquittal was heard and denied on March 17, 2010. This appeal followed.

## ARGUMENT

### I.

### THE DISTRICT COURT ABUSED ITS DISCRETION IN BINDING OVER TO CIRCUIT COURT AND THE CIRCUIT COURT ERRED IN REFUSING TO QUASH THE BINDOVER.

#### Standard of Review and Issue Preservation

After the preliminary exam had been held, and Defendant was bound over for trial to circuit court, the defense filed and argued a motion to quash the bindover. The trial court denied

the motion. (Hearing Transcript September 11, 2009). This Court reviews for an abuse of discretion a district court's decision to bind over a defendant. *People v. Hamblin*, 224 Mich.App. 87, 91, 568 N.W.2d 339 (1997); *People v. Hudson*, 241 Mich.App. 268, 615 N.W.2d 784 (2000). In *Hudson*, this Court described its reviewing function as follows, and adopts a de novo, rather than a traditional "abuse of discretion" standard:

> "A circuit court's decision with respect to a motion to quash a bindover order is not entitled to deference because this Court applies the same standard of review to this issue as the circuit court. This Court therefore essentially sits in the same position as the circuit court when determining whether the district court abused its discretion. See, generally, *People v. Reigle*, 223 Mich.App. 34, 36, 566 N.W.2d 21 (1997); *People v. Neal*, 201 Mich.App. 650, 654, 506 N.W.2d 618 (1993). In other words, this Court reviews the circuit court's decision regarding the motion to quash a bindover only to the extent that it is consistent with the district court's exercise of discretion. The circuit court may only affirm a proper exercise of discretion and reverse an abuse of that discretion. Thus, in simple terms, we review the district court's original exercise of discretion."

### Argument

Defendant had been charged with First Degree Premeditated Murder and Felony Murder. See District Court Felony Complaint, Circuit Court Information. A preliminary exam was held on June 24, 2009 in the 7th District Court. At the conclusion of the preliminary exam, the District Judge found that there was probable cause to believe the charged offenses had been committed and that Defendant had committed them. Accordingly, she was bound over for trial to circuit court.

Many of the same witnesses who testified at the preliminary exam later testified at trial. Counsel stipulated that the cause of death was thermal injuries and that gasoline had been found on Todd's clothing. (PE Tr, 5-6). Matheny testified that he saw smoke coming from the Stermer home at about 3:30 p.m., that he and his girlfriend drove there and arrived as Defendant was in the van. (Id., 11-13). Defendant pulled the van forward, parked, and was hysterical. In the

commotion, he did not see Todd lying on the ground and walked around a couple of times before he saw him. (Id., 14-15, 22-23, 25-26).

Deputy Evans arrived on scene and saw Todd lying on the ground. His head area was bloodied. (Id., 32-33). He saw the van parked, pointing to the south, still running, with what appeared to be blood on the front bumper. (PE, 34, 37). Todd was moved away from the fuel tank, and Defendant was hysterical. (Id., 38-40).

MSP Fire Investigator Leroy arrived at the house at about 6:00 p.m., viewed the body and then began to inspect the house. (PE 43). He concluded that Todd was "in the fire at some point or very near the fire" because of the severity of his burns. (Id., 44). He observed a gas can in the front yard. (Id., 46). The next day he continued his investigation, initially looking for the area of heaviest fire damage. (Id., 46-47). He determined that the fire originated in the living room. (Id., 48). He concluded that the fire was arson because of the time of day, the known people in the house, the rapidity of the fire, the presence of petroleum on Todd, and the severity of his burns. (Id., 49). He did not find any accelerant in the house. (Id., 55-57). He believed the burn pattern on the main floor (namely, the fact that the floor had entirely burned through and was absent) indicated the use of accelerants. (Id., 56).

Deputy Rought testified that she had interviewed Defendant the day of the fire. Defendant told her that Todd was snoozing in his recliner and she had gone to the basement to do laundry. (Id., 61-62). She heard a scream, ran upstairs, saw fire and left to get help. (Id., 62).

Cynthia DeLoach, the Marathon attendant, testified that she saw Defendant pumping gas into a container that morning. (Id., 72-74).

Chris Williams testified that he was having an affair with Defendant in January of 2007 and for some time before Todd's death. (Id., 82-85).

Detective Macyauski testified that the leading front bumper area and undercarriage of Defendant's van appeared to have blood and tissue. (Id., 87-88, 93-94). Additionally, tire tracks appeared to have run over the area where Todd was first found. (Id., 90).

The defense argued that there was no probable cause to find that Defendant caused the fire, but both the District and Circuit courts rejected this contention.

A magistrate has a duty to bind over to circuit court upon a finding of probable cause to believe that a felony has been committed and that the accused committed it. MCL 766.13. In *People v. Justice (After Remand)*, 454 Mich. 334, 344, 562 N.W.2d 652 (1997), the Michigan Supreme Court remarked that "probable cause" is a less exacting standard than beyond a reasonable doubt. "A magistrate may become satisfied about probable cause on much less than he would need to be convinced. Since he does not sit to pass on guilt or innocence, he could legitimately find probable cause while personally entertaining some reservations. By the same token, a showing of probable cause may stop considerably short of proof beyond a reasonable doubt, and evidence that leaves some doubt may yet demonstrate probable cause."

In this case, the Magistrate relied on the following to find "probable cause:"

(1)     Defendant was at the home (PE Tr, 102);
(2)     there was testimony she had bought gasoline that very morning in a gas can (PE Tr, 103);
(3)     she had sent the children to the mall (PE Tr, 103);
(4)     the fire was, according to the Fire Marshall, sudden, spread rapidly and quickly (PE Tr 103);
(5)     Defendant was having an affair (PE Tr, 103); and
(6)     Defendant was downstairs at the time the fire erupted (PE Tr, 103).

The District Judge himself was doubtful as to whether probable cause had been demonstrated:

"I think that none of those taken by themselves would constitute enough evidence for this Court to bind the Defendant over, but I think all those factors taken into consideration today, knowing that this is just a probable cause hearing, that this Court can at least conclude from the evidence today that there is probable cause to believe that Mrs. Stermer set this fire. Therefore, Mrs. Stermer, we are going to bind you over to Circuit Court on both Count and Count 2 to stand trial."

(PE Tr, 103).

Interestingly enough, one of the factors that was important enough to the District court that it mentioned it in its decision is that there was no evidence that Todd Stermer had been using gasoline and somehow accidentally ignited himself.   However, the District Court was wrong on this point, since the presence of gasoline on Todd Stermer's clothing, **and only on Todd Stermer's clothing**, would be "evidence" that he was using gasoline in the living room. When these facts are taken into consideration, there is a clear lack of probable cause to believe that Defendant set the fire.  Rather, it is equally consistent with a finding that Todd Stermer set the fire, either intentionally or accidentally.

At the hearing held on September 11, 2009, the defense conceded that there was probable cause to believe that the fire was intentionally set. (September 11, 2009 Tr, 2).  However, the evidence at the preliminary examination showed only that Defendant could have set the fire, but there was no probable cause to believe that she did set the fire.  (Id., 3).  As counsel noted, the evidence at the preliminary exam showed only "that she was present, not evidence that she did it." (Id, 3). The circuit court denied the motion to quash, holding that Defendant's mere presence "doesn't carry the day, but mere presence under these circumstances with the acquisition of accelerant and the absence of others is..." (Id., 5).

As the defense argued below, this evidence was insufficient to "cause a person of

ordinary prudence to ... entertain a reasonable belief of the accused's guilt." This evidence is equally consistent with a finding that it was Todd Stermer who set the fire. After all, it was Todd Stermer who had been involved in two previous arson fires, he had gasoline on his clothing, and he was upstairs when the fire started.

There is no dispute that the Stermer house burned. However, in order to bind Defendant over, there had to be evidence that the fire was set by her. See, e.g. *People v. Lindsey* 268 N.W.2d 41, 83 Mich.App. 354 (1978)(stating that "mere opportunity" to set the fire is insufficient to sustain a conviction); *People v. Lee*, 231 Mich. 607, 204 N.W. 742 (1925)(holding that it was error to bind over when there was insufficient evidence that fire was intentionally set); *People v. Williams*, 114 Mich.App. 186, 318 N.W.2d 671 (1982). In *Williams*, the defense argued, as here, that the magistrate should not have bound over an arson charge to circuit court. In *Williams*, the defense contended that the prosecution had not shown that the burning was the result of an intentional criminal act. But, because the defendant had made incriminating statements after the fire, the Court ruled that "a cautious man [would be warranted] to believe defendant committed the crime.". Id. at 194. Mich.App.,1982. Here, however, there were no similar incriminating statements by Defendant after the fire. As the defense argued below, it is the lack of evidence pointing to Defendant's culpability which establishes the lack of probable cause for a bindover. "The lack of proofs in this case was so substantial that this Court should find an abuse of discretion by the District Court in binding the Defendant over for trial." (Brief in Support of Motion to Quash, p 5).

## II.

**THE TRIAL COURT ERRED IN DENYING THE MOTION FOR A DIRECTED VERDICT. DEFENDANT'S CONVICTIONS FOR FIRST DEGREE MURDER AND FELONY MURDER MUST THEREFORE BE VACATED BECAUSE THE EVIDENCE IS INSUFFICIENT TO SUPPORT A FINDING OF GUILT BEYOND A REASONABLE DOUBT THAT (1) THE HOUSE FIRE WAS CAUSED BY ARSON, I.E. A DELIBERATELY SET FIRE OR (2) THAT IT WAS DEFENDANT WHO STARTED THE FIRE.**

### Standard of Review and Issue Preservation

This Court reviews a challenge to the sufficiency of the evidence by viewing the evidence in a light most favorable to the prosecution to determine whether there was sufficient evidence that would justify a reasonable trier of fact in finding that each of the essential elements of the offense was proven beyond a reasonable doubt. US Const, Ams V, VI, XIV; Const 1963, art 1, §17, 20; *Jackson v Virginia*, 443 US 307; 99 S Ct 2781; 61 L Ed 560 (1979); *People v Hampton*, 407 Mich 354, 366; 285 NW2d 284 (1979). Because this inquiry is a question of law that requires this Court to review all of the evidence, *Jackson*, 443 US at 319, review is de novo. MCR 6.419(B) allows for a motion for directed verdict of acquittal to be filed by the Defendant after a jury verdict. The defense moved for a directed verdict of acquittal after the prosecution rested (Tr V, 2-5) and again after trial but such preservation is not required when the reviewing court is assessing claims of insufficient evidence. *People v Patterson*, 428 Mich 502 , 514 (1987). The trial court's bench opinion is attached as Exhibit A.

### Argument

In *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the Supreme Court held that Fourteenth Amendment's Due Process Clause protects a criminal defendant against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the

24

crime with which he is charged." 397 U.S. at 364. Sufficient evidence supports a conviction if "after

viewing the evidence in light most favorable to the prosecution, any rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S.

307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Basing its holding on *Jackson v Virginia*, our own

Michigan Supreme Court, in *People v Hampton*, 407 Mich 354; 285 NW2d 284 (1979) rejected as

inconsistent with due process, the rule that as long as there is "some evidence" from which to infer

guilt, a conviction may be sustained.  Rather, the evidence must be sufficient to find guilt beyond

a reasonable doubt:

> "[A reviewing court] must consider not whether there was any
> evidence to support the conviction but whether there was sufficient
> evidence to justify a rational trier of fact in finding guilt beyond a
> reasonable doubt." Id. at 366.

Two charges were submitted to the jury: first premeditated  degree murder (being

caused during an arson) and felony murder, with the underlying felony being arson.  See Tr V, 177-ff

- jury instructions.  Under either theory the evidence is insufficient, requiring the conviction to be

vacated and the charges dismissed.

1. **The Evidence is Insufficient to Find Beyond a Reasonable Doubt that the Fire was
   Caused by Arson, i.e. a Deliberate Fire.**

   Defendant was convicted under MCL 750.316, which defines the crime of first degree

murder, either premeditated murder or felony murder:

> Sec. 316. (1) A person who commits any of the following is guilty of first degree
> murder and shall be punished by imprisonment for life:
>
> (a) Murder perpetrated by means of poison, lying in wait, or any other willful,
> deliberate, and premeditated killing.

(b) Murder committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, carjacking, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, kidnapping, vulnerable adult abuse in the first and second degree under section 145n, torture under section 85, or aggravated stalking under section 411i.

"Arson" for purposes of the statute means statutory arson, not common law arson:

(2) As used in this section:
(a) "Arson" means a felony violation of chapter X.

To establish first-degree premeditated murder, the prosecution must show that the defendant intended to kill the victim and the killing was accompanied by premeditation and deliberation. *People v. Taylor*, 275 Mich.App 177, 179; 737 NW2d 790 (2007). Premeditation and deliberation can be established with evidence of "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *People v. Abraham*, 234 Mich.App 640, 656; 599 NW2d 736 (1999). Premeditation and deliberation, for purposes of a first-degree murder conviction, require "sufficient time to allow the defendant to take a second look." *People v. Anderson*, 209 Mich.App 527, 537; 531 NW2d 780 (1995).

Felony murder includes arson as a predicate felony.   Statutory arson is set forth at MCL 750.72, which  provides:

Any person who wilfully or maliciously burns any dwelling house, either occupied or unoccupied, or the contents thereof, whether owned by himself or another, or any building within the curtilage of such dwelling house, or the contents thereof, shall be guilty of a felony, punishable by imprisonment in the state prison for not more than 20 years.

The elements of statutory arson are: (1) the burning of a dwelling house, (2) by, or at the direction of, or with the assistance of the defendant, and, (3) the defendant maliciously or

willfully set the fire. *People v. Lindsey*, 83 Mich.App 354, 355; 268 NW2d 41 (1978), *Gardner v. Kapture*, 261 F.Supp.2d 793 (ED Mich 2003). The prosecutor must show not only a burning of a dwelling house but also that the burning resulted from an intentional criminal act; where only a burning is shown, the presumption arises that it was accidentally caused. *People v. Williams* (1982) 318 N.W.2d 671, 114 Mich.App. 186. "Mere opportunity" of a defendant to commit arson is insufficient to support a conviction of arson. Thus, accidental fires are not arson, and cannot form the predicate to felony murder. In other words, the prosecutor must not only prove a burning, but also that the defendant willfully caused the burning. *People v. Smock*, 63 Mich.App 610, 616; 234 NW2d 728 (1975), rev'd on other grounds 399 Mich. 282 (1976).

In this case, if the Stermer fire was accidental, it could not, by definition have been "premeditated and deliberate", nor would it be "arson." Defendant would have to be acquitted. Defendant contends that the essential elements of wilful, premeditated action and/or a deliberate burning, required for either theory of first degree murder, were not proven beyond a reasonable doubt.

This was an entirely circumstantial case. The prosecution's case rested upon innuendo and speculation. No one saw Defendant set the fire. No one saw Todd set the fire, either, for that matter. The mere fact that Todd died in a house fire establishes nothing because the presumption is that the fire was accidentally caused. *People v. Williams*.

There was no motive for Defendant to have started the fire. The house was a home that Todd and she were building --- apparently a "dream home." She had already made arrangements to move in with a girlfriend during the period of separation. The children knew that the parties would be divorcing. (Tr IV, 102 -103, 112, 129-130, 146-147, 157). Unlike the case in *People v Williams*, there were no threats overheard to burn the house down.

The evidence that the fire was incendiary, a set fire, came from Fire Marshal Leroy, but this evidence was hardly compelling. His conclusion that the fire was incendiary rested on the speed and intensity of the fire. (Tr III, 197-199, 208). However, he conceded that the fire could spread fast if the living room area were uncarpeted and unfinished, which it was. The floors and ceiling were not carpeted nor dry-walled. Rather, there were simply OSB boards. Thus, his conclusion that the fire's speed was indicative of incendiary origin is false; the speed is equally attributable to the lack of substantial fuel.

The evidence supports a conclusion that the fire began accidentally. The testimony established that gasoline itself does not start on fire rather it is the vapors of evaporating gasoline that ignite. (Tr III, 225). Leroy testified that ignition would be possible so long as clothing which had gasoline on it got close enough to an open flame. This conclusion itself allows for the possibility of spontaneous or accidental ignition, given that there were two open flames in the Stermer living room, and Todd's clothing had gasoline on it. (Tr IV, 41-42, 77-78). From this evidence, it is reasonable to conclude that the evaporating gasoline from the victim's clothes was ignited by one of the several open flames in the living room and was not intentionally set by either Todd or Linda Stermer. Even the presence of gasoline on the clothing worn by Todd indicated nothing as to how it got there or how long it had been there. (Tr III, 147, testimony of forensic examiner Ernst). In short, the conclusion that the fire was intentionally set is subject to reasonable doubt.

The medical evidence also contradicts the prosecution's theory of a deliberate fire. The absence of controlled substances in Todd's blood points to a conclusion that he was **not** drugged. Had he recently consumed controlled substances, the residue would remain in his blood. The fact that medication was found in his urine indicated that it had been some time since he had ingested any controlled substances. Assuming that he had taken his medication, the evidence also

showed that Todd's medication had caused him to be "loopy." (Tr I, 275-277; Tr IV, 132, 158-159). This fact points to Todd having accidentally set himself on fire, due to medication induced disequilibrium.

Contrast the entirely circumstantial, speculative evidence in this case with the evidence in *People v. Wolford*, 189 Mich.App. 478, 473 N.W.2d 767 (1991). There, too, the defendant claimed that the evidence was insufficient to show that the fire was deliberate, as opposed to accidental. In *Wolford*, the evidence showed that the defendant was seen outside the trailer that burned ten minutes before witnesses saw flames coming from the trailer. One witness testified that the defendant was driving out of the trailer park when he stopped and asked if the witness had seen the owner of the trailer.   When the witness said no, the defendant said, "Well, if you see him, tell him that his trailer's on fire," and asked the witness to call the fire department.   The defendant's sister, a co-owner of the burned trailer, testified that the day after the fire the defendant stated, in a joking manner, that he had burned her trailer. Thus, this evidence showed more than mere opportunity to commit arson, but also that the defendant maliciously set the trailer on fire.

Another case involving circumstantial evidence of arson is *People v. Horowitz*, 37 Mich.App. 151, 194 N.W.2d 375 (1971). There, the defendant was convicted of arson of his catering business.   The defendant had motive (debts) and opportunity.   On appeal, he claimed that the circumstantial evidence was insufficient to establish that the fire was of incendiary rather than accidental origin. This Court affirmed the conviction, noting that a container with ignitible residue was found at the point of origin of the fire (the point of greatest destruction), there had been no evidence of breaking-in, the defendant was on the property not long before the fire started, and the defendants' debts.

This case is more analogous to *People v Lindsey*, 83 Mich App 354 (1978), the

defendant was convicted of arson. The Court of Appeals found insufficient evidence in support of

the verdict, primarily because the prosecution could not show that the named defendant was the

cause of the fire:

> "In the within case, there was expert testimony that the fire was started by human
> means with the use of an accelerant such as paper. But, from that testimony, an
> inference that the fire was negligently started by defendant or defendant's wife or
> defendant's friend appears equally as plausible as the prosecution's inference that the
> fire was wilfully and maliciously set by the defendant. There was no evidence that
> defendant had a motive to burn his rented house trailer.
>
> The total evidence offered by the prosecution indicates mere opportunity to commit
> arson. Unaccompanied by indication of a motive, there is insufficient evidence here
> to support the guilty verdict." 83 Mich App at 355.

In short, the evidence was insufficient to prove beyond a reasonable doubt that the

fire was incendiary. The motion for directed verdict should have been granted.


**2.   The Evidence is Insufficient to Find Beyond a Reasonable Doubt that it was Defendant
who Caused the Fire.**

The evidence was also insufficient to establish beyond a reasonable doubt that it was

the Defendant who started the fire. It is just as reasonable to conclude that the fire was started by

Todd himself, whether accidentally or intentionally. There were no witnesses to the fire starting,

thus no witnesses that it was Defendant who started it. He was in close proximity to the fire when

it started. The testimony established that he was "part of the fire." (Tr III, 198, 205).

And, he had motive. There were two other homes that Todd was involved with that

burned to the ground. Todd had financial reasons to start the fire, since he was thousands of dollars

in debt to other family members. (Tr IV, 82-83, 88).

He -- as well as the rest of the family members -- had regular access to gasoline on

their property, as they had farm implements and other vehicles that needed to be gassed up from time to time. (Tr IV, 16 - DeLoach testimony that the Stermers bought gas in containers from time to time). Trace amounts of gasoline were found on Todd's clothes at the time of the fire. Any rational trier of fact viewing the evidence would have to conclude that there is a reasonable doubt as to whether it was Linda Stermer or Todd Stermer who started this fire.

There was no finding of gasoline or accelerant on Defendant's clothing. However, there was gasoline on Todd's clothing. The first responders had testified that when Todd was found, he was unclothed except for the gray sweat pants, socks, and clothing that had been placed over his nude body. Clearly, he had been trying to remove the clothing which had ignited. Then, some of these items (maroon jacket, tan coat, plaid shirt and a hoody) were gathered together and placed in the same bag to log as evidence. (Tr III, 95-97). Blankets used to cover him were not taken into evidence but were returned to the ambulance crew. (Id.). Detective Macyauski said that the sweat pants had been seized at the scene (Tr III, 91-92), The socks and underwear found on his body were taken with the body to the autopsy but were not seized at the scene by the police. (Tr III, 75, 95-97).

The arson expert called by the prosecution testified that he believes the fire started in the family room on the main floor in the home. His conclusion that the fire was intentionally set was based on the speed that the fire consumed the living room area and the totality of the damage to the living room. However, the testimony at the trial also established that the fire would burn more rapidly if the main floor living area was not finished, as the undisputed evidence showed was the case at the Stermer home. The main floor of the living room was, in fact, not finished. There was no carpet on the floor, instead it was plywood. There were no drywall on the wall, instead it was open studs. But even the speed of the fire is equivocal. Leroy testified that the floor of the main floor living room had burned away and no longer existed when he began his investigation: the flooring

and ceiling joists from the basement had burned away. (Tr III, 213-214). The evidence established that the main floor of the living room was, in fact, not finished. There was no carpet on the floor, instead it was plywood. There were no coverings on the wall, instead it was open studs. There were no drywall on the ceiling, instead it was a cathedral ceiling covered by wood at the roof line. He also admitted that the absence of floor and wall coverings would allow for a "faster" burn. Leroy admitted that he had not seized any items from inside the home to test them for the presence of accelerants. (Tr III, 206). He conceded that the fire would burn more quickly if the flooring was not covered with carpeting and if the walls were primarily open studs, as opposed to being drywalled. (Tr III, 207-209). He conceded that an open cathedral ceiling, not drywalled, would burn faster. (Id.). He also conceded that the fact that Todd's sweat pants smelled of gasoline says nothing about how the gasoline got on the pants. (Tr III, 210-211). And, given that there were two sources of open flame in the living room, being an oil candle and the fireplace, gasoline residue on Todd's clothing could have emitted vapors that ultimately ignited. (See, Leroy's testimony, Tr III, 224-225).

Most significantly, no gasoline was found on Defendant's clothing, a fact that would be highly unlikely to occur if it were Defendant who splashed gasoline on him as he lay in a drug-induced stupor. There were no traces of drugs in Todd's blood, but only in his urine. This itself casts doubt on the prosecution's theory that Defendant had drugged him.

It is certainly true that Defendant had the opportunity to start the fire, since she was there. But, mere opportunity is insufficient to show arson. Rather, it must be shown that the house was burned wilfully and maliciously by the defendant (or with his / her urging and assistance). *People v. Lindsey*, 268 N.W.2d 41, 83 Mich.App. 354 (1978). Given this evidence, a reasonable fact finder could not find beyond a reasonable doubt that it was Linda Stermer, rather than Todd Stermer, who started this fire.

It is also true that circumstantial evidence alone can support a conviction, thus, merely because the evidence was circumstantial would not justify the trial court in directing a verdict of acquittal.  However, there are times when circumstantial evidence amounts only to reasonable speculation and not to sufficient evidence. See, e.g., *Parker v. Renico*, 506 F.3d 444, 452 (6th Cir.2007) (evidence that Parker was in a car containing guns with men who planned a murder was too speculative to support a finding that Parker constructively possessed the firearm); *Brown v. Palmer*, 441 F.3d 347, 352 (6th Cir.2006) (finding evidence that Brown was present at the scene and had some acquaintance with the perpetrator insufficient to support a conviction of armed robbery and car-jacking under an aiding and abetting theory); *Fuller v. Anderson*, 662 F.2d 420, 423-24 (6th Cir.1981) (verdict for felony murder not supported by evidence showing only that Fuller was present at the scene of the arson where evidence did not establish beyond a reasonable doubt that Fuller consciously acted to aid in the arson); *Hopson v. Foltz*, 818 F.2d 866 (6th Cir 1987)(evidence insufficient to support conviction of second-degree murder on theory of aiding and abetting where there was no proof "that Hopson acted in pre-concert with [the shooter] to commit the murder or that he said or did anything to support, encourage, or incite the commission of the crime.").

In *Fuller*, the petitioner allegedly acted as a lookout while another person committed arson by throwing a Molotov cocktail at the victim's home. 662 F.2d at 421-23. Evidence was presented that petitioner "stood guard," "turned his head from side to side more than twice," and ran away with the perpetrator after the arson. Id. However, the *Fuller* court held that while this evidence created reasonable speculation, there was no evidence the petitioner intended to burn the home, and the evidence Fuller acted as a lookout was "insufficient to establish beyond a reasonable doubt that [Fuller] took conscious action to aid [the perpetrator's] commission of arson." Id. at 424.

No rational trier of fact could find that the evidence establishes beyond a reasonable

doubt that the fire was set by Defendant. *Jackson v Virginia, People v Hampton.*   The trial court

should have directed a verdict of acquittal.   Because it did not, this Court must vacate the conviction.

III.

## THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE MOTION FOR A NEW TRIAL BECAUSE THE VERDICT IS AGAINST THE GREAT WEIGHT OF THE EVIDENCE.

**Standard of Review and Issue Preservation**

This issue was preserved by the defense's motion for a new trial on the basis that the

verdict was against the great weight of the evidence.  (See Record Entry, February 1, 2010).  The

motion was heard and denied from the bench in a hearing held March 17, 2010.  The Court's bench

opinion is attached as Exhibit B.

To determine whether a verdict is contrary to the great weight of the evidence, this

Court must review the whole body of proofs. *People v. Herbert,* 444 Mich. 466, 475; 511 NW2d 654

(1993), overruled in part on other grounds *People v. Lemmon,* 456 Mich. 625, 627; 576 NW2d 129

(1998). A verdict is contrary to the great weight of the evidence if "the evidence preponderates so

heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand."

*Lemmon,* 456 Mich.  At 627. "Conflicting testimony and questions of witness credibility are

generally insufficient grounds for granting a new trial." *People v. Unger,* 278 Mich.App 210, 232;

749 NW2d 272 (2008).

**Argument**

A trial judge is authorized to grant a new trial if the verdict is against the great weight

of the evidence.  MCR 2.611(A)(1)(e); MCR 6.431.  See also MCL 770.1.  A judge has wide

discretion in granting a motion for new trial on this ground, far broader than in determining if there has been insufficient evidence, and he may grant it even though there was enough evidence to take the case to a jury. *Bridwell v Segel*, 362 Mich 102, 105 (1960); *People v Brown*, 239 Mich App 735, 746, n 6 (2000). See also *United States v Pierce*, 62 F3d 818, 825-826 (CA 6, 1995). If "the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result," a new trial can be granted on this basis. *People v Lemmon*, 456 Mich. 625, 627; 576 NW2d 129 (1998). In *Lemmon* the Supreme Court overturned the standard for great weight of the evidence motions previously set forth in *People v Herbert*, 444 Mich 466 (1993). In *Herbert*, the Court utilized a "thirteenth juror" standard, permitting the trial judge to grant a new trial if the judge disagreed with the jury's determination as to the relative credibilities of the witnesses. *Lemmon* rejected the "thirteenth juror" standard in favor of a heightened standard focused on the relative weight of the opposing evidence. The Court nonetheless recognized that all such motions by necessity implicate the question of credibility to some degree. Id at 638.

The Court noted the differences between a motion for directed verdict (or appellate claim that the verdict was not supported by legally sufficient evidence), where a finding in the defense favor precludes re-prosecution under Double Jeopardy protections, and a motion directed at the great weight of the evidence. See *Jackson v Virginia, People v Hampton*.   By contrast, a post-verdict motion for new trial, asserting the conviction is against the great weight of the evidence, is directed to the trial court's discretion, and, if granted, does not constitutionally bar re-prosecution. See *Lemmon*, supra at 634, fn. 8.   The focus is not on the legal sufficiency of the evidence, when viewed most favorable to the prosecution, but instead on whether the verdict constituted a "miscarriage of justice," or whether the interests of "justice" require a new trial be ordered.

*Lemmon* held that jury determinations of the facts are almost unimpeachable.

However, the Court left open certain situations in which a jury verdict could be set aside: if "it can be said that contradictory testimony was so far impeached that it 'was deprived of all probative value or that the jury could not believe it,' or contradicted indisputable physical facts or defied physical realities..." presumably the trial court has some discretion to set the verdict aside.  In this case the evidence preponderates heavily against the verdict. The prosecution did no more than establish the possibility of the Defendant's guilt. That there are reasonable theories as to the cause of this fire cannot be ignored. This is not a case where the motion for a new trial was based simply on a differing evaluation of witness credibility.  "New trial motions based solely on the weight of the evidence regarding witness credibility are not favored." *Lemmon*, 456 Mich at 639.  Here, by contrast, the evidence pointed to by the defense in its motion for a new trial was the physical evidence and the proper inferences to be drawn from it.

Not one witness saw Defendant start the fire or admit to it afterward.  Her clothes were completely negative for the presence of gasoline, whereas Todd's clothing did have gasoline on them.  In addition, the testimony showed that Todd's blood was only on the leading edges of the van undercarriage, rather than on both the leading and the following edges, as one would expect if Defendant had rolled **over** him and then backed up again to finish him off.

The presence of a gas can on the Stermer property, or the presence of gasoline on either of their clothing, would not be inculpatory at all.  The evidence was undisputed that the Stermer property was rural, and that the Steamers had various farm vehicles such as tractors.  The family regularly filled up gas cans for these vehicles at the local Marathon station.  It is just as likely that gasoline vapors from Todd Stermer's clothing ignited spontaneously due to the proximity to the fires that admittedly were present in the living room, i.e. the fireplace and the oil lamps.

Another factor which weighs against the validity of the verdict in this case is the

"doctrine of chances" also known as the "doctrine of objective improbability." That theory was first

discussed in *People v. Crawford*, 458 Mich. 376, 582 N.W.2d 785 (1998). In *Crawford*, the Court

was considering whether propensity evidence should be admissible. It noted,

> "To establish the probativeness of the evidence, the prosecutor
> invokes the "doctrine of chances," also known as the "doctrine of
> objective improbability." This theory, which is attributed to Professor
> Wigmore, is widely accepted, although its application varies with the
> issue for which it is offered. Where material to the issue of mens rea,
> as here, it rests on the premise that "the more often the defendant
> commits an actus reus, the less is the likelihood that the defendant
> acted accidentally or innocently." Imwinkleried, Uncharged
> Misconduct Evidence, § 3:11, p. 45."

In *People v. Mardlin*, --- N.W.2d ----, 2010 WL 3037770 (July 31, 2010) the Supreme

Court held that evidence of past fires was logically relevant to rebut a claim that the any particular

fire is a mere accident. In that case, the trial court had ruled that evidence of past fires was relevant

and admissible. However, the Court of Appeals reversed, holding that evidence of past fires were

not admissible because there was not a high degree of similarity between the past fires and the

current fire. The Supreme Court reversed on the basis that the "doctrine of chances" clearly

establishes that unusually frequent events-and particularly purported accidents-associated with the

defendant and falling into the same general category of incidents are admissible to prove lack of

accident or to disprove innocent intent with regard to the charged event. "Such evidence is

particularly useful in arson cases where unusually frequent individual fires, which could appear to

be accidents when viewed in isolation, may constitute the most probative objective evidence that the

defendant intentionally set the fire underlying the arson charge."

> "Under this theory, as the number of incidents of an out-of-the-ordinary event
> increases in relation to a particular defendant, the objective probability increases that
> the charged act and/or the prior occurrences were not the result of natural causes. The
> doctrine is commonly discussed in cases addressing MRE 404(b) because the
> doctrine describes a logical link, based on objective probabilities, between evidence
> of past acts or incidents that may be connected with a defendant and proper,

noncharacter inferences that may be drawn from these events on the basis of their frequency. If a type of event linked to the defendant occurs with unusual frequency, evidence of the occurrences may be probative, for example, of his criminal intent or of the absence of mistake or accident because it is objectively improbable that such events occur so often in relation to the same person due to mere happenstance."

*Mardlin*, at 3.

*Mardlin* applies to this case, not necessarily to rebut a claim that this fire was accidental, but to cast doubt on the claim that, if the fire was intentionally set, it must have been started by Defendant. The *Mardlin* Court noted that the "doctrine of chances" may have applicability beyond the 404b context in which it arose there, and even applies to non-arson fires. "To the contrary, application of the doctrine of chances 'varies with the issue for which it is offered.'" Who had had two previous fires under his belt? Who had "been involved" in two prior house fires where the homes had been totally consumed? *Mardlin's* pertinence for **this case** is not whether evidence of prior fires was improperly excluded; indeed, the evidence that Todd had been involved in prior fires was in fact admitted without objection by either party. On cross examination, Todd's mother, Sandra Stermer, admitted that her son had been involved in two prior house fires before the January 2007 fire which caused his death:

> Q. To the best of your knowledge, this isn't the first house that Todd had or was involved with that burned, is it?
> A. No.
> Q. Todd also owned a property on Naomi Street in Portage that burned to the ground, is that true?
> A. True.
> Q. Todd was also involved and benefitted from the proceeds from a house in Three Rivers that burned to the ground, is that right?
> A. I don't know what he benefitted but he was – but he was involved, yes. He was working on it. ...

(Tr I, 283).

> Q. All right. Regardless of whether Todd got the proceeds, the house on Naomi that Todd was involved with burned to the ground?

A.     Yes.

Q.     The house in Three Rivers that Todd was involved with burned to the ground?

A.     Yes.

Q.     The house in Lawrence that Todd was involved with burned to the ground?

A.     Yes.

(Tr I, 285).     This evidence also came out in the testimony of Detective Gabrielle Rought. (Tr IV, 82-83).

The issue of the "doctrine of chances" bears on the question of **who is more likely to have set the fire,** assuming that the fire was intentionally set. In this case, it was Todd Stermer who had been involved in two previous fires. It was Todd Stermer who had gasoline on his clothing.

This means that it cannot be said that the evidence presented here establishes beyond a reasonable doubt that it was Defendant who set the fire. The "doctrine of chances" points to the equally likely and equally reasonable conclusion that the fire was started by Todd himself. The circuit court ruled on the motion for a new trial / directed verdict before the *Mardlin* case had been decided, thus the court did not have the benefit of the Supreme Court's reasoning. The circuit court said,

> "And in reviewing and recalling this testimony, I wouldn't agree with some of the conclusions the defense argues. For example, although there was an attempt to establish a connection with arson on the part of Todd Stermer, there was no evidence that the previous two fires that he was connected with in terms of being in a dwelling were arson cases, nor was there any indication of any culpability on his part, and I believe this was one of those fires where the parties, the Defendant and the deceased were together. So if there was any aspersions cast. They would go both directions, so I wouldn't agree with that as any evidence that would indicate that it would be a likelihood that the deceased would have caused this fire himself."

(March 17, 2010 Tr, 15). (Bench opinion attached as Exhibit B).

However, it is clear that the application of *Mardlin* to this case means that the trial court's reasoning was fatally flawed. The fact that Todd had been involved with two other fires does

mean that this fire – which led to his death – was more likely to be arson than an ordinary fire suffered by one who had never experienced a fire before. And, that the person "involved" with the fire was more likely Todd than Defendant.

If we assume that the fire was deliberate, all of the inculpatory evidence pointing to a deliberate, incendiary fire points to Todd, not to Defendant. Todd, not Defendant, was in such close proximity to the fire when it started that Fire investigator Leroy said that Todd was "part of the fire." (Tr III, 198, 205). This was corroborated by Dr. Markey, the pathologist. He stated that Todd's injuries were consistent with him having been "on fire" himself as opposed to being "in" a house that was "on fire." (Tr III, 22). His hands and fingers were extremely burned, to the extent that his skin was "sloughing" off. (Tr III, 26-27). Thus, we know Todd was close to the point of origin.

Todd had equal opportunity to start the fire. Todd had access to gasoline. It was customary for the Stermer family to have gas cans around their property and to pump gasoline into those cans (Tr IV, 16, DeLoach testimony); they were a rural family with farm equipment, quad vehicles and other equipment that would use gasoline.

If we assume that the fire was accidental, the evidence also points to Todd as the cause. Gasoline was found on Todd's clothing, but not Defendant's. There was no gasoline on her pants, her socks or her shirt. There were two sources of fire in the living room, being an oil lamp / candle and the fireplace. (Tr IV, 77-78 - Rought interview with Defendant). The fire could ignite from the presence on Todd's clothing of the gasoline vapors, assuming he got close enough to the source of ignition. Todd, not Defendant, was "loopy" from the use of prescription medications. It is conceded that there was evidence that could point to Defendant, as well, since she was present and arguably had opportunity. Also, there were negative facts such as her inconsistent statements and

her affair.  But this evidence establishes no more than the possibility of guilt. That there are reasonable theories as to the cause of this fire cannot be ignored.

In evaluating the evidence, one must look at the quality of the evidence. Cf, *People v Olson,* 13 Mich App 324, 330 (1968) (Fitzgerald, PJ, dissenting) ("[T]he concern here is not with the quantity of the evidence, but with the quality. If... there is a question of its validity which is resolved against it, then the jury verdict based on such evidence certainly cannot stand and a new trial should be granted."); *People v Kurazawa, 202 Mich App 462, 467* (1993) ("A review of the overall record reveals that the quality and quantity of evidence introduced was totally insufficient to suggest that defendant was actually involved in the murder."). Analyzing the evidence in the instant case under the above standards, the credible trial evidence weighs more heavily in Defendant favor than against it. Under the *Lemmon* analysis, given the consideration of the entire record, the proofs on the cause of the fire, and the identity of the person who caused it, "preponderate sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred," i.e. that Defendant is in fact innocent as the evidence fails to show that any crime occurred or that Defendant committed it.

## RELIEF REQUESTED

For the above reasons, Defendant-Appellant requests this Court to vacate the conviction and order Defendant to be discharged.  In the alternative, Defendant requests that this Court vacate the conviction and to remand the case for a new trial.

Dated: September __18__ 2010

Respectfully Submitted,

_____
Mary A. Owens P-33896
124 E. Fulton, Ste. 100
Grand Rapids, Michigan 49503
(616) 742-0431

PAW PAW, MICHIGAN

TUESDAY, JANUARY 12, 2010 - 8:59 a.m.

THE COURT:  We are I believe at a point
where Mr. Kaps is indicating he might be resting.  I
didn't know if we wanted to cover that before we bring
the Jury in.

MR. KAPS:  Yes, your Honor.  I anticipate
the People are resting.  For the purpose of Mr.
Getting's motion, I believe I can indicate to the
Court that the People rest.  I can do that again in
front of the Jury.

THE COURT:  Let's do that.

MR. GETTING:  I have no objection to that
process, your Honor.

THE COURT:  Okay.

Mr. Getting.

MR. GETTING:  Thank you, your Honor.  May
it please the Court.

Your Honor, at this time the Prosecution
having rested their case, the defense would move for a
directed verdict.  As the Court is aware, the
Prosecution, myself, I believe we all agree what the
proper standard is and that is that this Court must
view the evidence in the light most favorable to the
Prosecution and then ask itself based upon that,

2

taking the evidence in the light most favorable to the Prosecution, could a reasonable Jury find the Defendant guilty. We would argue in this case that even if you take the evidence in a light most favorable to the Prosecuting Attorney, a reasonable doubt exists in this case and, therefore, that a reasonable jury could not find the Defendant guilty.

Specifically, we would point out that the Prosecution has presented no evidence from which a reasonable jury could conclude beyond a reasonable doubt how this fire started. There has been no evidence from which a reasonable jury could conclude that this fire was started intentionally, only that the fire started.

Secondly, your Honor, even if a reasonable juror could conclude that the fire was started intentionally, there is not evidence from which a reasonable jury could conclude that it was Linda Stermer who started the fire. In this case the evidence is that Mr. Stermer was the person who was, quote, part of the fire. He was in the fire. He was there when the fire started. There is no evidence that Linda Stermer started this fire and there is no evidence, frankly, that Todd Stermer started this fire intentionally. From the evidence it is equally as

3



likely that this fire started essentially, that Todd

Stermer had gasoline on his clothing, that the vapors

from that gasoline came in contact with one of the

multiple fire sources that were in that living room,

including oil lamps, candles and a fireplace and that

he was started on fire, that he started the fire in

the house, but it was simply isn't intentionally done.

Given that the Prosecution has not proven beyond a

reasonable doubt either of those issues, that the fire

start intentionally or whom started the fire, we would

ask that the Court at this time dismiss the charges

and direct a verdict of not guilty.  Thank you.

      MR. KAPS:  Your Honor, the People oppose

the motion.  I'm not going to go into a lot of detail

on what the factual situation is, but I believe that a

fair assessment of the entire case would find that

there is sufficient evidence on each and every element

of the offense and facts that support that that would

-- could result in a reasonable jury finding beyond a

reasonable doubt that the Defendant is guilty of the

crimes alleged.

      THE COURT:  Well, I am satisfied that a

reasonable jury could conclude that this was an

intentionally set fire.  In looking at the evidence

from the fire inspection officer from the State

4

Exh A

Police, the presence of an accelerant, the conflicting versions of what was happening from the Defendant, there was a motive here that's been established where a divorce was being contemplated and an affair with another individual, which is entirely inconsistent as it continued after the death of Mr. Stermer with the Defendant being someone who was innocent in this. There is the duplicity as to the affair and the purchase of gasoline and the testimony of the attendant that what appeared to be putting gas in something in the back with the hatch up.  I think all of these things together could convince the Jury beyond a reasonable doubt that this fire was a vehicle to take the life of Mr. Stermer and the actions afterwards and with the vehicle I think might well confirm that in the minds of a reasonable juror.  So for that reason, I would find that there is evidence that a reasonable jury could conclude that this was a thought-through, premeditated act to take Mr. Stermer's life and that there was a felony involved in the process as well with the felony being arson, the intentional burning of the dwelling.  For that reason I would deny the motion.

　　　　Any other matters we should address out of the presence of the Jury?


ExhA

1          PAW PAW, MICHIGAN

2          WEDNESDAY, MARCH 17, 2010 - 9:02 a.m.

3          THE COURT:  Case Number 09-16654, People

4  versus Linda Kay Stermer.

5          MR. GETTING:  Good morning, your Honor.

6  May it please the Court, Jeffrey S. Getting, appearing

7  on behalf of the Defendant, Linda Stermer.

8          The record should reflect that she is

9  present.

10         THE COURT:  So noted.

11         You may proceed with your motions.

12         MR. GETTING:  Thank you, your Honor.

13         May it please the Court, your Honor,

14  pending before the Court are two motions.  First there

15  is a motion for directed verdict of acquittal;

16  secondly, there is a motion for new trial.  I think it

17  would probably be most efficient to address both of

18  the motions at one time if that is okay with the

19  Court.

20         THE COURT:  And that is agreeable.

21         MR. GETTING:  Thank you.

22         The motion for directed verdict of

23  acquittal, the Court first heard Defendant's motion

24  for directed verdict at the close of Prosecution's

25  proofs.  As outlined in my brief on this matter and

Exh B

1    motion, the Court is -- it is proper for the Court to

2    hear a second motion for directed verdict at the close

3    or at the conclusion of the trial in this matter.

4              In this matter there has been a verdict of

5    guilty of the offense of first degree premeditated

6    murder and first degree felony murder returned by the

7    jury.  My client has been sentenced on the offense of

8    first degree felony murder after the Court has vacated

9    the first premeditated murder conviction upon motion

10   of the prosecuting attorney.  The motion for directed

11   verdict of acquittal at the conclusion of the trial is

12   looked at with the same standard as we are familiar

13   with at the close of proofs, that is, that this Court

14   must view the evidence in the light most favorable to

15   the prosecution.

16             There is also pending a motion for new

17   trial.  That is somewhat different.  It also sometimes

18   is referred to as a motion for a judgment

19   notwithstanding the verdict.  Again, a verdict of

20   guilty has been returned in this case.  It is, I

21   believe, inaccurate to refer to it as a motion for

22   judgment notwithstanding the verdict because we are

23   not asking the Court for a judgment in that motion.

24   What we are asking the Court for is a new trial.  The

25   standard to be applied by the Court there is whether

3

1    the evidence preponderates against the verdict such

2    that it would be a miscarriage of justice to allow the

3    verdict to stand.  The citations for that are found

4    again in my brief.  For purposes of the record I can

5    pull those out if the Court wishes.  I believe that

6    it's appropriate to describe that standard.

7              Evidence preponderates against the verdict

8    such that it would be a miscarriage of justice to

9    allow the verdict to stand not only is different than

10   that applied in the motion for directed verdict of

11   acquittal, but it is somewhat as a lesser standard,

12   and I'm reluctant to say that one is here and one is

13   there or apply percentages, but in the motion for

14   directed verdict of acquittal the language is you're

15   viewing the evidence in the light most favorable to

16   the prosecution, could a reasonable juror find a

17   verdict of guilty.  That is far stronger language and

18   far higher standards than that it preponderates

19   against the verdict such that it would be a

20   miscarriage of justice to allow the verdict to stand.

21             Also, your Honor, I would note that the --

22   the outcomes are such that it's evident that the

23   standards are different.  If the Court grants the

24   motion for directed verdict of acquittal, it would be

25   entering a verdict of acquittal and that would bring

4

1   this matter to a conclusion.  If the Court grants a

2   motion for a new trial, it is not entering a verdict

3   of acquittal on behalf of the Defendant, rather, the

4   Court is only allowing there to be a second trial.  It

5   gives the parties a chance to see if a second trial

6   would result in a different verdict.

7           In looking at both of these motions, your

8   Honor, and the reason I said that it would probably be

9   efficient to address both at the same time, I think

10  that the arguments in support of both are the same and

11  when we ask why should the motion for directed verdict

12  of acquittal or why should the motion for a new trial

13  be granted, those motions are both based on this same

14  argument and that is that the Prosecution in this case

15  did not prove their case beyond a reasonable doubt.

16  The evidence in this case did little more than

17  establish why Miss Linda Stermer would be a suspect in

18  the case.  Certainly the Prosecution proved that she

19  was present at the time this fire occurred at the time

20  of her husband's death and certainly the Prosecution

21  proved that she was physically capable of having

22  started this fire and was in a place where she could

23  have.  She was at the home that burned.  And I -- the

24  Prosecution certainly proved that in the confusion and

25  chaos after this fire or during the fire, that Mr.

5

1    Stermer was struck by a van driven by the Defendant,

2    by Linda Stermer.   The autopsy established that there

3    were injuries to Mr. Stermer.   The pathologist

4    testified that he had injuries that were consistent

5    with having been struck by a van, blunt force trauma

6    and that there was evidence at the trial presented of

7    blood belonging to Todd Stermer on the undercarriage

8    of the van.   The Prosecution, however, did not prove

9    beyond a reasonable doubt anything further than that.

10   They did not proof that Linda Stermer started the

11   fire, only that she was present and capable of

12   starting the fire.   They did not proof that she killed

13   Todd Stermer, only that she was in a place where she

14   could have.

15           The evidence, however, in this case goes

16   much further than that in terms of establishing a

17   reasonable doubt.   It's not simply a failure of the

18   Prosecution to prove their case beyond a reasonable

19   doubt in this matter, your Honor.   It's the evidence

20   that Mr. Stermer could have or is equally as likely to

21   -- perhaps even more likely to have started this fire

22   than Linda Stermer.   The evidence established that

23   Todd Stermer was present at the time the fire was

24   started.   The evidence established that he was

25   physically capable of starting the fire.   The evidence

6

1   established that he had a history of or a history of

2   association with residences that have burned, that

3   there were two prior instances where he was involved

4   in homes that had burned.  The evidence established

5   that Mr. Stermer had an accelerant or an ignitable

6   residue on his clothing, that of gasoline.  The

7   evidence established that Mr. Stermer died from

8   injuries, of thermal injuries associated with that

9   fire.  He was, as described during this trial, part of

10  the fire.  He was the one who was present when that

11  fire occurred, not Mrs. Stermer.  There was evidence

12  of blunt force injuries in this trial to Mr. Stermer,

13  but the pathologist testified that there could be no

14  determination how those injuries were incurred except

15  to say that they were consistent with him having been

16  struck by the van.  We know that Mr. Stermer was using

17  drugs at the time or near the time of this fire.

18  There was evidence of two separate drugs in his system

19  or at least one type of drug, two -- I forget what the

20  correct word is -- different metabolites of those

21  drugs, likely Vicodin.  We know that he had been

22  acting strangely at or around the time of the fire.

23  The description was that he was, quote, looped.  We

24  know that Mr. Stermer had a reason to start this fire,

25  at least as good of a reason as Linda Stermer did,

7

1    considering his financial status.  He was tens of

2    thousands of dollars in debt and the fire would solve

3    that problem.  We also know that there was marital

4    problems in this family and it's reasonable to

5    conclude that the fire would solve those problems for

6    Mr. Stermer as well.  He had a reason to start this

7    fire, to cause his family to rally around him and to

8    bring an end to his financial difficulties.  All of

9    those -- all of that -- those reasons, your Honor,

10   were clearly established in the course of this trial.

11   All of them lead to a conclusion that it was not Linda

12   Stermer who started this fire.  All of them certainly

13   overcome any evidence presented against her in this

14   case which established nothing more than that she is

15   reasonably a suspect.

16          Also, your Honor, it's reasonable to

17   conclude based on the evidence presented during the

18   course of this trial that the fire had been

19   accidentally set.  We know that Mr. Stermer had the

20   residue of an ignitable liquid or accelerant,

21   gasoline, on his clothes.  We know that there were

22   open flames in the home in the area where he was at,

23   both in the fireplace and from candles or oil lamps on

24   the wall or half wall behind the chair where he was

25   seated.  We know from the testimony in this trial that

8

1       it would not require contact with a flame for that

2       ignitable residue on his clothing to start, to start

3       on fire.  It's the vapors that are evaporating from

4       that residue that actually ignite and it does not

5       require physical contact, only proximity for those

6       vapors to ignite.

7              Again, your Honor, even if we accept as

8       true and accurate the testimony of the expert -- arson

9       expert from the Michigan State Police that this fire

10      was intentionally set or had an accelerant involved in

11      it, the evidence would establish that it's more likely

12      that it was Todd Stermer who was involved in the

13      ignition of that fire than it was Linda Stermer.

14             Miss Stermer has been convicted of first

15      degree murder.  She is going to, if this conviction

16      stands, serve the remainder of her life in prison

17      without the possibility of parole.  In a case like

18      this, your Honor, I believe it's necessary for the

19      Court and the attorneys to look closely at the

20      evidence and not simply to accept the verdict of the

21      jury.  We work in a system where we rely on juries to

22      come to conclusions and then oftentimes we simply walk

23      away from the case and say, well, the jury heard the

24      evidence.  In this case the jury did hear the

25      evidence, but the jury has made a mistake.  Juries do

                                   9

1   make mistakes.  Courts do make mistakes.  Attorneys do

2   make mistakes.  We live in a society where every week

3   I read in the newspaper someone somewhere has been

4   released after spending a substantial period of time

5   in prison and we found that the verdict was a mistake,

6   that it could not have been true and someone has been

7   released after losing a substantial portion of their

8   life to prison.  In this case I think it's incumbent

9   upon the Court and the attorneys to look closely at

10  the evidence and not simply to accept the verdict of

11  this jury.  I'm not saying that the jury did not do

12  its job in this case.  They were attentive.  They

13  were here every day.  They listened to the evidence.

14  But it's clear that the evidence in this case

15  preponderates against the verdict.  It's clear that it

16  would be a miscarriage of justice to allow the verdict

17  to stand.  We would ask that the Court look closely at

18  the evidence in this case, not simply accept the

19  verdict of the jury and grant both our motion for

20  directed verdict of acquittal -- or grant I guess in

21  the alternative either our motion for directed verdict

22  of acquittal or at a minimum to allow us a new trial,

23  to have another jury look at this case to see if that

24  jury, the first jury, was accurate in its verdict.

25  Given the evidence in this case, your Honor, I can't

10

1   see how another trier of fact would reach this same

2   conclusion.  I've reviewed it in my mind again and

3   again and again and there simply was not evidence

4   beyond a reasonable doubt in this case that Mrs.

5   Stermer was guilty of this crime.  Evidence that she

6   could have done it?  Certainly.  A reason to think

7   that she may have?  Perhaps.  But when you consider

8   Mr. Stermer's history and the circumstances of this

9   fire itself, him having been present in the fire, him

10   having the ignitable residue on his clothes and

11   compare it with the evidence against Mrs. Stermer, she

12   was present, she was hysterical.  She acted as if she

13   had nothing to do with this.  All of the witnesses

14   agree that her behavior immediately after this fire

15   was that -- was consistent with someone who was a

16   victim in this situation as well, someone who did not

17   plan or premeditate or have involvement in the fire.

18   Physically there was no evidence of her involvement in

19   the fire.  There was no trace evidence, scientific

20   evidence that would lead someone to conclude that she

21   was involved in the fire.  Her clothes were seized

22   immediately after this fire.  She did not have any gas

23   on her shirt.  She did not have any gas on her pants.

24   She did not have any gas on her socks.  No evidence of

25   any ignitable residue, accelerant, gasoline was found

1    on her person or on her clothes.  There is nothing in

2    this record, your Honor, that would tie her to the

3    start of this fire.

4              This record is replete with evidence tying

5    Todd Stermer to the start of this fire.  He suffered

6    injuries.  He had the residue on him.  He was in the

7    room where the fire started.  He was the only person

8    in the room where the fire started.  If Mrs. Stermer

9    was in the room where the fire started, she also would

10   have had physical injuries.  She also would have

11   suffered from smoke inhalation.  She also would have

12   had residue on her clothes or damage to her clothing

13   from the fire.  There is nothing in this record that

14   puts her in contact with that fire in any way, shape

15   or form.  She had no opportunity to destroy any

16   evidence in this case.  She was at the scene when the

17   authorities arrived, when the neighbors arrived, when

18   Mr. Stermer was still alive gasping for air.  She was

19   there.  She could not have destroyed evidence in this

20   case.  She could not have hidden evidence in this

21   case.  The facts are what the facts are and the facts

22   are she was present and there is no other evidence to

23   tie her there to the start of this fire.

24             Given the testimony in this trial, your

25   Honor, I believe, as I said, it would be appropriate

12

1    for the Court to grant the motion for directed verdict

2    of acquittal, at least to grant the motion for new

3    trial.  We thank you for your attention to this

4    matter, your Honor.

5              Does the Court have any questions?

6              THE COURT:  No questions.

7              MR. GETTING:  Thank you, sir.

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LINDA KAY STERMER,

        Defendant-Appellant.

UNPUBLISHED
June 23, 2011

No.  297057
Van Buren Circuit Court
LC No.  09-016654-FC

Before: TALBOT, P.J., and GLEICHER and M. J. KELLY, JJ.

PER CURIAM.

A jury convicted defendant Linda Kay Stermer of felony murder in violation of MCL 750.316(1)(b), and the trial court sentenced her to life imprisonment without the possibility of parole.  Defendant's victim was her husband of 14 years, Todd Stermer.  The prosecution presented a plethora of circumstantial evidence to support its theory that defendant either sedated Todd or knocked him unconscious before dousing him with gasoline and setting him on fire.  On appeal, defendant challenges her conviction on sufficiency and great weight grounds.  We affirm.

The night before Todd Stermer died, he discovered that defendant was having an extramarital affair and informed defendant that he wanted a divorce.  The next morning, a gas station attendant witnessed defendant filling a container with gasoline.  Shortly thereafter, defendant gave her three teen-aged sons money and sent them out of the house.  When the boys left, their father appeared to be sleeping in front of the television and defendant would not allow the boys into the room.  Around 3:30 p.m., neighbors saw smoke billowing from the Stermer house and they drove over to assist.  These neighbors witnessed defendant drive her van in reverse down the driveway, but then change gears and drive forward behind the house.  When the neighbors exited their vehicle to speak to defendant, they discovered Todd's body lying alongside the driveway.  They also noticed blood on the bumper of defendant's van.  The medical examiner eventually determined that Todd had died from burns and smoke inhalation.  Todd also had cranial lacerations consistent with blunt force trauma, various bodily injuries consistent with being run over by a vehicle, and a small amount of Vicodine in his urine.  Forensics later identified the blood on defendant's van as belonging to Todd.

During the criminal investigation, defendant gave varying accounts of how she escaped the home following the fire and what she had been doing when the fire began.  Defendant characterized the fire as an accident, telling investigators that Todd likely got gasoline vapors on

-1-

his clothing while repairing their furnace and those vapors likely ignited when Todd approached the fire burning in the fireplace. An arson investigator later discredited that theory. Defendant's friend, Kate Fox, also offered a damaging account of defendant's pre-offense conduct. For approximately four months, defendant had been discussing how she could get rid of her husband, including shooting him and running him over with a car. Fox had previously sent police to the Stermer house when defendant threatened to shoot Todd. Following the murder, defendant told Fox that she wanted to sneak into her now burnt-out home to retrieve a coffee mug that might contain traces of a sedative that she had planned to give to Todd. Defendant was also betrayed by a fellow prisoner who indicated that defendant admitted to drugging Todd, hitting him over the head, and then using gasoline to light him on fire.

## I. CHALLENGES TO BIND OVER AND CONVICTION OF PREMEDITATED MURDER

Defendant challenges the evidentiary support for her conviction of first-degree premeditated murder in violation of MCL 750.316(1)(a). The prosecution charged defendant with two separate counts of first-degree murder: premeditated murder and felony murder based on an underlying arson. The jury convicted on both counts, but the trial court vacated the premeditated murder conviction before sentencing. Accordingly, any challenge to the premeditated murder conviction is moot and we decline to consider it. *People v Briseno*, 211 Mich App 11, 17; 535 NW2d 559 (1995) ("Where a subsequent event renders it impossible for this Court to fashion a remedy, the issue becomes moot.").

Defendant also contends that the district court lacked probable cause to bind her over for trial on the felony murder charge. Any error at the bind-over stage would be harmless given our conclusion that the prosecution presented sufficient evidence at trial to support defendant's ultimate conviction. *People v Moorer*, 246 Mich App 680; 682; 635 NW2d 47 (2001).

## II. SUFFICIENCY OF THE EVIDENCE AND GREAT WEIGHT OF THE EVIDENCE

Defendant argues that the prosecution presented insufficient evidence to support her conviction for felony murder and, therefore, the trial court erred in denying her motion for a directed verdict of acquittal. Defendant also challenges the trial court's denial of her motion for new trial where her conviction was against the great weight of the evidence. We reject each challenge.

In reviewing a trial court's denial of a motion for directed verdict of acquittal, we review "the evidence in the light most favorable to the prosecution in order to 'determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt.'" *People v Gillis*, 474 Mich 105, 113, 712 NW2d 419 (2006), quoting *People v Riley (After Remand)*, 468 Mich 135, 139-140; 659 NW2d 611 (2003). The prosecution is not required to present direct evidence of a defendant's guilt. Circumstantial evidence and reasonable inferences drawn from it may be sufficient to prove the elements of the crime. *People v Jolly*, 442 Mich 458, 466; 502 NW2d 177 (1993).

We review the trial court's denial of defendant's motion for new trial based on the great weight of the evidence for an abuse of discretion. *People v Unger*, 278 Mich App 210, 232; 749 NW2d 272 (2008). The court should grant a new trial "only where the evidence preponderates

heavily against the verdict and a serious miscarriage of justice would otherwise result." *People v Lemmon*, 456 Mich 625, 642; 576 NW2d 129 (1998). Most motions for a new trial involve some challenge to witness credibility, *id.* at 638; however, the judge may not sit as a "thirteenth juror" to evaluate the credibility of the evidence. *Id.* at 639-640. A court may interject its opinion regarding credibility only in exceptional circumstances, such as when the "testimony contradicts indisputable physical facts and laws, . . . where a witness's testimony is so inherently implausible that it could not be believed by a reasonable juror, . . . or where the witnesses [sic] testimony has been seriously impeached and the case marked by uncertainties and discrepancies." *Id.* at 643-644 (internal quotations and citations omitted). If one of these exceptional circumstances exists, the judge then must consider whether the jury convicted an innocent person or if "'it would be a manifest injustice' to allow the guilty verdict to stand." *Id.* at 644 (internal citation omitted).

Here, defendant was convicted of felony murder based on the underlying offense of arson. To convict a defendant of felony murder, the prosecution must present evidence to establish the following elements beyond a reasonable doubt:

> (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result i.e., malice, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [MCL 750.316, including arson]. [*People v Carines*, 460 Mich 750, 758-759; 597 NW2d 130 (19999).]

To establish the underlying arson offense, the prosecution must prove that the defendant "wilfully or maliciously burn[ed] any dwelling house, either occupied or unoccupied, or the contents thereof . . . ." MCL 750.72.

> In arson cases, the trier of fact usually draws inferences from circumstantial evidence: "There is rarely direct evidence of the actual lighting of a fire by an arsonist; rather, the evidence of arson is usually circumstantial." [*People v Nowack*, 462 Mich 392, 402; 614 NW2d 78 (2000), quoting *Fox v State*, 179 Ind App 267, 277; 384 NE2d 1159 (1979).]

The crux of defendant's appellate argument is that the evidence supports a more likely conclusion than her guilt; it establishes that Todd actually started the fire, either intentionally or accidentally. However, defendant misses the point of a jury trial: the jury heard the evidence both for and against defendant and determined that the evidence against defendant was more credible. The evidence against defendant does not "contradict[] indisputable physical facts or law," is not "so inherently implausible" as to defy all reasonable belief, and was not so "seriously impeached" that the verdict must be overturned. *Lemmon*, 456 Mich at 643-644. Accordingly, neither the trial court nor this Court may "disturb the jury findings" regarding the credibility of the evidence even if our judicial "judgment might incline [us] the other way. *Id.* at 644.

The prosecution in this case presented significant evidence at trial that defendant had motive and opportunity to commit the charged offense and presented sufficient circumstantial evidence to connect defendant to the commission of the crime. The prosecution presented evidence that defendant had been having an affair and wanted to leave her husband for her

boyfriend. Defendant made several comments to a friend indicating that she would rather kill Todd than divorce him. Defendant purchased a container of gasoline on the morning of the murder and later denied it. Defendant sent her children out for the day and would not allow them to see their father before they left. Todd suffered head injuries consistent with being hit with a blunt object and his urine sample tested positive for Vicodine. The clothing that Todd had been wearing at the time of the fire smelled strongly of gasoline and proved to be saturated with gas. Defendant drove over Todd in the driveway after he escaped the fire, a fact from which the jury could infer that defendant wanted to finish the job. Defendant showed a consciousness of guilt by telling varying tales of how she escaped the burning home. She also told a friend that she needed to return to the home to retrieve incriminating evidence (a coffee cup that may have contained traces of a sedative). Finally, defendant confessed her crimes to a fellow jail inmate.

The prosecution also presented evidence that the fire was set intentionally, not accidentally. The fire was fast moving and quite destructive, suggesting that someone used an accelerant to start it. The arson investigator opined that the point of origin for the fire was the center of the living room where Todd lay on a recliner. Further, the investigator opined that Todd was the source point of the fire given the presence of gasoline on his sweatpants and underwear.

Relying on the "doctrine of chances," defendant contended that Todd's involvement in two prior house fires rendered it likely that he had started the fire that took his life. The doctrine of chances holds that "when someone suffers a specific type of accident with extraordinary frequency, it is objectively probable that one or more of the incidents were not accidents." *People v Mardlin*, 487 Mich 609, 635; 790 NW2d 607 (2010). Despite defendant's presentation of evidence supporting this theory, the jury convicted her of felony murder, suggesting that it found this theory implausible.

We conclude that the prosecution presented sufficient circumstantial evidence to prove beyond a reasonable doubt the elements of felony murder based on arson. Further, the trial court properly declined to interfere with the jury's decision regarding the credibility of the evidence and, therefore, properly denied defendant's motion for a new trial.

Affirmed.

/s/ Michael J. Talbot
/s/ Elizabeth L. Gleicher
/s/ Michael J. Kelly

Issue II:

A. The trial court erred in denying the motion for a directed verdict. Defendants convictions for first degree murder and felony murder must therefore be vacated because the evidence is insufficient to support a finding of guilt beyond a reasonable doubt that (1) the house fire was caused by arson, ie. deliberately set or, (2) That it was defendant who started the fire.

People v Hampton 407 mich 354, 366; 285 NW2d 284 (1979) ... an essential of the due process guaranteed by the forteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof - defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of every element of the offense.

People v Lindsey 83 mich App 354 Mere opportunity of a defendant to commit arson is insufficient to support a conviction of arson where there is no evidence that the defendant had a motive to burn and where the evidence demonstrates that others also had opportunity to start the fire.

-1-

In People v Lee, 231 Mich 607, 613, 204 N.W. 742 (1925)
On trial for arson if nothing appears but the mere fact that the house was consumed by fire, the presumption is that the fire was the result of accident or of some providential cause.

The defendant argues that the Mich. Appeals court took creative reign too far in many of their statements used in their answers, ie "The prosecution presented a "plethora" of circumstantial evidence to support its theory that defendant either sedated Todd or knocked him unconscious before dousing him with gasoline and setting him on fire." In all testimony there were several of the prosecution witnesses who testified about drugs. The prosecutor was the only person to suggest that Todd was drugged or doused. The following points were made during the defendants trial. Transcripts are referenced and included.
The following points are testimony given that I would submit for issues II and III.

-2-

- Toxicology results showed the presence of hydrocodone in the urine only. Indicating that the drug could have been taken" as much as a couple days previously" (Dr Markey Vol 3 pgs 31-34)
- mother of the victim testified that he'd gone to the Dr, had an ear infection and was prescribed medication. That he was "loopy". (Sandy Stermer Vol 1 pgs 269, 275-278)
- Todds sons testified that he was "loopy", "stagering" at times, like he wasn't "aware of what he was doing" (Trenton V4 pg 132)
- Cory testified that his mom, defendant, had told him before that day that she was going to stay at her stepsisters. (Cory Vol 4 pg 157)
- Scientific testing proved no presence of ignitable liquid on Lindas, defendants, clothing (Ernst Vol 3 pg 148)
- Todds clothing tested positive for the presence of gasoline. The word saturated was not used in any testimony. (Ernst vol 3 pg 142

  Linda described as hysterical, being heard 1/3 mile away wailing (mousalli, Evans, Leach)

-3-

- Prosecution arson expert testified that
  - • victim "near" the area of origin (Leroy Vol. 3 pg 005)
  - • Vapors need only be near a flame to ignite (pg 224)
  - • Building materials, osb, plywood, studs, open rafters, open ceiling would burn rapidly. (pgs 208-209)
  - • Canine and human search found no accelerants, except small oil leak at oil furnace, in the house (pgs 205, 206)
- Families children testify that the living room and basement ceiling mostly unfinished. studs, osb, open ceiling. (Ashley Vol 5 pg 78 - Trevor vol. 4 pg 110)
- Witness Gordon, jail inmate, testified that police gave her suggestions of what to say after she told them she didn't remember. Then recanting the statements given. (Gordon Vol. 3 pg 174, 175)
- Witness Fox, "friend", testified that she lied to Det. Rought. Admitted to being admitted to psychiatric hospital two times. (Fox vol. 4 pgs 192, 193, 195)
- Steve Benny tells that his sister, witness Fox, is vindictive. (V4, pg 97)

- Chris Williams was asked during preliminary hearing only .."Was there any plan, either by either one of you that was expressed that we want to be together or anything of this nature?" Answer "NO" No plans to leave with a boyfriend. (Chris Williams pg 83)

- Prosecution expert, Dr Markey, testified he could not make a "determination as to what caused lacerations on the head" (Dr Markey Vol 3 pg 27)

I will submit each of these points for issue III as well. In addition I also rely on the brief, submitted to the michigan Court of Appeals. Prepared by Atty. Mary Owens, for issues II and III. I thank the Court for the time, and attention given in review of these issues.

```
 1   A    No.

 2   Q    When Mr. Stermer's blood -- you did not actually

 3        perform the testing yourself?

 4   A    No, that is correct.

 5   Q    But as part of your autopsy report that you have

 6        reviewed and signed you have included the results of

 7        that toxicology analysis?

 8   A    Yes.

 9   Q    When Mr. Stermer's blood was tested, Mr. Stermer's

10        blood tested negative for the presence of any sort of

11        common controlled substance, is that right, or

12        prescription drugs?

13   A    Correct.

14   Q    Mr. Stermer's stomach contents were never analyzed so

15        we don't know whether there was the presence of any

16        prescribed medication having been recently taken in

17        his stomach, is that true?

18   A    Correct.

19   Q    Mr. Stermer's urine, however, was tested, is that

20        right?

21   A    Yes.

22   Q    And Mr. Stermer's urine tested positive for the

23        presence of hydrocodone and hydromorphone, is that

24        right?

25   A    That is correct.
```

31

1  Q   Now, those are fancy names for what are commonly

2      referred to as painkillers, is that true?

3  A   Correct.

4  Q   The hydrocodone would be a Vicodin-type substance, is

5      that right?

6  A   Correct, one of the brand names for hydrocodone is

7      Vicodin.

8  Q   And the hydromorphone, is that a similar type of --

9  A   It's a similar substance.  Actually its presence in

10     the urine in addition to hydrocodone is most likely

11     due to its -- it's a metabolite or a breakdown product

12     of hydrocodone.  The body can concert hydrocodone to

13     hydromorphone and it's very common when an individual

14     is on a medication such as Vicodin to see both in the

15     urine.

16 Q   All right.

17             So it's likely the single substance of

18     Vicodin tests positive for these two different things,

19     hydrocodone and hydromorphone?

20 A   That would be the most likely scenario.  I couldn't

21     say for certain that he didn't ingest both of them,

22     but it could be from ingestion or -- of just

23     hydrocodone itself.

24 Q   Mr. Stermer has been -- as part of your conclusions in

25     this examination, you concluded that the cause of

32

```
 1              death was thermal injuries, the diffuse terminal burns

 2              over his body, is that true?

 3    A    Yes.

 4    Q    You also conclude that the manner of death is best

 5              classified as undetermined, is that right?

 6    A    In my opinion, for medical, legal death certification

 7              purposes, I use a death certificate.  That was my

 8              opinion.

 9    Q    The manner of death was best classified as

10              undetermined as opposed to a homicide?

11    A    The categories that I have available to me for death

12              certification purposes are natural, accident, suicide,

13              homicide, and then undetermined or indeterminable, and

14              based on everything that I knew at the time, I felt

15              that I couldn't differentiate between a couple of

16              those and so I thought it was best to classify it at

17              that time as undetermined.

18                   MR. GETTING:  Thank you.  I have no other

19              questions, your Honor.

20                              REDIRECT EXAMINATION

21    BY MR. KAPS:

22    Q    Doctor, just a couple of questions.

23                   The -- what would be the significance of

24              the fact that there is a substance that is found in

25              the urine but not in the blood?  What does that mean?
```

33

1   A   Well, it can mean one of several things.  Typically

2       substances are found for a longer period of time in

3       the urine than they are in the blood.  The body tends

4       to clear them usually through the liver or the kidney

5       and they can be excreted into the urine for a longer

6       period of time than they are actually present in the

7       blood so it could mean that he had used these

8       medications sometime previously, you know, hours,

9       maybe even a couple of days previously.  They are no

10      longer detectable in the blood, but they are

11      detectable in the urine.  Conversely, it could mean

12      that the concentration that is present in the blood is

13      just below what the laboratory can detect.  They can't

14      detect it once it gets down to a certain concentration

15      so negative in the blood means there's no substances

16      that are above the levels that we can detect.  It

17      doesn't mean there's absolutely no way in the world

18      that there's not, you know, any amount of that

19      substance so it could mean that it's just below what

20      they can detect.  It could mean that it's just no

21      longer present in the blood because he took it long

22      enough in advance that it's been cleared from the

23      blood.

24  Q   Okay.  Thank you.

25                  One final question:  As part of your

34

*Trial testimony of Patricia*
*Todd Sterner mother*

```
 1                   Now -- excuse me -- how did you become
 2       aware of the fire?
 3   A   Actually my sister came to tell me.  Linda I guess
 4       told the Van Buren Police to call the Portage Police.
 5       I don't know.  And they went and told my sister and
 6       she came over and told me.
 7   Q   Okay.
 8                   Now, what kind of physical shape was your
 9       son in?
10   A   He was in very good physical shape.
11   Q   Okay.
12                   You said he had some --
13   A   He had an ear infection.
14   Q   Ear infection and had been on some medications?
15   A   Right.
16   Q   As far as physical fitness and so forth, was he an
17       active, athletic type of person?
18   A   Yes, he was.
19   Q   My understanding is that he coached football,
20       baseball, whatever?
21   A   He coached, yes, he did, and he liked to play, too.
22   Q   All right.
23                   Under normal circumstances, was he the type
24       of individual that if he's awake and cognizant and
25       there is a fire in the house, that he would be capable
```

269

1    Q    When you met with your son on January 5th, you

2         described him as being in a good mood, upbeat?

3    A    Yeah.

4    Q    You also described him as having suffered or suffering

5         from an ear infection?

6    A    Yes, he'd had --

7    Q    And that he had gone to the doctor and gotten medicine

8         for that, right?

9    A    Yes.

10   Q    And Todd had told you that the doctor had prescribed

11        medication for him, is that true?

12   A    Yes.

13   Q    Todd also told you that the medication made him feel,

14        quote, loopy, is that right?

15   A    No.

16   Q    That's not right.

17   A    Trevor, his oldest son, told me that the medicine --

18        later told us that the medicine had made him loopy and

19        had made him sleepy, made him just want to sleep

20        basically.

21   Q    Do you recall, Miss Stermer, having spoken to

22        Detective Gabriele Rought of the Van Buren County

23        Sheriff's Department on February 14th of 2007 about

24        the case?

25   A    Yes.

275

1   A   I could have, yes.

2   Q   About their father?

3   A   And I know that that was all that Trevor said was that

4       the medicine made his dad, you know, sleepy, whatever.

5   Q   Well, sleepy is different than loopy and the report

6       here used a quote to say that the medicine he was

7       taking made him feel, quote, loopy, and I am just

8       trying to be precise.  You don't recall having said

9       that to Detective Rought?

10  A   No, I don't.

11  Q   And if Detective Rought put in her report that you

12      told her that, well, she must be wrong because didn't

13      say that?

14  A   No, I would say that I probably misspoke myself or --

15      and said Todd and I meant Trevor had told me that.

16  Q   All right.

17              The bottom line, whether it came from Todd

18      himself or whether it came from Trevor was that you

19      would have been told that the medicine made Todd

20      loopy.

21  A   But I took it as sleepy though, not as being, you

22      know, what you're trying to say.

23  Q   I'm not trying to say anything.  I am just trying to

24      use the words that were here.

25  A   Can I -- is there any chance that I could just say

                              277

1   something?

2 Q  Nope.

3 A  No?  About Todd's mood I guess.

4     THE COURT:  Not unless somebody asks you

5   the question.

6     THE WITNESS:  All right.  Thank you.

7 BY MR. GETTING:

8 Q  You knew that Todd and Linda's finances were, quote,

9   shaky, is that right?

10 A  They normally were, yes.  I didn't know any details.

11 Q  You knew that they owed a lot of money and that over

12   the years you had lent Todd a lot of money, was that

13   true?

14 A  True.

15 Q  And we talk about a lot of money, some people might

16   talk $10 is a lot, some people might think ten million

17   is a lot.  We're talking about tens of thousands of

18   dollars?

19 A  Yes.

20 Q  You also knew that Todd had been loaned money from

21   other family members in addition to the money you lent

22   him, is that true?

23 A  Yes.

24 Q  When you say Linda first described what happened at

25   the neighbor's house that night on January 7th, that

1   Q   You saw your dad sitting in the recliner chair?

2   A   No, I don't believe so.

3   Q   You don't think that you saw him sitting in the

4       recliner or you're not sure?

5   A   I'm not sure if I saw him.

6   Q   Before the fire happened, do you know whether or not

7       your dad was on some kinds of medicines?

8   A   He seemed like he was and I was told that he was.

9   Q   And you described him as sometimes appearing to be

10      staggering when he walked, is that right?

11  A   That's right.

12  Q   I think you used the word loopy, that he was kind of

13      loopy in nature, that sometimes he would just stand in

14      front of the refrigerator and it wouldn't seem like he

15      was really aware of what he was doing?

16  A   Right, sounds right.

17  Q   And your mom had told you that the fire had started

18      upstairs, is that right?

19  A   I think that's right.

20  Q   And that she had gotten out of the fire and that was

21      really all she had ever -- you had ever been told

22      directly by your mother, is that true?

23  A   That I remember, yes.

24  Q   Okay.

25                  MR. GETTING:  Thank you, Trenton.  I don't

                              132

```
 1              On the day that there was the fire when you
 2        woke up you heard your parents arguing, is that true?
 3   A    Yes.
 4   Q    And your father was accusing your mother of having
 5        cheated on him, is that right?
 6   A    Yes.
 7   Q    You could hear your father cussing at your mother, is
 8        that true?
 9   A    Yes.
10   Q    And that he had told her that she needed to move out
11        and that they were getting divorced, is that right?
12   A    That they were getting divorced.  I don't remember if
13        he said that --
14   Q    But that she needed to move out?
15   A    Right.
16   Q    And isn't it true that your mom had also talked to you
17        before this about that she was -- that she may move
18        out and go to stay with a sister or stepsister, is
19        that right?
20   A    Yep.
21   Q    So you knew it was possible that your parents were
22        separating, is that true?
23   A    Um, yeah.
24   Q    And when you left the house that morning, isn't it
25        true that you saw your father sitting in the chair in
```

157

1    Q    The residue of gasoline remains on a fabric for how

2         long?

3    A    It depends on the environment that fabric is.

4    Q    All right.

5              And nothing about your analysis would tell

6         you who exposed those products to gasoline, is that

7         true?

8    A    That's correct.

9    Q    Item number three, which was not brought up, contains

10        sweater, pants, and socks identified as belonging to

11        Linda Stermer, is that right?

12   A    Correct.

13   Q    You analyzed each of those items using the same

14        process that you did for the other things?

15   A    Those were within one nylon bag so they were analyzed

16        together, yes, same process.

17   Q    And the gas chromatograph mass spectrometer results of

18        the analysis of Linda Stermer's clothing showed no

19        presence of any gasoline or other ignitable residue --

20        ignitable liquid residue?

21   A    No identifiable ignitable liquid residue, correct.

22   Q    Item number two, do you still have that up there?  I

23        believe it's identified as a red gas can.

24             Is this gas can in essentially the same

25        condition it was at the time that you received it?

                              148

1      towel from on top of Todd Stermer.  What was the

2      result of that analysis?

3  A   No identifiable liquid petroleum product.

4  Q   All right.

5              And number seven was a brown shirt from on

6      top of Todd Stermer.  Again, did you conduct an

7      analysis of that and what was the result?

8  A   I did, and that also was negative, no identifiable

9      liquid petroleum product.

10 Q   And we have a number of other items that are labeled

11     Defendant's Proposed Exhibits 16, 17, 18 and 19 and I

12     would ask to you take a look at those items and ask if

13     you are familiar with those?

14 A   Those are my items 8, 9, 10 and 11 and they are metal

15     cans holding various articles of clothing.

16 Q   All right.

17             And my understanding -- if you know -- if

18     your notes reflect or if you recall, my understanding

19     would be two socks and pair of underwear and a shirt,

20     would that be correct?

21 A   That's correct.

22 Q   All right.

23             And what if any ignitable liquids did you

24     find on any of those items?

25 A   Each of these showed the presence of gasoline.

142

1      monoxide level is not very elevated, but we also have

2      evidence of these very severe burns, it's likely that

3      he was in the fire for a short period of time as

4      opposed to hiding in a closet in another area of the

5      house inhaling smoke, is that fair?

6  A    That's correct.

7  Q    The fact that he had severe burns over most of his

8      body places him, as I believe you used the phrase,

9      part of the fire, is that true?

10  A   At or near the area of origin.

11  Q   And on fire himself?

12  A   Correct.

13  Q   As part of your investigation the next day, you

14     requested the assistance of Sergeant Hetu, H-E-T-U,

15     for the record?

16  A   Hetu.

17  Q   Hetu.

18           From the Michigan State Police, is that

19     right?

20  A   Yes.

21  Q   Sergeant Hetu assisted you by using a canine to search

22     the home for accelerants, is that true?

23  A   That's correct.

24  Q   Sergeant Hetu did not find or maybe his canine did not

25     find any evidence of ignitable liquid residue within

```
 1        the home, is that true?
 2    A   In my report I said "no significant" and when I say
 3        that, he did alert to a small leak at the fuel oil
 4        furnace inside the structure.
 5    Q   Did he alert anywhere else inside the structure that
 6        you're aware of?
 7    A   No.
 8    Q   Did you seize any items from inside the structure to
 9        have them tested for any ignitable liquid residue?
10    A   No.
11    Q   Your testimony was that based on your investigation,
12        all of those items would have been consumed by the
13        fire?
14    A   That's correct.
15    Q   When we talk about your conclusion about the cause and
16        origin of this fire, one of the things that you
17        indicated you consider is the fast moving nature of
18        this fire, is that true?
19    A   Yes.
20    Q   Is it true that some things burn faster than others?
21    A   Yes.
22    Q   Is it true that some things have -- for instance, wood
23        would burn faster than drywall, is that true?
24    A   Than what.
25    Q   Drywall?
```

206

1   Q   Based on your examination at the Stermer residence,

2       were you satisfied that the washer and dryer had

3       nothing to do and were nowhere close to the origin of

4       the fire.

5   A   That is correct.

6   Q   All right.

7           At that point in time did you have any

8       information at all that any towels might have anything

9       to do with anything in this case?

10  A   At the time, no.

11  Q   All right.

12          And would that be the reason that you did

13      not seize those things out of the washer or dryer

14      because they weren't close to the ignition source and

15      you had no knowledge that they might have anything to

16      do with anything?

17  A   That's correct.

18  Q   All right.

19          MR. KAPS:  No, other questions.

20          MR. GETTING:  I do have a question that was

21      brought up by that.

22                  RECROSS-EXAMINATION

23  BY MR. GETTING:

24  Q   It's the vapor that actually ignites, is that right?

25  A   That's correct.

                          224

1   boards, plywood on the flooring without any covering

2   or carpeting covering it, that would burn faster

3   typically than this floor with carpeting on it, is

4   that right?

5  A   Yes.

6  Q   The main floor living room, if it was primarily open

7   studs or the walls were covered again with OSB or

8   plywood, that would burn faster than an area where it

9   had been finished with drywall, is that right?

10  A   Yes.

11  Q   If the ceiling in the main floor living room was a

12   cathedral ceiling and had wood on the ceiling as

13   opposed to some other finishing, that would burn

14   faster, is that true?

15  A   Faster than --

16  Q   Drywall or some other kind of item?

17  A   The other kind of item -- we can go either way.

18  Q   Faster than drywall?

19  A   Yes, it would burn faster than drywall.

20  Q   My point with this is that in making your conclusions

21   about how fast this fire spread, one of the things

22   that caused you to believe that there was an

23   accelerant was the speed of the fire spread, is that

24   true?

25  A   That is not the only thing.  That is one.

208

1    Q    And as I've described, this living room area where the

2         fire apparently started was plywood floor, plywood

3         walls, open studs, cherry ceiling, that fire would

4         burn faster than a typical normal finished living room

5         area?

6    A    Finished with --

7    Q    Drywall.

8    A    It would burn faster than a room finish with drywall.

9    Q    If it was finished with paneling, it would not go as

10        fast?

11   A    Correct.

12   Q    Okay.

13             The -- when you first came on Mr. Stermer,

14        you indicated that there was a noticeable odor, is

15        that right?

16   A    That's correct.

17   Q    But even a person with your background, your

18        experience, the multiple levels of school that you've

19        been to, you're not able to readily identify simply by

20        smelling what type of odor this is?

21   A    I am just like every other person that smells

22        gasoline, kerosene, charcoal lighter fluid.  I am just

23        a normal citizen when it comes to how my nose works.

24   Q    You rely on Michigan State Police laboratory to make

25        those determinations for you as part of this

209

```
 1          was it completely finished?

 2    A     No.

 3    Q     Do you know if there was carpeting on the floor?

 4    A     There was no carpeting.

 5    Q     Do you know if there was drywall on the walls?

 6    A     There was only -- between my mom's room and the living

 7          room, there was drywall, but the rest of it there

 8          wasn't.  There was only one wall.

 9    Q     I'm going to show you what's been introduced as

10          Exhibit 14.

11                    May I approach, your Honor?

12                    Now, this is a sketch that was done by

13          somebody other than you, is that right?

14    A     Yes.

15    Q     And what I want to focus on is the bottom of this

16          diagram near the front porch, front door area?

17    A     Mm-hmm.

18    Q     And this is the main floor living area.  There was a

19          fireplace in the main floor living area that was to

20          the center of the house, is that right?

21    A     Yes.

22    Q     And a big bay window on the outside to the back of the

23          house?

24    A     Yes.

25    Q     There is an area that's labeled living room here and
```

1    and your dad were living there, is that right?

2  A  It was mostly built and we were living there.

3  Q  Parts of it were finished, parts of it were

4     unfinished, is that right?

5  A  Some parts, yes

6  Q  For instance, the ceiling in the basement was open

7     rafters, it doesn't have any drywall covering it or

8     anything else, is that right?

9  A  The main rooms in the basement did not have any

10    ceiling in it. My room did, however.

11 Q  But the area under the living room did not?

12 A  No, it did not.

13 Q  That day -- you've been asked questions about this

14    before, is that right?

15 A  Yes.

16 Q  And one of those instances was under oath where you

17    had been sworn to tell the truth and the whole truth

18    on September 6th, 2007, by a different attorney by the

19    name of Mr. Willison.  Do you recall that?

20 A  I believe I do.

21 Q  Okay.

22              And he asked you questions about what

23    happened and what was going on in your house on that

24    day, is that right?

25 A  Yes.

110

Gordon Vol 3

```
 1   Q   You made no attempt to come forward with any of this
 2       information to the Sheriff's Department, to a
 3       detective, to a guard, to anyone during the course of
 4       your incarceration, is that right?
 5   A   That's true.
 6   Q   You didn't make any statements to the police or other
 7       law enforcement authorities about this at the time
 8       when you claim these statements were being made, is
 9       that right?
10   A   That's true.
11   Q   And even after Miss Stermer was released from jail in
12       August of 2009, you didn't come forward at any point
13       in time then, did you?
14   A   That is true.
15   Q   Ma'am, isn't it true that Detective Macyauski
16       indicated to you or brought to your attention, used
17       the word "frying pan" before you made any statements
18       about having been struck with any kind of object; is
19       that true?
20   A   Yes.
21   Q   And later Detective Rought asked you are you sure
22       about that, being that Detective Macyauski had
23       mentioned the possibilities of a frying pan; Detective
24       Rought asked you are you sure and isn't it true that
25       you then said, well, you don't know about the frying
```

174

1      pan, only that she did strike her husband, is that

2      right?

3  A   I did say that.

4  Q   So even during your interview with the detectives, you

5      were -- they were -- Detective Macyauski was

6      suggesting information to you, you were including that

7      in your statement and then you were retracting it

8      later, all during your one interview with the police,

9      is that right?

10  A   Yes.

11  Q   You continue to suffer from the memory problems that

12      are a result of your posttraumatic stress disorder,

13      bipolar disorder and anxiety disorder, is that true?

14  A   Yes, I do continue to suffer from them.

15  Q   Are you currently being treated for those?

16  A   Yes, I am.

17  Q   All right.

18              But they continue to affect your ability to

19      recall things in a clear and precise way, is that

20      right?

21  A   I wouldn't say that it affects me to be able to

22      decipher from right and wrong.

23  Q   That's not what I asked you.  I asked you whether or

24      not your memory continues to be impacted by the

25      Lortab, Xanax, Seroquel, your disorders of panic,

1    A      Something different?

2    Q      Well, you told Detective Rought you testified here

3           today that it was an incident where Linda Stermer had

4           called you and was holding a shotgun and asked you to

5           give her one good reason why she shouldn't kill her

6           husband?

7    A      Because she said he was abusing her.

8    Q      So when you called the State Police or called 911, you

9           didn't provide them with truthful information at that

10          time?

11                  MR. KAPS:  Objection, your Honor.  To

12          characterize it as not truthful wouldn't be accurate;

13          perhaps not complete.

14   BY MR. GETTING:

15   Q      You didn't tell the police in Thanksgiving, 2006, that

16          Miss Stermer had a shotgun and was threatening her

17          husband, did you?

18   A      Yes, I did.

19   Q      You told that to the police, that there was a weapon

20          involved?

21   A      I told them that there was an assault, that she told

22          me that she had a gun.

23   Q      You told the police that there was a gun involved in

24          that incident.  Ma'am, are you sure?

25   A      They specifically asked me while I was on the phone if

192