UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

LINDA STERMER,

       Petitioner,

-v-                                Case No. 2:12-CV-14013

                                        HON. ARTHUR J. TARNOW

MILLICENT WARREN,

       Respondent.

_____/

## **PETITIONER'S BRIEF IN SUPPORT OF AMENDED HABEAS PETITION**

Respectfully submitted,
SHELDON HALPERN, PC
shalpern@sbcglobal.net
SHELDON HALPERN
Attorney for Petitioner Stermer
26339 Woodward Avenue
Huntington Woods, MI 48070
(248) 554-0400

## TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................i

INDEX OF AUTHORITIES................................................................................ii

STATEMENT OF QUESTIONS PRESENTED ...................................................ix

STANDARD OF REVIEW...............................................................................1

STATEMENT OF CASE ................................................................................2

ARGUMENT ..............................................................................................11

I. THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN PETITIONER'S CONVICTION OF ARSON. .................................................................................................11

II. PETITIONER'S CONVICTION WAS BASED UPON INCOMPETENT, UNRELIABLE EVIDENCE THAT MISLED THE JURY, SUPPLANTED JURY FACT FINDING, WAS MANIFESTLY UNJUST, AND DENIED DUE PROCESS. .................................................17

III. PETITIONER DENIED DUE PROCESS AND FUNDAMENTAL FAIRNESS BY PROSECUTORIAL MISCONDUCT IN VOUCHING, BOLSTERING, PROVIDING EVIDENCE AND DELIBERATELY MISLEADING THE JURY............................................................33

IV. INEFFECTIVE ASSISTANCE OF COUNSEL DENIED PETITIONER A FAIR TRIAL......40

V. PETITIONER WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL. ....................................................................................................51

RELIEF SOUGHT .......................................................................................57

## INDEX OF AUTHORITIES

### Cases

*Abon, Ltd. v. Transcontinental Ins.*, No. 2004-CA-0029, 2005 LEXIS 2847, at *30 (Ohio App. June 16, 2005)........................................................................24

*Barefoot v. Estelle*, 463 U.S. 880, 899, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), ........31

*Barr v Farm Bureau Gen Ins Co*, 292 Mich. App. 456 (2011). ....................................30

*Beasley v. United States*, 491 F.2d 687 (6th Cir. 1974)........................................ 40, 41

*Berger v United States*, 295 US 78; 55 S Ct 629; 79 L Ed 1314 (1935 ........................33

*Bisaccia v. Attorney Gen.,* 623 F.2d 307, 313 (3d Cir. 1980) ......................................31

*Booth v. Black & Decker, Inc.,* 166 F. Supp. 2d 215, 220 (E.D. Pa. 2001); .................44

*Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). ...................................................18

*Clark v Procunier*, 755 F2d 394, 396 (CA 5, 1985)(emphasis in original) , cert. denied , US , 113 S. Ct. 330, 121 L. Ed. 2d 3156 (1992)." ...................................................15

*Corsa v Anderson*, 443 F Supp 176 (ED Mich 1977)...................................................51

*Cosby v. Jones*, 682 F.2d 1373 (11th Cir.1982).........................................................15

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986).......................................................39

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993),..........................22

*Donnelly v DeChristoforo*, 416 US 637; 94 S Ct 1868; 40 L Ed 2d 431 (1974).  33, 35, 37

*Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)..18

*Edwards v Carpenter*, 529 US 446; 120 S Ct 1587; 146 L Ed 2d 518 (2000) ..............55

*English v. Romanowski*, 602 F.3d 714 (6th Cir. 2010): ...............................................48

*Evitts v Lucey*, 469 US 387; 105 S Ct 830; 83 L Ed 2d 821 (1985).............................51

*Fagan v Washington*, 942 F2d 1155 (CA 7,1991) .....................................................55

*Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.,* 394 F.3d 1054, (8th Cir. 2005)............44

*Foster v. Lockhart*, 9 F.3d 722 (8th Cir. 1993)............................................................41

*Gardner v Kapture*, 261 F. Supp 2d 793 (ED Mich, 2003)............................................12

*Gardner v. United States,* 680 F.3d 1006 (7th Cir. 2012), ..........................................42

*Giglio v United States,* 405 US 150, 153; 92 S Ct 763; 31 L Ed 2d 104 (1972),............38

*Gilbert v DaimlerChrysler Corp,* 470 Mich 749, 782, 789; 685 NW2d 391 (2004). .. 20, 31

*Gonzales v. Elo,* 233 F.3d 348 (6th Cir. 2000);...........................................................48

*Gravley v. Mills,* 87 F.3d 779 (6th Cir. 1996) .............................................................51

*Gray v Greer,* 800 F2d 644 (CA 7, 1986)....................................................................54

*Groseclose v Bell,* 130 F3d 1161 (CA 6, 1997)...........................................................43

*Han Lee v. Superintendent Houtzdale SCI,* 14-3876 (3rd Cir. August 19th, 2015)........32

*Han Tak Lee v. Glunt,* 667 F.3d 397 (3rd Cir. 2012). ..................................................18

*Hart v Gomez,* 174 F3d 1067 (CA 9, 1999) ................................................................47

*Hodge v Hurley,* 426 F3d 689, (6th Cir., 2005); ........................................... 33, 35, 37

*Hollenback v United States,* 987 F2d 1272 (CA 7, 1993) .............................................54

*Holsomback v. White,* 133 F.3d 1382 (11th Cir. 1998)................................................47

*In re Ayres,* 239 Mich App 8, 23; 608 NW2d 132 (1999),...........................................46

*In Re Winship,* 397 U.S. 358 (1970) ..........................................................................11

*Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ......................54

*Keller v. Larkins,* 251 F.3d 408, 413 (3d Cir. 2001),...................................................31

*Kenley v. Armontrout,* 937 F.2d 1298, 1304 (8th Cir.), cert. denied, 112 S. Ct. 431 (1991)". ...................................................................................................................41

*Kimmelman v Morrison,* 477 US 365; 106 S Ct 2574; 91 L Ed 2d 305 (1986) ..............41

*Kowalak v United States,* 645 F2d 534, 537-538 (CA 6, 1981)....................................51

*Kumho Tire Co. v. Carmichael,* 527 U.S. 137 (1999),..................................................22

*Kyles v Whitley,* 514 US 419, (1995). .........................................................................49

*Landers v Rees*, 782 F2d 1042 (CA 6, 1985) ................................................................. 41

*Leonard v Michigan*, 256 F Supp 2d 723 (WD Mich, 2003) ........................................... 42

*Mapes v Coyle*, 171 F3d 408 (CA 6, 1999) ................................................................... 53

*Mapes v Tate*, (*Mapes II*), 388 F.3d 187 (6th Cir. 2004) ............................................. 52

*Mason v Hanks*, 97 F3d 887 (CA 7, 1996) ................................................................... 54

*Matire v Wainwright*, 811 F2d 1430 (CA 11,1987) ........................................................ 55

*Mayo v Henderson*, 13 F3d 528 (CA 2, 1994) .............................................................. 55

*McCoy v. Whirlpool Corp.*, 214 F.R.D. 646, 653 (D. Kan. 2003) ................................... 44

*McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir.2004) ............................................... 52

*McQueen v Scroggy*, 99 F3d 1302, 1311 (CA 6, 1996); ............................................... 49

*Miller v. Anderson*, 255 F.3d 455, 457 (7th Cir.2001) ................................................. 46

*Mooney v Holohan,* 294 US 103, 112; 55 S Ct 340; 79 L Ed 791 (1935), ................... 38

*Murray v Carrier*, 477 US 478; 106 S Ct 2639; 91 L Ed 2d 397 (1986) ....................... 55

*Napue v Illinois*, 360 US 264, 269; 79 S Ct 1173; 3 L Ed 2d 1217 (1959)................... 38

*nd. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 849-50 (D. Ohio 2004); ............. 24

*Page v. United States*, 884 F.2d 300, 302 (7th Cir.1989) ............................................ 54

*Pappas v. Sony Elecs., Inc.*, 136 F. Supp. 2d 413, 425 & n.15 (W.D. Pa. 2000); ......... 44

*Pavel v Hollins*, 261 F3d 210 (CA 2, 2001) ................................................................. 42

*People v Aceval*, 282 Mich App 379, 389; 764 NW2d 285 (2009),............................... 38

*People v Barber*, 255 Mich App 288, 294-295; 659 NW2d 674 (2003)........................ 17

*People v Bennett,* 290 Mich App 465, 478; 802 NW2d 627 (2010).............................. 36

*People v Chapo*, 283 Mich App 360,371;770 NW2d 68 (2009).................................... 40

*People v Cline*, 276 Mich App 634, 637; 741 NW2d 563 (2007).................................. 46

*People v Cooper,* 236 Mich App 643, 650-651; 601 NW2d 409 (1999). ...................... 33

*People v Daoust*, 228 Mich App 1, 9-10; 577 NW2d 179 (1998), ................................20

*People v Dobek*, 274 Mich App 58, 71 (2007). ............................................................37

*People v Dobek*, 274 Mich App 58, 94; 732 NW2d 546 (2007). ...................................20

*People v Fenner*, 136 Mich App 45 (1984) ..................................................................48

*People v George*, 130 Mich App 174, 180; 342 NW2d 908 (1983), ............................33

*People v Gonzalez*, 468 Mich 636, 644; (2003),..........................................................51

*People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012). ...................................20

*People v Lee,* 231 Mich 607, 612; 204 NW 742 (1925); ..............................................17

*People v Lindsey*, 83 Mich App 354, 355 (1978);........................................................12

*People v McGhee*, 268 Mich App 600,626;709 NW2d 595(2005). ..............................40

*People v Nowack,* 462 Mich 392, 409-410; 614 NW2d 78 (2000); ..............................17

*People v Pickens*, 446 Mich 298 (1994) ................................................................ 40, 51

*People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994); ............................49

*People v Pratt,* 254 Mich App 425, 430 (2002); ..........................................................51

*People v Reed*, 198 Mich App 639, 646 (1993)...........................................................52

*People v Reed*, 449 Mich 375 (1995) ................................................................... 51, 52

*People v Roger White*, 142 Mich App 581 (1985) .......................................................48

*People v Smith*, 425 Mich 98, 112 (1986). .................................................................43

*People v Smock*, 63 Mich App 610, 616 (1975) *rev'd on other grounds* 399 Mich 282 (1976)...........................................................................................................................13

*People v Ullah*, 216 Mich App 669 (1996). .................................................................48

*People v Watson,* 245 Mich App 572, 588; 629 NW2d 411 (2001). ............................33

*People v Williams*, 114 Mich App 186 (1982)..............................................................12

*People v Wolfe*, 440 Mich 508 (1992) ........................................................................14

*People v. Lester*, 232 Mich. App. 262 (1999),..............................................................38

*People v. Marshall*, 297115 (Mich. App. 11-29-2012 ..................................................40

*Perry v. New Hampshire,* 132 S. Ct. 716, 723 (2012..................................................17

*Rickman v Bell*, 131 F3d 1150 (CA 6, 1997) ..............................................................43

*Rock v. Arkansas,* 483 U.S. 44, 51-52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). ............48

*Roe v. Flores-Ortega,*528 U.S. 470,481,120 S.Ct. 1029,145 L.Ed.2d 985 (2000)..........49

*Rompilla v Beard*, 545 US 374 (2005).........................................................................41

*Royal Ins. Co. of Am. v. Joseph Daniel Constr., Inc.*, 208 F. Supp. 2d 423, 426 (S.D.N.Y. 2002);..................................................................................................................24

*Sanders v. Ratelle*, 21 F.3d 1446 (9th Cir. 1994).........................................................47

*Schlesinger v. United States,* 2012 U.S. Dist. LEXIS 15754, 3, 2012 WL 407098 (E.D.N.Y. Feb. 6, 2012) ..........................................................................................26

*Seehan v. State of Iowa*, 37 F.3d 389 (8th Cir. 1994)..................................................43

*Sims v Livesay*, 970 F2d 1575 (CA 6, 1992); ..............................................................42

*Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) .............52

*Snodgrass v. Ford Motor Co.,* No. 96-1814, 2002 U.S. Dist. LEXIS 13421, at *48-57 (D.N.J. Mar. 28, 2002); ........................................................................................44

*Speigner v. Jago*, 923 F2d 427 (6th Cir. 1991) ...........................................................12

*Stevens v. McBride,* 489 F.3d 883, 896 (7th Cir.2007)................................................46

*Stewart v. Wolfenbarger*, 468 F.3d 338, 361 (6th Cir. 2006)......................................49

*Strickland v. Washington*, 466 U.S. 668; 104 S.Ct. 2052; 80 L.Ed.2d 674 (1984).. passim

*Taylor v Kentucky*, 436 US 478; 98 S Ct 1930; 56 L Ed 2d 468 (1978).......................45

*Travelers Prop. & Cos. Corp. v. Gen. Elec. Co.*, 150 F.Supp.2d 360, (D.Conn.2001).....44

*Tunnell v. Ford Motor Co.*, 330 F. Supp. 2d 707, 725 (W.D. Va. 2004); ......................24

*U.S. v Leon*, 534 F 2d 660 (CA 6, 1975) ....................................................................16

*U.S. v Leos-Quijada*, 107 F3d 786, 794 (CA 10, 1997) ..................................................15

*U.S. v Lopez*, 74 F3d 575 (CA 5, 1996).......................................................................14

*U.S. v Saunders*, 325 F 2d 840 (CA 6, 1964) ...............................................................16

*U.S. v Stewart*, 145 F3d 273 (CA 5, 1998) .................................................................16

*U.S. v. Gholston*, 10 F.3d 384 (6th Cir. 1993) ...........................................................12

*United States ex rel. Bibbs v. Twomey*, 506 F.2d 1220, 1223 (7th Cir. 1974)). .............31

*United States v Sanchez*, 961 F2d 1169, 1173 (CA 5, 1992)( ......................................15

*United States v Solivan,* 937 F 2d 1146, 1150 (6th Cir. 1991). ...................................38

*United States v Wright*, 835 F2d 1249 (CA 8, 1987) ...................................................15

*United States v. Emuegbunam,* 268 F.3d 377, 404 (6th Cir. 2001). ............................36

*United States v. Gaudin,* 515 U.S. 506, 522-23, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).........................................................................................................11

*United States v. Harris*, 558 F.2d 366, 371 (7th Cir.1977).........................................54

*United States v. Hebshie,* 754 F. Supp. 2d 89, 128 n.39 (D. Mass. 2010)...................26

*United States v. Martinez,* 253 F.3d 251, 254 (6th Cir. 1992))....................................36

*United States v. Rusmisel*, 716 F.2d 301 (5th Cir. 1983) .............................................43

*Walker v. Russell*, 57 F3d 472 (6th Cir. 1995) .............................................................12

*Ward v United States*, 995 F2d 1317 (CA 6, 1993) .....................................................43

*Ward v United States*, 995 F2d 1317 (CA 6, 1993). ....................................................48

*Weygandt v. Ducharme*, 774 F.2d 1491 (9th Cir. 1985)..............................................43

*Wiggins v Smith*, 539 US 510 (2003).........................................................................41

*Wiggins v. Smith,*539 U.S. 510,527,123 S.Ct. 2527,156 L.Ed.2d 471(2003)................49

*Williams v. Taylor*, 529 U.S. 362, (2000)......................................................................1

*Workman v. Tate*, 957 F.2d 1339 (6th Cir. 1992) ......................................................46

**Statutes**

§ 2254(d)( ................................................................................................ 1

28 U.S.C. § 2254 ..................................................................................... 1

28 U.S.C. § 2254(d). ............................................................................. 16

MCL 600.2955(1) .................................................................................. 20

MCL 750.316(1)(b), .............................................................................. 12

MCL 750.72 ........................................................................................... 17

MCL 750.72: .......................................................................................... 12

**Other Authorities**

M Crim JI 31.1 ...................................................................................... 17

NFPA 921, Guide for Fire and Explosion Investigations, 2008 Edition ......................... 25

**Rules**

MCR 6.508(D) ........................................................................................ 55

MRE 702 .......................................................................................... 20, 21

**Constitutional Provisions**

Const 1963, Art 1, §17 ......................................................................... 51

Const 1963, Art 1, §20 .................................................................... 40, 51

U.S. Const., Amend. VI .......................................................................... 40

US Const, Amend VI ........................................................................ 40, 51

## <u>STATEMENT OF QUESTIONS PRESENTED</u>

I      WHETHER THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN PETITIONER'S CONVICTION OF ARSON?

Petitioner answers "Yes".

II.    WHETHER PETITIONER'S CONVICTION WAS BASED UPON INCOMPETENT, UNRELIABLE EVIDENCE THAT MISLED THE JURY, SUPPLANTED JURY FACT FINDING, WAS MANIFESTLY UNJUST, AND DENIED DUE PROCESS?

Petitioner answers "Yes".

III.   WHETHER PETITIONER DENIED DUE PROCESS AND FUNDAMENTAL FAIRNESS BY PROSECUTORIAL MISCONDUCT IN VOUCHING, BOLSTERING, PROVIDING EVIDENCE AND DELIBERATELY MISLEADING THE JURY?

Petitioner answers "Yes".

IV.   WHETHER INEFFECTIVE ASSISTANCE OF COUNSEL DENIED PETITIONER A FAIR TRIAL?

Petitioner answers "Yes".

V.    WHETHER PETITIONER WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL?

Petitioner answers "Yes".

## STANDARD OF REVIEW

Habeas relief is available where a state prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254 (a). A court may not grant a habeas petition for "any claim that was adjudicated on the merits in State court proceedings" unless the state proceedings:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the    State court proceeding. § 2254(d).

The "unreasonable application" clause authorizes federal courts to grant the writ when a "state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). For a federal court to grant habeas relief, the state-court application of federal law must be "objectively unreasonable." *Supra.*

Under § 2254(d)(1)'s "contrary to" clause, courts may grant the writ if the state court: (1) reaches a conclusion on a question of law opposite to that reached by the Supreme Court; or (2) decides a case differently than the Supreme Court has on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Under § 2254(d)(2)'s "unreasonable application" clause, courts may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the case. *Supra* at 413.

1

## STATEMENT OF CASE

***Statement of Proceedings:***

Petitioner Linda Kay Stermer was charged with premeditated murder and felony murder, (arson), arising out of the January 7, 2007 death of Todd Stermer in Van Buren Circuit Court. On January 13, 2010, Petitioner Stermer was convicted by a jury on both charges.  On February 8, 2010, Judge William C. Buhl vacated the premeditated murder conviction, and then meted out a life sentence to Petitioner on the felony murder charge.

The Michigan Court of Appeals affirmed her conviction June 23, 2011, docket no. 297057.  The Michigan Supreme Court denied leave November 21, 2011, in docket no 143546.  Habeas relief was sought in this Court, *Stermer v Warren*, 12-cv-14013-AJT-DRG.   On December 10, 2012, this Court entered an Opinion and Order holding the Petition for Habeas Corpus in abeyance to permit Petitioner to raise issues using State of Michigan post-conviction procedures made and providing for collateral attack of her conviction. (R. 10).

On July 13, 2013, Petitioner filed a pro per Motion for relief from judgment raising issues of ineffective assistance of appellate counsel, ineffective assistance of counsel; prosecutorial misconduct, and, constitutional error in allowing incompetent and unreliable opinion testimony that misled the jury.  Motion for appointment of counsel was also made, and granted on September 23, 2013; the court appointing attorney Michael Skinner to prepare and file pleadings.  Attorney Skinner advised he wanted to discuss the case during a prison visit, but no such prison visit was made,

2

and on March 6, 2014, the motion was denied before any visit and discussion of the case was conducted. (Copies of emails between Skinner and Petitioner in Appendix). Timely  Reconsideration was denied by the trial court.

Appeal was sought with the Michigan Court of Appeals and denied by Order of December 11, 2014 in docket no. 323443.  Motion for Reconsideration was denied on February 19, 2015. Petitioner sought leave to appeal with the Michigan Supreme Court and was denied by Order on November 24, 2015 in docket no. 150997.

This is Petitioner's Brief in Support of her Amended Petition filed contemporaneously with a Motion to Lift the Stay previously entered by this Court.

### *Statement of Facts:*

Petitioner Linda Kay Stermer and Todd Stermer had been married for 14 years, and lived with three sons in their Lawrence Township home; a home they were building and still under construction with areas of the house had not yet been closed up, leaving unfinished ceilings exposing rafters in the basement and uncovered floorboards in the living room.  (T I, 266-267; T IV, 110; T V, 78).

The home was located in a rural area with the house situated some 250 yards from the road, with a driveway that sloped downward, turning into a path that had been made at the rear of the home onto a mostly sandy, unpaved area. (T II, 11, 215-216).  The home faced east, with a long driveway on the north side, and featured a walk-out basement, with a fireplace in the middle of the home. (See drawings and design in Appendix).

The Stermer's kept 31 horses and also used the property for farming, often purchasing gas for equipment from the same nearby gas station; it was not uncommon for gas cans to be found around the front yard.    (T II 564; T IV, 16, 113, 159:T V, 9, 76-77, 113).   Two of the sons, Cory Pierce and Trevor Stermer said that when gas cans for the equipment were empty and needed to be refilled, it was customary to leave the cans in the front porch area, instead of the shed, as a reminder to get more gas.  (T IV 159; T V 113).

On January 7, 2007, neighbors Mike Matheny and Connie Calhoun were leaving to go bowling around 3:30 p.m., and as they passed the Stermer's property, they noticed smoke so they proceeded up the Stermer driveway to offer assistance. (T II, 43-44, 55, 71-72).    Petitioner was getting out of her van and was "hysterical" as Matheny and Calhoun asked where the boys were; Matheny went and walked around and eventually found Todd lying on the ground by the fuel tank near the house. (T II 49-50, 57-61, 65, 67-68, 77-78).  Mike Matheny had passed by Todd's body three times before he noticed where Todd was located.  (T III 50-51).   Mike Matheny described Todd's burns as being on the neck, head, and hands.  (T II, 51).

Another neighbor, Dr. Moussali, and his sons were doing chores outside, when he noticed smoke so they proceeded down the driveway and saw Matheny, Calhoun, Petitioner, and a body lying on the ground.  (T II 99-100).  Dr. Moussali checked for breathing and a pulse, found Todd was not conscious, and noticed Todd's tongue was bruised; he did not notice any lacerations or bleeding. (T II 101-104).  Dr. Mousssali said Petitioner was "wailing" and crying and had heard Petitioner wailing

4

from his home, 1/3 mile away.  (T II 106).  Other neighbors also described Petitioner Stermer as laying over Todd and screaming his name repeatedly in a "hysterical manner" at this time.  (T II, 23, 28, 63, 81, 110).

When the police responded, some 7 minutes after being dispatched, they found the house fully involved in fire.  (T II, 3-4, 12).  The police also saw five people had gathered around Todd Stermer, who was lying on muddy ground, 46 feet from the north side of the home, bleeding from his head, badly burned, but alive.  (T II, 12-13, 16, 58: T III, 43-44).  Three responding officers, Evans, Guss and Leach, also said Petitioner was "crying" and "hysterical". (TII, 28, 154, 111-112).

Todd's clothes had been removed, except his sweatpants and socks, which remained around his ankles, and Mike Matheny provided clothing from his truck to cover Todd until emergency personnel arrived.  (T II, 14, 35-36, 51, 64; T III, 45-46, 90-91).

Before rendering medical assistance, Todd Stermer first had to be put onto a sled and moved away from the burning home and the adjacent oil tank, (for the fuel oil furnace).  (T II, 16-19).  Fire Chief Leach was the first emergency responder, and, upon medical assessment, found Todd breathing, with a pulse, but with a lot of blood in his mouth; CPR was administered for about 30 minutes.  (T II, 113, 117, 156-157).

Todd Stermer did not survive and forensic tests and examinations were conducted.  Pathology examination revealed serious burns over the body, blunt force injuries manifested as lacerations and linear abrasions on head and back, rib fractures, and shallow skull fractures.  (T III, 6-7, 11). Soil and small amounts of soot

5

were found in the nasal cavity. (T III 12-13, 26). Dr. Markey noted the blunt force injuries did not contribute to death and could have occurred pre or post mortem, so cause of those specific injuries was not determined during his forensic examination. (T III 14-16). Similarly, rib fractures found were typical of trauma resulting from CPR being administered. (T III, 11, 23). Toxicology results were unremarkable as to alcohol or controlled substances, except finding Hydrocodone (Vicodin) present in the urine, but not in the blood, suggesting it was either consumed a few days earlier, or had been a small dose. (T III 31, 34).

Forensic pathologist Michael Markey determined death was from thermal injuries and smoke inhalation and the manner of death was "undetermined", as there was an insufficient basis to conclude homicide. (T III, 12-13, 33).

Concerning the events leading up to the fire, testimony and investigation results were provided. Petitioner had related to Deputy Guss that she was downstairs doing laundry when she heard yelling, went upstairs and saw the flames, so she left through the front door, got in the van to get help; when she saw Todd outside he was removing his clothing. (T II, 147-148, 158-160).

Detective Gabrielle Rought interviewed Petitioner who told her the house was heated by fuel oil and there were a couple of oil lamps, and, on that day, Todd awoke at 10.00 am feeling ill, she made him breakfast, and they briefly argued over her use of a debit card; Petitioner did not want their sons to hear the argument and sent them to see a movie at the mall. (T IV 32, 34, 41-42, 77-78).

The argument ended without talk of divorce or leaving, and, without threats of harm or suicide;  Todd began watching hunting shows on the television in the living room as a fire was going in the fireplace; Petitioner went to read information for medications for her son, and fell asleep.  (T IV 36, 69, 77).  Petitioner was awakened by Todd asking for juice, which she got for him, after which she went downstairs to do laundry.  (T IV 36).  Clothing was found in the machine by the police.  (T III 219).  Connie Calhoun, stated she later was told by Petitioner that she was downstairs doing laundry when she heard Todd scream. (T II 82).

Petitioner had also related to Det. Rought, that she heard Todd scream and ran upstairs being confronted by smoke and fire and ran outside, got into the van to drive over to Mike Matheny's for help.  (T IV 38). At that time, she saw Todd, running and shedding his clothes, but while Petitioner turned the van around she lost sight of Todd, and then saw him on the ground being helped by neighbors.  (T IV 39).

Transcripts of interviews of Petitioner, relating to the home-owners insurance claim, were also introduced. (T II 202, T IV 44-45).

The Stermer boys, Trevor, age 15, Trenton, age 13, and Cory, age 17, stated Petitioner sent them to a movie to avoid hearing their parents argue that day; they had also heard them arguing the night before. (T IV 102-103, 122, 129,  145, 147).    Cory Pierce heard Todd accuse Petitioner of cheating on him and talking about a divorce.  (T IV 147-148).

When Trevor, Trenton and Cory left for the movie, Todd Stermer was on the couch in the living room, watching television. (T IV 106, 125, 150).  Cory and

Trenton said after they got up Petitioner gave them money for the movies and sent them to the mall. (T IV 132, 158-159).   Breakfast was already over when they left. (T IV 152).   The three were in a movie when they were contacted about their house being on fire.  (T IV 104, 127, 152).

Cynthia DeLoach, cashier from the gas station where the Stermers often stopped, said that on the day of the fire, Petitioner had stopped and bought gas, bread and eggs, paying with a credit card at 9:00 am for a sale of $11.01.  (T IV  5-6, 12, 14).  Cashier DeLoach did not notice anything different about Petitioner that day as compared to any other day, as the Stermers frequently purchased small amounts of gasoline for equipment used at their home at that station.  (T IV 16).

The prosecutor called further civilian witnesses, including Todd's mother, who said Todd was treating an ear infection at the time with a prescription that made him drowsy. (T I 275-277). Todd's mother also indicated that Todd had two prior homes that had also "burned to the ground", and this was the 3rd home of Todd's that had been consumed by fire. (T I 285).  Also presented was Chris Williams, who stated he was sexually involved with Petitioner during that time.  (T IV 208).

Another witness called by the prosecutor was a Ms. Kate Fox, who related stories of Petitioner talking about shooting or running over Todd with a car, and how after the fire, she wanted to sneak back into the home to retrieve a mug that might contain traces of a sedative that had been planned to be given. (T IV 178, 181).   This testimony was impugned upon further examination, when Kate Fox admitted she had been "committed" to a mental hospital in January of 2007, that she and Petitioner had

8

ended their friendship in July of 2007 because of $5000 Fox believed she was owed, and, that Fox had later been charged and convicted with criminally assaulting Petitioner in Kalamazoo County. (T IV 184-185, 188, 190, 195).

Two more witnesses provided by the prosecutor were Veronica Tracy and Dardeda Gordon, both jail inmates who claimed to have heard Petitioner confess to the crime by drugging, clubbing and lighting the victim on fire; however, both admitted suffering from mental illness and were off their medications during the time of this alleged encounter with Petitioner.  (TII 143; T III 168-169).   Each of these inmates provided illuminating testimony, such as Veronica Tracy whose behavior was described by the prosecutor as "out there" and when asked how she controlled her anxiety and psychotic episodes responded "I worked out, the bars. I jammed every day" (T II 143), and, Ms. Gordon, who is prescribed Seroquel,  and told the jury she was not guilty of attempted uttering and publishing, the offense she had pled to and was serving, because she had lied to the judge in that case, (T III 165).

The defense called Linda Barton, Amber Papesh and Amy Loren, three other jail inmates who knew Petitioner and testified she never discussed her case and was never seen speaking with Ms. Tracy or Ms. Gordon.  (T V 33, 58, 68-69).

On the issue of cause and origin of the fire, the prosecutor presented local authorities who offered their opinions.   Fire   Chief   Leach,   the   first   emergency responder, saw a lot of heavy black smoke, which to him suggested a fast moving fire that been burning for some time. (T II, 110-111, 116, 122).

Fire Marshall Scott Leroy personally took into possession the sweat pants worn by Todd, and then returned the next day to conclude his investigation.  (T III 182-184).   Investigating authorities subjected clothing collected from the scene for testing: Todd Stermer's sweatpants and socks tested positive for gasoline, as did one of the shirts Matheny, a salvage yard owner, had provided from his truck. (T III 139-142, 148: Exam, 68).   Petitioner's clothing was also tested, (sweater, pants and socks) and all were negative for gasoline or ignitable fluids.  (T III 141, 148).

The scene was also subjected to a canine search: no accelerants were detected, though the canine did "hit" on a leak from the fuel oil furnace.  (T III 205-296). Samples were also sent for examination to forensic chemist, Craig Balliet, who could only find turpentine residue, but explained such a finding is meaningless where turpentine is present in the lumber used for home construction and would be present in fire logs. (T II 169, 173).

Fire Marshall Leroy thought that Todd was in the middle of an intense fire for a short period of time. (T III 201).  Supporting physical evidence of arson could not be found in the living room area, but the Fire Marshall explained this was due to the first floor having burnt away.  (T II, 197-198).  He then further opined the cause of the fire was arson because of the speed and intensity of the fire and after comparing areas of greater fire damage with areas of lesser fire damage, applying an old adage: "…the longer fire burns, the more damage it is going to create and…the longer it burns is where the fire starts…" (T III, 186, 197-199, 208).

10

## ARGUMENT

### I. THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN PETITIONER'S CONVICTION OF ARSON.

Due process requires that no criminal conviction be sustained unless each fact the prosecutor is required to prove for conviction is supported by proof beyond a reasonable doubt. "[T]he Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358 (1970).

> "The Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged." *United States v. Gaudin,* 515 U.S. 506, 522-23, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).

Applying the Due Process Clause, the United States Supreme Court has held that a federal court may determine whether a rational trier of fact could have found the existence of all the elements needed for conviction for a state offense. *Jackson v. Virginia,* 443 U. S. 307, 314 (1979).

The *Jackson* Court discussed the importance of the *Winship* rule :

> "The standard of proof beyond a reasonable doubt, said the Court, "plays a vital role in the American scheme of criminal procedure," because it operates to give "concrete substance" to the presumption of innocence to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding."

11

Under *Jackson* the evidence is viewed in the light most favorable to the prosecution, and then determined whether the evidence so viewed can reasonably be said to constitute proof beyond a reasonable doubt.  Or, as stated in *U.S. v. Gholston*, 10 F.3d 384 (6th Cir. 1993):

> "whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   See *Walker v. Russell*, 57 F3d 472 (6th Cir. 1995); *Speigner v. Jago*, 923 F2d 427 (6th Cir. 1991).

Petitioner was convicted of felony murder, pursuant to MCL 750.316(1)(b), imposing life for "murder committed in the perpetration of, or attempt to perpetrate, arson…"   The underlying felony predicate of arson is defined by MCL 750.72:

> Any person who willfully or maliciously burns any dwelling house, either occupied or unoccupied, or the contents thereof, whether owned by himself or another, or any building within the curtilage of such dwelling house, or the contents thereof, shall be guilty of a felony, punishable by imprisonment in the state prison for not more than 20 years.

The elements of arson are: (1) the burning of a dwelling house, (2) by, or at the direction of, or with the assistance of the defendant, and, (3) the defendant maliciously or willfully set the fire.   *People v Lindsey*, 83 Mich App 354, 355 (1978); *Gardner v Kapture*, 261 F. Supp 2d 793 (ED Mich, 2003).   As a result of these specific elements, it is insufficient to simply show the premises were burned as that circumstance only permits the presumption that the fire was accidentally caused. *People v Williams*, 114 Mich App 186 (1982).  Similarly, 'mere opportunity' to commit

arson is also insufficient as proof; the prosecutor must also show the defendant willfully caused the burning. *People v Smock*, 63 Mich App 610, 616 (1975) *rev'd on other grounds* 399 Mich 282 (1976).

The claim that the fire was intentionally set was made by the fire marshal based exclusively upon the speed and intensity of the fire for which he had assumed was of a house fully constructed with completed walls, ceilings and flooring; however that presumption was false in this case and the fire marshal conceded that an unfinished house would burn quicker than normal due to the lack of available materials to provide the fire with fuel.  (T III, 197-199, 208).

When other circumstantial evidence is considered, there is even less proof implicating Petitioner. The prosecutor had made claims that Petitioner had drugged Todd, however, when actual science becomes involved, the toxicology results revealed nothing in the blood, and trace amounts of Todd's prescribed medicine in his urine, taken days earlier. (T III 31, 34).   Further, Todd was supposed to be on a medication that made him "loopy" and affected his equilibrium.  (T I, 275-277; T IV 132, 158-159).

Additionally, the prosecutor claimed Petitioner introduced gasoline to cause the fire, however, no accelerant was found by the canine detecting dog or by forensic analysis. (T II 169, T III 205-296). The forensic analysis only confirmed the unfinished nature of the house. (T II 173).  Further analysis revealed no gasoline vapors or accelerants on Petitioner and her clothing, but gasoline was found on Todd's clothing. (T IV, 41-42, 77-78).   If Petitioner introduced the gasoline, the vapors would have

13

been detected on her person and clothing, and it was not.  The chemist noted that presence of gasoline in no way provides any indication of how the gasoline got there. (T III, 147).

The home had two active sources of flames, the fire place and the fuel oil furnace, and the testimony provided was that it is vapors of evaporating gasoline that ignites when near a source.   (T III, 224-225).  Todd himself, had been involved in two prior fires of his residences, this was his third house fire. (T I, 283-285; T IV 82-83).  It is more than likely Todd had started the fire and accidentally set himself on fire under the circumstances presented.  Even the evidence that Todd's burns were confined to the neck, head, and hands is consistent with Todd accidentally setting himself on fire.  (T II, 51).   Todd's hands and fingers were actively involved in the fire, as if his hands themselves had caught on fire.  (T III, 22, 26-27).   The physical and forensic evidence does not implicate Petitioner and the remaining circumstantial evidence was legally insufficient to convict.

Due process requires reversal if the reviewing court finds that the evidence is such that a reasonable jury could not determine beyond a reasonable doubt that the prosecution proved all the elements of the offense.  *People v Wolfe*, 440 Mich 508 (1992); *Jackson v. Virginia*, supra.   In *U.S. v Lopez*, 74 F3d 575, 577 (CA 5, 1996), the Court applied this rule to cases based on circumstantial evidence:

> "If the evidence, however, gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, we must reverse the conviction, as under these circumstances "a reasonable jury must necessarily entertain a

reasonable doubt." *United States v Sanchez*, 961 F2d 1169, 1173 (CA 5, 1992)(quoting *Clark v Procunier*, 755 F2d 394, 396 (CA 5, 1985)(emphasis in original) , cert. denied , US , 113 S. Ct. 330, 121 L. Ed. 2d 3156 (1992)."  See also *United States v Wright*, 835 F2d 1249 (CA 8, 1987).

The Court in *Jackson v Virginia* discussed the fact that triers of fact on occasion will convict a defendant even if a rational trier of fact could not properly find proof beyond a reasonable doubt, and that in such a case it is the duty of the reviewing court to grant relief:

> "Yet a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt, and the same may be said of a trial judge sitting as a jury.  In a federal trial, such an occurrence has traditionally been deemed to require reversal of the conviction.  [Cites omitted].  Under *Winship*, which established proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process, it follows that when such a conviction occurs in a state trial, it cannot constitutionally stand."

"The evidence supporting conviction must be substantial and must do more than raise a mere suspicion of the defendant's guilt."  *U.S. v Leos-Quijada*, 107 F3d 786, 794 (CA 10, 1997).

As the Court held in *Cosby v. Jones*, 682 F.2d 1373, 1383 (11th Cir.1982):

> "[I]f the reviewing court is convinced by the evidence only that the defendant is more likely than not guilty then the evidence is not sufficient for conviction."

15

In *Speigner v. Jago*, supra, the Court found that the preponderance of the evidence supported the petitioner's guilt, but since it fell short of proof beyond a reasonable doubt, they were required to reverse.  See also *U.S. v Stewart*, 145 F3d 273 (CA 5, 1998):   "A verdict may not rest on mere suspicion, speculation or conjecture, or on an overly attenuated piling of inference on inference."

Stated another way, where the proofs, taken most favorably to the prosecutor, present no more than a choice between competing probabilities, a judgment of acquittal must enter. *U.S. v Saunders*, 325 F 2d 840 (CA 6, 1964), and *U.S. v Leon*, 534 F2d 667 (CA 6, 1976).

*Jackson v. Virginia,* 443 U. S. 307, 314 (1979) requires proof on each element of the charged offense to sustain a conviction, and the evidence submitted to Petitioner's jury was insufficient.

Petitioner submits the state court appellate ruling was an objectively unreasonable application of established law, and, an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, meriting relief pursuant to 28 U.S.C. § 2254(d).

## II. PETITIONER'S CONVICTION WAS BASED UPON INCOMPETENT, UNRELIABLE EVIDENCE THAT MISLED THE JURY, SUPPLANTED JURY FACT FINDING, WAS MANIFESTLY UNJUST, AND DENIED DUE PROCESS.

Petitioner was convicted of felony murder, the underlying felony being arson of dwelling.  In order to sustain a conviction, the prosecution must prove three elements beyond a reasonable doubt: (1) defendant burned a building or structure, (2) the building or structure was a dwelling house, and (3) when defendant committed the act, she either intended to burn the dwelling or any of its contents, or she intentionally committed an act that she knew had a very significant risk of burning the dwelling or its contents and disregarded that risk. MCL 750.72; *People v Nowack,* 462 Mich 392, 409-410; 614 NW2d 78 (2000); *People v Barber*, 255 Mich App 288, 294-295; 659 NW2d 674 (2003).

Where the evidence only demonstrates that a fire occurred, there is a presumption that the fire was caused accidentally. *People v Lee,* 231 Mich 607, 612; 204 NW 742 (1925); *People v Williams*, 114 Mich App 186, 193; 318 NW2d 671 (1982); M Crim JI 31.1.

The United States Supreme Court has generally held that the Constitution "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Perry v. New Hampshire,* 132 S. Ct. 716, 723 (2012). Constitutional safeguards such as the right to counsel and confrontation of witnesses

17

serve to allow a defendant to challenge the reliability and credibility of evidence produced at trial. Supra.

However, it is "when evidence is so extremely unfair that its admission violates fundamental conceptions of justice, *Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (internal quotation marks omitted), have we imposed a constraint tied to the Due Process Clause". *Perry*, supra.  Habeas relief is also warranted where a state court's evidentiary ruling was so egregious that it resulted in a denial of fundamental fairness and thus violated the petitioner's right to due process. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  A conviction based on unreliable expert testimony violates due process. See, e.g., *Han Tak Lee v. Glunt*, 667 F.3d 397 (3rd Cir. 2012).

The prosecutor's theory of arson was premised upon Fire Marshal Leroy's investigation of the cause and origin of the fire.  According to Fire Marshall Leroy, the fire originated towards the west side of the home because when he stood in the basement and was able to look up at the sky, and saw the upper level, including the roof, was totally burned away;  a portion of the second story had collapsed inward; there was less damage on the east side, (front), and the north side, (driveway); and, not much fire came out of the lower west side, (back), where the basement with sliding doors was located. (T II 189-191, 214-215). Fire Marshall Scott Leroy opined the fire originated in the center of the first-floor living room because the second floor had collapsed inward and structural lumber remained intact around the fireplace.  (T III 192, 197, 216).

18

The Fire Marshal conceded that other factors or circumstances, such as oily rags and similar materials on the burnt away floor could have been present but consumed in the fire having faster burning rates.  (T III 206, 208).

Even these assumptions made by Leroy were already pyramided upon other assumptions:

> "Q.          The fire itself was bigger in the middle of the room than it was on the - - either the interior or exterior wall because the floor and ceiling above it was totally consumed?
>
> A.          Probably."  (T III 217).

Petitioner submits Scott Leroy was not qualified to express an expert opinion on the cause and origin of the fire; or any opinion when based upon inherently unreliable and incompetent evidence that constituted nothing more than a guess or hunch lacking any methodology and application of scientific method.

Petitioner claims the jury should not have been exposed to the testimony and opinion of Fire Marshall Leroy, and such exposure denied a fair trial and due process.[1]

"Before permitting expert testimony, a trial court must find that the evidence is from a recognized discipline, relevant and helpful to the trier of fact, and presented by a qualified witness." *People v Daoust*, 228 Mich App 1, 9-10; 577 NW2d

---

[1]  In Issue IV, Petitioner argues that counsel was ineffective in his investigation and preparation for trial, failure to move for suppression of testimony and evidence, ineffective cross-examination, and failure to introduce evidence that also involve the same standards provided herein.

19

179 (1998), *People v Dobek*, 274 Mich App 58, 94; 732 NW2d 546 (2007).    Expert testimony is admissible under MRE 702 and *Daubert v Merrell Dow Pharm, Inc,* 509 US 579, 593-594; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

> MRE 702 provides:

>> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MCL 600.2955(1) provides additional standards that the court must examine in determining the admissibility of expert testimony.

A trial court considering whether to admit expert testimony under MRE 702 acts as a gatekeeper and its principal duty is to ensure that all expert testimony is reliable. *Gilbert v DaimlerChrysler Corp,* 470 Mich 749, 782, 789; 685 NW2d 391 (2004) citing and relying upon United States Supreme Court case law. Specifically, MRE 702 requires "a court evaluating proposed expert testimony [to] ensure that the testimony (1) will assist the trier of fact to understand a fact in issue, (2) is provided by an expert qualified in the relevant field of knowledge, and (3) is based on reliable data, principles, and methodologies that are applied reliably to the facts of the case." *People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012).

The Michigan Supreme Court has explained:

20

"MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data. Thus, it is insufficient for the proponent of expert opinion merely to show that the opinion rests on data viewed as legitimate in the context of a particular area of expertise (such as medicine). The proponent must also show that any opinion based on those data expresses conclusions reached through reliable principles and methodology." [*People v Dobek,* 274 Mich App 58, 94; 732 NW2d 546 (2007), quoting *Gilbert*, 470 Mich at 782.]

Stated differently, MRE 702 calls for fact and data based conclusions and the question is whether the expert's opinion can reliably follow from the facts known to the expert and the methods used. It follows that if an opinion is drawn from unsupported speculation or beliefs, then the opinion is necessarily unreliable.

Recent advances in fire science and the acceptance and reliance on the scientific method have completely dispelled the myths and misconceptions previously relied on by fire investigators, including the investigators who investigated the fire in Petitioner's home and testified at her trial. While fire investigation now is largely considered to be a scientific pursuit, in the past, fire investigation was considered by many as more of an "art" than science, with investigation techniques and beliefs passed down through apprenticeship rather than scientific or academic study. See Marc Price Wolf, *Habeas Relief from Bad Science: Does Federal Habeas Corpus Provide Relief for Prisoners Possibly Convicted on Misunderstood Fire Science?* 10 Minn. J. L. Sci. & Tech. 213, 213-17 (2009). Conclusions were often reached by observation alone rather than application of the scientific method. Supra.  In 1992,

21

the National Fire Protection Association first published NFPA 921: Guide for Fire and Explosion Investigations, which eventually came to be regarded amongst fire investigators and courts as the standard for fire investigation methodology and interpretation. Supra. at 218. Over the past two decades, multiple editions of NFPA 921 have been published in an effort to keep up with the continuous scientific advancements in fire investigation. Supra. In 1999, however, NFPA 921 was not followed by a vast majority of fire investigators. Id. at 219. In the 1999 United States Supreme Court case *Kumho Tire Co. v. Carmichael,* 527 U.S. 137 (1999), the International Association of Arson Investigators (IAAI) went so far as to file an amicus brief objecting to the scientific classification of fire investigation and the application of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to the profession. *Carmichael*, 527 U.S. at 140; see Rachel Dioso-Villa, Scientific and Legal Developments in Fire and Arson Investigation Expertise in Texas v. Willingham, 14 Minn. J. L. Sci. & Tech. 817, 827, fn. 46 (2013). The Court ultimately rejected the IAAI's position, finding that all expert testimony is subject to a reliability challenge under *Daubert*. 526 U.S. 137, 147 (1999).

Despite the Court's ruling in *Kumho Tire v. Carmichael*, NFPA 921 and like sources that focus on the scientific underpinnings of fire investigation were not immediately accepted by the fire investigation profession. Studies conducted by ATF showed that even the most experienced fire investigators still made grave mistakes, especially in post-flashover fires. See Steven W. Carman, Improving the Understanding of Post-Flashover Fire Behavior, International Symposium on Fire

22

Investigation Science and Technology 221, 222 (2008), available at http://www.nacdl.org/uploadedFiles/files/resource_center/topics/post_conviction/ATF _SA_Carm an_Post_Flashover_Fires_ISFI_08.pdf.  Flashover occurs when, as with the fire in Ms. Garcia's home, the fire spreads rapidly to all exposed combustible materials and progresses to full room involvement. See Ex. B at 8, 15 (citing National Fire Protection Association, NFPA 921: Guide for Fire & Explosion Investigations 6.3.7.11.1 (2011 Ed.)).

In 2005, a training exercise was conducted by the ATF in which two identical cells were burned to the point of flashover and fifty-three fire investigators were asked to determine in which quadrant of each cell the fire started. For each cell, only three of the fifty-three investigators correctly identified the quadrant of origin, a rate of 5.7%. See Carman, supra, at 221. General  analysis of the fire investigation profession further showed that many investigators continued to treat fire investigation as an "art." In 2009, the National Academy of Sciences, in a landmark report addressing several forensic sciences, acknowledged that a number of fire investigators continued to make determinations regarding the intentional setting of a fire using "rules of thumb" that had been discredited. It was recommended that further experimentation was needed "to put arson investigations on a more solid scientific footing." Strengthening Forensic Science in the United States: A Path Forward, The National Academy of Sciences, 173 (2009).

Gradually, however, the treatment of fire investigation as a science has come to pass. Following *Kumho Tire v. Carmichael*, the International Association of

Arson Investigators endorsed NFPA 921 and in 2013, the IAAI issued a position statement acknowledging that NFPA 921 is an "authoritative guide for the fire investigation profession." International Association of Arson Investigators, NFPA 921/1033: IAAI Position Statement, http://firearson.com/nfpa- 921/1033.   Further, the U.S. Department of Justice issued a research report recognizing NFPA 921 as a "benchmark" for the training of those who make cause and origin determinations. Wolf, supra at 218 (citing U.S. Dep't of Justice, Fire and Arson Scene Evidence: A Guide for Public Safety Personnel 6 (2000)). Many courts, too, began to recognize NFPA 921 as the national standard of care for fire investigation. See *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 849-50 (D. Ohio 2004); *Tunnell v. Ford Motor Co.*, 330 F. Supp. 2d 707, 725 (W.D. Va. 2004); *McCoy v. Whirlpool Corp.*, 214 F.R.D. 646, 653 (D. Kan. 2003); *Royal Ins. Co. of Am. v. Joseph Daniel Constr., Inc.*, 208 F. Supp. 2d 423, 426 (S.D.N.Y. 2002); *Abon, Ltd. v. Transcontinental Ins.*, No. 2004-CA-0029, 2005 LEXIS 2847, at *30 (Ohio App. June 16, 2005).

The fire investigation paradigm truly shifted in recent years as many convictions have been overturned based upon modern fire science. See The National Registry of Exonerations, Browse Cases, www.law.umich.edu/special/exoneration/Pages/detaillist.aspx (cases of Joseph Awe, Kristine Bunch, David Lee Gavitt, James Hebshie, and Ernest Willis); see also Sharon Gribsy, Edward Graf to get new trial, dallasmorningviewsblog.dallasnews.com/2013/01/edwardgraf-to-get-new-trial.html/ (Ed Graf case, Texas); Chris Lamphere, Man's sentence vacated after serving 4 years

on                                      arson                                      conviction,

www.cadillacnews.com/news_story/?story_id=1810720&issue=20130703&year=2013

(accessed Nov. 13, 2013) (Victor Caminata case, Michigan).

Some states have taken steps to address the number of wrongful arson convictions, most notably Texas, which has developed a Science Advisory Workgroup to review previous arson cases and has passed a law that provides a procedure for challenging wrongful arson convictions. See Texas Dept. of Insurance, Texas State Fire Marshal's Office and the Texas Forensic Science Commission, www.tdi.texas.gov/fire/fmfsc.html (accessed November 12, 2013); Tex. Code Crim. Proc. Ann. art. 11.073 (West 2013).

The NFPA 921, Guide for Fire and Explosion Investigations, 2008 Edition, provides standards for investigating cause and origin of fire that outright reject Fire Marshal Leroy's basis for his opinion.

Fire investigation is a science and in 1992 the National Fire Protection Association (NFPA) in publication *NFPA 921* began promulgating the means and methods of proper fire investigations.   *NFPA 921* has emerged as the prevailing authority among fire investigators for everything from providing initial notice of a fire, to the procedures under which a proper lab examination is to be conducted, and all steps in between.

The NFPA "is an international nonprofit that now, among other things, promotes codes and standards 'intended to minimize the possibility and effects of fire and other risks.'" *Schlesinger v. United States,* 2012 U.S. Dist. LEXIS 15754, 3, 2012

25

WL 407098 (E.D.N.Y. Feb. 6, 2012) NFPA 921: Guide for Fire & Explosion Investigations "is widely accepted as the standard guide in the field of fire investigation." *United States v. Hebshie,* 754 F. Supp. 2d 89, 128 n.39 (D. Mass. 2010).

In this case, Fire Marshal Leroy did more than deviate and ignored *NFPA 921* standards when conducting his investigation and never should have been allowed to testify as an expert in the first place. The theory and factual basis for Fire Marshal Leroy's conclusion was based upon:

> "[C]omparing most damage versus least damage and specifically fire damage. The theory behind is that the longer fire burns, the more damage it is going to create and the …. longer it burns, is where the fire starts. That's where the fire first starts, it burns the longest, it's going to create the most damage." (T III 186).

Initially, the premise of the theory is fundamentally flawed and rejected by scientific standards. Consider NFPA 921 5.10.1.1 and 5.10.1.4:

> 5.10.1.1 The rate and pattern of fire development depend on a complex relationship between the burning fuel and the surrounding environments.

> 5.10.1.4    The rate of fire growth as determined by witness statements is highly subjective. Many times witnesses are reporting the fire growth from time of discovery, which cannot be directly correlated to ignition time. The rate of fire growth is dependent on many factors besides fuel load, including fuel configuration, compartment size, compartment properties, ventilation, ignition source, and first fuel ignited. Eyewitnesses reporting a rapid rate of fire growth should not be construed as data supporting an incendiary fire cause.

26

Scott Leroy made his guess without bothering to consider what had been inside the house, (furniture, contents, type of ceilings, condition of construction—sources of fuel), and did not bother to calculate, let alone contemplate, the fuel load of the structure or that it was still under construction at the time of the fire.

Consideration of these factors was necessary for Leroy's opinion because:

> "[a]lthough areas immediately over the source of heat and flame will generally experience heating before the other areas to which the fire spreads, circumstances can occur where fuel at the origin burns out quickly, but the resulting fire spreads to an area where a larger supply of fuel can ignite and burn for a longer period of time. This process can cause more damage to the ceiling in that area than in the areas immediately over the origin."   NFPA 921 6.3.3.1.2.

The approach of Scott Leroy was contrary to the provided methodology provided by NFPA 921.  Consider provisions for "*Origin Determination*"

> 17.2 Overall Methodology.  The overall methodology for determining the origin of the fire is the scientific method…This methodology includes recognizing and defining the problem to be solved, collecting data, analyzing the data, developing a hypothesis or hypotheses, and most importantly, testing the hypothesis or hypotheses.  In order to sue the scientific method, the investigator must develop at least one hypotheses based on the data available at the time.  The hypotheses should be considered 'working hypotheses." Which upon testing may be discarded, revised, or expanded in detail as new data is collected during the investigation and new analyses are applied.
>
> 17.2.1 Testing any origin hypotheses requires an understanding of the associated fie events as well as the growth of the fire and how the fire spread through the structure.  A narrow

27

focus on only identifying the first item ignited and a competent ignition source fails to take into account important data that can be used to test any origin hypotheses.  In such a narrow focus, **the growth and spread of the fire and the resulting fire damage are not well considered**."

These standards repudiate the basis for the Fire Marshal's conclusion, as being in total ignorance of the important and complex factors involved that impact upon spread and damage of the fire, and further to have been in stark contrast to recognized scientific methodology for fire cause and origin.

Furthermore, the Fire Marshall did not eliminate other possible causes as required for reliability when seeking cause and origin of a fire and therefore any conclusion expressed was incompetent and inherently unreliable.   Consider the following portions from *NFPA 921* standards:

> 18.2.1 Any determination of fire cause should be based on evidence rather than on the absence of evidence; … A clearly defined origin exists when it is known conclusively to the exclusion of all other potential origins… If the origin cannot be positively identified to the exclusion of all other potential origins, no inferences regarding the ignition source should be made."

> 18.2.5 The elimination of all accidental causes to reach a conclusion that a fire was incendiary is a finding that can rarely be justified scientifically, using only physical data; however, the elimination of all causes other than the application of an open flame is a finding that may be justified in limited circumstances, where the area of origin is clearly defined and all other potential heat sources at the area of origin can be examined and credibly eliminated.

Attention must be paid to the caveats noted in Section 18.2.5, namely:

28

(1) the area of origin is clearly defined and (2) all other potential heat sources at the area of origin can be examined and credibly eliminated.

Here the opining Leroy noted that the living room roof and floor were burned away, and therefore that was the point of origin.  (T III 189, 197-198).

Asserting cause of a fire based upon fire growth and fire damage, as the Fire Marshall has done, has been rejected for using subjective evidence that is unreliable, as demonstrated by reference to *NFPA 921*:

> 22.2.8 Assessment of Fire Growth and Fire Damage.  Investigators may form an opinion that the speed of fire growth or the extent of damage was greater than would be expected for the 'normal' fuels believed to be present and for the building configuration.  However, these opinions are subjective.  Fire growth and damage are related to a large number of variables, and the assumptions made by the investigator are based on that investigator's individual training and experience.   If subject language is used, the investigator should be able to explain specifically why the fire was 'excessive' 'unnatural,' or 'abnormal'.

> 22.2.8.1    What an investigator may consider as 'excessive' 'unnatural,' or 'abnormal' can actually occur in an accidental fire, depending on the geometry of the space, the fuel characteristics, and the ventilation of the compartment.  Some plastic fuels that are difficult to burn in the open may burn vigorously when subjected to thermal radiation from other burning materials in the areas.  This type of burning might occur in the conditions during or after flashover.

> 22.2.8.2    The investigator is strongly cautioned against using subjective opinions to support an incendiary cause determination in the absence of physical evidence.

The most that the Fire Marshall could have said about his investigation is that the cause of the fire was "undetermined."

> 18.6.2     Ultimately, the decision as to the level of certainty in data collected in the investigation or of any hypothesis drawn from an analysis of the data rests with the investigator. The final opinion is only as good as the quality of the data used in reaching that opinion. If the level of certainty of the opinion is only 'possible' or 'suspected' the cause should be listed as undetermined."

The 2011 version of *NFPA 921*, *Guide for Fire and Explosion Investigations,* again rejected the approach taken by the Fire Marshall as being inconsistent with the scientific method, based on the finding that the methodology generated unprovable and untestable hypotheses; it was determined that such approach may result in incorrect determinations of the ignition source and first fuel ignited. Where all hypothesized fire causes have been eliminated and no facts point to a cause the investigator's only remaining choice is to opine that the cause is *undetermined*.

The Fire Marshal's wholesale rejection of methodology and scientific method has been recognized as leading to unreliable results and precluded him from testifying as an expert. See *Barr v Farm Bureau Gen Ins Co*, 292 Mich. App. 456 (2011).

In *Barr*, the Michigan Court of Appeals used NFPA as the benchmark in determining admissibility of cause and origin experts. Fire Marshall Leroy Scott testimony was inadmissible and the error was not harmless, where that testimony misled the jury and allowed the jury to substitute Scott's findings for the jury's findings and thereby denying a fair trial and procedural due process.

30

Petitioner submits Leroy's opinion was based upon an outright rejection of scientific methodology, beginning with an incomplete and inadequate investigation premised upon the repudiated notions based upon hunches.

It was clear error for the trial court to have admitted the testimony without assessing the reliability of the methodology. *People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012); *People v Dobek,* 274 Mich App 58, 94; 732 NW2d 546 (2007); *Gilbert v DaimlerChrysler Corp,* 470 Mich 749, 782, 789; 685 NW2d 391 (2004).  This error led to a fundamentally unfair trial that denied due process.

Petitioner submits further that her continued incarceration is unconstitutional because her conviction is predicated on what scientific evidence has proven to be fundamentally unreliable expert testimony, in violation of due process. In this case the admission of the fire expert testimony "undermined the fundamental fairness of the entire trial," *Keller v. Larkins,* 251 F.3d 408, 413 (3d Cir. 2001), because "the probative value of [the fire expert] evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission." *Bisaccia v. Attorney Gen.,* 623 F.2d 307, 313 (3d Cir. 1980) (quoting *United States ex rel. Bibbs v. Twomey*, 506 F.2d 1220, 1223 (7th Cir. 1974)).

In this case, the fire marshal's evidence was so arbitrary that "the factfinder and the adversary system [were] not . . . competent to uncover, recognize, and take due account of its short-comings." *Barefoot v. Estelle*, 463 U.S. 880, 899, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), superseded on other grounds by 28 U.S.C. § 2253(c)(2).

The basis of the 'expert's opinion was that arson fires burn at higher levels of heat and intensity.  This was the same basis soundly rejected as being not only lacking reliability, and even if relevant, was outweighed by the prejudice and which denied due process meriting habeas relief in *Han Lee v. Superintendent Houtzdale SCI*, 14-3876 (3rd Cir. August 19th, 2015).  The 3rd Circuit affirmed habeas relief because:

> "the admission of the fire expert testimony undermined the fundamental fairness of the entire trial because the probative value of [that] evidence, though relevant, [was] greatly outweighed by the prejudice to the accused from its admission." *Lee*, 667 F.3d at 403 (alteration in original) (citations and internal quotation marks omitted).  Supra.

Petitioner is entitled to habeas relief where her conviction was based upon fundamentally unfair and unreliable evidence that the judge was required to keep out of the trial and thereby denied due process and a fair trial.

### III. PETITIONER DENIED DUE PROCESS AND FUNDAMENTAL FAIRNESS BY PROSECUTORIAL MISCONDUCT IN VOUCHING, BOLSTERING, PROVIDING EVIDENCE AND DELIBERATELY MISLEADING THE JURY.

The prosecutor may argue the evidence and all reasonable inferences therefrom as it relates to the theory of the case. *People v Bahoda,* 448 Mich 261, 282; 531 NW2d 659 (1995). However, it is improper for the prosecutor to inject into the case an issue broader than the defendant's guilt or innocence. *People v Cooper,* 236 Mich App 643, 650-651; 601 NW2d 409 (1999). A prosecutor may not inject "unfounded or prejudicial innuendo into the proceedings," *People v George*, 130 Mich App 174, 180; 342 NW2d 908 (1983), nor "argue facts not in evidence or mischaracterize the evidence presented," *People v Watson,* 245 Mich App 572, 588; 629 NW2d 411 (2001). The prosecutor also may not vouch for the credibility of a witness or suggest that they have some special knowledge concerning a witness's truthfulness. *Bahoda*, surpa at 276.

Where a prosecutor's comments violate an explicitly granted right under the Constitution, the comments constitute a constitutional violation. *Hodge v Hurley*, 426 F3d 689, (6th Cir., 2005); *Donnelly v DeChristoforo*, 416 US 637; 94 S Ct 1868; 40 L Ed 2d 431 (1974). Where a prosecutor argues facts not in evidence, the prosecutor becomes a witness, not subject to cross-examination. In so doing, he violates due process and the constitutional right of confrontation. *Berger v United States*, 295 US 78; 55 S Ct 629; 79 L Ed 1314 (1935).

33

The prosecutor during closing made claims based upon misrepresentation of facts, and, insertion of facts not from the witness chair.

There was testimony concerning empty gas cans in the front porch area. Both Cory Pierce and Trevor Stermer said that when the gas cans for the equipment were empty and would need to be refilled, they would leave the cans in the front porch area instead of the shed.  (T IV 159; T V 113).

However during closing, this evidence provided by prosecution witnesses became something else:

> "…isn't it ironic and coincidental that there was a gas can right out front where the van was, right where the vehicles were?"  (T V 107).

Similarly, the prosecutor created evidence during closing, telling the jury "[t]he phones were in the van according to her"  (T V 119), and then using this created fact as a basis to infer Petitioner was not driving to get help.   There was no testimony or evidence at trial that the phone was in the van.   Instead, prior statements of Petitioner were consistent: her phones were in the house, and destroyed in the rubble.

Later in rebuttal the prosecutor told the jury:

> "One of the other things I want to clear up right away, Mr. Getting keeps making reference to two previous first, two previous fires, the second which Linda Stermer is living with him and even by her own version it's not an arson,  nor was the first one…But there is no evidence that it was arson, so it's nonsense." (T V 169-170).

Here the prosecutor was informing the jury that there was no indication those prior fires were arson, misleading the jury into thinking the police had exonerated Todd Stermer of arson in those prior cases.  More importantly, the police reports did not exonerate Todd Stermer, and those reports should have been known to the prosecutor. (Copies in Appendix).

This is the type of misconduct which requires relief in the form of a new trial. *Hodge v Hurley*, 426 F3d 689, (6th Cir., 2005); *Donnelly v DeChristoforo*, 416 US 637; 94 S Ct 1868; 40 L Ed 2d 431 (1974).

The prosecutor also took every opportunity during closing, over a dozen times, to call Petitioner a liar. (T V 109-129).   Beginning early in the argument with: "we know she is a liar.  There is no question but that she is a liar and will lie when it suits her okay". (T V 109); and finishing the argument with "I would suggest that we are dealing with a diabolical, scheming, manipulative liar and murderer."  (T V 129).

However, when it came to prosecution witnesses, the prosecutor impermissibly both vouched for, and bolstered testimony.  When speaking about Cindy DeLoach, the prosecutor told the jury: "I would submit she certainly appears to be a very credible person who has recall of the incident, has no reason to make anything up." (T V 113).

As to Mike Matheny and Connie Calhoun, the prosecutor said "they were in here telling the truth". (T V 121).

Similarly when discussing Ms. Tracy and Ms Gordon, the prosecutor stated neither had an "incentive to lie, neither one of them do. They are getting absolutely nothing…". (T V 126).

In these examples, the prosecutor implied through their position that there was additional information known about these witnesses to the prosecutor and the jury could trust and rely upon the prosecutor to relieve themselves of determining credibility of witnesses.

A "prosecutor is free to argue from the evidence and its reasonable inferences in support of a witness's credibility . . . [but the] prosecutor must refrain from commenting on his or her personal knowledge or belief regarding the truthfulness of the . . . witnesses." *People v Bennett,* 290 Mich App 465, 478; 802 NW2d 627 (2010).

A prosecutor improperly bolsters a witness's credibility when he or she "implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury." *United States v. Trujillo*, 376 F.3d 593, 608 (6th Cir. 2004) (quoting *United States v. Martinez,* 253 F.3d 251, 254 (6th Cir. 1992)). Improper vouching occurs, in contrast, when "the prosecutor argues evidence not in the record, or when the prosecutor supports the credibility of a witness by expressing a personal belief in the truthfulness of the witness's testimony, thereby placing the prestige of the office of the United States Attorney behind that witness." *United States v. Emuegbunam,* 268 F.3d 377, 404 (6th Cir. 2001). Such conduct is improper

because "credibility matters are to be determined by the jury." *People v Dobek*, 274 Mich App 58, 71 (2007).

Here the prosecutor provided additional evidence during closing, not subject to cross-examination, and used his position to make credibility determinations for the jury: Habeas relief is warranted in the form of a new trial. *United States v Francis,* 170 F3d 546, 549-550 (6th Cir., 1999); *Hodge v Hurley*, 426 F3d 689, (6th Cir., 2005); *Donnelly v DeChristoforo*, 416 US 637; 94 S Ct 1868; 40 L Ed 2d 431 (1974).

Equally egregious was the prosecutor's introduction of perjury that was allowed to go uncorrected.   The prosecutor's theory was that Todd Stermer had become incapacitated due to actions by Petitioner, who had become secretive, before three boys left for the mall to see a movie.  Cory Pierce testified for the prosecution and he told the jury that Todd Stermer may not have been awake when he left for the movies: "I really didn't see him.  I just saw his leg really."  (T IV 151).  Cory Pierce also told the jury that Petitioner had two cell phones, but the one cell phone "nobody knew about".  ( IV 154-156).

However, Cory Pierce in all prior statements, including those given under oath during deposition, consistently provided that Todd was awake and watching television: "He was awake",  "Upstairs in the living room in a chair". (Dep. C. Pierce, 10/18/2007, 30-31).

Similarly, concerning the cell phones, the 11/2/2007 police interview of Cory Pierce provided that Cory said Petitioner had two cell phones, one was a personal or 'regular' phone, and the other was her 'work' phone.  (Copy in Appendix).

37

"A trial court may grant a new trial to a criminal defendant on the basis of any ground that would support reversal on appeal or because it believes that the verdict has resulted in a miscarriage of justice." *Terrell*, 289 Mich App at 559, citing MCR 6.431(B). "[A] conviction obtained through the knowing use of perjured testimony offends a defendant's due process protections guaranteed under the Fourteenth Amendment." *People v Aceval*, 282 Mich App 379, 389; 764 NW2d 285 (2009), citing *Napue v Illinois*, 360 US 264, 269; 79 S Ct 1173; 3 L Ed 2d 1217 (1959). Knowingly presenting false testimony, *Giglio v United States,* 405 US 150, 153; 92 S Ct 763; 31 L Ed 2d 104 (1972), citing *Mooney v Holohan,* 294 US 103, 112; 55 S Ct 340; 79 L Ed 791 (1935), and failing to correct it once presented, *Giglio*, 405 US at 153, citing *Napue*, 360 US at 269, are species of discovery violations, *United States v Agurs,* 427 US 97, 103; 96 S Ct 2392; 49 L Ed 2d 342 (1976).

Established law by the United States Supreme Court and this Court have held that knowledge of the police or another prosecutor is attributable to the trial prosecutor when analyzing claims of perjured testimony being presented and allowed to remain without correction. *People v. Lester*, 232 Mich. App. 262 (1999), citing *Kyles v. Whitley,* 514 U.S. 419, 437; 115 S.Ct. 1555; 131 L.Ed.2d 490 (1995).

Single errors or instances of misconduct may deprive a defendant of a fair trial; a pattern is not necessarily required.  "There are instances where a single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated." *United States v Solivan,* 937 F 2d 1146, 1150 (6th Cir. 1991).  "The relevant question is whether the prosecutors' comments so infected the

trial with unfairness as to make the resulting conviction a denial of due process."

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (internal quotation marks omitted)).

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL DENIED PETITIONER A FAIR TRIAL.

A criminal defendant is entitled to the effective assistance of counsel at trial. *Strickland v. Washington*, 466 U.S. 668; 10S.Ct. 2052; 80 L.Ed.2d 674 (1984); *Beasley v. United States*, 491 F.2d 687 (6th Cir. 1974). U.S. Const., Amend. VI. *People v Pickens*, 446 Mich 298 (1994); US Const, Amend VI; Const 1963, Art 1, §20.  Under *People v Pickens*:

> "a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced the defendant as to deprive him of a fair trial."  446 Mich at 303.

The standard employed therefore, asks two questions.  First, were the attorney's advice and actions "within the range of competence demanded of attorneys in criminal cases," or, stated differently, were the actions and advice "reasonable under prevailing professional norms." *Strickland*, at 687, 688.  The second question is whether the representation failing to meet these standards prejudiced the defendant.

*People v. Marshall*, 298 Mich App 607 (2012) in applying *Strickland*, held:

> "Trial counsel is responsible for preparing, investigating, and presenting all substantial defenses." *People v Chapo*, 283 Mich App 360,371; 770 NW2d 68 (2009). "A substantial defense is one that might have made a difference in the outcome of the trial." *Id.* Failure to make a reasonable investigation can constitute ineffective assistance of counsel. *People v McGhee*, 268 Mich App 600, 626; 709 NW2d 595(2005).

40

Petitioner makes separate and independent claims of ineffective assistance of counsel for actions and inactions taken or foregone beginning with the preliminary examination.

### a) *Failure to investigate and prepare for trial:*

Effective assistance of counsel requires that counsel make reasonable investigations and adequately prepare for trial. *Rompilla v Beard*, 545 US 374 (2005); *Wiggins v Smith*, 539 US 510 (2003); *Kimmelman v Morrison*, 477 US 365; 106 S Ct 2574; 91 L Ed 2d 305 (1986).

In *Beasley*, the Court stated that, to be constitutionally adequate:

> "Defense counsel must investigate all apparently substantial defenses available to the defendant and must assert them in a timely manner."

In *Landers v Rees*, 782 F2d 1042 (CA 6, 1985), the Court stated "Counsel's failure to pursue a substantial defense, however, violates the defendant's constitutional right when the failure is a result of ineffectiveness or incompetence."

An attorney fails to act reasonably where he fails to investigate defenses. *Foster v. Lockhart*, 9 F.3d 722 (8th Cir. 1993):

> "Reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories. An attorney must make a reasonable investigation in preparing a case or make a reasonable decision not to conduct a particular investigation. *Kenley v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir.), cert. denied, 112 S. Ct. 431 (1991)".

41

In this case, defense counsel did not familiarize himself with applicable standards or evidentiary requirements.  Counsel failed to seek out information, consult with an expert, and failed to retain a cause and origin expert.

In Habeas Corpus cases, it has been recognized that the failure to consult with or retain or call to the witness stand an expert witness was ineffective assistance of counsel.  *Sims v Livesay*, 970 F2d 1575 (CA 6, 1992); *Leonard v Michigan*, 256 F Supp 2d 723 (WD Mich, 2003); *Holsomback v White*, 133 F3d 1382 (CA 11, 1998); *Pavel v Hollins*, 261 F3d 210 (CA 2, 2001); *Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001).

Had counsel even performed a perfunctory review of the case law and NFPA 921 standards, as discussed in Issue II, the non-scientific nature of Leroy Scott's speculations could have brought to the attention of the trial court and suppressed, and/or brought to the attention of the jury so they could reasonably disregard the prosecutor's alleged expert witness.

### b)     *Failure to file Motion in Limine*

The failure of counsel to move to exclude prejudicial information is ineffective assistance of counsel.  See *Gardner v. United States,* 680 F.3d 1006 (7th Cir. 2012), finding no strategic reason for counsel not filing motion to suppress evidence.

The critical failure to object to the jury being exposed to anything prejudicial, where there are valid grounds for exclusion of that evidence, and no tactical reason to want the jury to be exposed to the prejudicial material, is ineffective

42

assistance of counsel.  *Hodge v Hurley,* 426 F3d 368, 376 (CA 6, 2005); *Rickman v Bell*, 131 F3d 1150 (CA 6, 1997); *Groseclose v Bell*, 130 F3d 1161 (CA 6, 1997); *Ward v United States*, 995 F2d 1317 (CA 6, 1993); *United States v. Rusmisel*, 716 F.2d 301 (5th Cir. 1983); *Seehan v. State of Iowa*, 37 F.3d 389 (8th Cir. 1994); *Weygandt v. Ducharme*, 774 F.2d 1491 (9th Cir. 1985).

Defense counsel failed to move the trial court to exclude any testimony offered by the prosecutor as expert testimony concerning cause and origin of the subject fire without first demonstrating said testimony was in conformity with, and met the requirements of MCL 600.2955, MRE 402, 702 and *Daubert v.Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).  MCL 600.2955 mirrors what the United States Supreme Court required in *Daubert v.Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

The motion would have been successful.  The party proffering the expert bears the burden of persuading the trial court that the expert has specialized knowledge that will aid the factfinder in understanding the evidence or determining a fact in issue.  *People v Smith*, 425 Mich 98, 112 (1986).  The United States Supreme Court in *Daubert v.Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993),  has identified four factors that this court should consider when assessing the reliability of an expert's testimony: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether

43

the technique has been generally accepted in the relevant scientific community. *Supra,* at 593-94.

As set forth in Issue II, for investigation of a fire for cause and origin, courts have recognized the "NFPA 921" guide for fire and explosion investigations, a peer reviewed fire investigation guide that is the industry standard for fire investigation. *Travelers Prop. & Cos. Corp. v. Gen. Elec. Co.*, 150 F.Supp.2d 360, 366 (D.Conn.2001) (NFPA 921 is "a peer reviewed and generally accepted standard in the fire investigation community").

Courts have found that NFPA 921 (promulgated by the National Fire Protection Association) is a "lengthy and specific document that contains detailed discussions on investigations of everything from motor vehicles and Molotov cocktails to explosions and electrical fires." *Booth v. Black & Decker, Inc.,* 166 F. Supp. 2d 215, 220 (E.D. Pa. 2001); *Pappas v. Sony Elecs., Inc.*, 136 F. Supp. 2d 413, 425 & n.15 (W.D. Pa. 2000); *Snodgrass v. Ford Motor Co.,* No. 96-1814, 2002 U.S. Dist. LEXIS 13421, at *48-57 (D.N.J. Mar. 28, 2002); see also *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.,* 394 F.3d 1054, 1057-58 (8th Cir. 2005) ("[NFPA 921] qualifies as a reliable method endorsed by a professional organization."); *McCoy v. Whirlpool Corp.*, 214 F.R.D. 646, 653 (D. Kan. 2003) (describing NFPA 921 as the "gold standard" for fire investigations).

Here trial counsel's inaction permitted the jury to hear testimony that was speculative and lacked reliability, and was also prejudicial and damaging,

44

impermissibly negating the presumption of innocence. *Taylor v Kentucky*, 436 US 478; 98 S Ct 1930; 56 L Ed 2d 468 (1978).

### c) *Failure to prepare for cross-examination*

The prosecutor presented an expert witness Scott Leroy. The cross-examination however, did not challenge Leroy's methodology, and at times actually adopted Leroy's flawed methodology. (T II 216-217). Instead, trial counsel avoided any reference to NFPA 921 standards, and would veer off on tangents, such as the weather. (T II 203 – 217).

Cory Pierce testified for the prosecution and he told the jury that Todd Stermer may not have been awake when he left for the movies: "I really didn't see him. I just saw his leg really." (T IV 151). Cory Pierce also told the jury that Petitioner had two cell phones, but the one cell phone "nobody knew about". ( IV 154-156). The prosecutor seized on Pierce's testimony to suggest Todd Stermer had been knocked unconscious before the fire as part of Petitioner's planned arson.

Trial counsel was aware of police reports, interviews and depositions, taken under oath, of witnesses, including Cory Pierce, that should have been used during cross-examination to provide the jury with Cory Pierce's prior testimony which is diametrically opposite of his trial testimony.

Transcript of Cory Pierce's deposition provided prior inconsistent statements, including:

Q. And so where was your dad sitting when he was watching TV?
A. Upstairs in the living room in a chair
….

45

Q.   Was he awake? Was he sleeping?

A.   He was awake."  (Dep. C. Pierce, 10/18/2007, 30-31).

Trial counsel also had at his disposal the 11/2/2007 police interview of Cory Pierce where he said the Petitioner had two cell phones, one was a personal or 'regular' phone, and the other was her 'work' phone.  (Copy in Appendix).

While a trial lawyer's decision on how to cross-examine a witness is a matter of trial strategy, *In re Ayres,* 239 Mich App 8, 23; 608 NW2d 132 (1999), counsel's representation will be considered ineffective only to the extent the strategy employed was unreasonable. *People v Cline*, 276 Mich App 634, 637; 741 NW2d 563 (2007).   Here, defense counsel could not adequately represent his client simply by cross-examining the State's expert. See *Miller v. Anderson*, 255 F.3d 455, 457 (7th Cir.2001) ("[C]ross-examination alone could weaken the prosecution's expert evidence, but not to the point of denying it the essential corroborative value for which the prosecutor was using it."), *judgment modified,* 268 F.3d 485 (7th Cir.2001).  See also: *Stevens v. McBride,* 489 F.3d 883, 896 (7th Cir.2007) (finding ineffectiveness due to failure to investigate expert "[w]here an expert witness's opinion is crucial to the defense theory" (internal quotation marks and citation omitted)).

### d)   Failure to present evidence.

In *Workman v. Tate*, 957 F.2d 1339 (6th Cir. 1992), the Court held that defense counsel's failure to contact or call witnesses who had important evidence of innocence, was ineffective assistance of counsel justifying Habeas Corpus relief.  In accord, finding ineffective assistance of counsel justifying Habeas Corpus relief, see

46

also *Sanders v. Ratelle*, 21 F.3d 1446 (9th Cir. 1994) [failure to introduce confession of another]; *Holsomback v. White*, 133 F.3d 1382 (11th Cir. 1998) [failure to present fact of lack of medical evidence supporting sodomy claim]; *Hart v. Gomez*, 174 F.3d 1067 (9th Cir. 1999) [failure to introduce evidence corroborating defense witness].  As the Court held in *Hart v Gomez*, 174 F3d 1067 (CA 9, 1999):

> "A lawyer who fails adequately to investigate, and to introduce into evidence, records that demonstrate his client's factual innocence, or that raise sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance."

In this case there was information available to counsel that was not submitted to the jury, but was needed to keep the trial fundamentally fair.  Some of that evidence not introduced was previously discussed in connection with ineffective cross-examination.    There also were the building permits and inspections that revealed the home was still under construction and had exposed rafters and areas that had not been sealed off for fire safety.  (Copies in the Appendix).   There were police reports and investigations of prior residential fires that were ruled to have been arson, and more importantly, Todd Stermer was named as the arsonist. (Copy in the Appendix).

Here there was evidence the jury needed to know that was available, but not heard because trial counsel's ineffectiveness.  There is a reasonable probability of a different result from this error, warranting a new trial.

### e)      *Failure to object to prosecutorial misconduct.*

47

As raised in the next issue, there certain instances of prosecutorial misconduct for which trial counsel did not object.  Failure to object is ineffective assistance of counsel. *Rickman v Bell*, 131 F3d 1150 (CA 6, 1997); *Groseclose v Bell*, 130 F3d 1161 (CA 6, 1997); *Ward v United States*, 995 F2d 1317 (CA 6, 1993).  See also *People v Fenner*, 136 Mich App 45 (1984) [failure to object to objectionable testimony]; *People v Roger White*, 142 Mich App 581 (1985) [same]; *People v Ullah*, 216 Mich App 669 (1996).   The prejudice from not objecting is discussed within the next issue concerning prosecutorial misconduct.

### f)     Erroneous *advice about right to testify.*

Petitioner wanted to testify, and tell her side of the story.  Petitioner had made this known to her counsel, family, friends and therapist.  Trial counsel removed that decision from Petitioner and refused to let her testify, and Petitioner feared being abandoned at trial and was coerced.   The erroneous advice provided by trial counsel regarding the right to testify provides the basis for ineffective assistance of counsel. *Gonzales v. Elo,* 233 F.3d 348 (6th Cir. 2000); *Rock v. Arkansas,* 483 U.S. 44, 51-52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).

### g)     *Conduct not strategic.*

Whether an action or inaction was strategic is really a question of whether it was reasonable under the circumstances, as noted in *English v. Romanowski*, 602 F.3d 714 (6th Cir. 2010):

> "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690, 104 S. Ct. 2052. However, even when

making strategic decisions, counsel's conduct must be reasonable. *Roe v. Flores-Ortega*, 528 U.S. 470,481,120 S.Ct. 1029,145 L.Ed.2d 985 (2000). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland* 466 U.S. at 690-91,104 S.Ct. 2052. The focus in failure-to-investigate claims, then, is the reasonableness of the investigation (or lack thereof).*See Wiggins v. Smith*,539 U.S. 510,527,123 S.Ct. 2527,156 L.Ed.2d 471(2003) (focusing on reasonableness of investigation, rather than underlying decision, in context of failure to investigate mitigating evidence for capital sentencing hearing).

The actions and inactions of trial counsel reflect a lack of understanding of the law, and a lack of investigation and preparation, and when considered within the context of the norms and practices, such conduct cannot be considered strategic and should be found by this Court to have been constitutionally deficient.

### h)      *Trial counsel's failures were prejudicial.*

Once deficient performance has been established, the deficient conduct must then be found prejudicial for relief to be granted. *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994);*McQueen v Scroggy*, 99 F3d 1302, 1311 (CA 6, 1996); *Kyles v Whitley*, 514 US 419, (1995).

"When determining prejudice, the Court must consider the errors of counsel in total, against the totality of the evidence in the case." *Stewart v. Wolfenbarger*,468 F.3d 338, 361 (6th Cir. 2006).

The evidence not presented to the jury combined with the testimony that would have excluded, provided the jury with more than a reasonable basis to find a not guilty verdict.  A defendant does not have to show that the result of the case "would have" been different.  He does not have to show that the result "probably" would have been different.  All that is needed is a reasonable probability. *Strickland*, supra:

> "On the other hand, we believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case... The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."

As the Court held in *Kyles v Whitley*, 514 US 419 (1995):

> "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial understood as a trial resulting in a verdict worthy of confidence."

The record reveals deficent conduct that was prejudicial and this Court should provide a new trial after granting leave and consideration of the merits of this issue.

## V.   PETITIONER   WAS   PREJUDICED   BY   INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL.

A criminal defendant is entitled to the effective assistance of counsel. *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *Beasley v United States*, 491 F2d 687 (CA 6, 1974); *People v Pickens*, 446 Mich 298 (1994); US Const, Amend VI; Const 1963, Art 1, §17, 20.   This right includes the right to the effective assistance of counsel on appeal.   *Evitts v Lucey*, 469 US 387; 105 S Ct 830; 83 L Ed 2d 821 (1985); *People v Reed*, 449 Mich 375 (1995); *Penson v Ohio*, 488 US 75; 109 S Ct 346; 102 L Ed 2d 300 (1988).

The critical failure of an attorney to object or raise an issue can be ineffective assistance of counsel if it deprives the defendant of an opportunity for dismissal of the case or for success on appeal.   *Gravley v. Mills*, 87 F.3d 779 (6th Cir. 1996); *Kowalak v United States*, 645 F2d 534, 537-538 (CA 6, 1981); *Corsa v Anderson*, 443 F Supp 176 (ED Mich 1977).

"The test for ineffective assistance of appellate counsel is the same as that for trial counsel." *People v Pratt,* 254 Mich App 425, 430 (2002); see also *People v Reed*, 449 Mich 375, 378, 382, 390 (1995). "To demonstrate ineffective assistance of counsel, defendant must show that his attorney's conduct fell below an objective standard of reasonableness and that the representation so prejudiced defendant that he was deprived of a fair trial." *People v Gonzalez*, 468 Mich 636, 644; (2003), citing *Reed*, 449 Mich at 390.

Under *People v Reed*, 449 Mich 375 (1995), counsel is not ineffective for failing to file all claims "of arguable legal merit."  449 Mich at 379.  However, suppose the merit is more than merely arguable?  The Supreme Court required that appellate lawyers must function "at a level of objectively reasonable performance."  449 Mich at 381.  "An appellate attorney's failure to raise an issue may result in counsel's performance falling below an objective standard of reasonableness. . . ." *People v Reed*, 198 Mich App 639, 646 (1993).  "The question is whether a reasonable appellate attorney could conclude that the [issue not raised was] not worthy of mention on appeal."). *Reed*, 449 Mich at 391.

The 6th Circuit in *Mapes v Tate*, (*Mapes II*), 388 F.3d 187 (6th Cir. 2004) ruled with respect to ineffective assistance of appellate counsel:

> In order to establish a Sixth Amendment violation, it must be shown both that counsel's representation fell below an objective standard of reasonableness, and that his deficiencies prejudiced the defendant. See *Strickland*, 466 U.S. at 687-88, 104 S.Ct. 2052. With respect to prejudice in the context of ineffective assistance of appellate counsel, a defendant must show a reasonable probability that, but for his counsel's defective performance, he would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). Although this analysis necessarily involves an evaluation of the underlying claims, it does not require a decision on or a determination of these issues. All that is required is a determination that, based on the nature of the underlying claims, there is "a reasonable probability that, but for his counsel's [failings] . . ., [the defendant] would have prevailed on his appeal." Id.; see also *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir.2004).

The issues in this case were so highly meritorious that, if raised and considered on the merits, they could not fail to win.   In her pro per motion, Petitioner noted how she had discussed the issues concerning incompetent and unreliable expert testimony, prosecutorial misconduct and ineffective assistance of counsel.  Petitioner had even made appellate counsel aware of the depositions and police reports that trial counsel did not use at trial.

Instead, appellate counsel raised the following issues: 1) Improper bind over to circuit court-(ruled harmless error because of subsequent conviction); 2) Lack of evidence to support premeditated murder verdict-(ruled moot because charge vacated by trial court); and 3) Sufficiency of evidence and great weight of the evidence challenge-(circumstantial evidence was presented).

Notably, appellate counsel did not advance the claims of ineffective assistance of counsel, prosecutorial misconduct, and conviction upon unreliable evidence, as raised herein.  The prejudice from not raising these issues is developed within those individual issues.

It is reasonably probable that Petitioner Stermer would have gotten a reversal on her appeal of right, but for the inaction of appellate counsel.   See *Mapes v Coyle*, 171 F3d 408 (CA 6, 1999), finding ineffective assistance of appellate counsel where counsel omitted issues that were "significant and obvious."

Under *Mapes v Coyle* and many other cases, a court may find ineffective assistance of appellate counsel from the failure to raise particular issues on appeal if the issues were obvious or should have been discovered, and if the failure to raise them

53

was prejudicial.  It is impossible to imagine how failure to raise these issues could have helped Linda Stermer's appeal in any way.

The issue of ineffective assistance of appellate counsel was discussed at length in *Mason v Hanks*, 97 F3d 887 (CA 7, 1996).  The Court held:

> "Effective advocacy does not require the appellate attorney to raise every non-frivolous issue under the sun, of course.  *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).  After all, "[o]ne of the principal functions of appellate counsel is winnowing the potential claims so that the court may focus on those with the best prospects."  *Page v. United States*, 884 F.2d 300, 302 (7th Cir.1989).  This is not to say that counsel's selection of the issues to pursue on appeal is beyond scrutiny.  **"Were it legitimate to dismiss a claim of ineffective assistance of counsel on appeal solely because we found it improper to review appellate counsel's choice of issues, the right to effective assistance of counsel on appeal would be worthless."**  *Gray*, 800 F.2d at 646.[2]  Instead, we engage in a pragmatic assessment of appellate counsel's work.  Genuinely strategic decisions that were "arguably appropriate at the time, but, with the benefit of 'hindsight', appear[ ] less than brilliant" will not be second-guessed.  *Gray*, 800 F.2d at 646 (citing *United States v. Harris*, 558 F.2d 366, 371 (7th Cir.1977)).
>
> But when appellate counsel omits (without legitimate strategic purpose) "a significant and obvious issue," we will deem his performance deficient (*Gray*, 800 F.2d at 646;  *Hollenback*, 987 F.2d at 1275)[3], and **when that omitted issue "may have resulted in a reversal of the conviction, or an order for a new trial," we will deem the lack of effective assistance prejudicial** (*Gray*, 800 F.2d at 646). ...
>
> The ultimate question we ask is "whether, but for counsel's errors, there is a reasonable probability that the outcome of the

---

[2] *Gray v Greer*, 800 F2d 644 (CA 7, 1986)
[3] *Hollenback v United States*, 987 F2d 1272 (CA 7, 1993)

proceeding [here, Mason's direct appeal] would have been different."

Ineffective assistance of appellate counsel is "good cause" for failing to raise an issue in the appeal of right. *Edwards v Carpenter*, 529 US 446; 120 S Ct 1587; 146 L Ed 2d 518 (2000) *Murray v Carrier*, 477 US 478, 488; 106 S Ct 2639; 91 L Ed 2d 397 (1986); MCR 6.508(D).

If the issues had been raised, the result of the appeal would unquestionably have been different.  In this case, the issues not raised in the earlier appeal are highly meritorious and will change the result, if they can get consideration on their merits.

As the Court held in *Mayo v Henderson*, 13 F3d 528 (CA 2, 1994):

> "a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."

See, also, *Fagan v Washington*, 942 F2d 1155, 1157 (CA 7,1991) ("His lawyer failed to raise either claim, instead raising weaker claims...   No tactical reason--no reason other than oversight or incompetence--has been or can be assigned for the lawyer's failure to raise the only substantial claims that [defendant] had."); *Matire v Wainwright*, 811 F2d 1430, 1438 (CA 11,1987) (ineffective assistance of counsel when appellate counsel ignored "a substantial, meritorious Fifth Amendment issue" raising instead a "weak issue")." *Mayo v Henderson*, supra.

55

In *Strickland v Washington*, supra, the Supreme Court held that prejudice is shown from ineffective assistance of counsel when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 US at 664.

While it is true that an attorney need not raise all arguable claims, it does not thereby follow that the attorney never need to raise any arguable claim.  Instead, "The question is whether a reasonable appellate attorney could conclude that [the claimed issue was] not worthy of mention on appeal."  Here the issues were worthy and merit relief.   Ineffective assistance of appellate counsel provides the requisite good cause required for hearing issues on the merits in a Motion for Relief from Judgment, and also precludes a claim of procedural default.

## RELIEF SOUGHT

WHEREFORE, Petitioner LINDA STERMER, seeks the following relief from this Honorable Court:

a)    Accept jurisdiction over this case;

b)    Require the Respondent to answer the allegations in this Petition and the Brief in Support;

c)    Hold such evidentiary hearings as this Court may deem necessary or appropriate;

d)    Issue an Order that this Court will grant a Writ of Habeas Corpus unless the State vacates the conviction and holds a new trial that complies with constitutional guarantees within a specified time;

e)    Issue a Writ of Habeas Corpus freeing Petitioner from her unconstitutional confinement.

Respectfully submitted,
/s/ SHELDON HALPERN
SHELDON HALPERN
shalpern@sbcglobal.net
_____

SHELDON HALPERN
Attorney for Petitioner Stermer
26339 Woodward Avenue
Huntington Woods, MI 48070
(248) 554-0400

Dated: January 23, 2016

57