STATE OF MICHIGAN

IN THE SEVENTH DISTRICT COURT FOR THE COUNTY OF VAN BUREN

PEOPLE OF THE STATE OF MICHIGAN,

                    Plaintiff,

                    **FILED**

v                   AUG 03 2009          DISTRICT COURT CASE
                                         NO. 090575FY
                    **TINA LEARY**
                    **Van Buren County Clerk**       09-16654-FC-B

LINDA KAY STERMER,

                    Defendant.
_____/

PRELIMINARY EXAMINATION

BEFDORE THE HONORABLE ROBERT T. HENTCHEL, DISTRICT JUDGE

WEDNESDAY, JUNE 24, 2009 - PAW PAW, MICHIGAN

APPEARANCES:

For the People:          MR. JURIS KAPS (P25281)
                         Prosecuting Attorney
                         212 Paw Paw Street
                         Paw Paw, Michigan  49079

For the Defendant:       MR. JEFFREY S. GETTING (P43227)
                         Attorney at Law
                         707 Academy Street
                         Kalamazoo, Michigan  49007

RECORDED BY:             Susan L. Klein, CER #3482
                         Certified Electronic Recorder



RECEIVED
NOV 03 2009
THIRD DISTRICT
SANDRA SCHULTZ MENGEL
CHIEF CLERK

TABLE OF CONTENTS

<u>WITNESSES:</u>                                              <u>PAGE</u>

MICHAEL MATHENY
     Direct examination by Mr. Kaps              08
     Cross-examination by Mr. Getting            17


TONY EVANS
     Direct examination by Mr. Kaps              31
     Cross-examination by Mr. Getting            35


SCOTT LEROY
     Direct examination by Mr. Kaps              41
     Cross-examination by Mr. Getting            49


GABRIELLE ROUGHT
     Direct examination by Mr. Kaps              58
     Cross-examination by Mr. Getting            65


CYNTHIA DELOACH
     Direct examination by Mr. Kaps              71
     Cross-examination by Mr. Getting            73


CHRIS WILLIAMS
     Direct examination by Mr. Kaps              79
     Cross-examination by Mr. Getting            83

THOMAS MACYAUSKI
     Direct examination by Mr. Kaps              87
     Cross-examination by Mr. Getting            91

TABLE OF CONTENTS
(CONTINUED)

EXHIBITS:

| | MARKED | RECEIVED |
|---|---|---|
| PX #1 - Photo | 11 | 12 |
| PX #2 - Photo | 15 | 15 |
| DX #3 - Photo | 36 | 46 |
| PX #4 - Photo | 41 | 45 |
| PX #5 - Photo | 41 | 45 |
| PX #6 - Photo | 89 | 91 |

1        Paw Paw, Michigan

2        Wednesday, June 24, 2009 - at 8:57 a.m.

3        (Court, counsel and all parties present)

4                  PROCEEDINGS

5        THE COURT: Okay. We are on the record. This is case

6  090575FY, it's called People versus Linda Kay Stermer. The matter is

7  scheduled for a preliminary examination today. I will have the record

8  show that Ms. Stermer is represented Attorney Getting who is here with

9  us. Also present is Prosecutor Kaps along with his investigating

10  officer.

11        Before we get under way, I guess I'm going to ask the

12  lawyers if we have any preliminary matters that need to be addressed

13  at this time?

14        MR. GETTING: Your Honor, just a couple of things for the

15  record. I spoke with the Prosecutor regarding sequestration of

16  witnesses and it's been agreed that the witnesses will be sequestered.

17  I make no objection to an investigating officer remaining in the

18  courtroom with the Prosecutor.

19        Second, Your Honor, my client is here, she is obviously in

20  custody and we would ask that the Court allow her to have her

21  handcuffs removed during the course of the preliminary exam so that

22  she can take notes and provide other assistance if--

23        THE COURT: Okay.

24        MR. GETTING: --needed or necessary.

25        THE COURT: I appreciate it. Do you want to be heard on

1    anything else?

2         MR. KAPS:  No, Your Honor.  I would--

3         THE COURT:  Okay.  That's fine.  If you would help us out

4    there I would appreciate that.  Okay.

5         MR. GETTING:  Lastly, Your Honor, with regard to proofs, I

6    believe that we have some stipulations that Prosecutor Kaps can place

7    on the record.

8         THE COURT:  Okay.

9         MR. KAPS:  Your Honor, my understanding is, for the purposes

10   of the preliminary examination only, there are two witnesses that we

11   would stipulate regarding what their testimony would be; one of those

12   being a Dr. Michael Markey who is the forensic pathologist that

13   conducted the autopsy on Todd Stermer and, I believe, that the

14   stipulation would be that if he were to testify he would testify that

15   Mr. Stermer died as a result of thermal injuries or burns and from the

16   inhalation of combustibles.  Is that correct?

17        MR. GETTING:  That's correct, Your Honor.

18        MR. KAPS:  Thank you.  And then the other person that would

19   testify would be Troy Ernst from the Michigan State Police Crime Lab

20   and Mr. Ernst examined clothing from Mr. Stermer, that being, a pair

21   of sweatpants, a plaid shirt, boxer shorts and two socks and

22   determined that there was the presence of gasoline on all those items

23   and that would be his testimony.  I believe that is our stipulation.

24        THE COURT:  Mr. Getting?

25        MR. GETTING:  That is also correct, Your Honor.

5

1        THE COURT: Okay. Could you spell Dr. Markey's last name?

2        MR. KAPS: M-A-R-K-E-Y.

3        THE COURT: M-A-R-K-E-Y. Okay, fine. Let me read this back

4   to you all to make sure that we're correct here. Dr.--again, these

5   are stips for these two witnesses. The first witness would be Dr.

6   Michael Markey. He is the medical examiner that performed the autopsy

7   on the victim and what's being stipulated to is that the victim died

8   from thermal injury, or burns, or inhaling combustibles. That is how

9   I wrote it down; would that be correct for the purposes of today?

10       MR. KAPS: Yes, Your Honor. The thermal--thermal injuries

11  and burns are synonymous.

12       THE COURT: The same. The same.

13       MR. KAPS: Yes.

14       THE COURT: Okay. And Attorney Getting, would you agree

15  that that's what the stip is?

16       MR. GETTING: I would, Your Honor.

17       THE COURT: Okay. Then Troy Ernst who works with the

18  Michigan State Crime Lab is the person who examined, I just wrote

19  pants, shirt, boxer shorts and socks, and when he examined those

20  articles of clothing he determined that there was the presence of gas

21  on all those articles. Would that be a fair, uh--

22       MR. KAPS: I believe so, Your Honor.

23       MR. GETTING: Yes, sir.

24       THE COURT: Okay. Well, I appreciate that. And then with

25  that out of the way, would you Mr. Kaps, would you turn around and see

6

1    if you have any witnesses in here?

2              MR. KAPS:  Yes.  Okay.  Mr. Matheny who is going to be my

3    first witness is here, but--

4              THE COURT:  Okay.

5              MR. KAPS:  --other than that.

6              THE COURT:  Okay.  Do we need to discuss anything else

7    before we get under way?

8              MR. KAPS:  I don't believe so, Your Honor.

9              THE COURT:  Okay.  Are you both ready then?

10             MR. KAPS:  Yes.

11             MR. GETTING:  Yes, sir.

12             THE COURT:  You can call a witness.

13             MR. KAPS:  Call Michael Matheny.

14             THE COURT:  Sir, could you come all the way up here for us,

15   okay?

16             (Mr. Matheny complies)

17             THE COURT:  And when you step around over here you're going

18   to see like a step okay.  And let me stop you before you come up.

19   Okay.  Raise your right hand.

20             (Mr. Matheny complies)

21             THE COURT:  Do you swear or affirm that the testimony you

22   will give today in regards to this proceeding will be the truth, the

23   whole truth, and nothing but the truth?

24             MR. MATHENY:  I do.

25             THE COURT:  Okay.  If you would step up here and have a seat

7

1     for us.

2               (Witness complies)

3               THE COURT:  Before you get under way, that microphone just

4     records it does not amplify, wish that it did but it doesn't okay; so

5     you're going to have to speak loud for us all today.

6               THE WITNESS:  Okay.

7               THE COURT:  We need you to give us your first name, your

8     last name?

9               THE WITNESS:  Michael Matheny.

10              THE COURT:  And spell your last name?

11              THE WITNESS:  M-A-T-H-E-N-Y.

12              THE COURT:  Okay.  Go ahead, sir.

13                         MICHAEL MATHENY

14    called by the People at 9:01 a.m., sworn by the Court, testified:

15                         DIRECT EXAMINATION

16   BY MR. KAPS:

17   Q   Mr. Matheny, I want to direct your attention back to January the 7th of

18       2007, do you remember that date?

19   A   Yes.

20   Q   All right.  And where do you live, Mr. Matheny?

21   A   Uh, 67030 County Road 215 in Lawrence.

22   Q   All right.  And did you live there back in January of '07?

23   A   Yes, I did.

24   Q   All right.  Did you know on that date or prior to that date a Todd

25       Stermer or a Linda Stermer?

1   A   Yes, I did.

2   Q   All right.  And how did you know either Todd or Linda Stermer?

3   A   They were my neighbor, right next door.

4   Q   Right next door?

5   A   Yes.

6   Q   Okay.  And for the record, we're going to be making reference to Linda

7       Stermer, is she in the courtroom today?

8   A   Yes, she is.

9   Q   All right.  Just for the record if you can point her out to us,

10      please?

11  A   Right here.

12              (At 9:03 a.m., witness points toward defense table)

13  BY MR. KAPS:

14  Q   Right next to me here?

15  A   Yes.

16              MR. KAPS:  If the record would reflect the witness has

17      identified the Defendant?

18              THE COURT:  It will reflect that.

19  BY MR. KAPS:

20  Q   Mr. Matheny, I want to direct your attention to the afternoon of

21      January 7, 2007, did you have occasion to go near or to the residence

22      of the Stermer's on that date?

23  A   When we noticed the fire.

24  Q   All right.

25  A   Yes.

9

1   Q   Well, okay, why don't you start from where you were and what you were

2         doing and what it was that you noticed?

3   A   Uhm, we bowl--I bowl every other Sunday so we leave the house at 3:30

4         and that day we left the house and--

5   Q   Okay, when you say "we" who are you referring to?

6   A   I'm sorry.  My girlfriend, Connie who lives with me.

7   Q   All right.

8   A   I'm sorry.  When I left the house at 3:30 and I got on the porch I

9         noticed fire coming from the Stermer's home.  Couldn't tell it was at

10       the house, we thought, my first thought was, wow, they've got a fire

11       real close to the back of the house.  And proceeded to get into the

12       vehicle and as I got down my driveway and got crested on our hill on

13       our driveway I could tell it was the back of the house.

14   Q   All right.  Now County Road 215, does that--which direction does that

15         run, an east/west or north/south or?

16   A   South, north/south.

17   Q   North/south.  And where is your residence in relationship to the

18         Stermer residence?

19   A   Just south.

20   Q   Just south?

21   A   Just south.

22   Q   All right.  And did you after making these observations did you go

23       toward the Stermer residence at that point in time?

24   A   Yes, I did.

25   Q   Okay.  So you would have been northbound at that point in time?

1   A   Yes.

2   Q   All right.  And as you're northbound which side of the road is the

3       Stermer residence on?

4   A   It would be on the west side?

5   Q   Okay.  Over to the left side of the road?

6   A   The left side of the road.

7   Q   All right.  And again, as you got closer what, if anything, further

8       were you able to see at that point in time?

9   A   I didn't see anything at that time.  I pulled down the driveway, uhm.

10  Q   All right.  And can you describe for the Court, in general terms,

11      where the Stermer residence is in relationship to the roadway?

12  A   Uhm, it's probably, uh, a hundred yards, a hundred and some yards off

13      the road, maybe a little further, 150 yards.

14  Q   And did you go up the driveway at some point in time towards the

15      house?

16  A   Yes, I did.

17  Q   All right.  Okay.

18                  (At 9:05 a.m., PX #1 marked)

19  BY MR. KAPS:

20  Q   And Mr. Matheny I want to show you what's been marked as People's

21      Proposed Exhibit #1 and ask if you're familiar with what is depicted

22      in that photo?

23  A   Yes, I am.

24  Q   And can you tell us what that is?

25  A   That's the Stermer's home.

                                11

1   Q   All right.  And that's obviously a photo taken after--after this fire,

2       is that correct?

3   A   That's correct.

4           MR. KAPS:  All right.  I would move for the admission of

5       Proposed Exhibit #1.

6           MR. GETTING:  I have no objection, Your Honor.

7           THE COURT:  Okay.  Number 1 is received.

8           (At 9:06 a.m., PX #1 given to Court)

9           THE COURT:  Thank you.

10  BY MR. KAPS:

11  Q   And Mr. Matheny as you are going up the driveway what, if any,

12      observations do you make as far as anybody in the area at that point

13      in time?

14  A   When I pulled in front of the house I jumped out, I told my girlfriend

15      call 9-1-1, uhm, I'm going off of memory but, I jumped out and I--

16      Linda was in the family vehicle, the van, behind the house still and

17      as I jumped out she pulled back behind the house and parked it and

18      then I started--she jumped out and I said, you know, "Is everybody out

19      of the house?"  "Where's the kids?"  Uh, can't remember if I said,

20      "Where's Todd?" but I was trying to find out if there was anybody in

21      the house and she was hysterical and I was just trying to make sure

22      there was nobody still in the house.

23  Q   All right.

24  A   Because it was at that time en--

25  Q   Were you--

                                    12

1   A   --gulfed in the backside.

2   Q   Did she respond at all to your inquiries as far as whether anybody was

3       in the house?

4   A   I don't recall.  I think I had--I just had to yell it a few times.  It

5       was a frantic situation and, but then she finally said no--I believe

6       she said nobody was in the house.

7   Q   All right.  Now you--in looking at what's been marked as Exhibit #1

8       which is the photo of the house and there's a vehicle that's shown

9       that's parked in front--near the front of the house, does that photo

10      allow you to show us or show the Court where it was that you pulled up

11      to when you went up toward the house?

12  A   Where this truck is parked is about where I believe I parked.

13  Q   All right.

14  A   The driveway kind of went down a little bit and I didn't want to get

15      too close to the house so where this truck is at is about where I was

16      parked.

17  Q   Okay.  Now you mentioned a family van of the Stermer's, do you recall

18      where you first saw that?

19  A   It was still behind the house.

20  Q   All right.

21  A   I never seen the van come up on the top side of the house.

22  Q   All right.  Can you explain to us how it was that you were able to see

23      it?

24  A   You could see it from, on the top side there's an area that you could

25      back up behind the house where you would because there wasn't like a

13

1    cul de sac type of a driveway it was, you pull down behind the house

2    and if you wanted to leave you'd have to back up to catch the drive.

3  Q   All right.

4  A   And the van was in that backed up position.

5  Q   All right.  So if I understand correctly, as you're--well, explain to

6    me where you were when you were able to see that the van was somewhere

7    near the back of the house?

8  A   I believe I seen it--I'm trying to go off of memory--I believe I seen

9    it when I was still driving up, you can see down as you drive up so I

10   don't know if I was still sitting in the seat of my truck or whether I

11   was on the ground already.

12 Q   All right.

13 A   But you can see it from the topside of the driveway.

14 Q   All right.  Mr. Matheny do you recall whether or not you ever saw the

15   van moving?

16 A   I did see the van moving.

17 Q   Okay.

18 A   If not in the reverse position forward after I stopped, pulled back

19   forward and parked it.

20 Q   All right.  Now after you got out and you made an inquiry if anybody

21   was in the house and so forth, what happened after that?

22 A   Uhm, still frantic I think at that time I made some, "Where's Todd?"

23   "Where's Todd?" and I never seen him at first and then I made the

24   statement, "Where is Todd?" again and she said, "Right there."  And

25   then it was like, just there he was I just had, through the commotion

14

1    I never seen him and he was laying there on the ground.

2              (At 9:11 a.m., PX #2 marked)

3  Q  Mr. Matheny, I want to show you what's been marked as People's

4     Proposed Exhibit #2 and ask if you can identify what is depicted in

5     that photo?

6  A  This is the north side of the house.

7  Q  All right.

8  A  And this is--wasn't much of a drive, but that's about the drive that

9     takes you down--

10 Q  All right.

11 A  --past the house.

12 Q  All right.  Now in that photo obviously this is taken later on.  In

13    that photo is the area where you saw Todd Stermer visible?

14 A  Yes.

15 Q  All right.

16             MR. KAPS:  First of all, I'd move for the admission of

17    Proposed Exhibit #2.

18             MR. GETTING:  I'd have no objection, Your Honor.

19             THE COURT:  Okay.  Exhibit #2 is received.

20 BY MR. KAPS:

21 Q  And actually I'm going to ask you to kind of hold it up so the Court

22    can see it.  Can you point out to us or point out to the Court, to the

23    Judge, about approximately where Mr. Stermer was when your attention

24    was drawn to him?

25 A  It was right in this area right here probably in this shadow area.  I

15

1    know he was relatively close to the fuel tank and that was a concern

2    to me so I remember that.

3                    THE COURT:   Could you basically describe which side of the

4    house that shaded area is on just so we're clear, if you know?

5                    THE WITNESS:   That is on the north side of the house.

6                    THE COURT:   North side in the shaded area?

7                    THE WITNESS:   Yes.

8                    THE COURT:   Okay.

9    BY MR. KAPS:

10   Q    Now did you make any contact with Mr. Stermer at that time?

11   A    He wasn't, uh, no, I didn't, he didn't say anything.

12   Q    What was his apparent condition, physical condition, at that point in

13        time?

14   A    Uhm, his--from what I recall the neck up was badly burnt and his hands

15        were badly burnt.

16   Q    Did you make any note of his clothing at all?

17   A    I don't think he had--his clothes were gone.   He was totally naked

18        that I could recall.

19   Q    All right.   Did you or anybody else put some type of clothing or--

20   A    Right.

21   Q    --covering on him?

22   A    Yes, I ran up to the truck and I found what I could in the--in my

23        truck, some coats and things like that to try and get under him

24        because there was--to try and cover him.

25   Q    All right.   Approximately how long after you arrived there was it

                                    16

1  | before any emergency personnel arrived?

2  A | Uh--

3  Q | Specifically the Sheriff's Department?

4  A | I'd be guessing, I--it seemed like it took a little bit, but 10, 15

5  | minutes, I--maybe.

6  Q | And at the time that the first officer arrived on the scene was Mr.

7  | Stermer still in the same location where you had initially seen him?

8  A | Yes.  Yes.

9  Q | All right.  And was he moved after that because of this oil tank

10  | situation?

11  A | We moved him--yes, after the Sheriff's Department got there we did

12  | move him at that time.

13  Q | All right.  Thank you.

14  | MR. KAPS:  I have no other questions.

15  | THE COURT:  Attorney Getting?

16  | MR. GETTING:  Thank you, may it please the Court.

17  | CROSS-EXAMINATION

18  BY MR. GETTING:

19  Q | Mr. Matheny, how are you employed?

20  A | I own a salvage yard in Lawrence.

21  Q | Do you have any background or training as a police officer, fire

22  | responder, in the military, that kind of stuff?

23  A | I was in the military for four years.

24  Q | When was that?

25  A | Uhm, '87 through '91.

17

1   Q   Did--as part of your job in the military, were you in a combat

2       situation?

3   A   Yes, I was.

4   Q   All right.  Where?

5   A   In Desert Storm, in '91, Persian Gulf.

6   Q   The reason I'm asking that is because a lot of people have never been

7       in a situation where they've come upon this kind of commotion you've

8       described to us or this hysteria--

9   A   Right.

10  Q   --is this something that you've seen before as a result of that--

11  A   Not as much.

12  Q   --military service?

13  A   My combat, you know, was minimal but he was--it was pretty--I hadn't

14      seen anything graphic like that before so it was quite a commotion.

15  Q   This was something that, even with your military background, you'd

16      never seen anything like?

17  A   Not like that, no.

18  Q   I have a hard time sometimes picturing things in my mind because you

19      use words like front, back, around, top in describing the house.  So

20      I'm going to go back over some stuff that you've already testified to

21      and I'm going to try and do it in a different way which will help me

22      and hopefully the Court as well later on.  You said that County Road

23      215 runs north and south?

24  A   Right.

25  Q   And that the driveway to the Stermer residence is on the west side of

18

1       the road?

2   A   Yes.

3   Q   On the left side of the road.  The driveway is, it goes back

4       approximately how far until you get to the house?

5   A   Hundred and fifty yards, I'm guessing.

6   Q   So the yard--the house is set quite a ways back from the road--

7   A   Yes.

8   Q   --on the left side?

9   A   Yes, yes.

10  Q   You described, you used words front and back to describe the house.

11      When you use the word "front" do you mean the east side or the west

12      side of the house or--

13  A   The east, east side of the house I would call the front, facing the

14      road.

15  Q   Front is east side facing the road?

16  A   Yes.

17  Q   Does the house, the length of the house, parallel the road so that the

18      house is kind of set in a north-south direction or is it perpendicular

19      to the road?

20  A   It seems to be parallel to the road.

21  Q   All right.  When you come up to the front of the house, the east side

22      of the house, you come off the road you head in a west direction for

23      approximately 150 yards then you're at the front of the house?

24  A   Yes.

25  Q   You said that the driveway leads around to the other side, the

```
 1        backside of the house, or west side of the house, is that correct?

 2   A    The north side of the house.

 3   Q    It goes around the north side--

 4   A    And then comes, kind of comes back around to the, what I call the back

 5        of the house which is the west.

 6   Q    Does that drive circle the entire house or once you're in back do you

 7        have to go back the way you came?

 8   A    When you get behind--you'd have to come back the way you came.

 9   Q    Okay.

10   A    At least that is how they were using it.

11   Q    On January 7th, in the afternoon, do you recall what the weather was

12        like?

13   A    Uhm, I believe it was a clear day.  There was a little bit of snow on

14        the ground, I'm not sure of the temperature, I don't think it was a

15        real cold day.

16   Q    Do you remember if it had been raining at all?

17   A    I don't believe it was raining but I don't recall that.

18   Q    Okay.  The driveway itself and the area in front of the house that the

19        driveway leads into is that paved, cement, mud?

20   A    Gravel right at the front that's all gravel.

21   Q    Did the remainder of the driveway leading to the road is that also

22        gravel?

23   A    Yes.

24   Q    Does the--

25             MR. GETTING:  May I approach, Your Honor?
```

20

```
 1                    THE COURT:  Sure.

 2                    (At 9:19 a.m., Attorney Getting at witness stand)

 3                    MR. GETTING:  Do you have Exhibit 1?

 4                    THE COURT:  Yeah, I think I saw them both up here.

 5                    MR. GETTING:  Thank you.  I just didn't know where they got

 6          left.

 7   BY MR. GETTING:

 8   Q    I'm going to show you what was previously introduced as People's

 9        Exhibit 1.  That shows what you would describe as the front of the

10        house?

11   A    Yes.

12   Q    And this area in front of the house is--

13   A    Okay--

14   Q    --this is the area you would describe as being gravel?

15   A    Yes.

16   Q    All right.  Now in this picture it looks like, as you had described,

17        that there might have been a small amount of snow on the ground, it

18        was January, and it also looks like the area in front of the house was

19        wet, tracked, muddy--

20   A    Uh-huh.

21   Q    Is that right?

22   A    Yes.

23   Q    Uh-huh and huh-uh, I know exactly what you're saying but they record

24        everything and it just doesn't come out well.

25                    Was this area in front of the house slippery, if you recall?
```

1    A    No, it didn't seem slippery.

2                    (At 9:20 a.m. Attorney Getting returns to podium)

3    BY MR. GETTING:

4    Q    Did it seem kind of frozen?

5    A    Could have been frozen, uh, it just seemed like it might have been,

6         like I said, a clear day and the snow had melted a little bit so it

7         left some water standing.

8    Q    Might have been a little muddy, might have been a little wet, might

9         have been a little frozen still?

10   A    Sure, yes.

11   Q    When you saw--had you been to the Stermer house before that day?

12   A    Uhm, I'd been down there before.  Linda and I had done hay together

13        so, uhm, but not often, no.

14   Q    What did she need to do hay for?

15   A    She raised horses.

16   Q    Did they grow the hay right there on the Stermer property?

17   A    She pastured, she pastured her property for her horses and I believe

18        she might have done some hay behind her house but I was selling her

19        some hay from my property.

20   Q    At any point in time did you ever hear Todd say anything?

21   A    No.

22   Q    You described Linda in your testimony today as hysterical?

23   A    I would say that, yes.

24   Q    Screaming?

25   A    Don't know if she was screaming, uhm, but just I'd have to go back on

1   what I seen that day, I can't remember--it was--she was hysterical in

2   my eyes.

3   Q   Do you recall that being on January 7, 2007, the day of the fire

4       having spoken with Detective/Sergeant Thomas Macyauski, for the

5       record, M-A-C-Y-A-U-S--

6               MR. KAPS:  Macyauski.

7   BY MR. GETTING:

8   Q   --Macyauski, M-A-C-Y-A-U-S-K-I?

9   A   Yes, I did.

10  Q   And if you describe--would your memory of this event have been better

11      on January 7, 2007 when it happened compared to today?

12  A   Yes.

13  Q   Do you recall having to describe for the Detective, Linda as

14      continuously or continually screaming hysterically?

15  A   If I told Detective Macyauski that that day then that's--would be--

16      that would be more--I recollected more that day than I do today.

17  Q   Of course.  You called to Linda several times asking where's Todd,

18      where's her kids, where's the other people, trying to get her

19      attention to that question?

20  A   Yes.

21  Q   I imagine it wasn't in a conversational tone given the frantic

22      commotion, the hysterical screaming, you probably were yelling as

23      well?

24  A   Yes.

25  Q   And she wasn't responding to you?

23

| | | |
|---|---|---|
| 1 | A | Not to that question.  I wasn't getting an answer so I was still |
| 2 | | trying to make sure no one was in the house. |
| 3 | Q | She was still screaming hysterically.  You're yelling questions at |
| 4 | | her.  Was she in the van at that time or on her feet or where was she? |
| 5 | A | She was on her feet. |
| 6 | Q | When you came from the road where did you park, when you came from the |
| 7 | | County Road 215? |
| 8 | A | I parked in the front of the house just off to the north. |
| 9 | Q | And then went around the north side of the house to the back? |
| 10 | A | I never drove down there, no.  I stayed up topside. |
| 11 | Q | Did you walk around the north side of the house? |
| 12 | A | I walked around the north side of the house to get. |
| 13 | Q | When you were--when you were seeing Linda screaming hysterically, |
| 14 | | she's outside the van, you're yelling questions at her, where is |
| 15 | | everybody, where did that take place at? |
| 16 | A | Directly behind the house on the west side of the house. |
| 17 | Q | So you had parked on the east side of the house, walked around the |
| 18 | | north side of the house to the back and that's where your contact with |
| 19 | | Linda was taking place? |
| 20 | A | Yes. |
| 21 | Q | Where was Todd's body found when you first saw it on the ground? |
| 22 | A | It was on the north side, north side of the house. |
| 23 | Q | So you had gone past Todd's body to get from the east side of the |
| 24 | | house around the north to the west side of the house, right? |
| 25 | A | Yes. |

24

1   Q   And you didn't see it when you went past?

2   A   I didn't see him, no.

3   Q   You went back around the north side of the house to speak with Connie

4       Calhoun, is that right?

5   A   Yes.

6   Q   She--you had wanted to make sure she was on the phone calling 9-1-1?

7   A   Yes.

8   Q   When you went back around the west side--excuse me--back around the

9       north side of the house to the east side where Ms. Calhoun was still

10      in your car, you didn't see Mr. Stermer?

11  A   I believe I didn't still at that time.  I don't--

12  Q   Speaking to Connie Calhoun, making sure she was calling the

13      authorities, you went back around the north side of the house, this

14      would be the third time to the west side where Linda is still was

15      screaming hysterically?

16  A   I don't think it was the third time.  I just wanted to make sure the

17      fire department was coming.  So I--

18  Q   Right.  You went around once, you went back--

19  A   Then down--

20  Q   --that's twice; you went around the third time because Linda was still

21      back there?

22  A   She was still back there.  I believe on the second time is when I

23      finally got her or I'm not for certain I even went to the topside

24      before I had seen the body.  I know I missed it the first time--

25  Q   All right.

1   A   --but I can't say for certain when I came down there I think before I

2       went back to the truck I believe is when she told me, "There he is,

3       there." I don't think I went back to my truck and down--I wouldn't

4       have done that. I think I passed it the first time coming down but I

5       didn't pass him again without seeing him because then I knew the

6       severity, what was going on and I ran up to get coats or something to

7       cover him with.

8   Q   And that's when you saw Linda Stermer and she was with Todd at that

9       point?

10  A   I went--she wasn't with him. I seen--

11  Q   When you came back with the clothing?

12  A   (No audible response)

13  Q   When you came back with the clothing to where Todd was Linda was there

14      holding him and crying, is that right?

15  A   I believe so. I don't know if that was before or after I brought the

16      clothes, but yes, she definitely was there with him.

17  Q   Here again, we're talking about something that happened approximately

18      two and a-half years ago?

19  A   Right.

20  Q   Your recollection at the time of this incident was probably better

21      than it is now?

22  A   Yes, it was.

23  Q   And you talked to the Detective that day, Macyauski?

24  A   Yes.

25  Q   Do you remember--

26

1  A    So if you're--

2  Q    --describing for Detective Macyauski that when you came back with the

3        clothing, Linda was on the ground on top of Todd Stermer hugging him

4        tightly, screaming and crying?

5  A    Yes, I remember saying that, yes.

6  Q    The articles of clothing that you brought from the truck, do you

7        recall which clothes or what clothes you brought from the truck?

8  A    I believe I had a couple of jackets maybe even a blanket, uhm, I had

9        quite a bit of different things in my truck.  So, whatever I could

10       find that would keep him warm.

11 Q    Would it be fair to say that you weren't paying attention to what you

12       grabbed--

13 A    I wasn't paying--

14 Q    --you grabbed what you could and ran?

15 A    --I grabbed what I could get, yes.

16 Q    All right.  When you first arrived on the scene you said that Ms.

17       Stermer was in the family van?

18 A    She was in a van.  I--we were neighbors but I mean I didn't--I'm

19       saying it was their van.  I don't know if it was their van.  It was a

20       van.

21 Q    All right.  I guess that's not even the point.

22 A    I didn't know--

23 Q    She was in a van?

24 A    Yes.

25 Q    That's fine.

1   A   Okay.

2   Q   Was she on the west side of the house, the east side of the house, the

3       north side of the house?

4   A   My recollection is she was on the north side of the house.

5   Q   In the van?

6   A   In the van.

7   Q   Was the van pointed such that it was going around to the east--or the

8       west side of the house or was it pointed coming back around to the

9       west side?

10  A   I recall it was pointing still to the south.

11  Q   Was it kind of behind the house?

12  A   It was to the north of the house.

13  Q   North of the house pointed south?

14  A   Right.

15  Q   Did the van go anywhere?

16  A   When I pulled up it pulled forward back to where they parked behind

17      the house on the west--

18  Q   All right.

19  A   --and that's when she got out.

20  Q   So you never saw the van on the east side of the house, the front of

21      the house?

22  A   No.

23  Q   I had written down the word "top" and I couldn't figure out what we

24      meant by that.  Did you ever see Todd moving?

25  A   No.

28

1  Q  He was laying on the ground when you saw him and he remained on the

2  ground the entire time?

3  A  Yes.

4  Q  Your best estimate is 10 to 15 minutes but you weren't looking at your

5  watch, and given the hysteria, and tending to the situation, it

6  wouldn't surprise you if your times were off, would it?

7  A  (No audible response)

8  Q  It could have been longer, could have been less?

9  A  Could have been longer, could have been less.

10  Q  When you brought the clothing back, the coats, the blanket, or

11  whatever you were able to get out of the car, when you brought that to

12  cover Todd did you cover Linda and Todd at the same time then because

13  she was holding him?  So you would have covered them both or do you

14  remember or?

15  A  I think I just covered Todd.

16  Q  How do you remember Linda being dressed?

17  A  At--at--today, I don't remember what she was wearing.

18  Q  All right.  Isn't it true that she had no shoes on, no socks on?

19  A  I'd be guessing because I didn't, uh, I don't recall that, but--

20  Q  All right.  Isn't it true that she didn't have any coat on?

21  A  I don't think she had a coat on but I, once again, I--

22  Q  All right.  Thank you, sir.

23  MR. GETTING:  I don't have any other questions.

24  MR. KAPS:  I have no other questions.

25  THE COURT:  Okay.  You can step down.  Watch your step

29

1     there.

2                    MR. KAPS:  May this witness be excused?

3                    MR. GETTING:  I have no objection, Judge.

4                    THE COURT:  You're excused.  That means you can also leave

5     if you need to.

6                    THE WITNESS:  Okay.

7                    THE COURT:  Or you're welcome to stay.  Whatever you want to

8     do.

9                    THE WITNESS:  Okay.

10                    (At 9:32 a.m., witness excused)

11                    MR. KAPS:  Call Tony Evans.

12                    THE COURT:  Can you come all the way up here for us?

13                    (Mr. Evans complies)

14                    THE COURT:  And let me stop you now before you come up the

15     step.  Could you raise your right hand?

16                    (Mr. Evans complies)

17                    THE COURT:  Do you swear or affirm that the testimony you

18     will give today in regards to this proceeding will be the truth, the

19     whole truth, and nothing but the truth?

20                    MR. EVANS:  I do.

21                    THE COURT:  Okay.  Step up here, please and have a seat.

22     Get yourself comfortable and then I need you to speak out loud today.

23     Okay?

24                    THE WITNESS:  Okay.

25                    THE COURT:  Give us your first name and your last name?

1          THE COURT:  Tony Evans.

2          THE COURT:  And spell your last name for us?

3          THE WITNESS:  E-V-A-N-S.

4          THE COURT:  Thank you.  Go ahead, sir.

5                          TONY EVANS

6     called by the People at 9:32 a.m., sworn by the Court, testified:

7                     DIRECT EXAMINATION

8  BY MR. KAPS:

9  Q    And Mr. Evans, how are you employed?

10 A    By the Van Buren County Sheriff's Office.

11 Q    And as a deputy sheriff?

12 A    Correct.

13 Q    And were you so employed on January 7, 2007?

14 A    Yes, I was.

15 Q    All right.  On that date did you have occasion to respond to a call to

16       66598 County Road 215 in Lawrence Township?

17 A    Yes, I did.

18 Q    All right.  And do you remember approximately what time of day that

19       was when you received that call?

20 A    Approximately 3:36.

21 Q    All right.  And about how long did it take you to get to that

22       location?

23 A    Seven minutes.

24 Q    All right.  And Deputy Evans when you first arrived at that location

25       did you note anything out of the ordinary as you pulled up near the

31

1    residence?

2  A  When I pulled up to the residence I noted the house was on fire.   That

3    the house set further back from the roadway and I noted a bunch of

4    people attending to Mr. Stermer on the north side of the residence.

5  Q  And as you got up to the residence did you make observations of a

6    person that was later identified as Todd Stermer on the north side of

7    the residence?

8  A  Yes, I did.

9  Q  All right.   And where was Mr. Stermer in relationship to the

10    residence?

11  A  He was approximately 20, 25 yards to the north of the residence.

12  Q  All right.   And were you able to observe his general condition at that

13    time?

14  A  Yes, I did.

15  Q  And can you tell us what your general observations were of him?

16  A  He had severe burns.

17  Q  All right.   And what, if anything, did you note as far as clothing

18    that Mr. Stermer had?

19  A  There was some clothing laying on top of him.   He appeared to be naked

20    to me.   After he was moved I did note that he had some sweatpants on,

21    underwear, and socks, but those were down near his ankles.

22  Q  All right.   And other than the burns, apparent burns to Mr. Stermer,

23    did you note any other injuries to his person?

24  A  Yes, I did.

25  Q  Okay.   What other injuries were obvious to you at that point in time?

1   A   There was a large amount of blood in his head area, in the rear of his

2       head, the back of his head.

3   Q   All right.  And was there also blood on the ground as a result of

4       that?

5   A   Yes.

6   Q   Okay.  Now after making these observations was Mr. Stermer's body

7       moved?

8   A   Yes, it was.

9   Q   And what was the reason for the movement of the body?

10  A   It was very close to the house.  There was a large oil tank on the

11      north side of the house and I was concerned for the other people that

12      were there.

13  Q   All right.  So as I understand, Mr. Stermer was moved some distance

14      away from the house, is that correct?

15  A   Yes, he was.

16  Q   All right.  And how was that done?

17  A   We attempted to grab him, I did, and due to his condition I was unable

18      to do that with his skin slippage.  We then grabbed a molded sled that

19      was laying out in the yard, we loaded him onto that and then pulled

20      him to a safer area.

21  Q   All right.  Now after this were there other officers that ultimately

22      responded to the scene, also?

23  A   Yes, there was.

24  Q   All right.  And was one of those Detective Macyauski?

25  A   Yes.

1  Q   All right.  The location where Mr. Stermer had originally been upon

2      your arrival did you point out that location to Detective Macyauski?

3  A   Yes, I did.

4  Q   All right.  Also while you were on the scene did you become aware of a

5      1993 Ford Econoline van in the area?

6  A   Yes, I did.

7  Q   And where was that located?

8  A   On the south side of the residence.

9  Q   All right.

10 A   I'm sorry about that, it would be on the west side of the residence.

11 Q   Okay.  The--

12 A   The van was facing the south side.

13 Q   All right.  And that would be behind the residence, basically?

14 A   Yes.

15 Q   All right.  And do you recall whether or not the vehicle was running

16     or whether it was--the motor was shut off?

17 A   It was running.

18 Q   It was running.  All right.  And did you make any observations other

19     than that about the vehicle either interior or exterior?

20 A   Yes, I did.

21 Q   And what was it that would have caught your attention?

22 A   I noted there to be what appeared to be blood on the front bumper of

23     the vehicle.

24 Q   All right.  Anything else?  Anything in the interior of the vehicle at

25     all or not?

34

1  A    I did not, no.

2  Q    All right.

3              MR. KAPS:  I have no other questions.

4              THE COURT:  Attorney Getting.

5                        CROSS-EXAMINATION

6  BY MR. GETTING:

7  Q    Officer, you noticed what appeared to be blood on the front bumper of

8       the van?

9  A    Yes, sir.

10  Q   Driver's side or passenger side?

11  A   It would have been, uh, near the driver's side.

12  Q   Was it center of the bumper or outside edge of the bumper?

13  A   It was approximately I'd say between the middle and the driver's side.

14  Q   Okay.

15  A   I believe there are some photos.

16  Q   On the bottom or on the top--

17  A   I noted--

18  Q   --of the bumper?

19  A   --what appeared to be blood on the front bumper and also underneath.

20  Q   Was it on the top of the front bumper or on the bottom of the front

21      bumper?

22  A   (No audible response)

23  Q   If you recall?

24  A   I don't recall.

25  Q   Would looking at a picture help refresh your recollection?

35

1    A      Yes.

2                    MR. GETTING:  May I approach, Your Honor?

3                    THE COURT:  Sure.

4                    (At 9:40 a.m., Attorney Getting at witness stand)

5                    MR. KAPS:  Your Honor, I would have--I would suggest we mark

6    it and I would have no objection to the admission of it.

7                    MR. GETTING:  Your Honor, if we could have it marked as, I

8    guess, Defense Exhibit A, I don't intend to--

9                    THE COURT:  Can we call it #3 though?

10                   MR. GETTING:  We can call it whatever you want, Judge.  I

11   didn't know that Prosecutor Kaps had others already previously marked.

12                   (At 9:40 a.m., DX #3 marked)

13                   MR. KAPS:  I don't have any other ones marked.

14                   THE COURT:  That's a good question.  And we tried that--we

15   tried that Prosecutor or People's 1 and Defendant's A and I find out

16   it's better if we just keep a chronological number.

17                   MR. GETTING:  I understand you're working with lawyers and

18   we have a hard time keeping track of it.

19                   THE COURT:  I didn't mean it that way, it's for me.  Go

20   ahead, sir.

21                   MR. GETTING:  Thank you.

22   BY MR. GETTING:

23   Q      I'm going to show you what's now been marked for purposes of

24          identification, it's Defendant's Exhibit #3.  Do you recognize what's

25          depicted in that photograph?

1    A    Yes, I do.

2    Q    And does it refresh your recollection as to the question asked?

3    A    Yes, it does.

4    Q    All right.  And the blood that you described as having or what

5         appeared to be blood to you that you described as having seen on the

6         bumper, was it on the top or the bottom of the bumper?

7    A    It appeared to be on the top and the bottom.

8    Q    All right.  And did you notice anything above the bumper?

9    A    No, I did not.

10   Q    All right.  So anything on the vehicle itself, the lights or higher on

11        the vehicle?

12   A    No.

13   Q    When you arrived at the scene do you know or recall where Ms. Stermer

14        was?

15   A    Yes, she was on the north side of the residence with Mr. Stermer.

16   Q    Was Mr. Stermer conscious, unconscious?

17   A    I think he was unconscious.

18   Q    Did you, in your contact with Mr. Stermer, did he ever say anything to

19        you?

20   A    No, he did not.

21   Q    Ms. Stermer, when you first had contact with her, she was not wearing

22        a jacket?

23   A    I don't recall.

24   Q    She didn't have shoes on?

25   A    I don't recall if she did or not.

1  Q  Mr. Stermer, you indicated he appeared to be naked?

2  A  Yes.

3  Q  He had no shirt on?

4  A  Correct.

5  Q  You later noted that there were what you said was sweatpants, socks,

6     and underwear but those were pulled down?

7  A  Yes.

8  Q  Were they pulled just below his waist, knees, ankles?

9  A  Below his ankles.

10 Q  The house was on fire and on this north side of the house or near the

11    house is a large fuel tank?

12 A  Yes.

13 Q  Do you know whether that was for fuel oil for the house or for

14    gasoline or what it was for?

15 A  I do not.

16 Q  The size of the fire, the proximity of the fuel tank, and where Mr.

17    Stermer and the other persons were caused you concern?

18 A  Yes.

19 Q  That's why it was decided to move Mr. Stermer?

20 A  I felt it was safer for everyone to move away from the fire and the

21    fuel tank.

22 Q  One of the persons that had arrived on the scene at the same time or

23    shortly before you was a doctor, is that right?

24 A  Yes.

25 Q  And they were providing first-aid to Mr. Stermer at the time?

38

1   A   Yes.

2   Q   When Mr. Stermer is moved for the purpose of safety of everyone so

3       they can continue to try and provide first aid for Mr. Stermer and not

4       be in danger from the fire?

5   A   Yes.

6   Q   You went to pick him up and my apologies to everyone for this

7       question, you went to move him and you were unable to do that and you

8       used the phrase, "skin slippage." I need to ask you what that means?

9   A   When I attempted to grab him his skin, as I grabbed him, his skin

10      slipped in my hands.

11  Q   All right.

12  A   And came off of him. Just slipped.

13  Q   That was as a result of the fire injury?

14  A   Yes, I believe.

15  Q   At the time that you first saw Ms. Stermer would it be fair to

16      describe her as upset?

17  A   Yes.

18  Q   Emotional?

19  A   Yes.

20  Q   Crying?

21  A   I don't recall if she was crying, uh, I remember her screaming and

22      yelling. She kept yelling over and over, "Todd, Todd."

23  Q   She was yelling what?

24  A   "Todd."

25  Q   The victim's name?

1  A    Yes.

2  Q    And she was doing that over and over?

3  A    Yes.

4  Q    I don't have any other questions.  Thank you.

5            THE COURT:  Okay.

6            MR. KAPS:  I have no other questions, Your Honor.

7            THE COURT:  Okay.  Thank you.  Deputy Evans, you can step

8    down.  Okay.  Would you watch your step there.

9            THE WITNESS:  Sure.

10           THE COURT:  Thank you.

11           (At 9:45 a.m., witness excused)

12           THE COURT:  Mr. Kaps?

13           MR. KAPS:  Call Scott Leroy.

14           THE COURT:  Sir, could you come all the way up here for us?

15           (Mr. Leroy complies)

16           THE COURT:  Now you can see a step right here.  Okay.  Let

17   me stop you before you come up.  Thank you.  Do you swear or affirm

18   that the testimony you will give today in regards to this proceeding

19   will be the truth, the whole truth, and nothing but the truth?

20           MR. LEROY:  I do.

21           THE COURT:  Okay, if you would come up here and have a seat.

22   Okay.

23           (Witness complies)

24           THE COURT:  Get yourself comfy.  Also, the microphone

25   doesn't amplify, okay, it just records.  So speak out for us today if

                                    40

1     you would.

2                   THE WITNESS:  Yes, sir.

3                   THE COURT:  Could you give us your first name and your last

4     name, please?

5                   THE WITNESS:  Detective/Sergeant Scott Leroy.

6                   THE COURT:  And could you spell your last name?

7                   THE WITNESS:  L-E-R-O-Y.

8                   THE COURT:  Okay, thank you.  Go ahead, sir.

9                   (At 9:48 a.m., PX #4 and #5 marked)

10                         SCOTT LEROY

11    called by the People at 9:47 a.m., sworn by the Court, testified:

12                      DIRECT EXAMINATION

13    BY MR. KAPS:

14    Q   And can you tell us how you are employed?

15    A   I'm currently employed as a fire investigator with the Michigan State

16        Police.

17    Q   And how long have you been employed in the capacity of a fire

18        investigator with the Michigan State Police?

19    A   I've been a fire investigator since 2001.

20    Q   And can you tell the Court what your background is as far as education

21        and training leading to your present position?

22    A   Within the state police I've attended several specialized classes

23        adding up to well over 250 hours of specialized training, fire

24        investigation which includes but not, uh, arson investigation, basic

25        fire scene investigation, advance fire scene investigation, vehicle

                                    41

1     fire investigation, mobile/modular home investigation, post-blast

2     investigation, burn pattern recognition and there's others in there

3     also.

4  Q  All right. And is there any type of certification that goes along

5     with your position or is it simply the training and the background?

6  A  I've obtained an International Certification through the International

7     Association of Arson Investigators as a Certified Fire Investigator.

8  Q  All right. Have you been qualified as an expert witness in fire

9     investigations specifically as far as cause and origin in the courts

10    of the State of Michigan?

11  A  I've been recognized--let me look at my CV so I get this right--I've

12    been recognized as an expert in Cause and Origin 27 times and 11 of

13    those are in Van Buren County.

14         MR. GETTING: Your Honor, at this time we have no objection

15    to him being qualified as an expert in Fire Investigation. I would

16    ask that we be supplied with a copy of his curriculum vitae when it's

17    available.

18         (Witness indicating has copy of curriculum vitae for

19    Attorney Getting)

20         MR. GETTING: He has--may I approach?

21         THE COURT: Yeah, sure.

22         MR. GETTING: Thank you.

23         THE COURT: Do you have one handy?

24         THE WITNESS: That's the one marked "D" for defense.

25         THE COURT: Okay. The record will reflect that was done.

1      Okay.

2             MR. GETTING:  Ask and you shall receive.

3             THE COURT:  Thank you.

4  BY MR. KAPS:

5  Q    I want to direct your attention to January 7, 2007, did you have

6      occasion to respond to investigate a fire at 66598 County Road 215,

7      Lawrence Township, Van Buren County?

8  A    Yes, I did.

9  Q    All right.  Do you recall approximately what time of day it was that

10     you arrived at that location?

11  A    I arrived at the location at approximately 6:00 p.m.

12  Q    All right.  And Sergeant Leroy can you tell us or tell the Court what

13     is it, in general terms, what you do when you arrive at the type of a

14     scene that you were faced with on that particular day?

15  A    On this particular day I knew going in that this was the scene of a

16     fatal fire for somebody who died.  Typically at these scenes when I go

17     there the first thing I do is do--I would examine the body and I

18     examine the body specifically looking for burns or any evidence that

19     may be related to the fire scene.  I document the body first when I

20     arrived on scene and that's what I did in this scene.  And then I

21     would move to the structure to determine the origin that caused the

22     fire.

23  Q    All right.  Now as far as making an examination of Mr. Stermer was

24     there anything regarding the condition of his body that led to any

25     ultimate determinations or opinions that you arrived at in this case?

1   A   Yes.

2   Q   And what was that?

3   A   Well, examining Mr. Stermer's body I noticed that there was severe

4       burns to his body, specifically the head, the arms, lesser degree to

5       his torso and his legs which indicated to me that I knew he was in the

6       fire at some point or very near the fire to receive severe burns.

7           Also, as I was examining the body, I had a detectible odor

8       of some sort of petroleum, some sort of petroleum liquid I couldn't

9       identify at that point.

10  Q   Did you note any other injuries that appeared to be possibly unrelated

11      to the fire to Mr. Stermer?

12  A   I--through my examination I noticed that there was some, I noticed a

13      large wound/gash in the back of his head.

14  Q   After making the examination of Mr. Stermer did you then continue to

15      the structure itself?

16  A   Yes, I did.

17  Q   Okay. Can you tell us what it is that you do or what did in this

18      particular situation?

19  A   In this particular situation I went to examine the house, however, the

20      problem was that at that particular time there was still smoke and

21      some hidden areas of fire still within the house. I made a cursory

22      examination of the exterior, took some preliminary photographs, and

23      then made arrangements to secure the scene and continue the scene of

24      the structure the next morning.

25  Q   I want to show you want to show you what's been marked as--

44

1   A   One and two are up here.

2   Q   Four and five.

3   A   Okay.

4   Q   I want to show you, first of all, what's been marked as Proposed

5       Exhibit #4 and ask if you can tell us what that depicts?

6   A   Four depicts the west side of the structure or what I would I refer to

7       as the back of the house.

8   Q   All right.  And I'll also show you what's been marked as Proposed

9       Exhibit #5 and ask if you can identify that?

10  A   Five shows the east side of the house or the front of the structure.

11  Q   All right.  And then we also have a couple of others that were

12      previously admitted, #1 and #2, can you tell us what those are?

13  A   People's Exhibit #1 is a photograph again of the east side of the

14      house, which is the front, however, a little further back than showing

15      in Exhibit 5.

16          People's Exhibit #2 shows partially of the north side of the

17      structure.

18          MR. KAPS:  I would move for the admission of Proposed

19      Exhibits #4 and #5.

20          MR. GETTING:  I have no objection, Your Honor.

21          THE COURT:  Okay, #4 and #5 are received.

22          MR. KAPS:  Actually, I would like to--not--I don't have any

23      questions, I don't believe, of this witness regarding Defendant's

24      Proposed Exhibit #3, but I would move for the admission of that one,

25      also.

1          MR. GETTING:  I have no objection, Your Honor, it's been

2     properly identified.

3          THE COURT:  Okay, Exhibit #3 is also received.   Thank you.

4          MR. KAPS:  Thank you.

5     BY MR. KAPS:

6     Q    Detective/Sergeant Leroy, I want to show you or direct your attention

7          to People's Exhibit #5.  On the evening of the 7th of January did you

8          note any objects that you felt might be of interest on the exterior of

9          the residence that are visible in Proposed--I'm sorry--Exhibit #5?

10    A    I took photographs and examined the exterior of the scene on January

11         the 7th, the evening, and on the east side there was noted to be red

12         gasoline, plastic gasoline can on the east side.  And in People's

13         Exhibit #5 it depicts the gasoline can still in the approximately same

14         area as it was the previous night.

15    Q    So basically laying in the front yard is a gasoline can?

16    A    Yes.  I'm sorry, yes, in the front yard on the east side of the

17         structure towards the south.

18    Q    All right.  Now going back to when you returned to the residence to

19         conduct a further investigation on the 8th can you tell us what you did

20         at that point in time, as far as your investigation, to attempt to

21         determine cause and origin?

22    A    To determine cause and origin the two basic theories is, I'm looking

23         for one of the--I'm looking for the most fire damage.  One of the

24         basics of fire investigation is you look for the heaviest fire damage

25         because wherever the fire burns the longest is going to create the

1     most damage in a fire.  So, wherever the damage is the greatest is the

2     area where the fire started.

3            With all investigations I start with an exterior exam and I

4     did so in this case.  In examining the exterior of the structure it

5     became apparent, early apparent, that the roof had collapsed.

6            Walking around the exterior I noticed on the east side, I'm

7     looking at the doors and the windows, and what I'm looking for is

8     where the fire comes out or the term is 'vent', where the fire vents

9     itself to the outside.  How is the fire trying to get out of the

10    structure.  And I'm looking at the different doors and windows to see

11    where the fire has tried to come out because that's typically the more

12    fire that is coming out is typically where the area where the fire is

13    starting.

14  Q  What, if any, observations did you make in this particular situation

15     that assisted you in making that determination?

16  A  Several.  Looking at the windows of the structure the windows with the

17     heaviest indications of fire coming out are going to be, as you can

18     see in People's Exhibit 4, the indications of the heavy burn of the

19     windows coming out shows heavy fire damage versus the adjacent

20     windows.  You can see the windows and the doors that are directly

21     underneath, which would be the basement or lower level the walkout on

22     the west side.  You see this is a vinyl siding, very easily burned

23     does not show any fire damage coming out. Again, you see the windows

24     to the north of these large bay windows very little fire coming out

25     even though the top is missing.  There is some fire coming out of the

47

1       southern window, however, not as severe as the windows that would

2       eventually be adjacent to the living room.

3               Further examination, I had brought in an aerial fire truck

4       with a large aerial ladder to get me up in the air to do an overall

5       look at the roof of the structure.  By looking at that I could see

6       that the roof of the house, the most destruction is directly over the

7       living room area.  There is still roof remaining to the south,

8       unburned roof, to the north of the living room area there is burning

9       to that roof area however there is still large portions that are

10      unburned however collapsed in.

11              In the area over the living room specifically its not only

12      collapsed in but totally consumed.  I didn't find any remnants of

13      large pieces of roofing, shingles, trusses, of anything of that

14      nature.

15  Q   What, if any, conclusions were you able to draw from these

16      observations as to the origin of the fire within that residence?

17  A   Continuing into the structure, specifically in the area of the living

18      room, I noticed the, what would be the floor joists which would--above

19      the floor joints would be the first main level which I would say is

20      the living room and below the floor joists is the basement, the

21      walkout, those floor joists are totally--again, totally consumed, no

22      large pieces.  By looking at those burn patterns, I determined that

23      the area of origin would have been in the living room.

24  Q   All right.  Were you able to, based on your examination or other

25      information, were you able to determine a cause of the fire?

1   A   Yes.

2   Q   And what was that?

3   A   Taking all the information, including the area of origin, plus the

4       facts surrounding the case, the time of day, the condition of the

5       known people in the house at that time and the fact that this fire was

6       started very rapidly and spread very--the fire was larger and spread

7       rapidly than any accidental fire could have spread.  Also the fact

8       that I know there's some sort of--eventually I found out there's

9       gasoline within the area of origin because there was gasoline found on

10      Mr. Stermer and his burns showing he is in the area of origin.  With

11      this information, it is my determination that this is an arson fire.

12              MR. KAPS:  I have no other questions

13              THE COURT:  Attorney Getting.

14              MR. GETTING:  Thank you, Your Honor.  May it please the

15      Court.

16                      CROSS-EXAMINATION

17  BY MR. GETTING:

18  Q   You weren't there when the fire happened?

19  A   Happened, as when it started?

20  Q   Yes.

21  A   That's correct.

22  Q   Okay.  You described the house as still smoking when you arrived?

23  A   Yes.

24  Q   What time did you arrive at the scene?

25  A   Approximately 6:00 p.m., on January 7th.

49

1   Q   The fire at that point had largely been put out?

2   A   For the most part, yes.

3   Q   You weren't present when the fire was put out?  I mean you weren't

4       there to watch the firemen put out the fire?

5   A   Not--I did not respond with the firemen.

6   Q   All right. And by the time you got there the fire had largely been put

7       out?  You said smoking still--

8   A   There was some--there was still areas of smoking.

9   Q   It wouldn't have been safe for you to start poking around at that

10      point?

11  A   I went in and took a cursory look but it was dark, it was rainy, still

12      smoking makes the investigation difficult.

13  Q   Do you know when it had started raining that day?

14  A   Not exactly.  It had been raining pretty much all day, if I recall.

15  Q   The area that has the most fire damage is the area where the fire

16      burned the longest, is that right?

17  A   Correct.

18  Q   The manner of which the first is put out would affect what area the

19      fire burned the longest?

20  A   That is true.

21  Q   If I start a fire over there and it spreads over here and if the

22      record would reflect I'm pointing to opposite corners of the

23      courtroom.  If I start a fire in the left corner of the courtroom and

24      the fire has spread to the right corner of the courtroom, but I put it

25      out over there on the left side and I let it burn for an hour on the

50

1   right side what area is going to have the most damage?

2 A They area that was not put out.  And--

3 Q Right.  And you weren't there to see the fire put out?

4 A Correct.

5 Q All right.  The area of this house that had the most fire damage was

6   the living room area, is that true?

7 A Correct.

8 Q And based upon the amount of damage that was there you concluded that

9   that was likely the origin or the area where the fire originated?

10 A There's also other information obtained, witnesses' statements, first

11   firefighter on scene, I've seen in-car dash cameras, uhm--

12 Q I'm sure you've did a whole lot of work.  One of the factors is that

13   that was the area that had the most burn damage?

14 A Yes.

15 Q Based on that and other things, as gone through your investigation,

16   you've concluded that that was likely the area where the fire started?

17 A Yes.

18 Q I'm going to use the word 'likely' because you weren't there to see

19   the fire start, right?

20 A That's correct.

21 Q All right.  When you saw Mr. Stermer at the scene you took notes and

22   as you testified, the first thing you want to do is examine the

23   victims, right?

24 A That's--that's usually one of the first things I need to do because

25   everyone wants to do is usually remove the victim from the scene.

1  Q    And that's what you did in this case?

2  A    Yes.

3  Q    You observed Mr. Stermer and he--you had been told that he had been

4      moved from where he was first found to a location further away from

5      the fire for purposes of safety?

6  A    That's correct.

7  Q    All right.  When you saw him you noted him to have severe burning on

8      his arms, his head, and then less severe burning on his torso and his

9      legs?

10  A    Correct.

11  Q    You noted that there did not appear to be any clothing or there was no

12      indication of any clothing on the upper torso of the victim, is that

13      right?

14  A    Correct.

15  Q    By that you mean he didn't have a shirt on?

16  A    He did not have a shirt on.  There were other clothing that were laid

17      on top of him which I later learned that many of the witnesses,

18      bystanders, initially started putting some other clothing on him but I

19      did not witness any clothing on him.

20  Q    Okay.  Did you know whether or not he had any clothes on this legs;

21      pants, socks, underwear?

22  A    He had socks on, and the grey sweatpants were around his ankles.

23  Q    You noted that his clothes--that the clothing did not show

24      considerable burn damage?

25  A    Correct.

1   Q   Did it have burn damage?

2   A   I didn't thoroughly examine the clothes for--I did not lay the clothes

3       out and examine for burn damage.  So what I could witness before I

4       packed them I did not see any--

5   Q   You did not see any?

6   A   Significant burn damage that I could visually see.

7   Q   Did you see any burn damage before they were packed?

8   A   I don't recall, no.

9   Q   You noted the smell of, you said an odor of petroleum, I presume that

10      you can't, even with all your expertise, tell just by the smell what a

11      product is?

12  A   Sometimes you can make a guess but I prefer not to.

13  Q   You prefer to have somebody with proper equipment make that

14      determination?

15  A   Correct.

16  Q   It could have been gas, it could have been something else based on the

17      odor?

18  A   Based on the odor it could have been gasoline, kerosene, I--charcoal

19      lighter fluid, I'm not going--I can't tell by my nose.

20  Q   One of the indications of injury that you saw was you said there was a

21      wound, a gash on the back of head?

22  A   Yes.

23  Q   Can you tell whether or not that happened before the fire started or

24      after--can you tell whether or not that's before the burn damage or

25      after the burn damage?

53

1   A      I cannot.

2                  MR. GETTING:  May I approach, Your Honor?

3                  THE COURT:  Sure.

4                  (At 10:08 a.m., Attorney Getting at witness stand)

5   BY MR. GETTING:

6   Q      Which one of these is #5?

7   A      That one.

8   Q      Okay.  I'm looking at what's previously been admitted as People's

9          Exhibit #5 and you noted a red gasoline can that you spoke about.  Is

10         that this item that I'm pointing to here on the left side of the

11         photograph?

12  A      Yes.

13  Q      And you said that it was--these photographs were taken January 8th?

14  A      That's correct.

15  Q      And your testimony was that it was in approximately the same location

16         that you noted it on January 7th?

17  A      Yes.

18  Q      What's approximately mean?

19  A      Approximately I can't tell--it might have been moved a couple of

20         inches, but it was within several feet of that area.

21  Q      All right.  It's not like you saw it on a different side of the house

22         and it was--

23  A      Correct, I--

24  Q      --put there--

25  A      --did--

                                    54

1   Q   It was in that same general vicinity?

2   A   I can't get into if it was moved two or three inches.

3   Q   I'm not suggesting that it was or that it wasn't, I'm just--

4   A   The general location of the house or the yard I should say.

5   Q   All right. Did you go and look around the property at all?

6   A   Yes.

7   Q   All right. And I'm looking at Exhibit #5, on the left side of that

8       photograph it appears that towards the back behind the house there's a

9       shed with an overhang?

10   A   Yes.

11   Q   Was that still on the Stermer property to the best of your knowledge?

12   A   Yes, I believe it was.

13   Q   You went back there and looked around?

14   A   Yes.

15   Q   How many gas cans are back there?

16   A   Without looking at a photograph of the shed there may have been two

17       gas cans and some kerosene cans, but I have--there's a photograph of

18       the inside, which I'd have to look at to know exactly.

19   Q   There was more gas cans than just the one that was located in

20       paragraph--or Picture 5 that were in the shed?

21   A   Correct.

22   Q   You're just unsure of how many at this time?

23   A   Without looking at my photographs, correct.

24   Q   Inside the house itself did you find any evidence of any accelerant?

25   A   I did not, no.

1  Q   Okay.

2  A   Evidence, being physical evidence that was sent to the lab, I did not.

3  Q   All right.  Was there--so there were no items seized that later tested

4       and showed positive for the presence of gasoline from inside the

5       house?

6  A   No.

7  Q   Was there a burn pattern that suggested that an accelerant had been

8       poured inside the house?

9  A   Yes.

10  Q   What?

11  A   The absence of the floor.  The absence--the entire--the complete

12      absence of the living room floor and floor joists in the amount of

13      time we're talking about--

14  Q   That--

15  A   --suggests, would suggest flammable liquids.

16  Q   All right.  The absence of those things suggest that a flammable

17      liquid was used?

18  A   Correct.

19  Q   No flammable liquid was found on any item within the house?

20  A   Correct.

21  Q   Your testimony is that it was consumed in the fire, I presume?

22  A   That is my testimony now, yes.

23  Q   I guess maybe that's--it's--is that what your theory is is that it was

24      consumed in the fire?

25  A   With the amount of fire in the living room it would have been all

1       consumed, yes.

2    Q  If there was one used?

3    A  If there was one used.

4    Q  But you did not find any physical evidence of that?

5    A  Correct.

6    Q  Thank you, sir.  I don't have any other questions.

7              THE COURT:  Mr. Kaps?

8              MR. KAPS:  I have no other questions.

9              THE COURT:  Okay.  You can step down.

10             THE WITNESS:  Thank you, Your Honor.

11             THE COURT:  Watch your step there, okay.  Thank you.

12             (At 10:12 a.m., witness excused)

13             MR. KAPS:  Your Honor, could we just take a quick bathroom

14   break?

15             THE COURT:  Yes, sir, we can.  Okay.  How about 25 after,

16   okay?  At 10:25, I may have some things to do myself, though.

17             MR. KAPS:  Okay.  Thank you.

18             MR. GETTING:  Thank you.

19             THE COURT:  All right.

20             MR. GETTING:  Thank you, Your Honor.

21             THE COURT:  You betcha.

22             (At 10:12 a.m., Court in recess)

23             (At 10:26 a.m., Court reconvenes, all parties present)

24             THE COURT:  Okay.  Are you all ready?

25             MR. KAPS:  Yes.

1            THE COURT:  Okay, we are back on the record on 090575FY,

2   it's called People versus Linda Kay Stermer.  We're in the process of

3   having a preliminary examination and Attorney Kaps, you can call

4   another witness then.

5            MR. KAPS:  I'd call Gabrielle Rought.

6            THE COURT:  Don't come up the steps yet.  Okay.

7            (Ms. Rought raises her right hand)

8            THE COURT:  Do you swear or affirm that the testimony you

9   will give today in regards to this proceeding will be the truth, the

10   whole truth, and nothing but the truth?

11            MS. ROUGHT:  I do.

12            THE COURT:  Step on up and get yourself a seat.  And speak

13   loud for us, okay, and then give us your first name and your last name

14   today?

15            THE WITNESS:  My name is Gabrielle Rought.

16            THE COURT:  And spell your last name?

17            THE WITNESS:  R-O-U-G-H-T.

18            THE COURT:  Okay, thank you.  Go ahead, sir.

19                   GABRIELLE ROUGHT

20   called by the People at 10:26 a.m., sworn by the Court, testified:

21                 DIRECT EXAMINATION

22 BY MR. KAPS:

23 Q   And how are you employed?

24 A   I'm employed at the Van Buren County Sheriff's Office, I'm a

25   detective.

1  Q  And were you so employed on January the 7th of 2007?

2  A  Yes, I was.

3  Q  On that date did you have occasion to become involved in the

4     investigation of a fire and death at the Stermer residence in Lawrence

5     Township?

6  A  Yes, I was.

7  Q  As part of the investigation on the 7th did you have occasion to have

8     contact with Linda Stermer?

9  A  Yes, I did.

10  Q  And for the record, the person that you had contact with, as Linda

11     Stermer is she in the courtroom today?

12  A  Yes, she is.

13  Q  And can you point her out for us?

14  A  She's sitting at the defense table wearing a green jumpsuit.

15         MR. KAPS:  If the record could reflect that she's identified

16     the Defendant?

17         THE COURT:  It will.

18  BY MR. KAPS:

19  Q  And at the point in time, when you had contact with Linda Stermer,

20     what information did you have in general terms about what had

21     happened?  What did you know at that point in time?

22  A  I didn't know a whole lot of information other than there was a fire

23     and that the male occupant of the home was deceased.

24  Q  All right.  And in order to gain further information, about what may

25     have happened on that date, did you have a conversation with Linda

59

1     Stermer?

2  A   Yes, I did.

3  Q   Okay.  And can you tell us what that conversation consisted of?  What

4     did you ask?

5  A   Well, I started off, I asked her if she could recall the events of

6     Sunday, the 7th, starting with the time that she woke up in the morning

7     to the present time, if she could just recall what happened.

8  Q   So basically you asked for a chronological recitation of the events of

9     her day, basically?

10  A   That's correct.

11  Q   All right.  And can you tell us what she told you about what had

12     happened that day?

13  A   Linda told me that she woke up before Todd that morning, she estimated

14     at about 7:00 a.m.  She said that Todd woke up that morning at what

15     she estimated was around 10:00 a.m., she said that he wasn't feeling

16     well and she had told me that he was taking some medication for an ear

17     infection.  She said that he was then seated in the living room chair

18     watching TV and kind of snoozing on and off.

19         She told me that she prepared breakfast, that she had made

20     eggs and I believe she said sausage or smokey links and coffee.

21         She told me that besides herself and her husband, Todd,

22     being home that morning, her three sons were home, she named them

23     Trenton, Trevor and Cory.

24         Linda told me that there was an argument that morning

25     between herself and her husband Todd and I had asked her questions

60

1    about what that argument was about.  She told me that the argument was

2    over a financial issue that she had apparently used a debit card and

3    didn't record that transaction and/or didn't transfer money from one

4    account to another to cover that.

5         She had also later told me that there was--that he was angry

6    with her about being at some birthday party Saturday, the evening

7    before.

8         Linda told me that she did not want her husband--or the

9    children to hear this--these arguments so she had decided to have the

10   boys go to Kalamazoo to the mall.  And I had asked her what time she

11   thought that this was and she said she thought that the boys had left

12   the residence around noon.

13 Q  And did she indicate to you what happened after the boys left the

14   residence, what she did and what Todd did at that point?

15 A  Yes, she did.  She actually told me that the arguing did not continue

16   after the boys had left, but she said he had left the residence and

17   went outside and had turned water on for her horses.  She said that

18   Todd was in the living room of the residence, that he was watching

19   hunting television--watching hunting shows on the TV and that she had

20   gone into her bedroom and was reading some kind of pamphlet or flyer,

21   something on some kind of medication that her son was taking and she

22   said she kind of snoozed off, dozed off herself.

23        She said at some point she woke up and Todd had asked her

24   for a drink of juice which she said she provided for him and then she

25   said she went downstairs to the basement area of their residence to do

61

1     some laundry.

2  Q  Did she indicate where Todd was located within the residence at the

3     time that she went downstairs to do some laundry?

4  A  I believe that she said that he was in the reclining chair in the

5     living room of their residence.

6  Q  All right.  Did she indicate to you what, if anything, unusual

7     happened while she was downstairs doing laundry?

8  A  She did.  She said she was downstairs in the basement doing the

9     laundry when she heard Todd scream, yell out something to the effect

10    of, "There's fire."  Linda said that she ran up the--ran to the stairs

11    and went up the stairs and saw fire and smoke in the living room of

12    the residence.

13  Q  All right.  Did she indicate to you whether or not she saw Todd or

14    became aware of where Todd was at that point in time?

15  A  She said she did not see Todd at that time.

16  Q  All right.  What did--did she tell you what she did upon seeing the

17    fire and the smoke?

18  A  She said she left the residence.  She also told me she was unable to

19    get to any type of telephone.  She said she left the residence and she

20    told me that she knew that she needed to get help and she thought

21    about going to her neighbor's house.  She told me the neighbors' names

22    were Mike and Connie and that it was her attempt to go get help.

23          She said she got in her van and that she was trying to turn

24    her van around, this part of the statement with Linda, she said she

25    just kind of didn't remember exactly what was going on at that point

1     other than she saw Todd shortly thereafter.

2  Q   Okay.  Let me back up for a moment.  When she indicated that she went

3     up the stairs and saw the fire and the smoke did she indicate whether

4     she then continued through the fire or smoke, or through the upstairs,

5     or did she retreat to the downstairs or if she indicated?

6  A   She said she couldn't get into the living room and she retreated out

7     of the home.

8  Q   Okay.   Did she indicate what exit she used in order to get out of the

9     home?

10  A   No, she did not.

11  Q   All right.  Now--then she indicated that she went outside and got in

12     the van to go get help?

13  A   That's correct.

14  Q   All right.  And did she indicate whether or not she saw Todd or had

15     any knowledge of where Todd was at that time?

16  A   Not initially.  When she was in the van she said she started to turn

17     the van around and then she saw Todd.  She said she heard a loud boom

18     and she saw Todd on the side yard, and I clarified with her what side

19     yard, what that meant to her.  She said it was the north side of her

20     property and that Todd was on fire, that he was outside, that he was

21     trying to shed his clothing.

22  Q   All right.  Did she indicate what she did at that time?

23  A   She said that she drove her van around the north side of her property,

24     uhm, along to the rear or the west side of the house.  Her attempts

25     were to either get help or get Todd in the van to get help but she

1    said that at one minute she saw Todd and the next minute she didn't

2    and that by the time she got to the rear side or west side of her

3    residence she did not see Todd anymore.

4  Q  All right.  As far as the statement, did you ask her to clarify as far

5    as the "getting Todd into the van" what, if anything, she did in that

6    regard?

7  A  I believe I asked her if she had gotten out of the van at any point

8    prior to stopping the van, you know, on the rear side of the

9    residence, I asked her if she had gotten out of the van to assist him

10    in and she--she couldn't remember or she didn't recall at that time.

11  Q  All right.  Did she indicate, during your conversation, that she had

12    tried to get him to stop moving?

13  A  Yes.

14  Q  And in what context was that?

15  A  I believe that was after she had stopped the van.

16  Q  Okay.  Now did she have any explanation as to what--as this was going

17    on, first of all, why she is heading in a direction away from where

18    she might be able to get assistance?

19  A  No explanation.

20  Q  Okay.  Did she give any explanation as to what the phenomena was that

21    she saw Todd and then she didn't see Todd?

22  A  No explanation.

23  Q  All right.  At that point in time when you were having the

24    conversation with Mrs. Stermer did you have any indication that Mr.

25    Stermer had possibly been run over by the van?

1   A   No, I did not.

2   Q   All right.  So at that point in time you made no inquiry of her as to

3       whether she might have run over Mr. Stermer with the van?

4   A   No, I did not.

5              MR. KAPS:  All right.  I have no other questions.

6              THE COURT:  Attorney Getting?

7              MR. GETTING:  Thank you.

8                        CROSS-EXAMINATION

9   BY MR. GETTING:

10  Q   Detective Rought, is it Rought?

11  A   Yes.

12  Q   Am I saying that correctly?

13  A   Yes.

14  Q   Thank you.  This interview took place on January 7th?

15  A   That's correct.

16  Q   Where at?

17  A   This would have been on the property of the Stermer residence and Mrs.

18      Stermer was seated in the back of a Coloma ambulance.

19  Q   Was she being treated?

20  A   I don't know if she had been treated before I got there.  At that

21      point in time she was not being treated.

22  Q   How was she dressed?

23  A   I believe she had pants and a sweater on.

24  Q   Is it true that she didn't have any shoes on?

25  A   I can't recall if she did or didn't.  That may have been the fact.

1   Q   Is it true that she didn't have a jacket on?

2   A   Right, she did not have a jacket on.

3   Q   Was she under arrest at the time?

4   A   No, sir.

5   Q   Was she handcuffed?

6   A   No, sir.

7   Q   Was anyone else present?

8   A   Yes, I believe there was a woman present.

9   Q   Do you know who?

10  A   I believe that it--what I would have reported in my--my statement is I

11      believe it was a Mrs. Crandall.  I did not know this woman personally.

12  Q   Gail Crandall?

13  A   That's correct.

14  Q   And did Ms. Crandall stay there during this statement?

15  A   Yes, she did.

16  Q   What was Ms. Crandall doing when you went up to the hospital or excuse

17      me, went up to the ambulance?

18  A   I can't recall what she was doing.  She was in the ambulance with Mrs.

19      Stermer.

20  Q   Consoling her?

21  A   Could be.  I didn't see what was happening other than when I got into

22      the ambulance.

23  Q   You prepared a report about this event, is that right?

24  A   That's correct.

25  Q   And your contact with her?

66

1   A   That's correct.

2   Q   And your report would be accurate as to what was happening, is that

3       right?

4   A   That's correct.

5   Q   And in your report is an entry that you said there was a female

6       consoling her who was identified as Gail Crandall?

7   A   Okay, that's correct.

8   Q   Was Ms. Stermer crying when you made contact with her?

9   A   On and off, yes.

10  Q   What time was it?

11  A   I believe it was approximately 6:25 in the evening.

12  Q   So three hours, a little more than three hours from the time of the 9-

13      1-1 call for the fire?

14  A   Yes.

15  Q   Had Mr. Stermer been removed from the scene yet?

16  A   No.

17  Q   Did you record the statement that you're talking about?

18  A   No, sir.

19  Q   Did you write it down?

20  A   Yes, sir.

21  Q   You wrote the statement out?

22  A   I wrote notes.  I did not write word-for-word the statement, I wrote

23      notes.

24  Q   Do you still have the notes?

25  A   No, sir.

1  Q  Did you destroy the notes?

2  A  Yes, after I prepare my report I don't typically keep any notes to the

3     report.

4  Q  After reviewing your notes did you have contact with Ms. Stermer and

5     say, when we talked I wanted to make sure that I've got everything

6     written down here accurately, is this what you said?

7  A  I believe I would recap at the end of a statement.  That's usually

8     what I do.  I didn't have any other chances to speak with Mrs. Stermer

9     after that initial time in the ambulance.

10 Q  Since January 7, 2007, you've had no opportunity to contact Ms.

11    Stermer to ask her to review your report or your notes in order to

12    make sure that they were accurate?

13 A  I believe at the time of her arrest I had contact with her.

14 Q  That was June 5, 2009?

15 A  Yeah, I don't have the date in front of me but if that's what you're

16    saying, yes.

17 Q  Okay.

18 A  And it was a brief time that I was with her, but as far as having any

19    contact with her after that initial statement no, we had received

20    notice, I believe, from your office that she had retained counsel.

21 Q  All right.  Let me ask the question this way.  Did Ms. Stermer at any

22    time sit down with you to review your notes or the report that you

23    prepared to say, "this is right", "this is wrong", "this is what my

24    recollection is now?"

25 A  No, this was her statement given to me on January 7th.

1  Q   On the scene three hours with her husband dead still there?

2  A   That's correct.

3  Q   All right.  Did she tell you in that statement that her neighbors had

4      come to the scene?

5  A   She did.

6  Q   And that she didn't know how or when they got there that they were

7      just there?

8  A   That's correct.

9  Q   You described her as crying on and off during your contact with her?

10  A   Uh, crying on and off both with my contact with me and I believe, you

11      know, when I saw her leaving the ambulance or at some point in time I

12      saw her crying, yes.

13  Q   Did you take Mrs. Stermer's clothes?

14  A   No, sir.

15           MR. GETTING:  I have no other questions, Your Honor.

16           THE COURT:  Mr. Kaps?

17           MR. KAPS:  I have no other questions, Your Honor.

18           THE COURT:  Okay, ma'am, you can step down.  Watch your

19      step, please, okay?

20           THE WITNESS:  Yes.

21           THE COURT:  Thank you.

22           (At 10:43 a.m., witness excused)

23           (At 10:43 a.m., Court in recess on this matter)

24           (At 10:46 a.m., Court reconvenes; all parties present)

25           THE COURT:  Okay, now we're going to switch gears back to

1     090575FY and you can call another witness.

2              MR. KAPS:  Call Cynthia DeLoach.

3              THE COURT:  Ma'am, could you sneak up here for me, okay?

4              MS. DELOACH:  Yes.

5              THE COURT:  When you get up here you're going to see a step

6     there, okay?

7              MS. DELOACH:  Yes.

8              THE COURT:  Now let me stop you before you come up.  Raise

9     your right hand.

10             (Ms. DeLoach complies)

11             THE COURT:  Do you swear or affirm that the testimony you

12    will give today in regards to this proceeding will be the truth, the

13    whole truth, and nothing but the truth?

14             MS. DELOACH:  Yes.

15             THE COURT:  Okay, step up here, okay.  Have a seat, please.

16             THE WITNESS:  Okay.

17             THE COURT:  You said that kind of soft.  Okay.

18             THE WITNESS:  Okay.

19             THE COURT:  That does not amplify your voice it just records

20    so you are going to have to speak out today.  You see the deputy by

21    the door?

22             THE WITNESS:  Yes.

23             THE COURT:  Okay.  If he can hear you then everyone can hear

24    you.

25             THE WITNESS:  Okay.

1          THE COURT:  Okay.  Would you give us your first name and

2    your last name?

3          THE WITNESS:  Cynthia DeLoach.

4          THE COURT:  Spell your last name for us?

5          THE WITNESS:  D-E-L-O-A-C-H.

6          THE COURT:  Thank you.  Go ahead, sir.

7                    CYNTHIA DELOACH

8    called by the People at 10:46 a.m., sworn by the Court, testified:

9                    DIRECT EXAMINATION

10   BY MR. KAPS:

11   Q    Ms. DeLoach, how are you employed?

12   A    I work at the Marathon in Lawrence.

13   Q    Okay.  Is that a gas station/convenience--

14   A    Yes, it is.

15   Q    --store?

16   A    Yes, it is.

17   Q    All right.  And do you know a person or know of a person named Linda

18        Stermer?

19   A    Yes.

20   Q    Okay.  Do you know her enough to recognize her if you see her?

21   A    Yes.

22   Q    All right.  The lady next to me here in the green, is that Linda

23        Stermer?

24   A    Yes.

25   Q    All right.  I want to direct your attention back to January the 7th of

1      2007, do you recall whether or not you saw Linda Stermer on that date?

2 A   Yes, I did.

3 Q   All right.  And were you working at the Marathon Gas Station in

4      Lawrence on that date?

5 A   Yes, I was.

6 Q   All right.  And can you tell us the circumstances under which you

7      happened to see Linda Stermer on that day?

8 A   She had came into the gas station and first of all, she was outside at

9      the third pump.  She had pumped gas outside into a container, then she

10     paid with--at the pump with a credit card and then she had came into

11     the gas station and purchased things in the gas station, also.

12 Q  All right.  And was there anything about the particular situation that

13     allowed you to recall it or that stood out to you?

14 A   No, not really.  I mean just pumping gas.

15 Q  All right.  Well, as far as the--you said that you recall that she

16     pumped gas into a container?

17 A   Yes, uh-huh.

18 Q  Okay.  Is there any particular reason that you happen to remember

19     that?

20 A   Only because I was just--I'd been at the counter and then I came

21     around the counter and I just seen it, you know, and I just went about

22     what I was doing because I've seen, you know, I had to turn the pump

23     on and that was it.  You know, I just noticed her doing it.

24 Q  All right.  And this was in January of the year, is that correct?

25 A   Yes.

1    Q    Is that usual that people are purchasing gasoline in containers at

2         that time of year?

3    A    No, mostly at that time of the year it's kerosene, you know, that you

4         don't really pay much attention to because a lot of people pump that.

5    Q    All right.

6    A    You know into containers.

7    Q    All right.  And do you recall about what time of day this was on the

8         7th of January that she was at the Marathon Station getting gas in a

9         container?

10   A    I don't remember exactly the time.  I just know it was in the morning

11        because I'm done there by noon.

12   Q    All right.

13   A    So it was in the earlier morning.

14   Q    All right.  Thank you.

15                  MR. KAPS:  I have no other questions, Your Honor.

16                  THE WITNESS:  Okay.

17                  THE COURT:  Mr. Getting?

18                  MR. GETTING:  Thank you.

19                         CROSS-EXAMINATION

20   BY MR. GETTING:

21   Q    Often times when people are pumping something into a container, I take

22        it, it's kerosene for heating or something?

23   A    Correct.

24   Q    It wouldn't be unusual for somebody to buy gasoline for their snow

25        blower or tractor--

```
 1   A    Right.

 2   Q    --for whatever?

 3   A    Right.

 4   Q    You're not saying that it never happens, right?

 5   A    Right.

 6   Q    Okay.  I--I--

 7              MR. GETTING:  May I approach, Your Honor?

 8              THE COURT:  Sure.

 9              (At 10:50 a.m., Attorney Getting to witness stand)

10   BY MR. GETTING:

11   Q    I've been given a cash register tape or a copy of a cash register

12        tape--

13   A    Uh-huh.

14   Q    --and I'm going to show it to you just because I want you to help

15        explain to me what's on it, okay?

16   A    Okay.

17   Q    You said--you testified that the first transaction was a credit card

18        transaction at the pump--

19   A    Okay.

20   Q    --at Pump #3.  Can you show me where on the tape that transaction is?

21   A    Can I stand up?

22   Q    Oh yeah, or look at it or whatever you need to do.

23   A    Okay.

24   Q    I'm not--I'm not--

25   A    Okay.  It would be right in here.
```

1   Q    And for the record it's--

2   A    Uh-huh.

3              THE COURT:  Ma'am, a little bit louder for us all.

4              THE WITNESS:  Sorry.  It would be right in here.

5              THE COURT:  Thank you.

6   BY MR. GETTING:

7   Q    Right in here?  Which line is the transaction?

8   A    Well, outside sale, right here.

9   Q    All right.  So where it says, 'outdoor sale pump 3?'

10   A    Correct.

11   Q    All right.  How much was purchased?

12   A    Eleven--right here, $11.01, amount.  All right, $11.01.

13   Q    All right.  And you can see why I might be having a hard time with

14       reading--

15   A    Yes.

16   Q    --this?

17   A    Yes, uh-huh.

18   Q    All right.  So where it says, approximately, almost halfway down where

19       it says, 'outdoor sale pump 3' that's a transaction?

20   A    Correct.

21   Q    And then one, two, three lines below that it says, 'approval' and then

22       a number and then an amount, 'one-one-zero-one'?

23   A    Right.

24   Q    All right.  And that's how much gas was purchased with a credit card

25       outside?

1   A   Correct.

2   Q   And that gas was pumped into a container?

3   A   Uh-huh.

4   Q   Is that a yes?

5   A   Yes.

6   Q   Do you recall how much gasoline cost of January 7, 2007?

7   A   No, I don't know.

8   Q   I don't either but I thought you might.  And then you said there was

9       another transaction--

10  A   Uh-huh.

11  Q   --that occurred inside?

12  A   Correct.

13  Q   And that transaction is--

14  A   It's right here.

15  Q   --where we have taxable and non-taxable amounts?

16  A   Yes.

17  Q   And it totaled $7.74?

18  A   Correct.

19  Q   So there was total purchases of $18.75; $11.01 and $7.74?

20  A   Right.

21              (At 10:52 a.m., Attorney Getting to podium)

22  BY MR. GETTING:

23  Q   All right.  Do you recall if anybody was there with Ms. Stermer?

24  A   No, I do not.

25  Q   Did you have any other contact with her later?

1   A   Just when I was working she may have came in before, you know, after

2       that, but, you know, no, I've never really spoke to her after that.

3   Q   All right.  When were you contacted by the police about this incident?

4   A   Uhm, two weeks ago.

5   Q   On June 11, 2009?

6   A   Yes.

7   Q   All right.

8               MR. GETTING:  I have no other questions, Your Honor.

9               THE COURT:  Mr. Kaps?

10              MR. KAPS:  I have no questions.

11              THE COURT:  Okay, ma'am, you can step down.  Would you watch

12      your step there?

13              THE WITNESS:  Yes.

14              THE COURT:  You're excused.

15              THE WITNESS:  Thank you.

16              THE COURT:  Okay, thanks.  Okay.

17              THE WITNESS:  Yep.

18              MR. KAPS:  May this witness be excused?

19              THE COURT:  Mr. Getting?

20              MR. GETTING:  I have no objection.

21              THE COURT:  Ma'am, you're also excused, you can leave if you

22      need to.

23              MS. DELOACH:  Okay, thank you.

24              THE COURT:  Okay, thank you.

25              (At 10:53 a.m., witness excused)

1          MR. KAPS:  Call Chris Williams.

2          THE COURT:  Mr. Williams, could you come all the way up here

3      for us, please?

4          (Mr. Williams complies)

5          THE COURT:  Could you step around to the side over here?

6          (Mr. Williams complies)

7          THE COURT:  Now when you get over here you're going to see a

8      step.  You see that step there?

9          MR. WILLIAMS:  Yes.

10         THE COURT:  Let me stop you before you come up.  Could you

11     raise your right hand?

12         (Mr. Williams complies)

13         THE COURT:  Do you swear or affirm that the testimony you

14     will give today in regards to this proceeding will be the truth, the

15     whole truth, and nothing but the truth?

16         MR. WILLIAMS:  Yes, I do.

17         THE COURT:  Okay, if you'll step up here please and have a

18     seat there.

19         (Witness complies)

20         THE COURT:  And scoot yourself up and get yourself comfy

21     there.  Also, that doesn't amplify it just records, so speak out so

22     everyone can hear you.  And I'm going to start you off state your

23     first name and your last name?

24         THE WITNESS:  Chris Williams.

25         THE COURT:  Spell your last name?

78

1          THE WITNESS:  W-I-L-L-I-A-M-S.

2          THE COURT:  Okay.  Go ahead.

3                    CHRIS WILLIAMS

4     called by the People at 10:53 a.m., sworn by the Court, testified:

5                    DIRECT EXAMINATION

6  BY MR. KAPS:

7  Q     Mr. Williams, how are you employed?

8  A     I'm laid off at the moment.

9  Q     Okay.  And basically I'm interested in more back in 2006 and the early

10       part of 2007, where were you employed at that time?

11 A     Chem Link.

12 Q     Okay.  And what is Chem Link?

13 A     Chem Link is a manufacturing company that makes caulking and roofing

14       materials.

15 Q     All right.  And where is that located?

16 A     Now it's located in Schoolcraft.

17 Q     Okay.  Where was it located back in 2006 and in the early part of

18       2007?

19 A     It was in Kalamazoo.  We had three separate buildings.

20 Q     All right.

21 A     Uhm, the manufacturing is on Factory Street and shipping was on

22       Ransom.

23 Q     All right.  During your employment at Chem Link did you become

24       familiar with a person named Linda Stermer?

25 A     Yes, I did.

                              79

1  Q   All right.  And is she in the courtroom today?

2  A   Yes, she is.

3  Q   And can you point her out for us, please?

4  A   She's right there.

5              (At 10:55 a.m., witness points toward defense table)

6              MR. KAPS:  All right.  If the record would reflect that the

7      witness has pointed to the Defendant?

8              THE COURT:  It will.

9  BY MR. KAPS:

10 Q   And Mr. Williams how was it that you happened to become acquainted

11     with Ms. Stermer back in 2006?

12 A   Working together.

13 Q   Okay.  She was also employed at Chem Link at that time?

14 A   I do believe she was.

15 Q   Okay.  And do you remember approximately and I'm not asking for a

16     specific date or even month, approximately when you became acquainted

17     with Mrs. Stermer?

18 A   I don't remember approximately.

19 Q   Okay.

20 A   The month or the time.

21 Q   All right.  Well, let me ask it this way.  Did you become aware that

22     either through the news or otherwise that her husband, Todd, died on

23     January the 7th of 2007?

24 A   By the news.

25 Q   Okay.  And how long before that, before his death, about how long had

80

1          you known Linda Stermer?

2   A     I can't recall the time in which she had started working there, but

3          that was the only time I ever met her.

4   Q     Okay.  Had it been days, weeks, months?  I mean I'm just asking for a

5          general idea.

6   A     Months.

7   Q     Months?

8   A     Yes.

9   Q     Okay.  And after you became acquainted with her did you develop any

10         kind of a relationship with her?

11  A     Yes.

12  Q     Okay.  And what kind of a relationship did you develop with Linda

13         Stermer?

14  A     It was a--

15              MR. GETTING:  Objection, Your Honor, I don't believe this is

16         relevant.

17              THE COURT:  Do you want to be heard?

18              MR. KAPS:  Your Honor, I think it will be relevant

19         especially in light of we've had questioning regarding the Defendant's

20         emotional state and apparent concern for her husband and so forth and

21         I think it will go to that.

22              THE COURT:  I'll allow it.

23  BY MR. KAPS:

24  Q     Mr. Williams, how would you describe your relationship with Linda

25         Stermer?

                                    81

1  A    I don't exactly understand how to answer that.

2  Q    Okay.  Well, let me be more specific.  Would you ever have contact

3       with Linda Stermer away from Chem Link?

4  A    Yes.

5  Q    All right.  Would you ever have contact with Linda Stermer at what

6       people might refer to as dating relationship?

7  A    Yes.

8  Q    Would that include perhaps going to different locations together or

9       having meals together?

10  A    Yes.

11  Q    All right.  Did it--did it also involve a sexual relationship?

12  A    Yes.

13  Q    And this--was this ongoing up until at least the time, if not after,

14       Mr. Stermer's death?

15  A    Yes.

16  Q    Was there any--

17       THE COURT:  Excuse me, Mr. Kaps, let me interrupt as the

18       trier of fact.  You asked a compound question, was it ongoing up to

19       and after--

20       MR. KAPS:  Okay, let me--

21       THE COURT:  --and he said yes.  Would you distinguish that,

22       please?

23       MR. KAPS:  Yes, Your Honor.

24  BY MR. KAPS:

25  Q    You had a sexual relationship with her prior to Mr. Stermer's death,

82

```
 1        is that correct?

 2   A    Yes.

 3   Q    And it had been ongoing for some time prior to his death, is that

 4        correct?

 5   A    Yes.

 6   Q    Did it continue after his death?

 7   A    Yes.

 8   Q    All right.  At any time during that relationship was there any

 9        expression by Linda Stermer of where she felt this relationship was

10        going or where she wanted it to go?

11   A    Between her and I?

12   Q    Yes.

13   A    No.

14   Q    So it was, and basically my question is, was there any plan, either--

15        by either one of you that was expressed that we want to be together or

16        anything of this nature?

17   A    No.

18   Q    All right.

19                   MR. KAPS:  I have no other questions, Your Honor.

20                   THE COURT:  Mr. Getting?

21                   MR. GETTING:  Thank you.

22                              CROSS-EXAMINATION

23   BY MR. GETTING:

24   Q    When did you meet Linda Stermer?

25   A    I don't--I met her at work, I can't say exactly when.  The date of her
```

1       hiring or a couple of days after.

2    Q  And you became friends with Ms. Stermer?

3    A  Yes, socially working-wise.

4    Q  All right.  What was it that you did for Chem Link?

5    A  Truck driver/maintenance.

6    Q  What was it that she did?

7    A  Manufacturing.

8    Q  So you would have contact with her at Chem Link daily, weekly,

9       monthly?

10   A  Off and on because I was on the road most of the time.

11   Q  All right.  You indicated that you and her had become friends?

12   A  Yes.

13   Q  That you would occasionally go someplace together or have a meal

14      together?  Is that right?

15   A  Yes.

16   Q  You talking about having lunch together when you were both working at

17      the same time?

18   A  We went out to dinner, went to an amusement park.

19   Q  What amusement park?

20   A  Uh, Ford Museum in Grand Rapids.

21   Q  All right.  When was that?

22   A  I'm not exactly sure.

23   Q  All right.  So let me get this right, you're not exactly sure when it

24      was that you went to the Ford Museum, you're not exactly sure when it

25      was that you started having a friendship with Ms. Stermer, is that

84

1       true?

2  A  I don't remember the dates.

3  Q  You do remember hearing about Todd's death?

4  A  Watching it on the news.

5  Q  And it's your testimony here today that you and Ms. Stermer had been

6      involved in a sexual relationship?

7  A  Yes.

8  Q  Isn't it true that that relationship didn't start until after Todd had

9      died?

10  A  Ask your question again.

11  Q  Isn't it true that that part of your relationship, the sexual part of

12      your relationship, did not start until after Todd had died?

13  A  No.

14  Q  It's your testimony that it started before?

15  A  Yes.

16  Q  All right.  Did you guys ever go somewhere together where you spent a

17      night?

18  A  No.

19  Q  Was there a hotel room or a place where you would meet that would have

20      a record that it shows--

21  A  At my house.

22  Q  You lived in Kalamazoo at the time?

23  A  Yes.

24  Q  Did you have a roommate?

25  A  No.

1        MR. GETTING:  I have no other questions, Your Honor.

2        MR. KAPS:  No other questions, Your Honor.

3        THE COURT:  Okay.  Mr.--

4        MR. KAPS:  May this witness be excused?

5        THE COURT:  Yeah.  You can step down.  Be careful when you

6  step down.

7        MR. GETTING:  I have no objection.

8        THE COURT:  And you can also be excused.  That means you can

9  leave if you need to.

10        THE WITNESS:  All right.

11        THE COURT:  Okay, thank you, sir.

12        (At 11:03 a.m., witness excused)

13        MR. KAPS:  Call Thomas Macyauski.

14        THE COURT:  Do you swear or affirm that the testimony you

15  will give today in regards to this proceeding will be the truth, the

16  whole truth, and nothing but the truth?

17        MR. MACYAUSKI:  I do.

18        THE COURT:  Okay.  If you'll also have a seat, please and

19  get yourself situated and then give us your first name and your last

20  name.

21        (Witness complies)

22        THE WITNESS:  Thomas Macyauski.

23        THE COURT:  And spell your last name for us.

24        THE WITNESS:  M-A-C-Y-A-U-S-K-I.

25        THE COURT:  Okay, go ahead, sir.

1         THOMAS MACYAUSKI

2   called by the People at 11:03 a.m., sworn by the Court, testified:

3         DIRECT EXAMINATION

4 BY MR. KAPS:

5 Q Mr. Macyauski, how are you employed?

6 A I'm employed by the Van Buren County Sheriff's office.

7 Q And did you have occasion on January the 7th of 2007, to become

8   involved in the investigation of a fire and death of Todd Stermer?

9 A Yes.

10 Q All right.  As part of that investigation, I take it, you had occasion

11   to go to the scene of where this had occurred, is that correct?

12 A Yes, I did.

13 Q All right.  As part of the investigation did you become aware that

14   there was, I believe, a 1993 Ford Econoline van that had been operated

15   at or around the time of the fire and the death of Mr. Stermer?

16 A Yes.

17 Q All right.  And did you have occasion to make, at least, a cursory

18   examination of that van?

19 A Yes, I did observe it.

20 Q All right.  And what, if anything, did you observe with the van that

21   you determined might be connected or might be unusual about the

22   situation?

23 A I observed that the van was parked with the front end of the van in a

24   south direction behind the west side of the house.  As I walked around

25   the vehicle I could see on the front driver's side bumper red stain

1        which appeared to be blood.  Also, walking around the vehicle I could

2        look into the window I could see that that keys were in the ignition

3        and that the van was running and also, could make note that there

4        appeared to be a purse on the front passenger side floorboard.

5    Q  All right.  Did you make any further examination of the purse at that

6        time or later on to determine whose purse that might be?

7    A  Not at that time, but later at a search warrant of the van I did

8        examine the purse and contents and found the identification for Linda

9        Stermer within that purse.

10   Q  All right.  Now, did you have occasion at some point in time also to

11       take a look at the undercarriage of the van?

12   A  Yes, I did.

13   Q  All right.  Was there anything on the undercarriage that you thought

14       might be unusual or that was subsequently looked at by anybody else?

15   A  It appeared to be, when looking underneath the van, that there was

16       reddish-brown stains, which I looked at it as blood or tissue, like

17       body tissue underneath the van.

18   Q  All right.  And during your investigation at the scene did you also

19       have contact with Deputy Tony Evans from the Van Buren County

20       Sheriff's Department?

21   A  Yes, I did.

22   Q  All right.  Did Deputy Evans point out to you the location where Mr.

23       Stermer's body had been at the time of Deputy Evan's arrival on the

24       scene?

25   A  Yes, he did.

1   Q    All right.  And I'm directing your attention to People's Exhibit #2

2       and there are some flags that are visible in that photo and that shows

3       basically it would be the north and east side of the residence, is

4       that correct?  In other words, the front and the right hand side as

5       we're looking at it from the road?

6   Q    What I'm looking at is a photo of the north side of the residence

7       looking south.

8   Q    Okay.

9   A    And I can see the rear portion of the residence, which would be to the

10      west.

11              (At 11:08 a.m., PX #6 marked)

12  BY MR. KAPS:

13   Q    All right.  And there are some red flags or orange flags that are in

14       that photo, is that correct?

15   A    Yes.

16   Q    What is the significance of those particular items?

17   A    Those flags were placed there by myself and Lt. Stump indicating a

18       tire impressions that traveled from the driveway to the back of the

19       van which was located behind the building on the west side.

20            MR. KAPS:  Your Honor, I'm sorry--

21            THE COURT:  That's okay.

22            MR. KAPS:  --I have a photo I wanted to show and I don't

23      know where I placed it right now.

24            THE COURT:  If you need a moment we can take one.

25            MR. KAPS:  Well, I don't know what in the world I did with

1           it.

2                        THE RECORDER:  Is this the picture?

3                        MR. KAPS:  Oh, yes.

4      BY MR. KAPS:

5      Q     Detective Macyauski, I also want to show you what's been marked as

6            People's Proposed Exhibit #6--

7                        MR. KAPS:  I want to show it to Mr. Getting first.

8                        MR. GETTING:  Thank you.

9      BY MR. KAPS:

10     Q     And ask if you can tell us what that depicts?

11     A     It would be, it appears to be an image of the tire impressions and the

12           location in which Deputy Evans showed me was where Todd Stermer was

13           located prior to being moved.

14     Q     All right.  And was there a large amount of what appeared to be blood

15           in that location?

16     A     Yes.

17     Q     Okay.  Where--and the location of where Mr. Stermer, where it was

18           pointed out to you that Mr. Stermer had been and where the blood was

19           how did that correlate to these tire tracks that ultimately lead to

20           the van?

21     A     It appeared as though those impressions went through that location?

22     Q     All right.

23                        MR. KAPS:  I would move for the admission of Proposed

24           Exhibit #6.

25                        THE COURT:  Mr. Getting?

                                             90

1                  MR. GETTING:  No objection.

2                  THE COURT:  Okay, #6 is received.

3                  MR. KAPS:  I have no other questions.

4                  THE COURT:  Attorney Getting?

5                  MR. GETTING:  May I approach, Your Honor.

6                  THE COURT:  Sure.

7                  (At 11:13 a.m., Attorney Getting at the witness stand)

8                            CROSS-EXAMINATION

9  BY MR. GETTING:

10  Q    Are the flags numbered in some way?

11  A    No, not that I recall.

12  Q    All right.  The flag on the left is set in or next to what appears to

13      be a tire track, is that right?

14  A    It appears so, yes.

15  Q    The flag on the right, what's that?

16  A    I believe that's another flag placed for part of the impression, from

17      that angle it's difficult to tell.

18  Q    That's why I'm asking you because I can't tell.  Was there--all right,

19      I guess on the left-hand flag, because there's no number on it, as I'm

20      looking at this picture, People's Exhibit #6, the left-hand flag, is

21      that set on the right tire or left tire?  I can't say right or left.

22      Is that set on the driver's side tire or the passenger side tire of

23      the vehicle that made this track?

24  A    I can't tell from that image.

25  Q    All right.  If presuming that the, Exhibit 3 shows blood on the lower

1     bumper of the van, it would be on the driver's side, right?

2 A   Yes.

3 Q   Okay.  And let me ask this then.  Which direction of travel on this

4     Exhibit 6 does the tire tread show, is it going from the top of the

5     picture down or is it going from the bottom of the picture up?

6 A   From the area of the photograph being taken it goes towards where the

7     van is parked which would be on the back, west side--

8 Q   Show--

9 A   --here.

10 Q   Well, this is Exhibit 2 that you're looking at now?

11 A   Yes.

12 Q   And Exhibit 2 shows the house from the north side--it's showing the

13     north side of the home facing south and so the right-hand side of the

14     picture is the back of the house?

15 A   The west side, yes.

16 Q   Where was the van?

17 A   The van was parked here on the west side with the front of the vehicle

18     facing south.

19 Q   I see one, two, three, four orange flags in this picture, what are

20     those flags depicting?

21 A   (No audible response)

22 Q   Again, this is--

23 A   Again, I'm not sure, but--

24 Q   Okay, this is Exhibit 2--

25 A   Yes.  It appears that those are flags placed for the tracking of the

1       vehicle.

2    Q  And in Exhibit 6 you believe that what's here on the ground is mud and

3       pooled blood?

4    A  That is what it looks like, yes.

5    Q  And this is where Mr. Stermer was found by Deputy Evans according to

6       what he told you?

7    A  That's the location that Deputy Evans had shown me, yes.

8    Q  What's this laying on the ground here, right there?

9    A  I'm not sure.  I believe that may be from people at the scene.  I

10      don't know what that is.

11   Q  All right.

12             MR. GETTING:  And for the record, I'm pointing to a off-

13      white, maybe light blue, colored object that's laying on the ground in

14      the middle of the picture on People's Exhibit 6, is that right?

15             THE WITNESS:  Yes.

16   BY MR. GETTING:

17   Q  All right.  The--what appeared to be blood on the van and the

18      underside of the van, the undercarriage, was it on the front edge or

19      the rear edge of the bumper in the items on the undercarriage?

20   A  Looking underneath the undercarriage of the van and looking at the

21      front bumper it appeared that things were on the, it would be the left

22      or the passenger, or excuse me, driver's side of the vehicle.

23   Q  All right.  Was it on the front or the rear of the items where you saw

24      the blood?

25   A  Okay.

93

1    Q    For instance, I guess I'll make this easy--

2    A    Okay.

3    Q    --in Exhibit #3 it shows what appears to be blood on the bumper, is

4       that right?

5    A    Yes.

6    Q    And that was on the front edge of the bumper?

7    A    Yes.

8    Q    It wasn't on the back of the bumper?

9    A    Oh, behind the--

10    Q    Right.

11    A    I don't know.

12    Q    The undercarriage where you indicated that you saw blood, it was on

13       the front parts of those pieces but not on the back, is that right?

14    A    Okay.  If we're--so, I understand.  I saw blood on the front side of

15       the bumper, the lower section on the driver's side and then continuing

16       on under the undercarriage through the structure of the frame saw

17       other reddish-brown stains which I thought were blood.

18    Q    You could see them when you were looking from the front towards the

19       back of the van?

20    A    Yes.

21    Q    You couldn't see them when you were looking from the back towards the

22       front of the van?

23    A    I don't recall.

24    Q    All right.  The tracks that you noticed you noted them to be in one

25       direction coming from the front or east side of the house around the

1      north side down to the back or the west side of the house, is that

2      right?

3  A   From where we were looking at I could see where the tracks would be

4      from--if you kind of go from a backwards way from the van, tracking

5      backwards they appear to come from the north side drive and then kind

6      of enter onto a lawn area, it was snowing and raining and such but it

7      appears there's a driveway that goes from the top on the east side and

8      travels around down behind on the north side.  The van, at one point,

9      appears through those tracks to be traveling off of that path at the

10     lower end of the north side and going off onto the lawn and coming to

11     a rest behind the van, directly behind the residence on the west side.

12  Q   And that's where the van was found stopped, running?

13  A   Yes.

14  Q   Pointed to the south?

15  A   Yes.

16  Q   When did you arrive at the scene Detective?

17  A   Approximately seventeen hundred.

18  Q   In real people time?

19  A   I'm sorry, five p.m.

20  Q   Five p.m.?

21  A   Five p.m.

22  Q   Thank you.

23          THE COURT:  Thank you for clarifying that for the Court,

24     too.

25  BY MR. GETTING:

1  Q  The van was seized?

2  A  I believe it was towed from the scene and retained until a search

3     warrant could be obtained.

4  Q  And then it was examined by who?

5  A  Myself and four members of the Michigan State Police Crime Lab.

6  Q  Would looking at the report refresh your recollection as to whether

7     there was blood only on the front forward leading edges?

8  A  Possibly.

9  Q  The report itself wasn't authored by you, it was authored by the

10    Michigan State Police, is that correct?

11 A  Uhm, I did do a report of my time out there at that.

12       MR. KAPS:  Your Honor, what Mr. Getting is referring to was

13    a Michigan State Police crime lab.  I didn't get into that because of

14    the level of expertise and on the other hand, I have no objection for

15    him pointing it out and I think he is accurate in where he is going.

16       THE COURT:  That's okay.  That's fine.  I appreciate it.

17       MR. GETTING:  May I approach, Your Honor?

18       THE COURT:  Sure.

19       (At 11:19 a.m., Attorney Getting at witness stand to have

20       witness review police report)

21 BY MR. GETTING:

22 Q  I'm going to point out just one portion of this police report.  You're

23    free to look at the whole thing if you want.  It says here in this

24    paragraph.  If you would just read that paragraph to yourself.

25 A  Okay.

                                    96

1  Q  And I guess this last one talks about that front forward edge here or

2     edge.

3  A  Okay.

4  Q  Detective, did you have an opportunity to review those portions of the

5     State Police Report?

6  A  Yes.

7  Q  And did that refresh your recollection as to the location of the blood

8     underneath the van?

9  A  It does.

10  Q  All right.  The question was, the blood located from the front to the

11     back of the van, but it was always on the forward edge of the items

12     underneath the van, is that right?

13  A  That's correct.

14  Q  All right.

15         MR. GETTING:  I don't have any other questions.

16         MR. KAPS:  I don't have any questions.

17         THE COURT:  Okay, you can step down, sir.

18         (At 11:20 a.m., witness excused)

19         MR. KAPS:  No other witnesses, Your Honor.

20         THE COURT:  Okay, the People are resting.  Any evide--

21     evidence, I can't say it, any evidence today, sir?

22         MR. GETTING:  No, sir, thank you.

23         THE COURT:  Okay.  Attorney Kaps?

24         MR. KAPS:  Your Honor, at this time the People would move to

25     bind the Defendant to the Circuit Court on Count I and II.

1          THE COURT:  Attorney Getting, any argument?

2          MR. GETTING:  Yes, Your Honor.  Your Honor, while I

3     recognize that we are at a preliminary examination the standard being

4     applied here is probable cause, which is a low standard of proof.

5          The Prosecutor has not presented any evidence whatsoever

6     that my client caused or started this fire.  I believe that there has

7     been testimony that the first was determined to be an arson by the

8     Michigan State Police, that the fire was determined, in his opinion,

9     to start in the living room, that the fire was the result of injuries

10    that caused that caused the death of Todd Stermer.

11         Beyond that, Your Honor, what we have is evidence that my

12    client purchased $11.00 worth of gasoline from Pump #3 that morning,

13    we have a gas can that was in the front yard, several gas cans that

14    were in the shed behind the house.

15         We have evidence to indicate that the van hit Todd Stermer

16    apparently and injuries that were caused, I believe.  There was

17    testimony that he had a gash to the back of his head with no evidence

18    that it was done intentionally.

19         We have evidence that Ms. Stermer was hysterical and crying

20    at the scene.  The evidence that has just been testified to here by

21    Detective Macyauski was that the evidence of blood on the van was

22    always on the forward or front leading edge of items.  This isn't an

23    incident where somebody ran over and backed over and ran over someone

24    in order to make sure that they were dead it's more, I think,

25    consistent with the evidence to say that Mr. Stermer got himself out

1    of this fire and was struck by the van after he was on the ground.   We

2    know that from Mr. Matheny that he wasn't easily visible.   Mr. Matheny

3    says he came around the front side of the house without seeing Todd

4    Stermer there on the ground and it was only later after Linda had

5    pointed out where he was that Mr. Matheny knew where he was.

6              I hate to use, the "where there's smoke there's fire"

7    analogy here, but all there is here is smoke.   There is a fire with

8    suspicious origins but absolutely no evidence, none, that my client

9    started that fire.   There's not even probable cause at this point,

10   Your Honor.   I would ask that the Court dismiss the charges at this

11   time.   Thank you.

12             THE COURT:   Okay, I appreciate that.   Mr. Kaps?

13             MR. KAPS:   Your Honor, just very briefly in response.

14   Obviously, this is a probable cause hearing, and also, I believe the

15   circumstantial evidence that the People have presented at this point

16   in, time starting from a 50/50 proposition where we have two people

17   that were present.   I believe that we've certainly presented

18   sufficient evidence to indicate that there is probable cause, based on

19   the circumstantial evidence, that Linda Stermer was the person that

20   started this fire and caused the death of Todd Stermer.

21             THE COURT:   Okay.   I'm going to take about a ten-minute

22   recess and review my notes, take a look at the exhibits.   I didn't

23   really have a good chance to do to that since I was taking notes and

24   listening and then we'll reconvene at exactly 11:40 in here.   Thank

25   you.

1          (At 11:24 a.m., Court in recess)

2          (At 11:41 a.m., Court reconvenes, Defendant being brought

3          into the courtroom)

4          THE COURT:  Okay, we are back on the record and this is case

5   090575FY, it's called People versus Linda Kay Stermer.

6          We have concluded our preliminary examination on a two-count

7   Complaint here.  We did hear argument from the attorneys, the Court

8   has had a chance to review the evidence and will now render its

9   decision.

10         In reviewing the evidence, I will note that I did review the

11  notes that this Court took, I also reviewed the exhibits, reviewed the

12  Complaint in question and also, I took a look at the Criminal Jury

13  Instructions.  I oftentimes find that when I do that the elements help

14  orient me as to what needs or does not need to be considered today.

15         We have a two-count Complaint, Count I alleges First Degree

16  Premeditated Murder; Count II alleges Homicide/Felony Murder.  We

17  heard from various witnesses today.

18         I will not review or summarize the testimony, everybody

19  heard what they had to say, but we did hear from Michael Matheny, and

20  I apologize for any mispronunciations, Tony Evans, Scott LeRoy,

21  Gabrielle Rought, Cynthia DeLoach, Chris Williams and Thomas

22  Macyauski.

23         In regards to the first findings, I will make a finding that

24  this incident did happen on January 7, 2007, and it did take place in

25  Lawrence Township in Van Buren County.

1    We had some stipulations that were received today only for

2    the purpose of prelim from a Dr. Michael Markey, the medical examiner

3    that performed the autopsy.  That stipulation or that evidence is that

4    the victim died from thermal injury and/or burns and/or inhaled

5    combustible materials.

6        We also have, as evidence today, from Troy Ernst from the

7    Michigan State Crime Lab that the pants, shirt, boxer shorts and socks

8    of the victim, Mr. Stermer, were examined and that the presence of gas

9    was determined to be on those particular articles of clothing.

10       So, of course, the first finding I'm going to make is that

11   there was a fire at the residence on this date.  That this fire was

12   arson, it was set on purpose, lets say, not by accident and that is

13   according to the evidence that we heard today.

14       Second, I will make a finding based on the stipulations that

15   Mr. Todd Stermer died as a result of this fire.  He died as a result

16   of the arson, in other words, which would be a crime; obviously, arson

17   is a crime.

18       And as both attorneys know, this is a probable cause hearing

19   this is not the point that if it goes that far where a person can be

20   found guilty or not guilty beyond a reasonable doubt.  This is a

21   probable cause hearing and I will note that a probable cause hearing

22   would require some evidence to be presented on each element of the

23   offense that the accused is charged with.

24       Now, I'll also note that the trier of fact, this Court is

25   the trier of fact on this case and I'll note that if a jury hears this

101

1    case, the other trier of fact that the trier of fact can take into

2    consideration, the common sense, their everyday experience, there's an

3    instruction on that and I will also note that the trier of fact can

4    also consider the absence of any evidence in making a decision today

5    and I will also note at this point in time that the Court can consider

6    and will consider what it believes to be using its own ordinary common

7    sense and everyday experience.

8         Now, is there anything that links this Defendant to this

9    arson?  I think that's the crux of the issue today.  I think both of

10   the attorneys recognize that, this Court certainly recognizes that.  I

11   will note as Attorney Getting said, there is no, in this Court's

12   opinion, no direct evidence that links Mrs. Stermer to the person who

13   set this fire.  I did not hear any.  There may be some, if there was,

14   it was not presented today.

15        As the attorneys know, there's another type of evidence in

16   this state called circumstantial evidence.  I'll note that

17   circumstantial evidence alone can be enough to convict a person of a

18   crime.  What evidence is there?  What circumstantial evidence is there

19   it link, if you will, Mrs. Stermer as the person who set this fire

20   that resulted in her husband's death?

21        First--and some of the things I say may be taken for granted

22   by folks who are not trained in the law, but I think it's important to

23   note this.  She was in the area, she was home.  By that I mean wasn't

24   out and about, she wasn't on vacation, so she was present and had the

25   ability, had the physical ability, to set the fire.

1        Second, there's testimony that she bought gas that very

2   morning.  That she put that gas in a gas can and there was a gas can

3   seen or observed on the front lawn of the premises.

4        Third, she's the one who sent the kids to the mall.

5        Fourth, the fire was, according to the fire marshal, the

6   expert, sudden, spread rapidly and spread quickly.  There's no

7   evidence to show that anyone else was in the area.

8        Now, either Mr. Stermer was in the living room, using

9   gasoline, there's simply no evidence of that, and somehow accidentally

10  ignited himself, or in this Court's opinion, Mrs. Stermer was involved

11  in the fire.

12       Fourth (sic), there's evidence of an extramarital affair

13  from the Defendant.

14       Fifth, the Defendant was downstairs, according to her

15  testimony, when the fire erupted.

16       I think that none of those taken by themselves would

17  constitute enough evidence for this case--for this Court to bind the

18  Defendant over, but I think all those factors taken into consideration

19  today, knowing that this is just a probable cause hearing, that this

20  Court can at least conclude from the evidence today that there's

21  probable cause to believe that Mrs. Stermer set this fire.

22       Therefore, Mrs. Stermer, we are going to bind you over to

23  Circuit Court on both Count I and Count II to stand trial.

24       Your Circuit Court arraignment date over here is going to be

25  July 6, 2009, it's going to be next door, Judge Buhl's courtroom,

1    Attorney Getting, upstairs, nine o'clock, would you help me out?

2              MR. GETTING:  Certainly.

3              THE COURT:  Okay.  I'm going to give you both notice and this

4    is a notice for Mrs. Stermer.  July 6, 2009 and that would conclude

5    our proceedings for the day.  Thank you.

6              MR. KAPS:  Thank you, Your Honor.

7              MR. GETTING:  Your Honor, before we conclude today, if I

8    may, I know that the Court has--has a pending appointment.  Would the

9    Court allow me to address bond after having heard proofs at the

10   preliminary exam?  I have not filed a written motion.

11             THE COURT:  I--Mr. Kaps is here.  If he would stipulate I

12   will take a short argument.

13             MR. KAPS:  I would waive notice, Your Honor.  I don't have

14   any objection to hearing it.

15             MR. GETTING:  Prior to binding the case over to Court, the

16   Court having heard the proofs, and having heard that there is no

17   direct evidence, as the Court has summarized, and only circumstantial

18   evidence of my client's involvement in this crime, we would ask that

19   the Court now, having heard evidence and being able to weigh the

20   likelihood of conviction as required as one of the factors under the

21   Michigan Court Rules take into consideration setting a cash bond.

22   Bond has been denied.  None of the other factors have changed with

23   regard to Ms. Stermer.  She owns a home in Kalamazoo.  She has

24   substantial family here, her family is here in support of her.  This

25   is an event that took place two and a-half years ago.  She's made no

1    attempts to leave the jurisdiction, she certainly had ample

2    opportunity to.  Her life is here; she was employed.

3         We would ask that the Court consider a cash bond.  She is

4    certainly not a flight risk.  There's been no evidence of any threats

5    to any witnesses in this case and she would abide by any court

6    conditions with regard to witness contact.

7         Lastly, Your Honor, in order to ensure any concerns about

8    flight, my client would volunteer to be placed on the tether or

9    electronic monitoring device at her expense during the pendency of

10   this case while we prepare for trial.  Thank you.

11        THE COURT:  Do you want to be heard on this?

12        MR. KAPS:  Yes, Your Honor.  I would--I believe it's

13   appropriate that bond be denied given the nature of the charges.  I

14   believe I would, obviously, disagree with Mr. Getting as far as the

15   strength of the case and I believe it is appropriate that bond not be

16   set.

17        THE COURT:  Okay.  All right, let me do this for today.

18   Okay.  I'm going to--I'm going to--I'm going to deny the motion today.

19   I'm going to continue to deny bond recognizing, of course, that some

20   of the factors in considering bond that were argued may actually be

21   prevalent in this case.

22        Attorney Getting, all I could suggest to you is to file an

23   actual written motion in front of Judge Buhl.  Okay?  And have a more

24   of an in-depth hearing on this.

25        MR. GETTING:  I will do that, Your Honor.  Thank you for

1    your time.

2              THE COURT:  Okay.  Thank you all.  Oh, Mr. Kaps?

3              MR. KAPS:  Yes.

4              THE COURT:  Are we still on the record?

5              THE RECORDER:  Yes.

6              THE COURT:  Can we return the exhibits to the People?

7              MR. KAPS:  Either that or we can send them with the file.

8    Either one agreeable.

9              THE COURT:  I have no preference.  I'm not certain Attorney

10   Buhl--

11             MR. KAPS:  We can return them if he--

12             MR. GETTING:  I would just assume you maintain them--

13             THE COURT:  Do you have any objection?

14             MR. GETTING:  --as opposed to putting them in the court

15   file.

16             THE COURT:  I would agree.

17             MR. KAPS:  All right.

18             THE COURT:  Okay.  I'm going to note that Exhibits 1 through

19   6 are being returned to the People.

20             MR. GETTING:  Thank you, sir.  Will Judge Buhl accept a

21   waiver of arraignment on these cases?

22             THE COURT:  That's a good question.

23             MR. GETTING:  That's why I'm asking.

24             THE COURT:  What he does is he does a pretrial summary.

25             MR. GETTING:  Well, it's good because then I can go ahead and

1          file a motion regarding bond.

2                    (At 11:52 a.m., Court proceedings concluded)

3                              *      *      *

4

5

6

7

8

9

STATE OF MICHIGAN   )
                    )
COUNTY OF VAN BUREN)


   I certify that this transcript consisting of 108 pages is a true, correct and complete transcript of the proceedings taken in this matter on Wednesday, June 242009, by Susan L. Klein, CER #3482, Certified Electronic Recorder.

Dated:   July 30 2009

_____
Susan L. Klein, CER #3482
Certified Electronic Recorder