Approved, SCAO

| | |
|---|---|
| Original - Court<br>1st copy - Prosecutor | 2nd copy - Defendant<br>3rd copy - Defendant attorney |

| STATE OF MICHIGAN<br>JUDICIAL CIRCUIT<br>Van Buren        COUNTY | MOTION FOR RELIEF FROM JUDGMENT | CASE NO.<br>09-16654 |
|---|---|---|

| ORI<br>MI- | Court   address | Court   telephone   no. |
|---|---|---|

THE PEOPLE OF THE STATE OF MICHIGAN

FILED

JUL 3 1 2013

TINA LEARY
Van Buren County Clerk

v

Defendant's name, address, and inmate no.

Linda Kay Sterner

To be completed by the court.

| CTN/TCN | SID | DOB |
|---|---|---|

**INSTRUCTIONS:** Answer each question as completely as you can. If you need more space to answer any question, you may attach extra pages. You may also attach documents, affidavits, or a brief, if you wish. Only one motion for relief may be filed, except as indicated in MCR 6.502(G)(2). Information for items 1 and 2 is on your judgment of sentence and basic information sheet, which are available at the prison record office.

1. I was found guilty on  January 13, 2010   of the crim(s) stated below.
   Date

| Count | CONVICTED BY | | | DISMISSED BY* | CRIME | CHARGE CODE(S)<br>MCL citation/PACC Code |
|---|---|---|---|---|---|---|
| | Plea* | Court | Jury | | | |
| 1 | | | X | | Felony Murder | 750.316B |
| | | | | | | |
| | | | | | | |

*For plea: insert "G" for guilty plea, "NC" for nolo contendere, or "MI" for guilty but mentally ill.  For dismissal: insert "D" for dismissed by court or "NP" for dismissed by prosecutor/plaintiff.

2. I was sentenced as stated below by Hon.  Bull
   Name of judge

| Count | SENTENCE DATE | MINIMUM | | | MAXIMUM | | DATE SENTENCE BEGINS | JAIL CREDIT | | OTHER INFORMATION |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Years | Mos. | Days | Years | Mos. | | Mos. | Days | |
| 1 | Feb 8, 2010 | Life | | | | | Feb 8, 2010 | | | no parole |
| | | | | | | | | | | |
| | | | | | | | | | | |

3. Fill in the charts below with the information requested about the court proceedings in your case and the names of the attorneys who represented you.

   a. **Trial Level - All Proceedings.** From arrest to sentencing, including lineups and other proceedings.

| NAME OF PROCEEDING | NAME OF ATTORNEY |
|---|---|
| Arrest | Getting |
| Arraignment | Getting |
| Preliminary Hearing | Getting |
| Motion to Quash Bindover | Getting |

| NAME OF PROCEEDING | NAME OF ATTORNEY |
|---|---|
| Motion to Adjurn | Getting |
| Motion Direct Verdict | Getting |
| Motion New Trial | Getting |
| Trial | Getting |

   b. **Postconviction - All Proceedings.** State and federal, including appeals, posttrial motions, and habeas petitions.

| COURT | DOCKET NO. | NAME OF PROCEEDING | NAME OF ATTORNEY | RESULT | DATE OF RESULT |
|---|---|---|---|---|---|
| Van Buren Co | unknown | Directed Verdict | Getting | denied | |
| Van Buren Co | unknown | Motion for New Trial | Getting | denied | March 17, 2010 |
| Mich COA | 297057 | first appeal | Mary Owens | denied | June 23, 2011 |
| Mich Supreme | 143546 | leave to appeal | none | denied | December 21, 2011 |

(Continued on the other side.)

CC 257 (3/08)  MOTION FOR RELIEF FROM JUDGMENT

MCR 6.502

## AFFIDAVIT

I, Linda Kay Stermer, attest that all information presented in Motion For Relief From Judgment and Motion For Evidentiary Hearing are true and accurate to the best of my knowledge.

Linda K. Stermer
MDOC No. 757152
3201 Bemis Rd.
Ypsilanti, Mi. 48197-9300

July 17th, 2013

Subscribed and sworn to before me on 07/17/2013 by Ms. Linda K. Stermer
Renata Fracz

RENATA FRACZ
NOTARY PUBLIC
OAKLAND, MICHIGAN
MY COMISSION EXPIRES
ON: 05/29/2020

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF VAN BUREN

PEOPLE OF THE STATE OF MICHIGAN

            PLAINTIFF,

V

LINDA KAY STERMER

            DEFENDANT

$09-16654-FC$

FILED

JUL 31 2013

TINA LEARY
Van Buren County Clerk

---

LINDA KAY STERMER #757152

DEFENDANT IN PRO PER

3201 Benis Rd.

Ypsilanti, Mi 48197

---

## BRIEF IN SUPPORT OF MOTION FOR RELIEF FROM JUDGEMENT

### *** ORAL ARGUMENT REQUESTED ***

# TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................... i

QUESTIONS PRESENTED........................................... ii

STATEMENT OF FACTS........................................... 1-9

ISSUE I....................................................... 10
ISSUE II...................................................... 14
ISSUE III..................................................... 27
ISSUE IV...................................................... 35
ISSUE V....................................................... 38
RELIEF REQUESTED.............................................. 43

## TABLE OF AUTHORITIES

### CASES

Amorello v Monsanro Corp 86 Mich. App;463 NW 2d 487 (1990)..........13

Babick v Berghuis 620 F3d 571 (6th 2010) ......................28,29,40

Berger v United States 295 US 78;55 SCt 629(1935) ... .... ... . ...19

Berry v Crown Equiptment Corp 108 F. Supp 2d 743 (ED Mich 2000). .22,42

Bigelow v Haviland 576 F3d 248 (6th 2009).......................29

Blank v Department of Corrections 462 Mich 103 (2000)...............28

Brady v Maryland 373 US 83 (1963).........................23,30,32

Carpenter v Mohr 163 F3d 938 (6th 1998).........................35

Cook v American s.s.Co  53 F3d 733 (6th 1995).................10,38,39

Darden v Wainwright 477 US 168;106 SCt 2464 (1986)..................20

Daubert v Merrill Dow Pharmecuticals Inc 609 US 579;113 SCt 7286
(1993)...........................................10,11,39,40,42

Donnelly v DeChristofors 416 US 637;94 SCt 1868(1974)...............19

Dugas v Coplan 428 F3d 317 (1st 2005)..............................29

Evitts v Lucey 469 US 387;105 SCt 830 (1985).........................35

Folksdorf v Griffith 464 Mich 1; 626 NW 2d (2001)..................27

Giglio v US 405 US 150;92 SCt 763 (1972).........................32,34

Grievance Adminstration v Lopatin 462 Mich 235 n.12;NW 2d 120(2000).27

Hodge v Harley 426 F3d 368 (6th 2005)...................16,20,21,32,33

Jackson v Virginia 443 US 307;99 SCt 278(1979)...................38,41

Johnson v Bell 525 F3d 466 (6th 2008).............................19

Kumho Tire Ltd. v Carmichael 526 US 137;119 SCt 1167 (1999).........11

Lamberti v US 22 F Supp 2d 60 (1998)..........................

Lundgren v Mitchell 440 F3d 754 (6th 2006).........................34

McDougal v McDougal 451 Mich 80;545 NW 2d 357 (1996)...............27

Mooney v Holohan 249 US 103;55 SCt 340 (1935)..................20,22

Napue v Illinois 79 SCt 1173 (1959)..............................32

Nelson v American Sterilizer (on remand) 223 Mich App 485.........13

Nelson v Mitsubishi Motor Corp 200 F Supp 2d 770(ED Mich 2002)..39,4

People v Albert 89 Mich App 350;280 NW 2d 523(1973)...............31

People v Amison   Mich App 70; 245 NW 2d 405 (1976)..............31

People v Anderson 42 Mich App 10;201 NW 2d 299 (1972).............31

People v Bahoda 448 Mich 261; 531 NW 2d 659 (1995)...........14,17,26

People v burnett 166 Mich App 649; 436 NW 2d 659 (1988).....

People v Coy 243 Mich App 270 (2000)..............................42

People v Cooper 236 Mich App 643;601 NW 2d 409 (1999).............26

People v Denbar 463 Mich 606;625 NW 2d 1 (2001)...................28

People v LeBlank 465 Mich 575 (2002).............................26

People v Lee 231 Mich 607 (1925)..................................41

People v Lester 232 Mich App 262 (1988)...........................32

People v Owens C.O.A. No. 288074..................................17

People v Simon 174 Mich App 649; 436 NW 2d 659 (1988).............15

People v Wallace 102 Mich App 386 (1980).....................24,30,31

Pyle v Kansas 317 US 213;635 SCt 177 (1942).......................20

Ratliff v US 999 F2d 1023 (6th 1993)............................

Richey v Bradshaw 498 F3d 344 (6th 2007).......................28,29

Romonez v Berghuis 490 F3d 482 (6th 2007).........................29

Schauer v McKee 662 F Supp 2d 864 (ED Mich 2009)...............17,18

Smelser v Norfolk Southern Ry. Co. 105 F3d 299 (6th 1997)....12,39,42

Sparks v Sparks 440 Mich 141 (1982)...............................27

Strickland v Washington 466 US 668;104 SCt 2052 (1988).......32,33,35

Trejo v Menors 462 Mich 341 (2000)................................27

US v Agurs 427 US 97; 965 SCt 2392 (1976).......................15,34

US v Carroll 26 F3d 1387 (6th 1994)..............................17,18

US v Carver 470 F3d 222 (6th 2006)..................................34

US v Delo 115 SCt 851;130 LEd 2d 808 (1995).....................1 j J.42

US v Francis 170 F3d 546 (6th 1999).............................16,19

US v Hebshie 754 F Supp 2d 89 (D Mass 2010).......................13

US v Helmsley 985 F2d 1202 (1993)..................................15

US v Lane 479 F2d 1134 (CA6 1973)..................................30

US v Mclallie 554 F2d 770 (CA6 1997)...............................30

US v Pearce 912 F3d 159 (6th    )..................................38

US v Saunders 325 F2d 840 (6th 1964)...............................38

US v Walbach 935 F2d 445 (1991)....................................15

US v Welch 97 F3d 142 (6th 1996)................................38,42

US v Young 470 US 1; 105 SCt 1038 (1985)...........................16

Washington v Hoffauer 228 F3d 689 (6th 2000).......................21

Zuzla v ABB Power T.E.D Co  267 F Supp 2d 703(ED Mich 2003).......42

## CONSTITUTIONS, STATUES, COURT RULES

US Const  Amends VI.........................................10,14,27,35

US Const. amends XVI........................................10,14,27,35

Const 1963 art 1 s 20..............................................27

MCL 750.316B........................................................1

MCR 2.613 (c)......................................................27

MCR 6.001 (D)......................................................27

MCR 7.211 (A)(3)(a)................................................27

MRE/FRE 104a.......................................................10

MRE/FRE 403...................................................10,12,28

MRE/FRE 404.............................................................21

MRE/FRE 608(b)......................................................32,33

MRE/FRE 702.........................10,11,12,13,28,29,38,39,42

Fed. R. Crim. Proc. 29(a).............................................41

CJI 2d 3, 5 Evidence.................................................41

## MISCELLANEOUS

NFPA (National Fire Protection Agency) 921-1033..............12,28,40

34ALR 3d 16..........................................................25

The Gate Keeper Effect...............................................41

15 Psy. Pub. Poly. E 1, 12 (2009)...................................41

The American Bar Association Standards..............................15

The Random House Dictionary.........................................31

# QUESTIONS PRESENTED

I. WAS MS STERMER DENIED HER FOURTEENTH AMENDMENT RIGHT WHEN SCOTT LEROY
WAS ALLOWED TO TESTIFY AS AN EXPERT ON CAUSE AND ORIGIN OF FIRE. WAS THE
ACCEPTANCE OF LEROY AN ABUSE OF DISCRETION IN ACCORDANCE WITH MICHIGAN
AND FEDERAL RULES OF EVIDENCE 702?

Defendant - Appellant answers "Yes".
Plaintiff - Appellee has not yet answered.

II. WAS STERMER DENIED A FAIR TRIAL BEFORE AN IMPARTIAL JURY IN VIOLATION
OF HER FOURTEENTH AMENDMENT RIGHTS BY THE PROSECUTORS ACTIONS? DID
PROSECUTOR KAPS ENGAGE IN VOUCHING AND BOLSTERING, OFFER FACTS NOT IN
EVIDENCE, MISCHARACTERIIE FACTS, DENIGRATE AND ASSASSINATE STERMERS CHARAC-
TER WITH IMPROPER NAME CALLING DURING CLOSING? DID THE PROSECUTOR ELICIT
KNOWN FALSE TESTIMONY AND TESTIMONIAL EVIDENCE NOT SUPPORTED BY ACTUAL
EVIDENCE? WERE THESE ACTIONS PREJUDICIAL TO STERMER?

Defendant - Appellant answers "Yes".
Plaintiff - Appellee has not yet answered.

III. DID TRIAL COUNSEL RENDER INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLA-
TION OF STERMER'S SIXTH AMENDMENT CONSTITUTIONAL RIGHT IN HIS FAILURE TO:
OBJECT TO PROSECUTORIAL MISCONDUCT, PROPERLY CHALLENGE THE ACCEPTANCE OF
PROFFERED EXPERT, SCOTT LEROY, INVESTIGATE THE STATES SCIENTIFIC DETERMINA-
TION OF ARSON, BE AWARE OF RULES CRITICAL TO THE CASE, HIRE EXPERT AS
REQUESTED, INTERVIEW POTENTIAL ALIBI WITNESSES AS REQUESTED, INTERVIEW
STATES WITNESSES OR EXPERTS AND OBJECT TO TRIAL COURTS FAILURE TO READ A
REQUESTED CURRATIVE INSTRUCTION TO THE JURY? DID TRIAL COUNSELS ACTIONS

PREJUDICE STERMER?

Defendant - Appellant answers "Yes".
Plaintiff - Appellee has not yet answered.

IV.  DID APPELLATE COUNSEL FAIL TO RAISE STRONGER ISSUES THEN THOSE RAISED?
WAS APPELLATE COUNSELS PERFORMANCE DEFICIENT AND VIOLATE STERNERS DUE
PROCESS RIGHTS OF THE SIXTH AMENDMENT?

Defendant - Appellant answers "Yes".
Plaintiff - Appellee has not yet answered.

V.  SHOULD MS. STERMERS CONVICTION BE REVERSED BECAUSE THE EVIDENCE WAS
LEGALLY INSUFFICIENT TO PROVE BEYOND A REASONABLE DOUBT THAT STERMER INTEN-
TIONALLY SET FIRE THAT RESULTED IN THE FELONY MURDER CHARGE, AND CONTRARY
TO THE GREAT WEIGHT OF EVIDENCE?

Defendant - Appellant answers "Yes".
Plaintiff - Appellee has not yet answered

## STATEMENT OF FACTS AND PROCEEDINGS

### Procedural Background

Linda Kay Stermer was convicted on January 13, 2010 of felony murder, MCL 750 316P, for the murder of her husband Todd Stermer, following a six day trial. Ms Stermer is currently serving a life sentence without the possibility of parole at the Huron Valley Womens Complex in Ypsilanti, Michigan  She was sentenced on February 8, 2010 in the Circuit Court of Van Buren County Michigan before Judge Buhl.

Her conviction and sentence were confirmed by the Michigan Court of Appeals on June 23, 2011, (NO297057). Michigan Supreme Court denied leave to appeal on November 21, 2011 (NO143546). On September 11, 2012 Petitioner filed her Habeas petition pro se and Judge Tarnow granted an order holding the petition in a beyance and stay the proceedings on December 10, 2012, in order for Stermer to return to the state courts to exhaust additional claims, (NO2:12-cv-14013-AJT-DRG)

All of Stermer's issues raised in the current motion for relief from judgement are newly discovered and have not been raised in any previous motion or appeal. Her current deadline is July 25, 2013 on her current extension. Represented by Jeffrey Getting, trial and pretrial, Mary Owens on appeal.

### FACTS

On January 7, 2007, the Van Buren County Sheiff's department responded to a house fire in Lawrence Township at 3:30 p.m. (TrII,2-3). The house was located about 250 yards from the road, down a long driveway which sloped downwards at the back of the house. (TrII,4,11,28,56). Then continued to the back of the house, a sort of pathway that had been repeatedly driven over, so that the grass had

(1)

been worn away. (Tr,68-69;TrIII,98). The back area was described as "real sandy" and unpaved, (TrII,215-216,220-221,256;TrV,8-9,20). The house itself was still under construction although the Stermers were living there (TrI,267;TrIV,109-110,148;TrV,9,78). For example, the ceilings in the living room and basement were unfinished and the rafters were exposed. (TrVIV,110;TrV,78). It was not uncommon for gas cans to be placed in the front yard (TrV,9,76-77).

It took the officer about 10 minutes to arrive at the home, by which time the house was fully involved, and the smoke was traveling upwards, but did not obscure the scene. (TrII,3-4,12).

When the police arrived there were 5 people on the north side of the lot, and Todd Stermer was laying on the grass, badly burned with lacerations, but still alive. (TrII,12-13,24-25,37,79-80,155;TrIII,43-44) There were articles of clothing placed on Todd (including clothing belonging to neighbor), but the only clothing he was wearing was a gray pair of sweat pants pulled down to his ankles and socks. (TrII,14,35-36,51,61,79;TrIII,45-46,90-91 183).

The sweat pants later tested positive for the presence of gasoline, as did Todd's socks, underwear and shirt. (TrII,139-140,142). The tan coat, a red sweatshirt, brown shirt, blue shirt and towel that had been laid on top of Todd were negative for the presence of "ignitable liquids." A shirt belonging to neighbor Mike Matueny tested positive. (TrIII,140-142). The clothing worn by Defendant-her sweater, pants and socks-tested negative for the presence of "ignitable liquids " (TrIII,141,148). The witness on the scene described Defendant as laying on top of Todd, screaming his name over and over, hysterical. (TrII,22,28-29,37-38,63,81,111-112,120). Todd

(2)

was bleeding from his head, had a laceration, and trauma to his back. Officer Eveans and the others put Todd onto a sled and pulled the sled away from the house and the oil tank and began first aid. (TrII,16-17,19,30-32,52-53,117).

Neighbor Mike Matheny and Connie Calhoun were leaving to go bowling about 3:30 p.m. As they passed the Stermer house they noticed smoke and went up the driveway to see if help was needed. (TrII,43-44,55,71-72). Defendant got out of the van and was "hysterical." (TrII,49,59-61,87-88). Matheny and Calhoun kept asking where the boys and Todd were, and when he went back towards the van, he saw Todd lying on the ground close to the fuel tank. He passed by several times before he saw Todd on the ground. (TrII,49-50,57-58,65,77-78). Matheny then got some clothes from his own car and put them over Todd. (TrII,51-52,64). Later, Defendant told Calhoun that she was downstairs doing laundry and Todd was upstairs watching TV when she heard him scream. (TrII,82-83,90-93).

Dr. Moussali and his sons were doing chores outside and noticed smoke. They drove down the driveway, where he saw Methenys and Defendant standing, and one person on the ground. (TrII,99-100). Dr. Moussali checked his breathing and tried to get a pulse. Todd did not seem to be conscious. He noticed Todd's tongue was bruised, but did not notice any lacerations or bleeding. (TrII,101-104). Defendant was "wailing" and crying. (TrII,106)

Fire Chief Leach stated that he lived on the same street as the Stermers and was the first emergency responder there that day. He saw a lot of heavy black smoke, indicative of a fast moving fire that had been burning a long time. (TrII,110-111,116,122) When Leach performed

(3)

a medical assessment, Todd was breathing and had a pulse, but there was a lot of blood in his mouth (TrII,113,117). CPR was performed for about 30 minutes. (TrII,156-157).

Defendant and Todd had been married for 14 years. (TrI,266). They had been living at their home with their three sons. (TrI,267-268).

Defendant told Deputy Gruss that she was downstairs doing laundry and that she heard yelling, went upstairs and saw the flames, so she left through the front door. She did not know how Todd managed to escape, so she got in the van to try to get him help. She saw him again, he had begun removing his clothes. (TrII,147-148,158-160).

A forensic chemist, Craig Balliet, testified. *TrII,164-ff). He had been sent materials by fire investigator James Shinsky, including carpet pad from the Stermer home, to test for the presence of ignitable liquid residue. (TrII,167-170,235-236,238-239,258). He found turpentine residue, which would not necessarily indicate deliberate ignition, but could be the result of "natural contamination" from the burning of wood products such as fireplace log. (TrII,173,184).

Defendant was interviewed both on the scene, and two days later. (TrIV,28,71,74). She told Detective Gabrielle Rought that Todd had gotten up around 10:00 a.m. and was not feeling well. She said she made breakfast and argued with Todd about having used a debit card. (TrIV,32-33,76-77) Because she did not want the children to hear any arguing, she sent them to the mall. (TrIV,34,102-104,111-112) She said there was no more arguing after the boys left. She did not mention that there was any discussion of divorce or moving out of the house. Then, Todd began watching hunting shows while she went into the bedroom to read literature for her son's medication. (TrIV,36,77). A

(4)

fire was going in the fireplace in the living room. She fell asleep
but woke up when Todd asked her for some juice. She got him the juice
then went to do laundry downstairs. (TrIV,36-37). Next, she heard Todd
scream and she ran upstairs where she saw a lot of smoke and fire. She
fled the house and was about to go to Mike Matheny's house for help.
(TrIV,38-39). Todd made no threats of suicide or killing her.
(TrIV,69) She got in the van and tried to turn around She saw Todd
in the side yard on fire She tried to turn the van around, got out of
the van to try to assist him, then got back in the van, then she
didn't see Todd. She got back out of the van and saw him laying in the
yard with the neighbors there. (TrIv,39-39,78-80,93-94). She told
Rought that the house was heated with fuel oil, there was no kerosene,
but a couple of oil lamps. (TrIV,41-42,77-78).

On January 9 and 10, she was interviewed by James Shinsky, a
private fire investigator who had been hired to determine the cause
and origin of the fire (TrII,194-ff). Exhibit 13, the transcript of
the interview, was admitted into evidence by stipulation and portions
of it were read to the jury by the witness. (TrII,202-205) She was
also examined under oath by the insurance company on February 27,
2007. The transcripts of that interview, exhibits 58 and 59, were also
admitted into evidence by stipulation. (TrIV,44-45).

The three boys had gotten up that day and been told by Defendant
to go to the mall in Kalamazoo to avoid hearing their parents argue.
(TrIV,102-107,122,144-145). Todd and Defendant had been arguing the
night before and the boys had figured out that their parents would be
separating (TrIV,102-103,112,129-130,146-147,157). According to Cory,
Todd accused Defendant of "cheating on him" and wanted a divorce. Cory

(5)

did not hear any discussion about who would be moving out of the
house (TrIV,147-148,157).

Todd was lying on the couch in living room when they left Both
Cory and Trenton said Defendant gave them money for the movies and
sent them to the mall after they got up. Todd had recently obtained a
prescription for an ear infection. The medication made him feel
"sleepy" and affected his balance. (TrI,275-277;TrIV,132,158-159).
There was no breakfast cooking when the boys left (TrIV,152). The
boys were in a movie when they were called on a report that their
house was on fire. (TrIV,107,127,152).

Fire Marshal Scott Leroy seized Todd's gray sweat pants on the day
of the fire. (TrIII,182-184). He noticed that there was a "noticeable
odor" of accelerants coming from the sweat pants. (Id.). The next day
he returned and concluded his investigation (TrIII,185). He began by
comparing the area of most damage to the area of least damage, on the
theory that "longer fire burns, the more damage it's going to create
and the...longer it burns, is where the fire starts." (TrIII,186,216).
He determined that the fire originated towards the west side of the
home, where a portion of the second story had collapsed in.
(TrIII,189) There was less damage on the east side of the home (the
front) and the north (where the driveway was) (TrIII,189-190,214-
215). Not much fire came out of the back (west) side basement of the
home. Leroy stood in the basement slider doors and was able to look up
at the sky; the upper level, including the roof, was totally burned
away (TrII,191).

He determined that the fire did not start in the area of the
fireplace, because there was still some intact structural lumber

(6)

around the fireplace (TrIII,192). He determined that the fire began in the center of the living room (TrIII,193-194,197,216) "The area consumed the most is the living room, the floor and the roof of the main floor living room because there was also no roof deck, rafters, joists or shingles that remained. (TrIII,216). He concluded that it was an intentionally set arson fire on the basis of the speed and intensity of the fire. (TrIII,197-199,208).

He could not ascertain the presence of accelerants on the first floor because the "floor does not' exist anymore. It's totally burned up." (TrIII,197). But, because Todd was "part of the fire deris" and there were petroleum products on him, he knew "that there is in this case gasoline in the area of origin." (TrIII,198,205). A canine search conducted the next day did not find any ignitable accelerants (except for a small amount of fuel oil at the furnace). He concluded that Todd was in the middle of an intense fire for a short period of time. (TrIII,200-201,204-205). On cross-examination, Leroy admitted that it is the vapors (not the liquid gasoline) which ignite, and that is gasoline gets on one's hands or clothes, the vapors emanating from those areas may ignite. (TrIII,225).

An autopsy on Todd revealed burn injuries on most of his body, as well as blunt force injuries and lacerations on his head and upper back area, several rib fractures (both front and rear) shallow depressed skull fractures and linear abrasions consistent with being run over by a car. (TrIII,6-7,12-13,23-24,28-30). Additionally, there was soil and plant material in his nasal cavities. (TrIII,26). The socks and underwear he had been wearing at the time of his death were taken with him to Dr Markey's in the body bag (TrIII,25). However,

(7)

the sweat pants did not go to Dr Markey's. (TrIII,75)

The cause of death was "thermal injuries" (burns) and smoke inhalation, although the amount of soot in his airways was not large, (TrIII,13,20-22,32-33). The lacerations and blunt force injuries did not contribute to his death. (TrIII,14). Because the lacerations were in four different parts of the scalp, Dr. Markey opined that his head hit something, such as having been struck in the head multiple times, hitting the ground, a table or a vehicle, but indicative of more than one impact. (TrIII,14-15) Dr. Markey could not say whether the lacerations occurred before or after death (TrIII,16-18) Blood and urine specimens taken from Todd showed no controlled substances or prescription drugs in his blood, but Vicodin was found in his urine (Id.,31-32). The significance of finding drugs in his urine but not his blood is that it means that 1) he took the medication hours or days earlier or 2) the amount taken was so small as to be undetectable. (Id ,34). Dr. Markey concluded that the manner of death was classified as **"undetermined"** rather than homicide. (TrIII,33).

Cynthia DeLoach worked as a store clerk at the Lawrence Marathon. On January 7, 2007, she saw Defendant pumping gas at about 9:03 a m., but could not see if she was pumping it into a container. (TrIV,4-5,7-12,22-23,24). Because the register receipt was for $11.01, Cynthis agreed that Defendant also much have purchased gas for the truck. (TrIV,23). She also bought bread and eggs. (TrIV,14-15). It was not uncommon for the Stermers to purchase gas in gas cans for their equiptment at home. (TrIV,16,113,159).

Fox's credibility was seriously questioned because of her animosity against Defendant. First Fox and Defendant had a falling out

(8)

on July 31, 2007, At which time she assaulted Stermer and was charged.
Second, Defendant had changed her work shift without consulting with
Fox, contrary to an earlier agreement that the two of them had that
they would only change shifts together, so as to continue car-
pooling (TrIV,184-187,188-189,195-197,200-201). Finally, Fox herself
had been admitted twice to psychiatric hospitals and was being treated
for depression

At the beginning of Day five of trial, the prosecution rested and
the defence made a motion for directed verdict, which was denied.
(TrV,2-5). The defense then presented its witnesses.

Cassandra Grigg, Tonya Stevens, Julie McCray, Christine Sillars,
Sheri Macomber, Stephen Benny and Ashley Gibson had known Defendant
for many years They described Defendant as a peaceful, honest and
nonviolent person incapable of intentionally killing her husband.
(TrV, 10-11,16-17,21-22,26-27,49-50,64-65,72-73,95). Ashley Gibson was
Defendant's daughter. She testified that the second cell phone and the
post office box were not kept a secret from Todd (TrV,81,88-
89,91,93)

Several jail inmates housed with Defendant, testified that
Defendant never talked about her case, never spoke with Dardeda
Gordon, and that Dardeda Gordon was not a truthful person (TrV,32-
35,47,55,68-69).

(9)

ARGUMENT

I. MS STERMER WAS DENIED HER FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL
WHEN THE COURT ALLOWED SCOTT LEROY TO TESTIFY AS AN EXPERT ON CAUSE AND
ORIGIN. THE COURT DID NOT FULFILL IT"S ROLE AS "GATE KEEPER" WHEN LEROY
WAS ALLOWED TO PRESENT UNRELIABLE TESTIMONY TO THE JURY AS AN EXPERT,
WHICH DID NOT COMPORT WITH MRE/FRE702. THE ALLOWANCE OF LEROYS TESTIMONY
WAS AN ABUSE OF DISCRETION AND PREJUDICIAL TO STERMER UNDER MRE/FRE403.

   Stermer was denied her Sixth Amendment Right to effective assistance
of counsel when trial and appellate counsel failed to object to/raise,
on appeal, this issue  Where it did not comport with MRE/FRE 702 and
MRE/FRE 403

### STANDARD OF REVIEW

   The admissibility of expert testimony has been determined in Cook v
American Steamship Co , F3d 733, 738 (6th 1995). The Sixth Circuit Court
set forth the standard of review to be used when examining a trial
court's ruling on the admissibility of expert testimony under Fed R Evid
702. Preliminary fact finding under Fed R Evid 104(a), eg., a finding
that the witness is qualified to testify as an expert on a certain
subject is reviewed for clear error, Id  Reviewing de movo the trial
court's determination "whether the opinion the expert wishes to offer is
properly the subject of 'scientific, technical, or other specialized
knowledge'" and this includes it's "determination whether 'the reasoning
for methodology underlying the testimony is scientifically valid.' "Id.
(quoting Daubert 509 US at 592-93; 113 S Ct 2796)

   In Cook, the Sixth Circuit court also observed that the trial
court's assessment of whether an expert opinion will assist the jury in
understanding the evidence or in determining a fact issue is a relevancy
determination that is reviewed for an abuse of discretion. Cook at 738.

Evaluative responsibility is placed on the trial judge. The judge is
the "gate keeper " As gate keeper he must keep unreliable expert
testimony from each jury Michigan and Federal Rule of Evidence 702 To
be considered reliable, scientific testimony must be grounded in the
scientific method and must constitute more than subjective belief or
unsupported speculation. (Daubert v Merrell Dow Pharmaceuticals Inc.
609 US 579; 113 S Ct 7286; 125 L Ed 2d 469 (1993), Kumho Tire Co Ltd V
Charmicheal 526 US 137; 1195 Ct 1167; 143 L Ed 2d 238 (1999)

Among factors bearing on reliability are; whether the theory can be
tested, the theory has been subject to peer review and publication, the
known or potential rate of error; and general acceptance in the field.
MRE/FRE 702.

The testimony of Michigan State Police Fire Investigator, Scott
Leroy, did not meet this criteria Leroy's testimony, consisting of
option only should not have been allowed.

MRE/FRE 702 states in Part:

.... "A witness qualified as an expert by knowledge, skill, experience,
training or education may testify thereto in the form of an option or
otherwise it (1) the testimony is based on sufficient facts or date;
(2) the testimony is the product of reliable principles and methods; and
(3) the witness has applied the principles and methods reliably to the
facts of the case.

Prosecutor Kaps offered Leroy as an expert in the field of determin-
ing cause and origin. Leroy offered his training and background
experience, at which point trail attorney Getting aquiesed to Leroy as
an expert. (T-III p 170-181) At this point no offering or request of
methods or principles which were employed in Leroys conclusions were
made.

"Once the proposed expert has crossed the foundational threshold of
establishing his personal background qualification as an expert, he must

(11)

then provide further foundational testimony as to the validity and
reliability of his theories. Berry v. Crown Equiptment Corp., 108F Supp
2d 743 (ED Mich 2000)

Leroy's theory, (T-III p 186)

"A. To determine cause and origin, I would obviously inspect the
entire structure and basic term, especially with this structure, what I
was examining is looking-comparing most damage verses least damage and
specifically of fire damage. The theory behind that is the longer fire
burns, the more damage it's going to create and the more-longer a fire
burns is where the fire starts."

The NFPA 921 and 1033, National Fire Protection Association, Fire
Investigator principles on practice handbook lays out the standard
requirements for the investigation of a fire.

Chapter 4 "Wrap up" review states, "The area of the most damage may not
indicate the point of origin" and Chapter 3 "Rapid fire, growth in
itself is not a reliable indicator of an incendiary fire."

Leroy's theory and reasoning are in complete contrast to not only
the NFPA 921 1033 they also do not comport with MRE/FRE 702.

Because of the complete lack of accepted methods and reliable prin-
ciples, Leroy's testimony has prejudiced Stermer.

MICHIGAN AND FEDERAL RULE OF EVIDENCE 403 Although relevant, evidence
may be excluded if it's probative value in substantially outweighed by
the danger of unfair prejudice, confusion of the issues or misleading
the jury...

According, Stermer asserts that the testimony of Leroy should not
have been presented to the jury. That the court abused it's discretion
in allowing Leroy's testimony. That the court further abused it's dis-
cretion when it denied Stermers two motions for Direct Verdict. Without
Leroy's testimony there is no evidence of arson, the conviction there-
fore is against the weight of the evidence.

(12)

Smelser v. Norfolk Southern RY Co 105 F3d 299 (6th 1997) "the trial
court errored when it allowed Smelser's expert Ronald Huston to offer
his opinion...The court did not asses the reliability of the methodology
...The court further erred when it denied Norfolks motion for a directed
verdict, because without Dr. Huston's improper testimony, there is not a
scintilla of evidence that...."

Jurors assume that judge review scientific evidence before it is

presented to them, and that any evidence used in a trial must be above

some threshold of quality. Because of these assumptions jurors seem to

be less critical of scientific evidence used in trials and are more

persuaded by it.

"a certain patina attaches to an experts testimony unlike any other
witness; this is science, a professionals judgement, the jury may think,
and give more credence to the testimony than it may deserve." US v.
Habshie 754 F Supp 2d 89, 113 (D Mass 2010)

Cited in Nelson v. American Sterilizer (on Remand) 223 Mich App 485,

489-482 "But that is not to say that the trial court's hands were

inexorably tied, or that it must have accepted, uncritically, any sort

of opinion espoused by either parties proffered experts merely because

their credentials rendered them qualified to testify. To the contrary,

under the rules of evidence, the trial; court was charged with ensuring

that any and all scientific testimony to be admitted was not only

relevant by also reliable.

Amorello v. Monsanto Corp. 86 Mich App 324, 331-332; 463 NW 2d 487
(1990)

"We concluded that MRE 702 requires a trial court to determine the
evidentiary reliability to trust-worthiness of the facts and data under-
lying an experts testimony before that testimony may be admitted. To
determined whether the requisite standard of reliability has been met,
the court must determine whether the proposed testimony is derived from
"recognized scientific knowledge..."

(13)

## ARGUMENT

II. THE PROSECUTOR PREJUDICED MS STERMER AND COMMITTED REVERSIBLE ERROR
WHEN HE ENGAGED IN IMPROPER CONDUCT:


a   vouching for and bolstering the credibility of testimony of seven
states' witnesses during closing arguments;

b   offered facts not in evidence, he knew to be false and improperly
mischaracterized facts during closing arguments;

c.  denigrated Stermer and appealed to the passions and emotions of the
jury with repeated, impermissible name calling and character
assassination of Stermer during closing;

d.  elicited known false testimony from state's witness Cory Pierce;

e.  elicited testimonial evidence from detective which were not
supported by actual evidence itself;


The prosecutorial misconduct committed by Kaps denied Stermer her
Fourteenth Amendment due process right to a fair trail before an
impartial jury.

Stermer was denied her Sixth Amendment right to effective assistance of
trial counsel  Trial counsel failed to object to any of the enumerated
acts of prosecutorial misconduct

Stermer was denied her Sixth Amendment right to effective appellate
counsel on appeal. Appellate counsel advised Stermer that the issues of
prosecutor misconduct and other issues were too weak to present on
appeal.

## STANDARD OF REVIEW

Questions involving prosecutorial misconduct are decided case by case,
and the court must evaluate each question within the context of the
particular facts of the case  People v. Burnett, 166 Mich App 741, 754;

(14)

421 NW2d (1988)

"The propriety of a prosecutor's remarks depend on all the facts of the case, and the remarks must be read as a whole. Also, the prosecutor's remarks must be evaluated in light of the relationship or lack of relationship they bear to the evidence admitted in trial. People v. Simon, 174 Mich App 649, 655; 436 NW2d 659 (1988)

The American Bar Association Standards provide respecting the prosecution function:

(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to inferences that may be drawn.

(b) It is unprofessional conduct for the prosecutor to express his or her personal belief or opinions as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

(c) The prosecutor should not use arguments calculated to inflame the passions of prejudices of the jury.

(d) The prosecutor should refrain from argument which would divert the jury from it's duty to decide the case on the evidence.

(e) It is the responsibility of the court to ensure that final arguments to the jury is kept within proper, accepted bounds.

## KNOWN PERJURY LEFT UNCORRECTED
## BY THE PROSECUTOR, AND ATTORNEY'S

The Standard of Review de novo, Lamberti v. US 22 F Supp 2d 60 (1998). "Whether the introduction of perjured testimony requires a new trial depends on the materiality of perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury at the time of trial." US v. Wallach 935 F 2d 445, 456 (1991)" Of the defendant demonstrates that the prosecutor knew or should have known of the perjury, then the court will set aside the conviction" "if there is any reasonable likihood that false testimony could have affected the judgement of the jury" Id quoting US v. Agurs, 427 US 97, 965 SCt 2392 (1976) US v Helmsley 985 F2d 1202 (1993)

(15)

A.   VOUCHING FOR AND BOLSTERING THE CREDIBILITY AND TESTIMONY OF SEVEN
STATE'S WITNESSES DURING CLOSING ARGUMENTS.

"It is patently improper for a prosecutor either to comment on the
credibility of a witness...." Hodge v. Hurley 426 F 3d 368 (6th 2005)

"You had the opportunity to see Cindy DeLoach. You had an
opportunity to judge her credibility. I would submit she certainly
appears to be a very credible person who has recall of the incident, has
no reason to make anything up." (T-V p113)

"They were in here, you had a chance to judge their credibility.
They were in here telling the truth." (T-V p121) regarding Mike Mathany
and Connie Calhoun.

"Same thing with Dareda Gordon. She's got no incentive to lie,
neither one of them do...There is absolutely nothing in it for them to
make this up." (T-V p126) Gordon Veronia Tracy.

"We brought in Mr. Williams, who I'm sure possibly wasn't real
thrilled to come in here and tell us about what his relationship was and
certainly he's not going to come in and lie about that. So that was
pretty much a non issue." (T-V p169)

And lastly, "The fire itself, there's no question but that it was an
arson. Okay ...I mean there is no doubt that this was an arson fire,
okay, and I don't think that there is any serious argument about that."
(T-V p170-171)

Prosecutor Kaps has made the point, to the jury, that he wants them
to believe. Not for one or two, but for seven different witnesses.

"The prosecutor's opinion carries with it that imprimatur of the govern-
ments and may induce that jury to trust the government's judgement
rather than it's own view of the evidence." United States v. Francis
170 F 3d 546 (6th 1999) citing United States v. Young 470 US 1 at 18-19;
105 SCT 1038; 84 L Ed 2d 1 (1985)

"It is well settled that a prosecutor may not vouch for the credibility of his witness by suggesting that he has some special knowledge of the witness' truthfulness" People v. Bahoda 448 Mich 261, 276; 531 NW 2d 659 (1995)

In the upholding opinion in People v. Gary Clinton Ownes, November 2, 2010, Court of Appeals no. 288074, the prosecutor injects that prestige of her office into the case. It was held that, "The prosecutor essentially stated that 'MP' was telling the truth... all believed 'MP's' account of the incident." (Those who interviewed her.) These arguments were improper and highly prejudicial in this case that involved a pure credibility."

"We have also noted that even the use of the words "I want to suggest" would not be sufficient to prevent a statement from constituting improper comment on the Witness credibility when the statement is coupled with a statement that the witness in question is basically telling the truth...because she had no reason to lie." United States v. Carroll 26 F 3d, 1387-89 (6th 1994)

In the present case of Stermer it was largely a credibility contest with mostly circumstantial evidence. Prosecutor Kaps did not vouch for just one or two witnesses inadvertently. His vouching, unobstructed by objection, continued on to include seven of the states witnesses. His carefully placed comments on credibility, "he's not going to come in and lie", "They were in here telling the truth", and "she's got no incentive to lie". All Statements were made just before deliberations, leading to maximal impact upon results and retention.

Judge Tarnow is highly respected for his long years of experience and fairness, including more than twenty years as a Federal Court Judge serving the Eastern District of Michigan. In Schauer v. McKee 662 F Supp

(17)

2d 864 (ED Mich 2009) Judge Tarnow reversed base solely on improper prosecutorial vouching of one witness, there are seven in the instant case. An attorney may not state 'the prosecutions witnesses are telling the truth' or 'I believe they are telling the truth', see US v. Krebs 78 F2d 1166, 1176-77 (6th 1986) US v. Carroll 26 F 3d 1380, 1387, 1389 (6th 1994)

In Stermer's case, as in Schauer, trial counsel failed to object, an error that allowed the prejudicial value to be multiplied over and over. Trial counsel for Stermer did however request that the court read to the jury, CJI 2d 3.5, "evidence".

Trial court judge Buhl stated however, "I guess I missed your request for it. I think however, my preliminary instructions cover at least 90% of it so I'm no inclined to bring them (jury) back in and regive it...". The requested and missed instructions included the same language which Tarnow determined could not "cure the prejudicial nature of these remarks." In Stermer's case, absent the requested instruction, trial court felt his "90 percent" was enough in dealing with 100 percent of Stermer's liberty.

The precedent set by Judge Tarnow should be honored in this state court due to the fact that Stermer has been assigned to Judge Tarnow on her Habeas petition. Stermer's Habeas is being held in "Stay and Abeyance" while these issues are pursued.

In Schauer, Judge Tarnow concluded "that the state courts' decision regarding the specified ineffective assistance of counsel claim and proisecutorial claim in this case were contrary to, or an unreasonable application of, clearly established Supreme Court precedent, and finds that Petitioner has established that he is presently in custody in violation of the Constitution or laws of the United States."

"Generally, improper vouching involves either blunt comments or

(18)

comments that imply that the prosecutor has special knowledge of the facts not in front of the jury or of the credibility the truthfulness of witnesses and their testimony " Johnson v. Bell 525 F 3d 466, 482 (6th 2008) quoting United States v. Francis 170 F3d 546, 550 (6th 1999)

## B. OFFERED FACTS NOT IN EVIDENCE, HE KNEW TO BE FALSE, AND MISCHARACTERIZED FACTS, DURING CLOSING ARGUMENTS.

"Misrepresenting facts in evidence can amount to substantial error because doing so may profoundly impress a jury and may have a signifi- cant impact on the jury's deliberations", Donnelly v. DeChristofors 416 US 637, 646; 94 SCT 1868; 40 L Ed 2d 431 (1974)

For similar reasons, asserting facts that were never admitted into evidence may mislead a jury in a prejudicial way. Berger v. United States 295 US 78, 84; 55 SCT 629; 79 L Ed 1314 (1935). This is p particularly true when a prosecutor misrepresents evidence because a jury generally has confidence that a prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty. Id at 88.

"...but isn't it ironic and coincidental that there is a gas can right out front where the van was, right where the vehicles were?" Prosecutor Kaps closing (T-V p107) The inference made is contrary to all testimony given on the subject.

Cory Pierce (T-IV p159), State's witness:

Q. And it wasn't uncommon for an empty gas can to be kept there by the front porch area so it could be put in the vehicle and taken to the gas station, is that right?

A. Yes

Trevor Stermer (T-V p113) State's witness"

Q. Sometimes when gas cans were empty and they needed to be filled, rather than leaving them out back in the shed they were left by the front porch where they would be picked up, put in a vehicle, taken to the station...right?

A. Yes.

(19)

"Consequently, improper suggestions, insinuations, and especially assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none" Hodge v. Hurley 426 F3d 368, 377.

During a deposition under oath, Stermer answered that "the phones were in the house" (Feb 27, 2007 p149) "Where is your cell phone now? In the rubble." (October 18, 2007 p263 line 15), yet Kaps tells the jury (T-V p119) "The phones were in the van according to her." This complete- ly false statement from Kaps may have been the single most prejudicial comment made. "The phones were in the van according to her," any reason- able person would question why she would not have made the potentially life saving call. Inexcusable if it were true. Kaps knew his comments were improper, trial counsel failed to object and Stermer was prejudiced beyond repair.

Yet again (T-V p169-170) Kaps; "One of the other things I want to clear up right away, Mr. Getting keeps making reference to two previous fires, two previous fires, the second which Linda Stermer is living with him and even by her own version it's not an arson, nor was the first one ...But there is no evidence that it was arson, so it's nonsence."

Both properties owned and controlled by victim, Todd Stermer, were arson. Exhibit $\underline{\mathcal{B}}$ (Police Report) Regardless of Ms Stermer's unaware- ness at the time of her deposition, the prosecutor had the police report clearly labeling both fires arson. Prosecutor Kaps infers Getting is mis representing a fact, again, placing it before the jury at closing.

"This court has made it clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with the rudimentary demands of justice." Mooney v. Halohan 249 US 103, 112; 55 SCT 340. 342; 79 LEd 79 (1935)
Pyle v Kansas 317 US 213; 635 SCT 177; 87 LEd 214 (1942)

In Hodge at 380, the prosecutor combined comment on witness credibi- lity with misrepresentation of the evidence. Unlike Darden v. Wain Wright 477 US 168, 181-82; 106 SCT 2464; 91 LEd 2d 144 (1986)

(20)

..."despite the prosecutor's other severe misconduct the prosecutor's argument did not manipulate or misstate the evidence"...

Kaps clearly committed several types of misconduct, including the misstatements and msnipulation of the evidence.

C. DENIGRATED THE DEFENDANT AND APPEALED TO THE PASSING AND EMOTIONS OF THE JURY WITH REPEATED, IMPERMISSIBLE NAME CALLING AND CHARACTER ASSASSINATION OF STERMER DURING CLOSING.

"It is patently improper for a prosecutor to comment on the credibility of a witness or to express personal belief that a particular witness is lying. Hodge at 378

In Stermer's case the prosecutor both vouched for his witnesses and stated that Stermer was lying; "What I want to caution you as we look at this, we know she is a liar. There is no question but that she is a liar and will lie when it suits her, okay." Kaps (T-V p109)

(T-V p129) "I would suggest that we are dealing with a diabolical, scheming, manipulative liar and murderer."

More than a dozen times in the twenty pages from 109 to 129, the prosecutor has illustrated a picture for the jurors which will be the last they have before diliberations.

The prosecutor's continuous persistant berating of Stermer's character can be prejudicial with a jury by over persuading them as to prejudge.

Washington v. Hoffbauer 228 F3d 689 (6th 200) " A fundamental rule of evidence is that a defendants "bad character" cannot be used to argue that the defendant committed the crime for which he is being tried, or had the propensity to commit that crime." Fed R Evid 404 (a)" (Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion...)" Mich R Evid 404 (a)

D. ELICITING KNOWN FALSE TESTIMONY FROM STATE'S WITNESS CORY PIERCE.

"If the state has contrived a conviction through the pretence of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a state to procure a conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as it is to the obtaining of a like result by intimidation. Mooney at 112.

Pierce (T-IV p151) when asked if there was a reason he didn't speak to Todd Stermer, the day of the loss, before he left.

A. She told us when she came down to the basement for us to sneak out of the house. (T-IV p150) Going upstairs to exit.

A. I just--I really didn't see him. I just saw his leg really.

However, in Pierce's deposition, October 18, 2007, two years before trial, only months after the loss (Deposition p30-31);

Q. And so where was your dad sitting when he was watching T.V?

A Upstairs in the living room in a chair.

Q. Did he have like his chair he always sat in?

A. Pretty much.

Q. And that's the chair he was in?

A. Yeah.

Q. Was he awake? Was he sleeping?

A. He was awake.

Q. Did you say "see ya later dad"?

A. No, I just went?

Q. Why is that?

A I don't know.

Q Were you avoiding him? Or was it typical for you to just walk out without saying good bye?

A It was typical....

(22)

During a police interview on November 2, 2007, Cory Pierce told that interviewer that Stermer had two cell phones...if he could not reach her on her 'regular' phone he would contact her on her 'work' phone. Exhibit $\underline{Q}$ attached. More than two years later, at trial, )TOIV p154-56) Pierce testified; "Yeah she had another cell phone that um nobody knew about."

Ashley Gibson, sister of Pierce (T-V p81)

Q. Do you know whether or not Todd was aware that there was more than one cell phone?

A  Yes.

Q. He did?

A. Yes.

Q. Was this second phone secret from Todd?

A. No.

Q. Do you know why she had it?

A. Um, they both were driving trailers, hauling campers...both her and Todd used it when they were gone.

Q  But you know that there was a second phone and that both Todd and Linda were aware of it?

A. Yes.

Kaps should have been aware of the interview and deposition under oath. Forth of which were opposite of the testimony, deliberately deceived the court and jurors, and never corrected it or referenced the earlier statements. Allowing deception of the jury. Prejudice results when lies cloaked as truth prevent the trier from fail assessment.

E. ELICITED TESTIMONIAL EVIDENCE FROM DETECTIVE ROUGHT WHICH COULD NOT BE SUPPORTED WITH DOCUMENTS DUE TO DESTRUCTION OF EVIDENCE.

The duty of disclosures required in Brady v. Maryland 373 US 83; sct 1194; 10 LEd 2d (1963) operates as a duty to preserve prior to a request for discovery.

(23)

At preliminary Hea..ng on June 24, 2009 (Preli... T p67-68)

Detective Rought testified regarding Rought's interview with Stermer.

    Q   Did you record the statement you're talking about?

    A.  No sir.

    Q.  Did you write it down?

    A  Yes sir.

    Q.  You wrote the statement out?

    A.  I did write notes. I did not write word for word the statement,
I wrote notes.

    Q.  Do you still have the notes?

    A.  No sir.

    Q.  Did you destroy the notes?

    A.  Yes. After I prepared my report I don't typically keep any notes
to the report.

In People v. Wallace 102 Mich App 386-387 (1980), The court held: the
police officers notes were clearly material evidence. It may be presumed
that those unavailable notes would have been beneficial to the accused
since they may have been of assistance to the defence counsel in his
cross examination of the police officer.

    Detective Rought's testimony is largely regarding her only interview

with Stermer, taken January 7, 2007. Rought's answers range from "I can-

not recall" and "I believe" to some affirmative answers. Prosecutor

Kaps uses the interview with Rought to further solidify his portrayal

of Stermer to the jury. (T-V p115) "The other thing that are somewhat

inconsistent when she was asked by deputy Rought shortly after the fire,

tell me everything you did that day, just tell me everything, okay  She

doesn't mention anything about going to the Marathon Station."

"Where bad faith by the prosecutor is shown to relative to preserve
evidence favorable to an accused, a;; prosecutorial evidence upon the
unavailable evidence should be suppressed at prosecutorial evidence is
not suppressed at trial." Wallace Id 386-87.

(24)

" If it were revealed t t the government was mere negligent in
handing the documents, then relief would be granted if the evidence
might have been produced a different verdict, if there was negligence on
the part of the prosecution plus deliberate misuse of statements to the
court and to the defendant then the defendant's showing of prejudice
would be less than in the case of negligence alone but more in the case
of deliberate suppression, 34 ALR 3d 16.

Detective Macyausk is Rought's boss, testimony makes it clear what
the handling of evidence procedures were in the Stermer case. (T-III
p104-105)

Q    Did you receive the lab report from Michigan State Police
Forensic Science Division on October 22, 2009? Is that true?

A.    I believe so.

Q.    It that because you hadn't requested the report from the
Michigan State Police in the two years that it had been completed?

A.    Um, actually what was it---and, again, I'm not certain, but I
think I may have requested an additional copy because I could not locate
the copy that I had from them possibly initially and requested another
copy from them.

Q.    So you might have lost it?

A.    I could not locate it at the time.

(T-III p108-109)

Q.    Now the video tapes that you seized on February 1, 2007, were
placed into evidence June 11--June 11, 2009. What did you do with them
after you viewed them on February 2nd?

A.    They were in my possession in my office with other items and
reports from the investigation...It wasn't until that date listed as
putting into evidence that I finally packaged them up and put them down
in the evidence room

Q.    So those items that you seized and took into custody on February
1, 2007 were not secured in the evidence room for over two and a half
years?

(25)

A. That's correct.

Destruction of notes, losing a report, evidence left unsecured for two and a half years. The preservation fell below what is mandated in Brady, by their own admission

## PREJUDICE

The state's case against Stermer was not particularly strong. In it's entirety it consisted of the testimony of state's expert, Leroy, as the only 'proof' of arson, and of circumstantial evidence. The prosecutor's closing argument focused heavily on a credibility contest, suggesting that several of the states witnesses were credible, telling that truth and had no reason to make anything up. While also interspersing that Stermer was a liar, diabolical, scheming, manipulative, murderer and an actress   There was no physical evidence of a crime.

The prosecutor misstated facts, that Stermer had phones with her, while no statements can support even an inference of that nature. Kaps elicited false testimony, Most of these incidents may have been harmless by themselves, not even warranting defense to call attention to them by objecting, Yet the combination of all incidents together dug a pit for Stermer while trial attorney Getting set back, during closing and failed to defend Stermer.

## CUMULATIVE ERROR

"The cumulative effect of a number of errors may amount to errors requiring reversal, People v. Cooper, 236 Mich App 643, 659-60; 601 NW 2d 409 (1999) as cited in People v. LeBlanc 465 Mich 575, 591 (2002)

"It is true that the cumulative effect of several errors can constitute sufficient prejudice to warrant reversal where the prejudice of any one error would not. People v. Bahoda, 448 Mich 261, 292 n64; 531 NW 2d 659 (1995)."

ARGUMENT

III. DEFENSE COUNSELS PERFORMANCE WAS CONSTITUTIONALLY DEFICIENT UNDER THE SIXTH AMENDMENT AND CONST 1963, art 1, S 20, AND PRECLUDED HER FROM MOUNTING A SUBSTANTIVE AND EFFECTIVE DEFENSE. THIS IS VIOLATION OF GUARANTEED DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT, AND CONST 1963, art 1 s 20 WHERE COUNSEL FAILED: TO CHALLENGE THE SUBMISSION OF SCOTT LEROYS TESTIMONY AS AN EXPERT, FAILED TO CHALLENGE THE THEORY OF ARSON ON A SCIENTIFIC LEVEL, TO INVESTIGATE AND PREPARE, TO CONSULT WITH AN EXPERT TO REBUT PROSECUTIONS ARSON EXPERT, TO INTERVIEW ANY STATES WITNESSES OR EXPERTS, TO QUESTION POTENTIAL WITNESSES AND TO OBJECT TO IMPROPER CONDUCT BY THE PROSECUTOR, AND FAILURE TO BE AWARE OF RULES CRITICAL TO THE CASE.


## STANDARD OF REVIEW

Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law. A judge must first find the facts, and then must decide whether those facts constitute a violation of the defendants constitutional right to effective assistance of counsel.

A trial court findings of fact are reviewed for clear error. MCR 2.613 (C), 6.001 (D); cf MCR 7.211 (A)(3)(a). See generally, Grievance Administration v. Lopatin, 462 Mich 235, 247, n 12; 612 NW2d 120 (2000); In re Trejo Menors, 462 Mich 341, 356-57; 612 NW2d 407 (2000); McDougal v. McDougal, 451 Mich 80, 87; 545 NW2d 357 (1996); Sparks v. Sparks, 440 Mich 141, 151-52; 485 NW2d 893 (1982)

Questions of Constitutional law are reviewed by this court de novo. Folksdorf v. Griffith, 464 Mich 1, 5; 626 NW2d 163 (2001) People v

(27)

Denbar, 463 Mich 606, 615; 625 NW2d 1 (2001); Blank v. Dept of Corrections, 462 Mich 103; 112; 611 NW2d 530 (2000)

There was no firect evidence of arson in this case. The testimony of Scott Leroy Michigan State Police Fire Investigator did not comport with MRE/FRE 702 or MRE/FRE 403 (See issue I) Leroys theory and investigation also did not comport with the guiding authority on fire investigations, NFPA 921 and 1033. Arson/fire investigation is a science and the outmoded manner and theory which Leroy presented to the jury was entirely subjective and unreliable.

The same mistakes were noted in Babick v. Berghuis 620 F3d 571 (6th 2010). Circuit Judge Merritt in his dissenting opinion was well aware of the "egregious mistakes" of the presentation of junk science.

"The evidence of arson is based on expert testimony inconsistent with the clear standards set out in the bible of arson forensic science, the NFPA (National Fire Protection Association) 921 Guide for Fire and Explosion Investigations."

Chapter 22 of the NFPA s 22.2.2.3. offers a strongly worded warning to investigators.

"Investigators may form an opinion that the speed of fire growth or the extent of damage was greater than would be expected for "normal" fuels... However, these opinions are subjective...What an investigator may consider as "excessive", "unnatural" or "abnormal" can actually occur in an accidental fire... The investigator is strongly cautioned against using subjective opinions to support an incendiary cause deter- mination in the absence of physical evidence." Babick at 581-82

Further, in Babick, citing the NFPA "wood and gasoline burn at essentially the same flame temperatures as high as two thousand degrees fahrenheit.

(28)

"See David Grann, trial by fire, The New Yorker (Sept 7, 2009) quoting Dr. Hurst, an acknowledged arson expert, who explains that many arson trials reach the wrong conclusions because so-called "experts" frequently give mistaken testimony" Id at 582

"His counsel could certainly have done more work to try to understand the faulty nature of the states evidence" Babick 583.

Stermer and her family repeatedly asked Getting to hire an expert to refute Lewroy's testimony. Stermer obtained copies of the building permits to show proof that the house was not complete. Getting failed to utilize the evidence where it would have proven an alternative reason for the speed of fire.

Getting had a copy of Leroy's report and heard him testify at Stermer's preliminary hearing. Yet Getting did nothing to prepare for or prevent his testimony. Clearly showing a lack of familiarity with Rule 702.

"Finding counsel ineffective for doing nothing to determine if arson evidence was impeachable; accord D U gas v. Coplan 428 F3d 317 (1st 2005) finding counsel ineffective for failing to consult an arson expert or edict himself concerning the use of accelerants in arson cases." Richey v. Bradshaw 498 F3d 344 (6th 2007) Babick 583

This court has repeatedly found prejudice resulting from trial counsel failing to investigate or present favorable witnesses" see Bigelow v. Haviland 576 F3d 284, 291-92 (6th 2009) Romonez v. Berghuis 490 F3d 482, 491 (6th 2007)

Had Getting investigated expert testimony between the preliminary hearing and trial, six months, he could have prevented Leroy's testimony on a Daubert motion or impeached it or presented an expert or science to refute the testimony of Leroy. Gettings refusal to hire an expert when requested and where Stermer could have afforded one, was negligent. Where the expert presented invalid testimony in accordance with Rule 702 there is little left. No proof of an arson and should therefore be determined as accidental. The fact that as in Babick 585

"In summary, there cannot be homicide by arson in this case without plausible expert evidence of the use of a liquid accelerant. There is none at all."

(29)

Leroy detected, with the assistance of a canine (T III p205-() no accelerant in the house but for an oil leak at the furnace. The gasoline on Todd Stermer's clothing, a neighbor, Matheny, covered him with work clothes from the back of his vehicle. Matheny worked at a salvage yard. (Prelim T p17)

The neighbor, Matheny covered Todd Stermer. Matheny's shirt had the presence of gasoline as well. The shirt was removed when the victim was moved. The sweat pants that tested positive were largely undamaged. The socks and underwear, undamaged as well. Which would stand to reason if gas was transferred from the neighbors shirt, on that rainy day, as it covered Todd Stermer.

Getting elicited testimony from Rought that Stermer was never given the opportunity to view the notes, to check them for accuracy. (T Prelim p 68 )

"If the formal police report submitted to defence counsel was not materially different from the original rough notes, there would be no violation of the Brady Standard US v. Lane 479 F2d 1134 (CA6, 1973), US v. McCallie 554 F2d 770, 773 (CA6, 1977) The record, however does not disclose how comprehensive and inclusive the report is or to the expert to which the two documents correspond. As a result, the fact that a police report was filed does not eliminate the Brady due process issue." Wallace 102 Mich App 386 (1980)

Getting made no attempt to suppress Rought's testimony where it would pertain to the content of the destroyed notes. Which allowed a subsequent reference to Stermer, in closing, by Kaps. (TV p115) "The other thing that are somewhat inconsistent, when she was asked by Deputy Rought, shortly after the fire, tell me everything you did that day, just tell me everything, okay? She doesn't mention anything about going to the Marathon Station."

The deliberate destruction of original notes prevented Getting from an effective cross examination of Rought pertaining to her original

interview of Stermer.

"Because the unavailability of the notes herein possibly inhibited
defense counsel's ability to cross examine the interrogating officer,
such evidence will be viewed as beneficial to defendant." Wallace at 391
citing People v. Anderson 42 Mich App 10; 201 NW 2d 299 (1972)

"...because there has been no explanation of the failure of the
prosecution to preserve the officers notes..., Brady requires a remand
to determine what efforts police and prosecution made in initially
preserving the evidence. Should prosecutorial bad faith be shown to be
present prior to a defendants discovery request, reversal of defendants
conviction is appropriate. People v. Albert 89 Mich App 350; 280 NW 2d
523 (1979) quoting People v  Amison to Mich App 70; 245 NW 2d 405
(1976).

Negligence- noun, Law. the failure to exercise the degree of care that
in the circumstances, the law requires for the protection of other
persons or those interests of other persons that may be injuriously
affected by the want of such care. RANDOM HOUSE DICTIONARY OF THE
ENGLISH LANGUAGE 2nd EDITION.

   This failure, by Getting should be construed as a lack of

familiarity with a rule/law that was critical to Stermer's attack on the

testimony of Rought.

"police notes are clearly material and may be presumed that the

unavailable notes" would have been beneficial to the accused since they

may have been of assistance to defense counsel in his cross examination

of the police officer"

"...all prosecutorial evidence touching on the unavailable evidence
should be supported at trial and reversal on appeal is mandated where
such prosecutorial evidence is not suppressed at trial." Wallace at 386.

   Getting was aware that Detective Rought destroyed her notes to the

only interview by police, of Stermer. (Prelim T p67-68) Six months prior

to Stermer's trial and the destruction of the notes were never mentioned

at trial. Getting questioned Rought about several things contained in

her interview. Getting never moved to prevent Rought's testimony

regarding those destroyed notes. Destruction of police notes and

testimony touching on the destroyed notes should have not occurred.

Getting acquiesed to this testimony when he should have claimed a
Brady/Giglio violation.

Stermer's case was replete with prosecutorial misconduct )Issue II)
The misconduct was not isolated to the closing alone, nor was it of only
one type. All of the misconduct went unobjected to. Kaps vouched for
seven states witnesses in his closing. Kaps called Stermer a liar more
than a dozen times in closing.

"a failure to object to comments on witness credibility or
derogatory statements by the prosecutor is much less suseptible to the
argument it should be considered reasonable trial strategy." Hodge 386

Kaps referred to Stermer as a "diabolical, scheming, manipulative
liar and murderer" as well as an "actress", a "pretty good actress."

"With the exception of certain of the bad character arguments, these
statements are harmful to the Hodge's case precisely because they are
false, unsupported or misleading. ...We are unable to articulate a sound
professional reason why defense counsel did not object to this pattern
of repeated misconduct and accordingly. We must conclude that counsels
failure to object was outside the wide range of professionally competent
assistance, from Hodge quoting Strickland at 690.

Kaps elicited false testimony from Pierce. (Issue II D) It is
reasonable to expect that Kaps should have known the truth. Getting
possessed extrinsic evidence to prove the false testimony. Police
interview and deposition of Pierce in which Getting attended with
Pierce.

i

"It is of no consequence that the falsehood bore upon the witnesses
credibility rather than directly upon defendants guilt. A lie is a lie,
no matter what its subject and if its in any way relevant to the case...
for its impact is the same, preventing as it did, a trial that in any
real sense be termed fair " Napue v. People of the State of Illinois
79SCt 1173, 1177 (1959)

The People v  Lester 232 Mich App 262 (1988) "The trial court determined
that defendant was not prejudiced by the alleged false testimony because
pursuant to MRE608 (b), defendant could not have contradicted the

testimony with extrinsic evidence We conclude that the trial court erred A prosecutor has a duty to correct his witness' false testimony without regard to whether evidence to rebut the witness would be admissible for impeachment under MRE 608 (b)."

Kaps misrepresented facts in evidence as well as introduce facts into evidence that were false Getting again possessed the evidence, by way of police reports and depositions to refute these

Kaps assertion that two previous fires "but there is no evidence that it was arson...." Police reports clearly liable but as arson. Kaps should, reasonably, have been expected to be aware of these reports. Yet he still felt free to present this falsehood to the jury for their consideration

Strickland v. Washington 466 US 668, 690; 104 SCt 2052; 80LEd 2d 674 (1984) "The performance prong is satisfied if the representation at issue falls outside the wide range of professionally competent assistance...

"We believe that the trial counsels failure to object to any of the numerous improper statements in the prosecutors closing arguments is well outside this range. Hodge 367

Prejudice results from the allowance of all the improper references falsehoods, vouching and name calling that were allowed, undetered and unobjected to, to be considered, as they were, from a prosecutor who is charged with fairness and intergrity.

Much like in Hodge, Stermer's case was largely a credibility determination. Had Getting objected to some of the comments it may have detoured the repeated pattern.

"The Supreme Court has made it clear that prejudice is readily shown in such cases, and the conviction must be set aside unless there is no reasonable likelihood that the false testimony could have

(33)

affected the judgement of the jury US v. Argurs 427US 97, 103; 96 SCt
2392; 49 LEd 2d 342 (1976) Giglio v. US 405 US 150, 154; 92 SCt 763;

31 LEd 2d 104 (1972)

"Not to draw attention to [a[ statement may be perfectly sound from a
tactical stand point. United States v. Carver 470 F3d 222  244 (6th
2006) To breach the unreasonableness threshold 'defense counsel must so
consistently fail to use objections, despite numerous and clear reasons
for doing so, that counsels failure cannot reasonably have been said to
have been part of a trial strategy or tactical choice" Lundgren v
Mitchell 440 F3d 754, 774-75 (6th 2006)

There is a reasonable likelihood that absent the many enumerated
foul blows struck by the prosecutor that the jury could have reached a
different conclusion. Prosecution prejudiced Stermer in many ways, it is
impossible to say that Stermer received a fair trial.

The lack of advocacy from defence attorney Getting throughout the
closing of Kaps and at many points during testimony should not be
excused as tactical. Unawareness of rules that are critical to a case is
a foundational and fundamental error, that for Stermer was debilitating.

## ARGUMENT IV

APPELLANT COUNSEL RAISED WEAK ISSUES ON APPEAL WHILE IGNORING STRONGER MORE MERITORIOUS ARGUMENTS. COUNSELS DEFICIENT PERFORMANCE PREJUDICED STERMER AND VIOLATED HER SIXTH AMENDMENT DUE PROCESS RIGHTS.

The Due Process clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right... A first appeal of right therefore is not adjudicated in accord with the due process of law if the appellant does not have the effective assistance of an attorney. Evitts v. Lucey 469 US 387, 396; 105 S Ct 830, 831 L Ed 2d 821 (1985)

In order to establish a violation of the Sixth Amendment it must be shown that appellate counsels performance was 1) deficient and 2) prejudicial. Strickland v. Washington 466 US 668, 687. 104 SCt 2052, 2064; 80 L Ed 2d 674 (1984) Ratliff v. US 999 F2d 1023, 1026 (6th 1993)

"Once shown to be exhausted the ineffective assistance of appellate counsel could be properly utilized as cause for the default of the sufficiency of the evidence claim, and the court was then required to continue the cause and prejudice analysis by determining whether ineffective assistance of appellate counsel rose to the level of a constitutional violation, there by satisfying the cause element for excusal of state procedural default." Carpenter v. Mohr 163 F3d 938 (6th 1998)

Stermer discussed most of the issues raised, on this appeal, with appellate counsel, Mary Owens. Many of the issues are also apparent from the record and should

"have leaped out upon even a casual reading of the transcript" "a habeas petitioner may establish ineffective assistance of appellate counsel by showing what counsel ignored a significant and obvious issue while pursuing weaker claims." Carpenter at 947.

In this case a cursory glance of the testimony of Leroy, who presented the only "expert" testimony labeling the fire as arson, would have shown that the acceptance of Leroy as an expert and his testimony

(35)

were improper. (see issue I) Had Owens, in Stermer's appeal, raised the issue that Leroys testimony did not comport with MRE/FRE 702 and that, in so allowing, trial attorney Getting was ineffective. Leroys testimony of his theory was not based on any scientific methods or data and gave no bases for reliability.

Had Ownes looked at the transcripts of the acceptance of Leroy she could have also determined that the trial court did not perform its duty as gate keeper, preventing unreliable testimony from reaching the jury.

The trial transcript would have provided the information to argue several of the prosecutor's improper acts (see issue II (A)(C)) and that trial attorney Getting failed to lodge any objections. The preliminary transcript revealed (issue II (E)) that Detective Rought destroyed her original notes, but also Kaps reference as well to Stermer keeping information from Rought, during his closing. Again showing no objections from Getting.

Stermer was very clear with Ownes on the perjured testimony from Pierce (issue II (D)) that was clear from the record, police report, deposition trial transcript. Other issues in which Ownes could have raised a claim for ineffective assistance of counsel.

Finally, the last issue raised in this appeal against the prosecutor (issue II (B)) was brought to Owens attention, by Stermer, and is shown by the record. Stermer shared with Owens that Stermer was completely dismayed that Kaps was free to present blatently false information and detrimental mischaracterization of facts in evidence. Stermer shared that she could not understand why Getting did nothing when Kaps presented these, and that Getting possessed the necessary evidence to

(36)

correct the record and did not.

Owens could have determined both issues from the record. There was
no testimony from which to infer that Stermer ever said "the phones
were in the van according to her". Quite the opposite is presented in
Stermers deposition. Kaps reference to two previous fires not being
arson could have been determined improper from the record.

Appellate counsel could have determined numerous issues from the
record, and yet chose not to raise any of the claims which were stronger
issues than those raised in Stermer's first appeal. Raising the issue
of the insufficiency of evidence and abuse of discretion in three
motions previously raised: Motion to quash the binover, motion for a
directed verdict and a motion for a directed verdict and a motion for a
new trial, all previously denied.

The most obvious error from the record was the allowance of Leroys
testimony and the only "evidence" of arson. This issue in Stermer's
humble opinion held more merit than any of the other errors, also
apparent from the record posed so much cummulative error that is hard to
justify the ignoring of these and the claim of ineffective assistance of
counsel.

(37)

ARGUMENT V

MS STERMER'S CONVICTION SHOULD BE REVERSED BECAUSE THE EVIDENCE WAS
LEGALLY INSUFFICIENT TO PROVE BEYOND A REASONABLE DOUBT THAT THE FIRE
WAS INTENTIONALLY SET OR THAT STERMER INTENTIONALLY SET FIRE THAT
RESULTED IN THE FELONY MURDER CHARGE. THE EVIDENCE WAS CONTRARY TO THE
GREAT WEIGHT OF EVIDENCE AND FED. R. EVID/MICH R. 702.

STANDARD OF REVIEW

"In determining the sufficiency of the evidence to support a guilty
verdict the relevant question is whether after viewing the evidence in
the light most favorable to the prosecution any rational trier of fact
could have found the essential elements of the crime beyond a reasonable
doubt" United States v. Pearce 912 F2d 159, 161 (6th quoting Jackson v.
Virginia 443 US 307, 319;99 SCt 2781; 61 L Ed 2d 560 (1979)

In undertaking this task, the court must "refrain from independently
judging the credibility of the witness or weight of the evidence."
United States v. Welch 97 F3d 142, 148 (6th 1996). However, evidence
that at most establishes no more than a choice of reasonable
probabilities cannot be said to be sufficiently substantial to sustain
a criminal conviction upon appeal." United States v. Saunders 325 F2d
840, 843 (6th 1964).

The States reliance on Leroy's testimony was critical in the case
against Stermer, hinging on his determination of arson. Without evidence
of arson there cannot be homicide by arson. In Stermers case, Leroy's
testimony was presented without expert testimony. FRE/MRE 702, rendering
it inadmissible.

In Cook v. American S.S. Co. 53 F3d 733 (6th 1995) "The Court of
Appeals, Ryan, Circuit Judge held that: (1) opinion of proffered expert
was not admissible as expert opinion" ... "The first universal

requirement for the admissibility of expert opinion testimony is that
the evidence must be reliable and relevant." "The courts determination
whether the opinion the expert wishes to offer is properly the subject
of "scientific, technical, or other specialized knowledge" is a question
of law we review de-novo...When, for example scientific testimony is
offered, is the determination whether "the reasoning or methodoly
underlying the testimony is scientifically valid." Daubert at 2796.

Validity of methods, not the accuracy or "correctness" of the find-

ings is the unwavering requirement when an expert offers opinion

testimony. Due to the complete lack of any determination on the record,

Leroys testimony or rather his determination is not valid.

The court is not to "judge the weight of the evidence," here the

court has no evidence of arson to conseider.

In Cook it was held that: the district court erred when it allowed
Timmins to offer expert opinion testimony as to the cause...because the
opinion was not the product of any expert testing and was not
"scientific, technical, or other specialized knowledge" under Fed R Evid
702." Cook at 743

The specious nature of Leroy's testimony is obvious from the

preliminary hearing and the trial record. Leroy testified to his train-

ing and experience, his "ciriculum vital" was accepted by Getting,

and no one objected to Leroy testifying as an expert. (T-III p179-180)

"The Sixth Circuit in Smelser explained: First, the court is to
determine "Whether the experts testimony reflects 'scientific
knowledge,' Whether their findings are' derived by the scientific
method' and whether their work product amounts to 'good science.'" "An
expert opinion that is based on scientifically valid principles will
satisfy FRE 702; an expert's subjective belief or unsupported
speculation will not." Nemir v. Mitsubishi Motors Corp 200 F Supp 2d 770
(ED Mich 2002) quoting Smelser v. Norfolk Southern Railway Co 105 F3d
299, 303 (6th 1997)

Leroy's testimony provides the following: Leroy did not seize any

items from inside the structure for testing. (T-III p206)

Q. My point with this is that in making your conclusions about how

(39)

fast this fire spread, one of the things that caused you to believe

that there was an accellerant was the speed of the fire spread, is that

true?

A   That is not the only thing  That is one. (T-III p217)

Leroy testified that it was determined that it may be a crime scene

because it was "a fatal fire and the direction of what could be an

accellerant on the victim." and there was no knowledge of how or where

something [accellerant[ got on the victims sweat pants. (T-III p210-
211)

Q   The fire itself was bigger in the middle of the room than it was

on the _____ either the interior or exterior wall because the floor and

ceiling above it was totally consumed?

A. Probably,

Q. Probably, yes?

A. Most likelt. (T-III p217)

Q. It;s hard for you to be exact, you weren't there, you didn't

actually see the fire, your drawing conclusions based opinion your

experience, your training, your education, and what you saw there?

A. Correct (T-III p217)

"We've been presented with only the expert's qualification, their
conclusions and their assurances of reliability. Under Daubert that's
not enough." Daubert 1319.

Judge Merritt, Circuit Judge, desenting in Babick v. Berghuis 620

F3d 571 (6th 2010) recognized the importance of the NFPA in the

investigation of arson. Babick, like Stermer,

"got convicted of arson on the bases of pure 'junk science'," Idat 580.
"The evidence of arson is based on expert testimony inconsistent with
the clear standards set out in the bible of arson forensic science, the
NFPA"....The remainder of the evidence used to convict Babick is expert
testimony of a similar nature that the national standards condemn as
unreliable."

Leroy's theory that rapid growth, speed indicated an accellerant are scientifically unsupported and outmoded. This testimony was very prejudicial because a jury is likely to place greater reliance on expert testimony

"Jurors assume that judges review scientific evidence before it is presented to them, and that any evidence used in a trial must be above some threshold of quality. Because of these assumptions jurors seem to be less critical of scientific evidence used in this trial and are more persuaded by it." The GATE KEEPER EFFECT, 15 Psychol. Pub. Poly E 1, 12 (2009)

A. "To determine cause and origin I would obviously inspect the entire structure...comparing most damage verses least damage...The theory behind that is that the longer a fire burns, the more damage it's going to create and the more--the longer it burns, is where the fire starts " (T-III p186)

The only area of Leroy's investigation that were in keeping with the standards, set forth in the NFPA, was documentation of the scene. Beyond that and a complete lack of comporting with Rule 702, Leroys testimony should no have been relied upon. (See issue I) Leroy presented no evidence, no science, only speculation and opinion cloaked as expert findings.

"When the fact of the burning is established, then it is necessary to show how the act was done, and by whom." "on trial for arson if nothing appears but the mere fact that the house was consumed by fire, the presumption is that the fire was the result of accident or of some providential cause." People v. Lee 231 Mich 607, 612 (1925)

The investigation was concluded the day after the fire happened (T-III p 182)

FEDERAL R CRIM PROC 29 (a) WE CONSIDER EVIDENCE AND INFERENCES IN LIGHT MOST FAVORABLE TO THE GOVERNMENT AND WE REFRAIN FROM INDEPENDENTLY JUDGING THE CREDIBILITY OF WITNESSES OR WEIGHT OF THE EVIDENCE. JACKSON V. VIRGINIA 443 US 307, 319; 99 SCt 2781, 2789; 61 LEd 2d 560

(1979) US v. Welch 97 F3d 142, 148 (6th 1996)

The Sixth Circuit and Michigan have recognized numerous cases where expert testimony must adhere to rule 702 and recognizing the standards set forth in Daubert. Nelson v. Tennessee Gas Pipeline Co 243 F3d 244 (6th Cir 2001) Nemir v. Mitsubiski Motors Corp. 200 F Supp 2d 770 (ED Mich 2002) Zuzla v.ABB Power T E D Co., 267 F Supp 2d 703 (ED Mich 2003) Smelser v. Norfolk Southern Ry. Co. 105 F3d 299 (6th Cir 1997) Berry v Crown Equip Corp 108 F Supp 2d 734 (ED Mich 2000) and

People v. Coy 243 Mich App 270 (2000) Where "the Court of Appeals held:... That testimony, unaccompanied by statistical or other interpretive evidence...should not have been admitted because it is essentially meaningless and violates MRE 702."

## GOOD CAUSE

Fire investigation is a science. To allow testimony which violates clear rules of evidence to be used in stripping a defendant of their liberty and life is a gross miscarriage of justice and negligent at best.

The United States Supreme Court observed that the "cause" requirement be waived where there is a fundamental miscarriage of justice. United States v. Delo 115 SCt 851, 856; 130 L Ed 2d 808 (1995)

In this present case, Stermer contends that her conviction is invalid, and that she shows good cause for failure to raise this issue in her prior appeal is satisfied where; 1.) external factors prevented her from raising the issue on appeal; 2 ) Ineffective assistance of appellate counsel prevented her from presenting the issue on appeal: and, 3) even if Defendant cannot demonstrate good cause, the court should address the merit of the issue because she suffered and continues to suffer from a miscarriage of justice.

(42)

RELIEF REQUESTED

For all of these reasons Linda Kay Stermer respectfully requests that this Court hold on evidentiary hearing on all claims presented in this Motion For Relief From Judgement and, after that hearing, vacate her judgement of conviction or order a new trial.

Dated July 17, 2013
Respectfully submitted,


Linda Kay Stermer #757152
(in pro per)

(43)

# Marilyn R. Christensen, LLP, NCP
## *Consulting, Counseling & Mediation*
### 304 West Michigan Avenue
### Paw Paw, MI  49079

Phone:  269.655.6740

Email:  marichris6740@hotmail.com

May 6, 2013

Linda Stermer, #757152
Women's Huron Valley Correctional Fac.
3201 Bemis Rd.
Ypsilanti, MI  48197

Dear Linda:

As per our telephone conversation of 05/03/13, I am providing you with the following information from your therapy record that you requested regarding your issues with your defense attorney, Jeffery Getting.

I am providing this to you according to the dates of your therapy sessions:

09/14/09    Linda very anxious due to her uncertainty of her attorney's diligence.  Trial scheduled for 10/27/09.

10/22/09    Linda not feeling confident with attorney.  He's talking about filing a postponement.  Her PTC is tomorrow.

10/29/09    Linda expresses a lack of confidence in her attorney.  She reports that his secretary is very rude.  She has not heard from him since the postponement.

11/03/09    Linda is very distraught; she still cannot reach her attorney.  She reports having left numerous messages and also dropped off a written letter to his office.  She is worried and feels she has no support from her attorney.

11/06/09    Linda reports she was given an opportunity to meet with her attorney.

11/10/09    Another postponement of the trial.  It is now scheduled for 01/05/10.  She is very distressed over the delay.

12/15/09    Linda reports difficulty reaching her attorney.  December 3 was her last contact with Mr. Getting.  She reports that on that day he instructed her to set up an appointment the following week because he wanted to go over the case with her.

12/17/09    Linda came in extremely distressed.  Still unable to reach her attorney.  I stated to her that I would attempt to reach him on her behalf while she continues to contact him as well.

My efforts were:    12/17 @ 12:45 pm    LVM
                    12/18 @ 9:30 am      LVM
                    12/18 @ 9:40 am also LVM on cellphone
                    12/18 @ 12:30 pm    LVM
                    12/18 @ 4:30 pm      LVM
                    12/20 sent letter by fax asking that he please contact
                             Linda.

12/22/09    Linda reports no contact with attorney.  Very depressed.  I stated that I would again attempt to contact him on her behalf.

My efforts were:    12/21 called but did not LVM
                    12/22 @ 10:00 a.m.  LVM
                         @1:30 pm spoke w/receptionist, fax
                    had been received but she did not have contact with
                    Mr. Getting.
                         @ 4:00 pm LVM on cellphone
                    12/23 @ 10:02 am LVM on cellphone

12/23/09    I spoke with Linda by phone, she was waiting in Mr. Getting's office in the hope that he would stop by.

At 11:15 am I again spoke with Linda and she reported that Mr. Getting had texted her while she was waiting in his office and stated that he would meet with her at 4:00 pm that same day.

At 6:00 p.m. I received a phone call from Linda stating that she had met with Mr. Getting, however, she reported he had not done any work on her case and she stated that he offered no excuses, explanations, or apologies for not returning her many calls.  He scheduled another appointment with her on 12/30/09.

Marilyn R. Christensen, LLP, NCP

**AFFIDAVIT OF MARTEE BAKHUYZEN**

Name: Martee Bakhuyzen

Occupation: Retired/ work Partime as a Receptionist

      I Martee Bakhuyzen swear or affirm:

1. That I am the mother of Linda Stermer and went with her to Attorney Gettings Office on numerious occasions. That we went to his office asking him to contact Todd Chapmen regarding a previous fire. We gave Mr. Getting the NAME & ADDRESS. He refused to contact saying that he would just deny any involment with hy husband concernng the fire.

2. When my daughter was released on bond, Mr Getting told us that he would need a week for preparing my daughter for trial. We Could not reach Mr. Getting (He did not return our calls. Myself, my daughter and her tharapist decided to bombard his office with phone calls, messages and faxes to reach him untill he called us back. Myself and my daughter went to his office trying to catch him to no avail. When he did get back to us just before the trial he said that "We would be ok".

3. Lastly, we begged Mr. Getting to hire an expert. Mr. Getting assured us that an expert in the firld of arson or fire investigation was a waste of money and he woud use the prosecutors ecperts to his own means. Mr. Gettings assured us that the case against my daughter was purly circumstantial and that she had nothing to prove, he also stated that the prosecutor could prove nothing and would not be able to convict her with what little they hadf.

Frther affiant saith not.

I SWEAR OR AFFIRM THAT THE ABOVE REPRESENTATION ARE TRUE AND CORRECT TO THE BEST OF MY INFORMATON, KNOWLEDGE, AND BELIEF.

7-9-2013      *Martee Bakhuyzen*

Date                          Martee Bakhuyzen

STATE OF MICHIGAN

COUNTY OF KALAMAZOO

i, the undersigned Notory Public, do hereby affirm that Martee Bakhuyzen personallu
appeared befor me on the 9th day of July 2013, and sogned the above Affidavit as his
free and voluntary act and deed.

> JOHN MARSHALL
> NOTARY PUBLIC, STATE OF MI
> COUNTY OF KALAMAZOO
> MY COMMISSION EXPIRES Feb 15, 2015
> ACTING IN COUNTY OF

Kalamazoo

2

# SUPPLEMENT REPORT

## PORTAGE POLICE DEPARTMENT

| 1. COMPLAINANT, DRIVER, VICTIM, OR ARRESTEE STERNER, TODD | 2. ARREST NO. | 3. COMPLAINT NO. 17946-91 |
|---|---|---|

ON FORM USED AS CONTINUATION SHEET FOR CURRENT REPORT

☐ FORM USED TO REPORT FOLLOW-UP INVESTIGATION OR SUPPLEMENTAL INFORMATION — 9. DATE 12/9/91

| 4. EXTRA COPIES | 5. PAGE NO. 2 | 6. TRAFFIC CITATION NO. |
|---|---|---|

10. CORRECT OFFENSE OR INCIDENT CLASSIFICATION — CHANGED? ☐ YES

7. KIND OF REPORT CONTINUED ☐ OFFENSE ☐ TRAFFIC ACCIDENT ☐ ARREST ☐ FOLLOW-UP OR SUPPLEMENTAL OR PROSECUTION

11. MULTIPLE CLEAR-UP ☐ YES (LIST OTHER COMPLAINT NOS. IN NARRATIVE) ☐ NO

8. OFFENSE, CHARGE OR INCIDENT ON ORIGINAL REPORT ARSON

12. VALUE OF PROPERTY RECOVERED $

## OFFICER ASSIGNED:

Undersigned dispatched to Central Fire Station to make contact with the Fire Marshall, reporting person. Upon arrival, contact made with the Fire Marshall in his office.

## REPORTEE INTERVIEWED:

Reportee related that on 11/24/91, the Fire Department was dispatched to a vacant house which had been remodeled into an office-type building in the 6400 block of Naomi. They were dispatched at 0107 hours. It took approximately one hour for the Fire Department to control the fire and extinguish it. The interior of the home was destroyed. Based on his and other employees of the Fire Department's preliminary investigation, they determined that it was an electrical fire.

However, the insurance company sent a private investigator by the name of JIM GARBO to investigate the insurance claim. The house was insured for $34,000. Approximately one week ago from this date, JIM GARBO inspected the burned house and came up with a different determination than our Fire Marshall. He requested that the State Fire Marshall be summoned to the scene.

Michigan State Police Fire Marshall Detective Sergeant FREDERICK KEMPSKI came to the scene and came to the conclusion, based on patterns on the floor, that the fire possibly was started by some type of incendiary devices.

| REPORTING OFFICER EGGERDING | NO. #9 | STATUS (CHECK ONE) OPEN | SUSPENDED CLOSED | DATE TIME TYPED 12/11/91 Louise | REPRODUCED |
|---|---|---|---|---|---|
| SECOND OFFICER | NO. | SUPERVISOR APPROVING | | UNIT REFERRED TO | UCR DISPOSITION |

# SUPPLEMENT REPORT

## PORTAGE POLICE DEPARTMENT

| | | | | 1. COMPLAINANT, DRIVERS, VICTIM, OR ARRESTEE STERNER, TODD | 2. ARREST NO. | 3. COMPLAINT NO. 17946-91 |
|---|---|---|---|---|---|---|
| ☐ FORM USED AS CONTINUATION SHEET FOR CURRENT REPORT | | | | ☐ FORM USED TO REPORT FOLLOW-UP INVESTIGATION OR SUPPLEMENTAL INFORMATION | | 9. DATE 12/9/91 |
| 4. EXTRA COPIES | 5. PAGE NO. 3 | 6. TRAFFIC CITATION NO. | | 10. CORRECT OFFENSE OR INCIDENT CLASSIFICATION | CHANGED? ☐ YES | |
| 7. KIND OF REPORT CONTINUED ☐ OFFENSE ☐ TRAFFIC ACCIDENT ☐ ARREST | | | ☐ FOLLOW-UP OR SUPPLEMENTAL OR PROSECUTION | 11. MULTIPLE CLEAN-UP? ☐ YES (LIST OTHER COMPLAINT NOS. IN NARRATIVE) ☐ NO | | |
| 8. OFFENSE, CHARGE OR INCIDENT ON ORIGINAL REPORT ARSON | | | | 12. VALUE OF PROPERTY RECOVERED $ | | |
| 13. INSTRUCTIONS FOR FOLLOW-UP OR SUPPLEMENTAL USAGE. | | Under narrative, record your activity and all developments in the case subsequent to last report. Describe and record value of any property recovered. Names and arrest numbers of any persons arrested. Explain any offense classification change. Clearly show disposition of recovered property and inventory etc. Recommend to supervisor case status and to reviewer UCR disposition. Indicate "Item Number Continued" at left, if any. | | | | |

ITEM NO.

Reportee related that at this time, his department is labeling it a suspicious fire, but that the State Fire Marshall is labeling it an incendiary fire. No further information is available at this time.


STATUS:

Refer this complaint to Detective PETROSKI, Arson Investigator for the Police Department.

| | | | | OFFICE USE ONLY | |
|---|---|---|---|---|---|
| | | | | 33 DATE TIME TYPED NO 12/11/91 Louise | REPRODUCED NO |
| 30. REPORTING OFFICER EGGERDING | NO #9 | 31. STATUS (CHECK ONE) OPEN | SUSPENDED CLOSED | 34 UNIT REFERRED TO I-1 | 35 UCR DISPOSITION |
| SECOND OFFICER | NO | 32 REVIEWING APPROVING | | 36 REVIEWER | NO |

# SUPPLEMENT REPORT

## PORTAGE POLICE DEPARTMENT

| | | | 1. COMPLAINANT, DRIVERS, VICTIM, OR ARRESTEE STERMER, TODD | 2. ARREST NO. | 3. COMPLAINT NO. 17946-91 |
|---|---|---|---|---|---|
| ☐ FORM USED AS CONTINUATION SHEET FOR CURRENT REPORT | | | ☒ FORM USED TO REPORT FOLLOW-UP INVESTIGATION OR SUPPLEMENTAL INFORMATION | | 9. DATE 12/16/91 |
| 4. EXTRA COPIES | 5. PAGE NO. 4 | 6. TRAFFIC CITATION NO | 10. CORRECT OFFENSE OR INCIDENT CLASSIFICATION | | CHANGED? ☐ YES |
| 7. KIND OF REPORT CONTINUED ☐ OFFENSE ☐ TRAFFIC ACCIDENT ☐ ARREST | | | ☒ FOLLOW-UP OR SUPPLEMENTAL OR PROSECUTION | 11. MULTIPLE CLEAR-UP? ☐ YES (LIST OTHER COMPLAINT NOS IN NARRATIVE) | ☐ NO |
| 8. OFFENSE, CHARGE OR INCIDENT ON ORIGINAL REPORT Arson | | | | 12. VALUE OF PROPERTY RECOVERED $ | |
| 13. INSTRUCTIONS FOR FOLLOW-UP OR SUPPLEMENTAL USAGE | | Under narrative, record your activity and all developments in the case subsequent to last report. Describe and record value of any property recovered, names and arrest numbers of any persons arrested. Explain any offense classification change. Clearly show disposition of recovered property and inventory no. Recommend to supervisor case status and to reviewer UCR disposition. Indicate "Item Number Continued" at left, if any. | | | |

ITEM NO.

**ASSIGNMENT:**

The U/D has been assigned to this investigation which has been classified as an arson. The determination that it was an incendiary fire was made by the state fire marshal 's office at the time when they responded at the request of the insurance claim investigator.

**INFORMATION REGARDING COMPLAINANT:**

As in all arson cases, the possibility exists that when insured property has been burned, the person who would stand to benefit from the insurance money is considered a possible suspect. At this time, no other motive can be found for the fire and there has not been a pattern of arsons occurring in the last few years in the city of Portage.

The owner of the property is TODD STERMER and information provided from the state fire marshall's office, which was turned over to me by the Portage fire marshall, indicates that the residence in question was in the process of being sold and there was remodeling taking place. The report however does not indicate who the property was being sold to and that anyone was contacted to confirm that information. The property involved apparently was a residence and had been lived in by MR STERMER and was being sold to be used as office building. As indicated, none of that information has been verified. It's also unknown at this time how long ago prior to this fire had the property been insured.

| | | | OFFICE USE ONLY | | |
|---|---|---|---|---|---|
| | 12/11/91 | | 11. DATE TIME TYPED NO 12/17/91 zc | 12. REPRODUCED NO | |
| 10. REPORTING OFFICER R. PETROSKI | DET. NO RP | 11. STATUS (CHECK ONE) ☐ OPEN SUSPENDED: CLOSED: | 13. UNIT REFERRED TO | 14. UCR DISPOSITION | |
| SECOND OFFICER | NO | 12. SUPERVISOR APPROVING | 15. REVIEWER | NO | |

# SUPPLEMENT REPORT

# PORTAGE POLICE DEPARTMENT

| | | 1. COMPLAINANT, DRIVER, VICTIM, OR ARRESTEE STERMER, TODD | 2. ARREST NO. | 3. COMPLAINT NO. 17946-91 |
|---|---|---|---|---|
| □ FORM USED AS CONTINUATION SHEET FOR CURRENT REPORT. | | 9. FORM USED TO REPORT FOLLOW-UP INVESTIGATION OR SUPPLEMENTAL INFORMATION | | 8. DATE 12/16/91 |
| 4. EXTRA COPIES | 5. PAGE NO. 5 | 6. TRAFFIC CITATION NO. | 10. CORRECT OFFENSE OR INCIDENT CLASSIFICATION | CHANGED? □ YES |
| 7. KIND OF REPORT CONTINUED □ OFFENSE □ TRAFFIC ACCIDENT □ ARREST | | 8. FOLLOW-UP OR SUPPLEMENTAL OR PROSECUTION | 11. MULTIPLE CLEARUP? □ YES (LIST OTHER COMPLAINT NOS. IN NARRATIVE) □ NO | |
| 8. OFFENSE, CHARGE OR INCIDENT ON ORIGINAL REPORT Arson | | | 12. VALUE OF PROPERTY RECOVERED $ | |
| 13. INSTRUCTIONS FOR FOLLOW-UP OR SUPPLEMENTAL USAGE. | Under narrative, record your activity and all developments in the case subseq. t'd to last report. Describe and record value of any property recovered, names and arrest numbers of any persons arrested. Explain any offense classification change. Clearly show disposition of recovered property and inventory no. Recommend to supervisor case status and to reviewer UCR disposition. Indicate "Item Number Continued" at left, if any. | | | |

ITEM NO.

I have run a criminal history check on MR STERMER and have found that he's a w/m with [  ] , a state ID number o[  ] and an FBI number [  ]. MR STERMER shows an arrest by the City of Portage PD in 1982 for a misdemeanor A&B for which he was found guilty. He also has an arrest in 1985 by the MSP White Pigeon post for dangerous drugs. He was convicted of a misdemeanor and put on probation for three years. In 1987, MR STERMER was again arrested for dangerous drugs and charged with a misdemeanor there in which he pled guilty and received one day in jail and fines and costs of $75.00. In 1989, MR STERMER was againt arrests by the Portage PD and he was convicted of a misdemeanor, impaired operating of a motor vehicle for which he paid fines and costs of $515.00.

## INFORMATION FROM STATE FIRE MARSHALL'S REPORT:

The state fire marshall investigator is DET/SGT RICK KEMPSKI. According to his report which has been copied and filed with the original report of this complaint, the property in question is co-owned by TODD STERMER and his brother BRADLEY STERMER and that they'd inherited the property after the demise of their father. Apparently the contact that the investigator had was with TODD STERMER because there is no further information available on BRADLEY STERMER. The report does indicate that there was no one home at the time of the fire and that the building was being remodeled due to

| | | | | OFFICE USE ONLY | |
|---|---|---|---|---|---|
| | | | | 13. DATE TIME TYPED NO 12/17/91 zc | REPRODUCED NO |
| 30. REPORTING OFFICER R. PETROSKI DET. | NO | 31. STATUS (CHECK ONE) OPEN | SUSPENDED CLOSED | 14. UNIT REFERRED TO | 15. UCR DISPOSITION |
| SECOND OFFICER | NO | 32. SUPERVISOR APPROVING | NO | 16. REVIEWER | NO |

# SUPPLEMENT REPORT

## PORTAGE POLICE DEPARTMENT

| | | 1 COMPLAINANT, DRIVERS, VICTIM, OR ARRESTEE | 2 ARREST NO | 3 COMPLAINT NO |
|---|---|---|---|---|
| ☐ FORM USED AS CONTINUATION SHEET FOR CURRENT REPORT | | STERMER, TODD | | 17946-91 |

| | | | ☒ FORM USED TO REPORT FOLLOW-UP INVESTIGATION OR SUPPLEMENTAL INFORMATION | | 9 DATE |
|---|---|---|---|---|---|
| 4 EXTRA COPIES | 5 PAGE NO 6 | 6 TRAFFIC CITATION NO | 10 CORRECT OFFENSE OR INCIDENT CLASSIFICATION | | 12/16/91 |
| 7 KIND OF REPORT CONTINUED ☐ OFFENSE ☐ TRAFFIC ACCIDENT ☐ ARREST | | | ☒ FOLLOW-UP OR SUPPLEMENTAL OR PROSECUTION | 11 MULTIPLE CLEAR-UP ☐ YES (LIST OTHER COMPLAINT NOS IN NARRATIVE) | CHANGED? ☐ YES ☐ NO |
| 8 OFFENSE, CHARGE OR INCIDENT ON ORIGINAL REPORT Arson | | | | 12 VALUE OF PROPERTY RECOVERED $ | |

| 13 INSTRUCTIONS FOR FOLLOW-UP OR SUPPLEMENTAL USAGE | Under review, record your activity and all developments in the case subsequent to last report. Describe and record value of any property recovered, names and arrest numbers of any persons arrested. Explain any offense classification change. Clearly show disposition of recovered property and inventory no. Recommend to supervisor case status and to reviewer UCR disposition. Indicate "item Number Continued" at left, if any |
|---|---|

ITEM NO.

a pending sale agreement. It indicates also that three acres of land were going along with the sale. According to the report, all the doors were closed and locked, both the front and back door, and there had been no fire alarm systems installed or smoke detectors. I have talked to the fire marshall of Portage, FRED BYRNES, and he has indicated also that at the time when the fire department arrived it was necessary for them to force entry into the building because the doors were locked.

The insurance on the residence is through the Wolverine Ins. Co. out of Dowagiac. Their investigator JIM GARBER had been to the fire scene and had requested the fire marshall from the state fire marshall's office to examine the scene.

The fire marshall indicates that prior to his search he did receive a consent to search of the scene by getting consent from TODD STERMER. DET/SGT KEMPSKI did photograph the scene and has sent those photos on for processing to the Lansing photo lab. He also took evidence of burn material from three locations in the residence where he felt that it was obvious that there were burn patterns on the floor which indicated to him that a flammable liquid substance had been used to cause the fire to occur. It was his conclusion that the origin of the fire was in the northwest corner bedroom, but that there was evidence of another origin of fire in the bathroom. Evidence of flammable liquid was seen from those areas on out into the living room and dining room area and to the exterior porch area. DET/SGT KEMPSKI indicates the cause of the fire

OFFICE USE ONLY

| 30 REPORTING OFFICER R. PETROSKI DET. | NO | 33 STATUS (CHECK ONE) OPEN SUSPENDED CLOSED | 31 DATE TIME TYPED NO 12/17/91 zc | REPRODUCED NO |
|---|---|---|---|---|
| SECOND OFFICER | NO | 32 SUPERVISOR APPROVING NO | 34 UNIT REFERRED TO | 35 UCR DISPOSITION |
| | | | 36 REVIEWED | |

# SUPPLEMENT REPORT

## PORTAGE POLICE DEPARTMENT

| | | | 1. COMPLAINANT, DRIVERS, VICTIM, OR ARRESTEE | 2. ARREST NO. | 3. COMPLAINT NO. |
|---|---|---|---|---|---|
| ☐ FORM USED AS CONTINUATION SHEET FOR CURRENT REPORT | | | STERMER, TODD | | 17946-91 |
| 4. EXTRA COPIES | 5. PAGE NO. 7 | 6. TRAFFIC CITATION NO. | 9. FORM USED TO REPORT FOLLOW-UP INVESTIGATION & OR SUPPLEMENTAL INFORMATION | | 8. DATE 12/16/91 |
| 7. KIND OF REPORT CONTINUED ☐ OFFENSE ☐ TRAFFIC ACCIDENT ☐ ARREST | | ☐ FOLLOW-UP OR X SUPPLEMENTAL OR PROSECUTION | 10. CORRECT OFFENSE OR INCIDENT CLASSIFICATION | | CHANGED? ☐ YES |
| 6. OFFENSE, CHARGE OR INCIDENT ON ORIGINAL REPORT Arson | | | 11. MULTIPLE CLEARUP? ☐ YES (LIST OTHER COMPLAINT NOS. IN NARRATIVE) ☐ NO | | |
| 13. INSTRUCTIONS FOR FOLLOW-UP OR SUPPLEMENTAL USAGE. | Under narrative, record your activity and all developments in the case subsequent to last report. Describe and record value of any property recovered, names and arrest numbers of any persons arrested. Explain any offense classification change. Clearly show disposition of recovered property and inventory no. Recommend to supervisor case status and to reviewer UCR disposition. Indicate "item Number Continued" as left, if any | | 12. VALUE OF PROPERTY RECOVERED $ | | |

ITEM
NO.

as humanly caused due to the characteristics of flammable liquid burn pattern throughout the entire residence. The debris material that he has sent on to the state crime lab will be examined for the presence of flammable material.

It should be noted that the report does indicate that the residence was insured for the amount of $34,600, however, there was no insurance on contents of the residence, there were no contents in the residence.

STATUS:

Open, pending further investigation.

| | | | OFFICE USE ONLY | |
|---|---|---|---|---|
| | 12/17/91 | 12/18 | 17. DATE TIME TYPED NO. 12/17/91 zc | REPRODUCED NO. |
| 30. REPORTING OFFICER R. PETROSKI DET. | 31. STATUS CHECK ONE) X OPEN | SUSPENDED CLOSED | 14. UNIT REFERRED TO KPET | 35. UCR DISPOSITION |
| SECOND OFFICER | 32. SUPERVISOR APPROVING | NO. | 16. REVIEWER | NO. |

# SUPPLEMENT REPORT

## PORTAGE POLICE DEPARTMENT

| 1. COMPLAINANT, DRIVERS, VICTIM, OR ARRESTEE | 2. ARREST NO. | 3. COMPLAINT NO. |
|---|---|---|
| STERMER, TODD | | 17946-92 |

| ☐ FORM USED AS CONTINUATION SHEET FOR CURRENT REPORT | ☒ FORM USED TO REPORT FOLLOW-UP INVESTIGATION OR SUPPLEMENTAL INFORMATION | 9. DATE 3/31/92 |
|---|---|---|

| 4. EXTRA COPIES | 5. PAGE NO. 33 | 6. TRAFFIC CITATION NO. | 10. CORRECT OFFENSE OR INCIDENT CLASSIFICATION | CHANGE? ☐ YES |
|---|---|---|---|---|

| 7. KIND OF REPORT CONTINUED ☐ OFFENSE ☐ TRAFFIC ACCIDENT ☐ ARREST | ☒ FOLLOW-UP OR SUPPLEMENTAL OR PROSECUTION | 11. MULTIPLE CLEAN-UP? ☐ YES (LIST OTHER COMPLAINT NOS. IN NARRATIVE) ☐ NO |
|---|---|---|

| 8. OFFENSE, CHARGE OR INCIDENT ON ORIGINAL REPORT | 12. VALUE OF PROPERTY RECOVERED |
|---|---|
| Arson | |

| 13. INSTRUCTIONS FOR FOLLOW-UP OR SUPPLEMENTAL USAGE. | Under narrative, record your activity and all developments in the case subsequent to last report. Describe and record value of any property recovered, names and arrest numbers of any persons arrested. Explain any offense classification change. Clearly show disposition of recovered property and inventory no. Recommend to supervisor case status and to reviewer UCR disposition. Indicate "Item Number Continued" at left, if any. |
|---|---|

ITEM
NO.

being his own. The information for MCMANN would be supportive of what was told to me in the original interview with CHRIS KHOURY and TOM EBERT.

CONTACT WITH WHITE PIGEON MSP POST:

I've also been in contact with TRPR JIM BEDELL of the White Pigeon Post who indicated he recalled the incident involving STERMER that he had investigated. He states that that fire was definitely an arson and that it never was shown who was involved or responsible for that incident. He states that TODD STERMER, the complainant in this incident, was the insured party and was regarded as the suspect. The contact made with TRPR BEDELL was on 3/26/92.

RECONTACT WITH INSURANCE CO:

On this date, I also made contact with a Wolverine Mutual Insurance agent JOHN BREITENBACH who informed me that they'll be settling the claim with TODD STERMER for the amount of $20,000. I advised him of all the efforts that had been made to identify a suspect in this case and the fact that there were no further leads that have not been exhausted and that at this time, the investigation was going to be made inactive after contact was made with MR STERMER, who was the original reporting person and that notification made.

| | | OFFICE USE ONLY | | |
|---|---|---|---|---|
| | | 13. DATE TIME TYPED NO 4/1/92 zc | REPRODUCED NO | |
| 30. REPORTING OFFICER NO R. PETROSKI DET. | 31. STATUS (CHECK ONE) ☐ OPEN ☐ SUSPENDED ☒ CLOSED | 14. UNIT REFERRED TO | 15. UCR DISPOSITION NO | |
| SECOND OFFICER NO | 32. SUPERVISOR APPROVING NO | 16. REVIEWER | NO | |

Run: 11/02/2007
10:59

Page: 3
of 4

Van Buren County Sheriff's Department

Report of Incident Detail / Followup

Incident 2007 0068027

police and CORY PIERCE informed investigating officer that they sat in a patrol car for approximately 20 minutes until they went over to the MOUSSALLI'S, who were neighbors of theirs.

CORY PIERCE also told investigating officer that he was informed that his father had died at the scene by police officers. At that time, investigating officer asked CORY PIERCE if he had a cell phone at that time, at which he stated at that time he did. Investigating officer asked what the cell phone number was and was informed it was 269-352-6373. Investigating officer also asked if his mother had a cell phone, which he stated that she had two cell phones, which he identified as one being her regular phone and the other being a work phone.

CORY PIERCE told investigating officer that if he could not get ahold of his mother, LINDA STERMER, on her regular cell phone that he would contact her on the work phone. Investigating officer asked if he remembered what the cell phone numbers were to his mother, LINDA STERMER'S, phones and he stated that he did not remember what the numbers were and that she had a new cell phone since then. He also told investigating officer that his father also had a cell phone as did his brothers, TRENTON and TREVOR.

Investigating officer asked if that was at the time of the fire and he stated that it was. Investigating officer asked CORY PIERCE if he had ever been told by his mother, LINDA STERMER, how the fire did happen. He stated that he had been told by her that she did not know how it had happened. At that time, investigating officer asked CORY PIERCE about the arguments between his father and mother and asked if there had been any violence between the two of them. He stated that he had seen his father, TODD STERMER, hit his mother, LINDA STERMER, on prior occasions. He stated that on one occasion it was while they lived in a house in Kalamazoo and on another occasion, that it occurred in a house in Lawrence, other than the one that burned down.

Investigating officer asked what he had seen. He stated it was more that he had heard TODD hitting LINDA rather than seeing it happen. Investigating officer asked CORY PIERCE if there any friends of his mother that he knew that she spent time with. He informed investigating officer that his mother did hang out with KATE SWIFT and with another woman by the name of KATE FOX. Investigating officer asked about any of his father's friends. He stated that there was a friend of his dad's, who he knew as TC, who was a white male, approximately 40-50 years old from Kalamazoo, who had came out recently.

He stated that TC had been out to the house recently after he had been involved in an accident prior to the fire and that his father borrowed STEVEN DUNN'S car to give the friend a ride home. Investigating officer asked CORY PIERCE if his mother had ever discussed any of the nature of the arguments to which he stated that she had not, however, that occasionally his mother would ask him who he would want to live with. Investigating officer asked CORY PIERCE where he had gone , after the fire, to live. He stated for approximately 4 months, he and his brothers along with his mother, LINDA STERMER, moved into KATE SWIFT'S home and lived there with her family.

He also stated that after the fire, they had gotten new cell phones. He then stated after 4 months with the KATE SWIFT family, that they rented a house in the village of Lawrence and off and on ASHLEY GIBSON and BRITTANY GIBSON would stay there as well. Investigating officer asked CORY PIERCE about an incident between his brother, TREVOR STERMER and ASHLEY GIBSON in regards to a domestic argument. He stated that there had been a domestic argument in the home in Lawrence between ASHLEY and TREVOR, to which investigating officer asked if there had been talk about a firearm at that time.

| | | Page 30 |
|---|---|---|
| 1 | Q | Two bedrooms upstairs or one bedroom or what? |
| 2 | A | Two bedrooms upstairs. |
| 3 | Q | So did you ever -- let me back up. Do you remember the last |
| 4 | | time you talked to your dad? |
| 5 | A | No. |
| 6 | Q | Really? |
| 7 | A | No. |
| 8 | Q | What is the last memory you have of your dad? |
| 9 | A | On Sunday I saw him upstairs watching T.V. |
| 10 | Q | So there was another T.V. upstairs? |
| 11 | A | Yeah. |
| 12 | Q | Is it kind of like upstairs was the parents' T.V., |
| 13 | | downstairs was the boys' T.V.? |
| 14 | A | Yeah, pretty much. |
| 15 | Q | And so where was your dad sitting when he was watching T.V.? |
| 16 | A | Upstairs in the living room in a chair. |
| 17 | Q | Did he have, like, his chair he always sat in? |
| 18 | A | Pretty much. |
| 19 | Q | And that's the chair he was in? |
| 20 | A | Yeah. |
| 21 | Q | Was he awake? Was he sleeping? |
| 22 | A | He was awake. |
| 23 | Q | Did you say, "See you later, Dad"? |
| 24 | A | No. I just went. |
| 25 | Q | Why is that? |

| | | Page 31 |
|---|---|---|
| 1 | A | I don't know. |
| 2 | Q | Were you avoiding him? Or that was typical for you to just |
| 3 | | walk out without saying good-bye? |
| 4 | A | It was typical. We just -- yeah. |
| 5 | Q | Did he seem happy, sad, tired, sick, energetic? |
| 6 | A | I don't know. |
| 7 | Q | I mean, did he seem -- what can you tell me about your dad |
| 8 | | the last time you saw him? |
| 9 | A | I just glanced around the corner and saw him real quick, so |
| 10 | | I didn't really -- |
| 11 | Q | Do you know what he was wearing? |
| 12 | A | No. |
| 13 | Q | So when is the last time you remember having a conversation |
| 14 | | with your dad? |
| 15 | A | Probably the weekend before that, maybe. I don't -- |
| 16 | Q | So the last time you remember having a conversation with |
| 17 | | your dad was a week before the fire? |
| 18 | A | I don't -- I don't know. |
| 19 | Q | Do you remember if the last time you talked to him was |
| 20 | | positive or negative? Were you fighting or were you getting |
| 21 | | along? |
| 22 | A | We were getting along I think. |
| 23 | Q | Your dad built the house you lived in? |
| 24 | A | Yeah. |
| 25 | Q | Did you help? |

| | | Page 32 |
|---|---|---|
| 1 | A | Yeah. |
| 2 | Q | What did you do? |
| 3 | A | Helped carry drywall and putting in nails and stuff. |
| 4 | Q | So he was teaching you how to hang drywall and stuff? |
| 5 | A | Uh-huh (affirmative). |
| 6 | Q | "Yes"? |
| 7 | A | Yes. |
| 8 | Q | Did you help out with maintaining stuff once you were living |
| 9 | | in there? I mean, were you -- I mean, something would |
| 10 | | break; would say, "Come on, Cory, we're going to fix |
| 11 | | this"? |
| 12 | A | No. |
| 13 | Q | Do you remember if your dad was sick at the time of the |
| 14 | | fire? |
| 15 | A | I think he was on medication for -- 'cause he was, like -- |
| 16 | | something was wrong with his equilibrium or something. |
| 17 | Q | How did you know that? |
| 18 | A | 'Cause he had told us that he was, like, off balance |
| 19 | | sometimes. |
| 20 | Q | How long had that been going on? |
| 21 | A | About a week or two, maybe. |
| 22 | Q | And what about his -- was he in pain from anything? |
| 23 | A | I don't know. I don't think so. |
| 24 | Q | Any other health problems your dad had? I mean, did he |
| 25 | | have, like, high blood pressure or high cholesterol? Was he |

| | | Page 33 |
|---|---|---|
| 1 | | treating for any of that kind of stuff? |
| 2 | A | No. |
| 3 | Q | Was he generally healthy or unhealthy? |
| 4 | A | Healthy. |
| 5 | Q | Pretty active? Pretty lazy? What? |
| 6 | A | Active. |
| 7 | Q | What kinds of things was your dad doing? I mean, what would |
| 8 | | he do when he would just be doing stuff around the place? |
| 9 | A | He'd come and play, like, sports outside with us, like |
| 10 | | football and stickball and stuff. |
| 11 | Q | The fire was January 7; right? |
| 12 | A | Uh-huh (affirmative). |
| 13 | Q | That Christmas you had together just before, do you remember |
| 14 | | anything special about that? Was it a really good |
| 15 | | Christmas? Was it a really bad Christmas? Was it -- |
| 16 | A | Average I think. |
| 17 | Q | Did you go anywhere? |
| 18 | A | I think we were out at our house. |
| 19 | Q | You had relatives over? |
| 20 | A | Yeah, I think so. |
| 21 | Q | His family or her family? |
| 22 | A | His family. |
| 23 | Q | Did you get gifts from Mom and Dad? |
| 24 | A | Yeah. |
| 25 | Q | Were they bigger, smaller, average -- than usual? |

# BUILDING PERMIT

**BUILDING DEPARTMENT**
240 North Grand • Suite #1
Schoolcraft, MI 49087-0662
(616) 679-4900
1 (800) 627-2801

Date: 9/25/98

Jurisdiction of Lawrence    Permit # 7-101-98065

New residential construction, addition, and alteration

Job Address: 66398 CR. 215          Property Tax I.D.: 80-13-029-003-40
Zoning district: AG                 Permit Determinant: 240558
Use Group: R3                        Owner: Todd Stermer (616)674-3210 phone
Type Const.: Stick 5B                Address: 44849 48th St. (616)674-7611 phone
Basic Dimensions: 38 ft. x 60 ft.   Contractor: Same Lawrence MI 49064
No. Floors: 3                        Address: Same

Sq. ft. main floor –1800            5  No. rooms 2nd floor           No. wood burners
Sq. ft. second floor 1476           3  No. full baths                Sq. ft. porches/breezeways
Sq. ft. fin. basement                  No. half baths               8  Sq. ft. wood deck
Sq. ft. unfin. bsmt. 1800              No. fireplaces               8  (ft.) ceiling height
No. rooms 1st floor                    No. chimneys                 30 (ft.) building height
Sq. ft. garage (attached garage requires fire separation)

## PLEASE FILL IN OR CHECK THE APPROPRIATE SPACES BELOW:

**FOUNDATIONS (11)**
___ ftgs. ___ "x ___ "
___ " below fin. grade
___ No. post footings
___ "x ___ "x ___ "
✓ Poured walls
___ H.C. block
___ Wood foundation
___ (provide diagram)
9 Ft. Foundation wall height
___ " crawl space wall height
___ " egress sill height
2 No. bsmt. windows
___ Crawl space vent openings

**ROUGH-IN FRAMING (10)**
✓ Sill plate (treat.)
✓ Wall plates
✓ headers
✓ wood girder
___ steel girder
___ post ___ ft. O.C.
✓ stud wall
✓ masonry
✓ fl. joists 18 " O.C.
✓ Ceil. jsts 18 " O.C.
✓ Rafters 18 " O.C.
___ Truss (diagram required)
3/4 " floor sheathing
7/16 " wall sheathing
7/16 " roof sheathing
___ " corner brace sheath

**EXTERIOR (3)**
___ Wood
___ Aluminum/Vinyl
___ Brick
___ Block
**ROOFS (4)**
___ Hip
___ Gable
✓ Front overhang
✓ Other overhang
✓ Eavestrough
**CHIMNEY TYPE**
___ Brick
✓ Block
✓ Stone
___ Metal
___ Asphalt Shingles
___ Underlayment
___ Vents
___ Other Coverings
**WINDOWS (5)**
30 No. of windows
___ Wood sash
___ Metal sash
___ Type
___ egress/bedrms
✓ attic access 22" x 30"

*Modified as to area/size of construction of new changes*
*9/21/98*

**INSULATION (9)**
✓ * Fiberglass
___ * Cellulose
___ * Blown in fb. glass
___ * Foam
___ other
___ * rigid poly ure.
___ * rigid styro
___ * insul sheath
___ wind barrier
___ (mil) moisture barr.
**INTERIOR (13)**
✓ Foyer
✓ Kit fl.
✓ Other fl,
✓ drywall
___ plaster
___ covered ceiling
___ pnl. wainscot
___ 5/8" garage fire code
**BUILT-IN ITEMS (15)**
___ oven ___ range
✓ disposal
✓ hood/fan
✓ dishwasher
___ refrigerator
___ incinerator
___ vanities
___ ' cupboard length

Contractor Will Stake 2 Adjacent Lot Lines for First Inspection. Sketch Lot Diagram On Back.

COST OF PERMIT  $ 610 00

Building Dept.  SEP 08 1998
By: _____

Make checks payable to:
Pd. 9/8 # 2035 96

**Permits eventually required for this project:**

| Electrical Permit | Plumbing Permit | Mechanical Permit |
|---|---|---|
| ✓ yes ☐ no | ✓ yes ☐ no | ✓ yes ☐ no |

PLEASE COMPLETE THE INFORMATION ON THE BACK OF THIS PAGE, READ AND SIGN THE AFFIDAVIT

# ELECTRICAL PERMIT

**LAWRENCE TOWNSHIP BUILDING DEPARTMENT**
P.O. Box 662
240 N. Grand, Suite 1
Schoolcraft, MI 49087-0662
(616) 679-4900
1 (800) 627-2801

Date _____

LAWRENCE TOWNSHIP

Permit # 7-E-98065

Job Location 66598 66348 CR 215, Lawrence MI 49064

Power Co. Consumers Energy   Request No. 021365121

Owner Todd Stermer   Phone No. (616) 674-3210

Address P.O. Box 673, Lawrence MI 49064

## PLEASE FILL IN OR CHECK THE APPROPRIATE SPACES BELOW:

| COMMERCIAL | No. | ITEMIZATION | |
|---|---|---|---|
| Plan review and administration base fee and all required and final inspections | | $84.00 | |
| Services: Through 200 amp. | | $ 10.50 | |
| 200 amp thru 600 amp | | 15.75 | |
| 600 amp thru 800 amp | | 21.00 | |
| 800 amp and over | | 26.25 | |
| Circuits | | 3.15 each | |
| Lighting Fixtures - per 25 and fraction of | | 6.30 each | |
| Dishwasher, Garbage Disposal & Range Hood | | 4.20 each | |
| Furnace - unit heater | | 5.25 each | |
| Electrical heating units (baseboard) | | 4.20 each | |
| Power Outlets (including (including ranges, dryers, etc.) | | 7.35 each | |
| Signs - per circuit | | 5.25 each | |
| Feeders | | 5.25 each | |
| Mobile Home Park Sites | | 6.30 each | |
| Recreational Vehicle Park Sites | | 4.20 | |
| K.V.A. or H.P. - each unit up to 20 K.V.A./H.P. | | 6.30 | |
| 21 to 50 K.V.A. or H.P. | | 10.50 | |
| 51 K.V.A. or H.P. and over | | 12.60 | |
| Fire Alarm  Up to 10 stations and horns | | 52.50 | |
| 11 to 20 stations and horns | | 105.00 | |
| over 21 stations and horns | | 5.25 each | |
| Enter Cost of Permit: TOTAL | | | |

| RESIDENTIAL | |
|---|---|
| Single Inspection | $42.00 |
| Service Upgrade | $42.00 |
| Addition or Remodel | $99.75 |
| Addition or Remodel With Service Upgrade | $136.50 |
| New Residence | $136.50 |

**FOR RESIDENTIAL PERMITS:**
Please indicate applicable equipment in "No," column, and disregard commercial fee schedule.

COST OF PERMIT:$

Building Dept.
By: _____

Make Checks Payable to:

**LAWRENCE TOWNSHIP**

PLV # 2051  9/3/02

Contractor Name (Self) Todd Stermer   Phone 616 674-3210

Address P.O. Box 673   City Lawrence   State MI   Zip 49064

Federal ID No./Social Security no. 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   MESC Employer No.

License No.   Expiration Date   Worker's Disability Compensation Carrier

If exempt from any of the above, explain here:

[X] I am/will be the owner and occupant of premises on which the described installation is proposed.

Section 23A of the State Construction Code Act of 1972, Act No. 230 of the Public Acts of 1972, being Section 125.1523a of the Michigan Complied Laws, prohibits a person from conspiring to circumvent the licensing requirements of this state relating to persons who are to perform work on a residential building or a residential structure. Violators of Section 23a are subject to civil fines.

## HOME OWNER'S AFFIDAVIT and SIGNATURE
I hereby certify that the work described above shall be installed in accordance with the local code and shall not be enclosed, covered up, or put into operation until it has been inspected and approved by the inspector. I will cooperate with the inspector and assume the responsibility to arrange for necessary and timely inspections.

Signed: Todd O. Stermer   Date: 8-29-02

## AGENT/CONTRACTOR AFFIDAVIT and SIGNATURE
I hereby certify that the proposed work is authorized by the owner of record and I have been authorized by the owner to make this application as his authorized agent.

Signed: Todd O. Stermer   Date: 8-29-02

# MECHANICAL PERMIT

**LAWRENCE TOWNSHIP BUILDING DEPARTMENT**
P.O. Box 662
240 N. Grand, Suite 1
Schoolcraft, MI 49087-0662
(616) 679-4900
1 (800) 627-2801

Date 12-23-102

LAWRENCE TOWNSHIP

Permit # 7-M-9806s

Job Location 66598 CR. 215 - Lawrence MI 49064

Owner Todd Stermer Phone No. 674-3210

Address P.O. Box 673 - Lawrence MI 49064

## PLEASE FILL IN OR CHECK THE APPROPRIATE SPACES BELOW:

| COMMERCIAL | No. | ITEMIZATION | RESIDENTIAL | |
|---|---|---|---|---|
| | | | Single Inspection | 42.00 |
| Plan review, administrative base fee and all required and final inspections | | $84.00 | Addition/Remodel | $99.75 |
| | | | New Residence | 99.75 |
| Gas oil burning equipment-new and/or conversion | | $26.25 ea. | | |
| Chimney, Factory built (Class A) | | 26.25 ea. | **FOR RESIDENTIAL PERMITS:** | |
| Duct System/Hydronic Piping | | 21.00 | Please indicate applicable equipment in "No." column, and disregard commercial fee schedule. | |
| Solar Equipment System + Piping System | | 15.75 | | |
| Gas Piping (New Installation) | | 5.25 | | |
| Exhaust Fan/Power Exhaust | | 5.25 | COST OF PERMIT: $ 99.75 | |
| Flue Damper/Vent Damper | | 5.25 | Building Dept. | |
| L.P.G. & Fuel Oil Tanks (piping fee incl.) | | 15.75 | By _____ | |
| Central Air Conditioning & Heat Pump | | 15.75 | Make Checks Payable to: | |
| Enter Cost of Permit: TOTAL | | | CK # _____ LAWRENCE TOWNSHIP | |

| Contractor Name | | Phone ( ) | | |
|---|---|---|---|---|
| Address | City | | State | Zip |
| Federal ID No./Social Security no. | | MESC Employer No. | | |
| License No. | Expiration Date | | Worker's Disability Compensation Carrier | |

If exempt from any of the above, explain here:

☒ I am/will be the owner and occupant of premises on which the described installation is proposed.

**Section 23A of the State Construction Code Act of 1972, Act No. 230 of the Public Acts of 1972, being Section 125.1523a of the Michigan Compiled Laws, prohibits a person from conspiring to circumvent the licensing requirements of this state relating to persons who are to perform work on a residential building or a residential structure. Violators of Section 23a are subject to civil fines.**

## HOME OWNER'S AFFIDAVIT and SIGNATURE
I hereby certify that the work described above shall be installed in accordance with the local code and shall not be enclosed, covered up, or put into operation until it has been inspected and approved by the inspector. I will cooperate with the inspector and assume the responsibility to arrange for necessary and timely inspections.

Signed: Todd Stermer Date: 12-19-02

## AGENT/CONTRACTOR AFFIDAVIT and SIGNATURE
I hereby certify that the proposed work is authorized by the owner of record and I have been authorized by the owner to make this application as his authorized agent.

Signed: _____ Date: _____



LIBER 1099 PAGE 605

WARRANTY DEED  ·TITLE OFFICE·  STATUTORY FORM FOR INDIVIDUALS

This Indenture,

Dated this day of:
NOVEMBER 7, 1996

KNOW ALL MEN BY THESE PRESENTS THAT:
GERRI FLEETWOOD, A MARRIED WOMAN
25512 CR 665
BLOOMINGDALE, MI 49026
Convey(s) and Warrant(s) To:
KEVIN R. LOCKHART AND SUSAN J. LOCKHART, HUSBAND AND WIFE
49482 49TH STREET
LAWRENCE, MI 49064
for the sum of
REAL ESTATE TRANSFER VALUATION AFFIDAVIT FILED
the following described premises situated in
THE TOWNSHIP OF LAWRENCE, COUNTY OF VAN BUREN AND STATE OF MICHIGAN TO WIT:

BEGINNING ON THE EAST LINE OF SECTION 29, TOWN 3 SOUTH, RANGE 15 WEST AT A POINT 798.90 FEET SOUTH
OF THE EAST QUARTER POST OF THE SECTION; THENCE WEST, 264.00 FEET; THENCE NORTH, 165.00 FEET;
THENCE SOUTH 89 DEGREES 17 MINUTES 55 SECONDS WEST, 976.45 FEET; THENCE NORTH 77 DEGREES 00
MINUTES 30 SECONDS WEST, 472.50 FEET; THENCE SOUTH 34 DEGREES 55 MINUTES 47 SECONDS WEST, 241.81
FEET; THENCE SOUTH 00 DEGREES 22 MINUTES 52 SECONDS WEST TO THE SOUTH LINE OF THE NORTH HALF
OF THE SOUTHEAST QUARTER; THENCE EAST ON SAID SOUTH LINE, 1913 FEET MORE OR LESS TO THE EAST
LINE OF THE SECTION; THENCE NORTH ON SAME, 515.00 FEET TO THE PLACE OF BEGINNING.
80 13 019 002 40
SUBJECT TO EASEMENTS, RESERVATIONS, RESTRICTIONS AND LIMITATIONS OF RECORD, IF ANY.

Witnesses:                                    Signed and Sealed

KIMBERLY S. BUDZYN                            GERRI FLEETWOOD

KARYN WITT

STATE OF MICHIGAN COUNTY OF VAN BUREN

The foregoing instrument was acknowledged before me

ON NOVEMBER 7, 1996 BY GERRI FLEETWOOD, A
MARRIED WOMAN

PREPARED BY:

GERRI FLEETWOOD
25512 CR 665
BLOOMINGDALE, MI 49026

ASSISTED BY:

THE TITLE OFFICE, INC.
215 NORTH KALAMAZOO STREET
PAW PAW, MICHIGAN, 49079

KIMBERLY S. BUDZYN
NOTARY PUBLIC VAN BUREN COUNTY, MICHIGAN
MY COMMISSION EXPIRES: 10/16/1999

WHEN RECORDED RETURN TO

RECORDED

2076 K AW 801

# VAN BUREN/CASS DISTRICT PUBLIC HEALTH DEPARTMENT

**VAN BUREN COUNTY OFFICE**
Environmental Health Services
57418 CR 681, Suite A
Hartford, MI   49057
(616) 621-3143

**CASS COUNTY OFFICE**
Environmental Health Services
201 M-62 North
Cassopolis, MI   49031
(616) 445-5280

## SANITATION PERMIT APPLICATION FOR

☒ New Construction $45.00     ☐ Existing/Replacement $45.00     ☐ Hook-up to Existing System $45.00     ☐ Business/Migrant Housing $60.00

APPLICATION FOR _Todd & Linda Sterner_   Telephone # _674-7011 (Fax)_
<span style="display:block; text-align:center;">Owner's Name</span>

_49849 48th St_   City _Lawrence_   State _Mi_   Zip _49064_
<span style="display:block;">Complete Current Mailing Address</span>

LOCATION OF PROPERTY   Township _Lawrence_   Section _29_   Lot Size _120 AC_

Address/Street/Avenue _66398 C.R. 215 Lawrence Mi_

_CR 215 South 3 miles from light in Lawrence. Driveway on right on ~~east~~ Nov[t]_
_side of condemned house_ Provide Directions to Property _Top of Hill - oul[?]_

Subdivision Name (if applicable) _____ Lot Number _____

## ANSWER FOLLOWING QUESTIONS

Is this a single family dwelling? ☒ Yes  ☐ No        IF NO......... _____
<span style="display:block; text-align:right;">List dwelling type and/or Business Name</span>

Will you have or do you have a garbage grinder
in the kitchen sink?   ☒ Yes   ☐ No   Number of bedrooms in home? _4_   Number of occupants? _7_

Note: Prior to this department performing any site evaluation that involves disturbing the ground surface, i.e. auger borings, probing, etc., the property owner(s) must contact MISS DIG to clearly identify any/and all underground utilities. If the property owner(s) fails to notify MISS DIG, then the local public health department assumes no liability in the event of any damages occurring and the property owner shall bear all cost of repairs.

_Todd D Sterner_
<span style="display:block; text-align:right;">Applicant's Signature</span>

Note:   A Soil Erosion & Sedimentation Permit is needed when any soil is disturbed within 500' of any water bodies, (i.e. lake, stream, pond, river, etc.,) by contacting the Van Buren County Courthouse at (616) 657-8230 or the Cass County Road Commission at (616) 445-8611.

### HEALTH DEPARTMENT USE ONLY

| | | |
|---|---|---|
| _8/6/98_ | _03823_ | _57385 P&[?]_ |
| Application Received | Receipt Number | Computer ID Number |

(See reverse side for health dept. action)
(Previous Applications Obsolete Effective 01/01/98)

# VAN BUREN/CASS COUNTY DISTRICT PUBLIC HEALTH DEPARTMENT

Van Buren County Office
57418 CR 681, Suite A
Hartford, MI  49057

Cass County Office
201 M-62 North
Cassopolis, MI  49031

Permit for:   X  New Well-$45,   ___ Replace Existing Well $45,   ___ Hook-up to Existing Well $45,   ___ Business/Migrant Housing Well $60

**For Health Department Use Only**
Well Permit Number: 98-5166
Corresponding Sewage Permit No.: 03-618

## APPLICATION AND PERMIT TO INSTALL A PRIVATE OR TYPE III WATER SUPPLY

**For Health Department Use Only**
Today's Date: 8/5/98
Receipt Number: 03-23

NAME Todd & Linda Sterner ADDRESS 66398 CR 215 CITY/STATE Lawrence MI ZIP 49064
(Owners)
PHONE # 674-7011 TOWNSHIP Lawrence SECTION 29 SUBDIVISION NAME _____ LOT# ___

WELL CONTRACTOR'S NAME _____ LOCATION OF WELL 66398 CR 215
DRIVING DIRECTIONS CR 215 south 3 miles from light in Lawrence Driveway By Barn

APPLICANT'S SIGNATURE Todd A Sterner

**(For Health Department Use Only - Do Not Write In Shaded Area)**

SCALE DRAWING: Make a SCALE DRAWING, including dimensions, in the space provided below. Locate all possible sources of contamination.
NORTH

After well construction is completed, a water well record must be submitted to the Health Department. Notify the Health Department for a final inspection and sampling of the well.

# BUILDING PERMIT

## This Permit Must Be Displayed on The Premises When Work Starts

Any person wilfully destroying this permit before the completion of this building will be punished the full extent of the law.

Date 9-25-98 Permit No. 2-101-98065

This permit is issued for the (Erection) of a Single Family Residence

Location: 66398 CR 215

Lawrence

NAME OF CITY, TOWNSHIP OR VILLAGE



Building Inspector.

FORM NO. M-290-C
DOUBLEDAY BROS. & CO., KALAMAZOO, MICH.





Provide this design

Pre-Engineered Trusses
Insulation

metal Drip Edge
Finished Ceiling

Facia
Double 2x6 Ceiling

Finished Wall
Insulation
Base Mold

1/2" OSB under 15#
3 in 1 Asphalt Shingles

Finish Floor

Vented Soffit
Sub Floor

2x6 Sole Plate

Insulating Sheathing

Siding

Pre-Engineered Joist

2x6 Studs
Double 2x6 Ceiling

Base mold

Finish Floor

Sub Floor

2x6 Sole Plate

Header

Grade Line

Sill Sealer
Pre-Engineered Joist

1/2" anchor bolts
8" into concrete
8' O.C.
2x6 Sill Plate (Treated)

8" Concrete Wall

3" Concrete Floor

Damp Proofing

SIDE (SOUTH)



SEP 2 2 1998

PLAN REVIEW
66398 CR 215
Stermer
Lawrence Township
9/24/98

All references herein are to the State Construction Code:
BOCA/1993 National Building Code, 1993 Mechanical Code, the 1990
Plumbing Code, and the State Electrical Code (1993 NEC), plus
Construction Code Commission Amendments. The plan review that
follows is not intended to identify all construction details that
may have been omitted from the drawings or are inadequately or
improperly shown. It may also identify items shown but to which
the Building Official wants to draw special attention.

**AFTER BUILDING PERMIT IS ISSUED:**

A.  **Provide all engineering** requested by this plan review that
    has not already been provided.
B.  **Stake two adjacent** property lines.
C.  **Post hard card** in visible place before footing inspection.
D.  Apply for Plumbing, Mechanical, and Electrical inspections
    to this office (679-4900)
E.  Contact this office at 679-4900 **one day in advance** of all
    inspections. Include: **Permit Number, Address of Project,
    Phone Number, Requested Inspection and Information on
    accessing the Building.**

    1.  **Footing** inspection shall be conducted after two
        adjacent property lines have been staked and after
        forms have been installed prior to concrete placement.

    2.  **Foundation** shall be inspected prior to placement of
        backfill, and after installation of any subgrade
        insulation.

    3.  **Rough-in Framing** shall be inspected when all
        Electrical, Mechanical and Plumbing rough-ins have been
        completed and approved. No framing shall be concealed
        before this inspection.

    4.  **Final Building/Certificate of Occupancy** inspection
        shall be conducted after all final Electrical,
        Mechanical and Plumbing inspections have been approved.

**BUILDING**

107.7    **TRUSSES and LAM BEAM:** Engineered drawings or specs.
         shall be provided for pre-manufactured structural
         members such as laminated beams and trusses. These must
         be provided to our office at the time of the
         installation of the pre-manufactured members. **Such
         specs shall verify that the minimum live, dead, and
         other loads imposed are adequately supported by these**

SEP 25 1998

1022.2.2   **Handrails** in stairwells shall be mounted **30" to 38"** above and vertical to the nosing of the tread.

1615.8.1 & 1615.8.2   **Handrails and guards** shall be designed to resist a concentrated load of **200 pounds** applied at any point and in any direction.

1014.3   Provide a **minimum stair width of 36-inches** for all stairways serving a single family residential structure.

1014.3.2   A **landing** shall have a minimum width and depth equal to 36" or the width of the stairs whichever is greater.

1014.4   The **head room** in all areas of the stairwell shall not be less 6'-8" measured vertically from the nose of the tread.

1014.6   The maximum **riser height** shall not exceed **8.25 inches** and the minimum **tread depth** shall not be less than **9"** inches.

1014.6.1   Install solid risers or guards so that a sphere of 4" can not pass through the **riser space.**

1014.6.2   **Adjacent risers and treads** shall not vary more than **3/16"**, and the difference between the largest and smallest risers or treads in a run shall not exceed 3/8"

720.6.2   **Firestopping** is required in all horizontal to vertical construction such as bulkheads and soffits.

720.6.4   **Firestopping** shall be provided at openings around vents, pipes, duct, chimneys and fireplaces at ceiling and floor levels.  *Do not use flammable foam.*

919.3.2, 919.4, and 919.5   Wired, battery back-up, **smoke detectors** shall be located at all levels including basements, near all sleeping areas, in all bedrooms, and shall be interconnected.

1806.1   The minimum **depth of footings** measured from finish grade shall be no less than **42"**.

1812.3.2   The maximum unbalanced fill height against a unreinforced 8 inch **poured wall** foundation shall not be more than 7 feet.

1813.3   Where hydrostatic pressure will not occur, foundation walls shall be **damp proofed** from the top of the footing to above grade level as required.

1812.4   Foundation walls subject to hydrostatic pressures shall

SEP 25 1998

*E*

1/6 of the depth of the member; shall not be longer than 1/3 of the depth of the member; and not located in the middle 1/3 of the span.  Notch depth at the ends of the member shall not exceed 1/4 of the member.

2305.3.2   **Holes** bored or cut into **joists,** rafters, or beams shall not exceed 1/3 the depth of the member and shall not be closer than 2" to the top or bottom or to any other hole or notch in the member.

2305.3.4   A **stud shall be notched less than 1/3** of its depth, or the member shall be reinforced.

2305.4   **Interior bearing walls** shall be laterally braced or sheathed to provide stability to transfer all lateral loads to the foundation.

2305.6.2   **Joists hangers** or other approved devices shall be installed where joists do not bear on walls or beams by at least 1 1/2 inches.

2305.6.2   **Joists** framing over beams from opposite sides shall either **lap at least 3"** inches and be securely fastened together, or where framed end to end, the joists shall be secured together with sheathing or equal.

2305.6 & 2305.6.1   **Beams shall bear** on girders, walls, or beams at least **4"** or shall be supported in hangers or other approved devices.

2603.4   All **foam plastic** insulation shall be separated from the interior of a building (including attic cavities) with 1/2" gyp. board, or other approved material.

722.2   Insulating batts including **vapor retarders and breather papers** shall meet the maximum flame spread and smoke developed rating of this section or be protected with gypsum board or other approved material.

P-1206.2.1 A water closet **(toilet),** lav, or bidet shall not be set closer than 15 inches from its center to any side wall, partition, vanity or other obstruction.  There shall be min. 18 inches clearance in front of the water closet, lav, or bidet to any wall, fixture or door.

2114.5   The hearth of **fireplaces** having openings less than 6 square feet shall extend a minimum 16 inches in front of the opening and a minimum of 8 inches on each side of the fireplace opening.  For openings greater than 6 sq.ft. install minimum 20" extension in front of opening and 12" on each side.  **For zero-clearance fireplaces, provide manufacturer's specs on job site at time of rough-in inspection.**

SEP 2 5 1998

# CORRECTION NOTICE

LAWRENCE TOWNSHIP      PERMIT DATE:   9/25/98      OWNER:   STERMER

7   101   98065      FTG      INSPECTION DATE: _____

66398 CR 215      INSPECTOR: _____

NOTES:
**R-3**

NEW RESIDENCE
1800 SQ FT. MN FL,  1476 2ND FL,
1900 SQ FT. UNFIN, 3 1/2 BATHS,
1 CHIMNEY, 1266 SQ FT DECK

TODD STERMER
49849 48TH STREET
LAWRENCE, MI  49064

CONTRACTOR PH#:   874-7011 / 207-4055

CALL FOR RE-INSPECTION (616)679-5396

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ BUILDING | ☐ foundation | ☐ rough in | ☐ final | ☐ other _____ | ☐ APPROVED | ☐ PENDING |
| ☐ ELECTRICAL | ☐ service | ☐ rough in | ☐ final | ☐ other _____ | ☐ APPROVED | ☐ PENDING |
| ☐ MECHANICAL | ☐ underground | ☐ rough in | ☐ final | ☐ other _____ | ☐ APPROVED | ☐ PENDING |
| ☐ PLUMBING | ☐ underground | ☐ rough in | ☐ final | ☐ other _____ | ☐ APPROVED | ☐ PENDING |

Pursuant to Parts 4, 7, 8 & 9 of the Dept. of Labor's General Rules, the attached corrections shall be made (in the case of Plumbing, Electrical, and Mechanical within 7 days of receipt of this notice).  Please notify this office one day before reinspection is to be scheduled.

| | Code Section |
|---|---|
| _Mostly sand, Dug_ | |
| _16" X 8" ftg poured_ | |

PRIOR INSPECTIONS ON THIS PROJECT:

Power company to be contacted: _____

(for office use only) Power company contacted on: _____

# CORRECTION NOTICE

E

LAWRENCE TOWNSHIP          PERMIT DATE   9/25/1998          OWNER:   STERMER

   7   101   98065          STS          INSPECTION DATE:   4-12-02

66398 CR 215          INSPECTOR:   Bob Cegla

NOTES:          INSPECT CONDITION OF FND SYSTEM (LAST INSPECTED 11/1999) REQUESTING EXTENSION OF PMT FOR ABOVE GRADE

R-3

NEW RESIDENCE
1800 SQ FT. MN FL, 1476 2ND FL,
1900 SQ FT. UNFIN, 3 1/2 BATHS,
1 CHIMNEY, 1266 SQ FT DECK

TODD STERMER
49849 48TH STREET
LAWRENCE, MI  49064

CONTRACTOR PH#:   674-7011 / 207-4055

CALL FOR RE-INSPECTION AT (616) 679-5398

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ BUILDING | ☐ foundation | ☐ rough in | ☐ final | ☐ other STS | ☐ APPROVED | ☐ PENDING |
| ☐ ELECTRICAL | ☐ service | ☐ rough in | ☐ final | ☐ other | ☐ APPROVED | ☐ PENDING |
| ☐ MECHANICAL | ☐ underground | ☐ rough in | ☐ final | ☐ other | ☐ APPROVED | ☐ PENDING |
| ☐ PLUMBING | ☐ underground | ☐ rough in | ☐ final | ☐ other | ☐ APPROVED | ☐ PENDING |

Pursuant to Parts 4, 7, 8 & 9 of the Dept. of Labor's General Rules, the attached corrections shall be made (in the case of Plumbing, Electrical and Mechanical within 7 days of receipt of this notice). Please notify this office one day before reinspection is to be scheduled.

| | Code Section |
|---|---|
| ① Need Engineering to determine condition of trusses that have been exposed to the weather for 2 plus years | |
| ② Properly nail anchor straps to treated plates | |

PRIOR INSPECTIONS ON THIS PROJECT:
10/12/99 FTG A          11/2/99 FND A

M
4/15

Power company to be contacted:

(for office use only) Power company contacted on:

# CORRECTION NOTICE

LAWRENCE TOWNSHIP          PERMIT DATE   9/9/2002          OWNER:   STERMER

   7   E.   98065      SVCre     INSPECTION DATE: _10-03-02_

66598 CR 215             INSPECTOR: _Bert Yale_

NOTES:    VERIFY PMT # 7-E-2052 GIVEN ON VM
**R-3**        02136512/CE

NEW RESIDENCE
200 - 600 AMP SVC/ 9 CIRCUITS/ 2 LIGHT
DW RH AND OR GD/FURNACE/
4 POWER OUTLET/ FIRE ALARM

TODD STERMER
49849 48TH STREET
LAWRENCE, MI 49064

CONTRACTOR PH#:  674-7011 / 207-4055

CALL FOR RE-INSPECTION AT (269) 679-5396, extention 201  -  CALL BY 3:30 PM FOR A NEXT-DAY INSPECTION

| | | | | | |
|---|---|---|---|---|---|
| ☐ BUILDING | ☐ inspection | ☐ rough in | ☐ final | ☐ other | ☐ APPROVED | ☐ PENDING |
| ☐ ELECTRICAL | ☐ service | ☐ rough in | ☐ final | ☐ other | ☒ APPROVED | ☐ PENDING |
| ☐ MECHANICAL | ☐ underground | ☐ rough in | ☐ final | ☐ other | ☐ APPROVED | ☐ PENDING |
| ☐ PLUMBING | ☐ underground | ☐ rough in | ☐ final | ☐ other | ☐ APPROVED | ☐ PENDING |

Pursuant to Parts 4, 7, 8 & 9 of the Dept. of Labor's General Rules, the attached corrections shall be made (in the case of Plumbing, Electrical and Mechanical within 7 days of receipt of this notice).  Please notify this office one day before reinspection is to be scheduled.

| | Code Section |
|---|---|
| Perm l overhead res, l new 1-Phase | |

PRIOR INSPECTIONS ON THIS PROJECT:
10/1/02 svc bg

     issued as 66398

Power company to be contacted: _____

(for office use only) Power company contacted on: _____

E

# CORRECTION NOTICE

LAWRENCE TOWNSHIP          PERMIT DATE  12/19/2002          OWNER:   STERMER

    7    M    98065      RI          INSPECTION DATE:  _8/19/03_

66598 CR 215                 INSPECTOR:  _____

NOTES:     269-674-3210 OR 910-1668 TODD

                                     NEW RESIDENCE
                                       1GAS OIL BURNING EQUIP.
          TODD STERMER                 1CHIMNEY/1DUCT/3EXHAUST
          P.O. BOX 673                 2DAMPER/1TANK/1A/C
          LAWRENCE, MI 49064

                                  CONTRACTOR PH#:   674-7011 / 207-4055

CALL FOR RE-INSPECTION AT (269) 679-4900, extention 201  -  CALL BY 3:30 PM FOR A NEXT-DAY INSPECTION

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ BUILDING | ☐ foundation | ☐ rough in | ☐ final | ☐ other _____ | ☐ APPROVED _____ | ☐ PENDING |
| ☐ ELECTRICAL | ☐ service | ☐ rough in | ☐ final | ☐ other _____ | ☐ APPROVED _____ | ☐ PENDING |
| ☑ MECHANICAL | ☐ underground | ☑ rough in | ☐ final | ☐ other _____ | ☑ APPROVED _____ | ☐ PENDING |
| ☐ PLUMBING | ☐ underground | ☐ rough in | ☐ final | ☐ other _____ | ☐ APPROVED _____ | ☐ PENDING |

Pursuant to Parts 4, 7, 8 & 9 of the Dept. of Labor's General Rules, the attached corrections shall be made (in the case of Plumbing, Electrical, and Mechanical within 7 days of receipt of this notice).  Please notify this office one day before reinspection is to be scheduled.

|  | Code Section |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| PRIOR INSPECTIONS ON THIS PROJECT: |  |
|  |  |
|  |  |

Power company to be contacted: _____

(for office use only) Power company contacted on: _____

# CORRECTION NOTICE

E

LAWRENCE TOWNSHIP                    PERMIT DATE   9/9/2002          OWNER:   STERMER

    7   E   98065       RI        INSPECTION DATE: 11/5/03

66598 CR 215                                            INSPECTOR:  T. Smith

NOTES:     MAIN FLOOR & LOFT AREA NOT BSMT   OPEN
R-3                    02136512/CE

                                    NEW RESIDENCE
                                    200 - 600 AMP SVC/ 9 CIRCUITS/ 2 LIGHT
    TODD STERMER                      DW RH AND OR GD/FURNACE/
    PO BOX 673                        4 POWER OUTLET/ FIRE ALARM
    LAWRENCE, MI 49064

                                    CONTRACTOR PH#:   674-7011 / 207-4055

CALL FOR RE-INSPECTION AT (269) 679-4900, extention 201  -  CALL BY 3:30 PM FOR A NEXT-DAY INSPECTION

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ BUILDING | ☐ foundation | ☐ rough in | ☐ final | ☐ other ____ | ☐ APPROVED ____ | ☐ PENDING |
| (☒ ELECTRICAL) | ☐ service | (☒ rough in) | ☐ final | ☐ other ____ | (☒ APPROVED) ____ | ☐ PENDING |
| ☐ MECHANICAL | ☐ underground | ☐ rough in | ☐ final | ☐ other ____ | ☐ APPROVED ____ | ☐ PENDING |
| ☐ PLUMBING | ☐ underground | ☐ rough in | ☐ final | ☐ other ____ | ☐ APPROVED ____ | ☐ PENDING |

Pursuant to Parts 4, 7, 8 & 9 of the Dept. of Labor's General Rules, the attached corrections shall be made (in the case of Plumbing, Electrical, and Mechanical within 7 days of receipt of this notice). Please notify this office one day before reinspection is to be scheduled.

|  | Code Section |
|---|---|
|  |  |

PRIOR INSPECTIONS ON THIS PROJECT:
10/1/02 svc P              10/3/02 svc re A
Input as 66398            see pmt 7-101-02052

Power company to be contacted: _____

(for office use only) Power company contacted on: _____

I am hoping that your company
will be able to give us the
permission and permits we need
for this. We have our finances in
order to complete the project. I am
sorry that I did not apply for
an extension as you mentioned.
We are new at this and through
our own ignorance we were
unaware of that option. Please
advise us of any procedures of
paperwork we need to secure
and we will be happy to comply
with any requirements. Again
thank you for any help your
able to provide us with.

Respectfully

Linda Stermer
P.O. Box 673
Lawrence MI 49064
616-674-3210 eves home
616-655-8365 work M-T-W days

PLAN REVIEW

3.  **Rough-in Framing** shall be inspected when all Electrical, Mechanical and Plumbing rough-ins have been completed and approved. No framing shall be concealed before this inspection.

4.  **Final Building/Certificate of Occupancy** inspection shall be conducted after all final Electrical, Mechanical and Plumbing inspections have been approved.

*NOTE: BEFORE A CERTIFICATE OF OCCUPANCY CAN BE ISSUED ALL ENTRANCE DOORS (INCLUDING SLIDING DOORS AND FRENCH DOORS) MUST HAVE A 36"X36" LANDING AND STAIRS TO GRADE AT EACH DOOR. HANDRAILS SHALL BE PROVIDED WHERE THERE ARE 3 OR MORE RISERS AND RISERS SHALL BE CLOSED OR REDUCED IN SPACE TO 4 INCHES. GUARDS SHALL BE PLACED ALONG OPEN SIDES OF LANDINGS, STAIRS AND WALKING SURFACES OVER 30 INCHES ABOVE FINISH GRADE.*

## BUILDING

Foundations

R403.1.4 The minimum **depth of footings** measured from finish grade shall be no less the 42".

R402.2 **Air-entrained concrete** (between 5% and 7%) shall be used when pouring in water.

R403.1.1 Spread **footing thickness** shall be a minimum 6", shall extend a minimum of 2" beyond the wall being carried, but that projection shall not exceed the thickness of the carried wall.

R404.1.1 The **maximum unbalanced fill** height against an 8-foot high, unreinforced 8" **poured wall** foundation shall not be more than 7 feet for GW and Gp (Sand Gravel) soil types. Other variations are possible with reinforcement bar, different wall thickness, different wall height, or where soil characteristics are different, but all must comply with this section.

A **drain** shall be placed around the perimeter of a foundation that consists of drainage tiles, gravel or crushed stone, or perforated pipe. Gravel or crushed

*E*

## PLAN REVIEW

**R303**    **Stair Illumination:**  All interior and exterior stairways shall be provided with a means to illuminate the stairs, including the landings and treads. Interior stairways shall be provided with an artificial light source located in the immediate vicinity of each landing of the stairway.  Exterior stairways shall be provided with artificial light source located in the immediate vicinity of the top landing of the stairway. Exterior stairways provide access to a basement for the outside grade level shall be provided with an artificial light source located in the immediate vicinity of the bottom landing of the stairway.

**R304**    **Minimum area:**  Every dwelling unit shall have at least one habitable room that shall have not less than 120 square feet of gross floor area, other rooms shall have a floor area of not less than 70 square feet.  The minimum horizontal shall be no less than 7 feet with exception to kitchen.

**R305.1**   **Minimum height:**  Habitable rooms, hallways, corridors, bathrooms, toilet rooms, laundry rooms and basements shall have a ceiling height of not less than 7 feet. The requirement height shall be measured from the finish floor to the lowest projection from the ceiling.

## WINDOWS/GLAZING:

**R308.4**   Safety glass shall be installed within the window units installed to enclose hot tubs, whirlpools, saunas, steam rooms, bathtubs and showers.  Glazing in any part of a building wall enclosing these compartments where the bottom exposed edge of the glazing is less than 60 inches measured vertically above any standing or walking surface.

**R308.4**   Safety glass shall be installed within an individual fixed or operable panel adjacent to a door where the nearest exposed glazing is within a 24-inch arc of either vertical edge of the door in a closed position and where the bottom exposed edge of the glazing is less than 60 inches above the walking surface. Demonstrate compliance at the windows located in the great room.

**R308.4**   Safety glass in walls and fences enclosing indoor and outdoor swimming pools, hot tubs, and spas where the bottom edge of the pool or spa side is less than 60

PLAN REVIEW

or exterior door opening for emergency escape and
rescue. Where openings are provided as a means of
escape and rescue they shall have a sill height of not
more than 44 inches above the floor. Where a door
opening having a threshold below the adjacent ground
elevation serves as an emergency escape and opening and
is provided with a bulkhead enclosure, the bulkhead
enclosure shall comply with section R310.3. The net
clear opening dimensions required by this section shall
be obtained by the normal operation of the window or
door opening from the inside. Escape and rescue window
openings with a finished sill height below the adjacent
ground elevation shall be provided with a window well
in accordance with Section R310.2.

R310.1.1 **Minimum opening area:** All emergency escaped and rescue
openings shall have minimum net clear openings of 5.7
square feet with exception to grade floor openings
which may be reduced to 5.0 square feet.

R310.2 **Window Wells:** Window wells requirements for emergency
escape and rescue shall have horizontal dimensions that
also the door or window of the emergency escape and
rescue opening to be fully opened. The horizontal
dimensions of the window well shall provide a minimum
net clear area of 9 square feet with a minimum
horizontal projection and width of 6 inches.

R310.2.1 **Ladder and steps:** Window wells with a vertical depth
greater than 44 inches below the adjacent ground level
shall be equipped with a permanently affixed ladder or
steps usable with the window in the fully open
position. Ladder to be a minimum of 12 inches in width
and project from the wall 3 inches.

R310.3 **Bulkhead enclosures:** Bulkhead enclosures shall provide
direct access to the basement. The bulkhead enclosure
with the door panels in the fully open position shall
provide the minimum net clear opening required by the
Section R310.1.1 (5.7 square feet). Bulkhead enclosure
shall also comply with section R314.9. Stairways
serving bulkhead enclosures not part of the required
building egress and providing access from the outside
grade level to the basement shall be exempt from the
requirements of section R312, R314 and R315 when the
maximum height from the basement finished floor level
to grade adjacent to the stairways is covered by a
bulkhead enclosure with hinged doors or other approved

## PLAN REVIEW

R314        **Treads and Risers:**  The maximum riser height shall be 8 1/4" inches and the minimum tread depth shall be 9 inches.  The riser height shall be measured vertically between leading edges of the adjacent treads.  The tread depth shall be measured horizontally between the vertical planes of the foremost projection of adjacent treads, and at a right angle to the tread's leading edge.  The walking surface of treads and landings of a stairway shall be sloped no steeper than one unit vertical in 48 units horizontal.  The greatest riser height within any flight of stairs shall no exceed the smallest by more than 3/8".  The greatest tread depth within any flight of stairs shall not exceed the smallest by more than 3/8".

R314.2.1  **Profile:**  Nosing shall be provided no less than 3/4" to 1.25" for stairways having enclosed risers.

R314.3    **Head room:**  The minimum headroom in all parts of the stairway shall not be less than 6 feet 8 inches measured vertically from the sloped plane adjoining the tread nosing or from the floor surface of the landing or platform.

R314.8    **Under Stair Protection:**  Enclosed accessible space under stairs shall have walls, under stair surface and any soffits protected on the enclosed side with 1/2" gypsum board.

R315.1    **Handrails:**  Handrails having minimum and maximum heights of 34 inches and 38 inches respectively, measured vertically from the nosing of the treads shall be provided on at least one side of stairways.  All required handrails shall be continuous the full length of the stairs with 3 or more risers from a point directly above the top riser of flight to a point directly above the lowest riser of the flight.  Ends shall be returned or shall terminate in newel posts or safety terminals.  Handrails adjacent to a wall shall have a space of not less than 1.5 inches between the wall and the handrail.

R315.2    **Handrail Grip Size:**  The handgrip portion of handrails shall have a circular cross section of 1 1/4" minimum to 2 5/8" maximum.  Other handrail shall that provide an equivalent grasping surface are permissible.  Edges shall have minimum radius of 1/8" inch.

PLAN REVIEW

R803.2.2   The maximum allowable spans for wood structural panel roof sheathing shall not exceed the values set forth in Table R503.2.1.1(1).

R806.1   Attic ventilation shall be provided at a rate of 1 square foot of ventilation for every 150 square feet of attic area.   The ventilation may be reduced when both sofits and ridge vents are installed at a ration of no less than 1:300. (1 square foot of ventilation for every 300 square feet of attic area)

806.1   Access shall be provided to all roof areas having a minimum net clear height of 30 inches.   The opening shall have a minimum dimension of 22 inches by 30 inches and have a minimum clear height in that area of 30 inches.

R808.1   Combustible insulation shall be separated a minimum of 3 inches for recessed lighting fixtures, fan motors and other heat-producing devices with exceptions to units that are listed for a lesser clearance.

R905.2.7   1507.4.3A double layer of underlayment shall be installed under asphalt shingles where applied to roofs having slopes under 4:12.

R905.2.7.1An ice shield shall be installed which consists of 2 layers of underlayment cemented together or an approved waterproofing membrane that extends from the eaves edge to a point at least 24 inches inside the exterior wall line of the building.

R905.2.8   Flashing shall be installed against a vertical front wall as well as soil stacks, vent pipe and chimney flashings in accordance with the manufactures specifications.   Flashing against a vertical sidewall shall be by the step-flashing method.

G2406.2   _Prohibited locations._ Fuel fired appliances shall not be located in or obtain combustion air from, any of the following rooms or spaces:
   1. Sleeping rooms
   2. Bathrooms
   3. Toilet rooms
   4. Storage closets
   Exception: This section shall not apply to the

# BUILDING PERMIT

**BUILDING DEPARTMENT**
240 North Grand • Suite #1
Schoolcraft, MI 49087-0662
(616) 679-4900
1 (800) 627-2801

Date: _8.15.02_

Jurisdiction of _Lawrence_     Permit # _7-101-52559_

New residential construction, addition, and alteration

Job Address: _16398  CR 215_                Property Tax I.D.: _80-13-029-032-90_

Zoning district: _A-G_                        Permit Determinant: _____

Use Group: _MRC-D3_                     Owner: _Todd Stermer_ (616) 674-3__

Type Const.: _Stick_       _TB_       Address: _P.O. Box 173_ (616) 674-9011

Basic Dimensions: ~~38~~ 36 ft. x 50 ft.     Contractor: (Same) _Lawrence, MI 4806_

No. Floors: _____                        Address: _Same_

| | |
|---|---|
| 1800 | Sq. ft. main floor |
| 292 | Sq. ft. second floor |
| | Sq. ft. fin. basement |
| ~~Crawl space~~ | Sq. ft. unfin. bsmt. 1800 |
| | No. rooms 1st floor |
| | Sq. ft. garage (attached garage requires fire separation) |

| | |
|---|---|
| | No. rooms 2nd floor |
| | No. full baths |
| | No. half baths |
| | No. fireplaces |
| | No. chimneys |

| | |
|---|---|
| | No. wood burners |
| | Sq. ft. porches/breezeways |
| | Sq. ft. wood deck |
| | (ft.) ceiling height |
| | (ft.) building height |

## PLEASE FILL IN OR CHECK THE APPROPRIATE SPACES BELOW:

**FOUNDATIONS (11)**
_____ ftgs _____ x _____
_____ below fin. grade
_____ No. post footings _____ x _____
✓ Poured walls
_____ H.C. block
_____ Wood foundation (provide diagram)
9 Ft. Foundation wall height
_____ crawl space wall height
_____ egress sill height
_____ No. bsmt. windows
_____ Crawl space vent openings

_Egress Permit 07-101-98005_

**ROUGH-IN FRAMING (10)**
✓ Sill plate (treat)
✓ Wall plates
✓ headers
✓ wood girder
_____ steel girder
_____ post _____ ft. O.C.
✓ stud wall
✓ masonry
✓ fl. joists _24_ O.C.
✓ Ceil. jsts _18_ O.C.
✓ Rafters _18_ O.C.
✓ Truss (diagram required)
3/4" floor sheathing
7/16" wall sheathing
7/16" roof sheathing
_____ corner brace sheath

_All also Permit # 02-101-98005 7-101-98005_

**EXTERIOR (3)**
_____ Wood
_____ Aluminum/Vinyl
_____ Brick
_____ Block

**ROOFS (4)**
✓ Hip
✓ Gable
✓ Front overhang
✓ Other overhang
✓ Eavestrough

**CHIMNEY TYPE**
_____ Brick
_____ Block
✓ Stone
_____ Metal

_____ Asphalt Shingles
_____ Underlayment
_____ Vents
_____ Other Coverings

**WINDOWS (5)**
_23_ No. of windows
✓ Wood sash
_____ Metal sash
_____ Type
_____ egress/bedrms
✓ attic access 22" x 30"

_Party wall less using new floor trusses & load bearing wall per plans_

**INSULATION (9)**
✓ " Fiberglass
_____ " Cellulose
_____ " Blown in fb. glass
_____ " Foam
_____ other
_____ " rigid poly-ure.
_____ " rigid styro
_____ " insul sheath
_____ wind barrier
_____ (mil) moisture barr.

**INTERIOR (13)**
✓ Foyer
✓ Kit fl.
✓ Other fl.
✓ drywall
_____ plaster
_____ covered ceiling
✓ pnl. wainscot
_____ 5/8" garage fire code

**BUILT-IN ITEMS (15)**
_____ oven _____ range
✓ disposal
✓ hood/fan
✓ dishwasher
_____ refrigerator
_____ incinerator
_____ vanities
_____ ' cupboard length

> Contractor Will Stake 2 Adjacent Lot Lines for First Inspection. Sketch Lot Diagram On Back.

COST OF PERMIT  $ _____

Building Dept.

By: _____

Make checks payable to:

## Permits eventually required for this project:

| Electrical Permit | Plumbing Permit | Mechanical Permit |
|---|---|---|
| ☑ yes ☐ no | ☑ yes ☐ no | ☑ yes ☐ no |

# BUILDING PERMIT

This Permit Must Be Displayed on
the Premises When Work Starts

Any person wilfully destroying this permit before the completion of this building will be punished the full extent of the law.

Date 8-5-02     Permit No. 7-101-02052

This permit is issued for the ( Erection ) of a New house

Location: 66 398  CR 215

Lawrence _____
NAME OF CITY, TOWNSHIP OR VILLAGE

_____
Building Inspector



SCALE - ONE SQUARE = ONE FOOT

EXTERIOR
FRONT VIEW (EAST)



SCALE – ONE SQUARE = ONE FOOT

EXTERIOR
REAR VIEW (WEST)

SCALE — ONE SQUARE = ONE FOOT

INTERIOR MAIN FLOOR

DINNING ROOM

KITCHEN

LAUNDRY ROOM

LIVING ROOM

FOYER

MASTER BEDROOM

WALK-IN CLOSET

OFFICE / BEDROOM

E

# PLAN REVIEW

August 06, 2002
Stermer
66398 CR 215
Lawerence Township

This document is intended to be used as part of the plan review along with the drawings submitted and reviewed for the identified project. All references herein are to the State Construction Code: Michigan Residential Code 2000 and the State Electrical Code (1999 NEC) plus State Amendments. The plan review that follows is not intended to identify all construction details that may have been omitted from the drawings or are inadequately or improperly shown. It may also identify items shown but to which the Building Official wants to draw special attention. Some elements of construction and installation procedures not identified in this report will have to be reviewed by inspection.

Once approved the construction documents shall not be altered unless the modification is submitted and approved by the Building Official (Section 106.4). Where special conditions exist, the Building Official is authorized to require additional construction documents to be prepared by a registered designed professional (section 106.1), and a permit shall expire after six (6) months if the work is not commenced; is abandon; or is suspended (Section 105.5).

**AFTER BUILDING PERMIT IS ISSUED:**

A.  **Stake two adjacent** property lines.
B.  **Post hard card** in visible place before footing inspection.
C.  Your approved set of plans shall be kept on site for rough-in and final inspections.
D.  Apply for Plumbing, Mechanical, and Electrical inspections to this office (679-4900)
E.  Contact this office at 679-5396 **one day in advance** of all inspections. Include: **Permit Number, Address of Project, Phone Number, Requested Inspection and Information on accessing the Building.**

1.  **Rough-in Framing** shall be inspected when all Electrical, Mechanical and Plumbing rough-ins have been completed and approved. No framing shall be concealed before this inspection.

2.  **Final Building/Certificate of Occupancy** inspection shall be conducted after all final Electrical, Mechanical and Plumbing inspections have been approved.

PLAN REVIEW

R303       **Stair Illumination:**  All interior and exterior stairways shall be provided with a means to illuminate the stairs, including the landings and treads. Interior stairways shall be provided with an artificial light source located in the immediate vicinity of each landing of the stairway.  Exterior stairways shall be provided with artificial light source located in the immediate vicinity of the top landing of the stairway. Exterior stairways provide access to a basement for the outside grade level shall be provided with an artificial light source located in the immediate vicinity of the bottom landing of the stairway.

R304 **Minimum area:**  Every dwelling unit shall have at least one habitable room that shall have not less than 120 square feet of gross floor area, other rooms shall have a floor area of not less than 70 square feet.  The minimum horizontal shall be no less than 7 feet with exception to kitchen.

R305.1      **Minimum height:**  Habitable rooms, hallways, corridors, bathrooms, toilet rooms, laundry rooms and basements shall have a ceiling height of not less than 7 feet. The requirement height shall be measured from the finish floor to the lowest projection from the ceiling.

**WINDOWS/GLAZING:**

R308.4    Safety glass shall be installed within the window units installed to enclose hot tubs, whirlpools, saunas, steam rooms, bathtubs and showers.  Glazing in any part of a building wall enclosing these compartments where the bottom exposed edge of the glazing is less than 60 inches measured vertically above any standing or walking surface.

R308.4    Safety glass shall be installed within an individual fixed or operable panel adjacent to a door where the nearest exposed glazing is within a 24-inch arc of either vertical edge of the door in a closed position and where the bottom exposed edge of the glazing is less than 60 inches above the walking surface. <u>Demonstrate compliance at the windows located in the great room.</u>

R308.4    Safety glass in walls and fences enclosing indoor and

PLAN REVIEW

R310.1    **Emergency Escape and Rescue Required:** Basements with habitable space and every sleeping room shall have at least one openable emergency escape and rescue window or exterior door opening for emergency escape and rescue. Where openings are provided as a means of escape and rescue they shall have a sill height of not more than 44 inches above the floor. Where a door opening having a threshold below the adjacent ground elevation serves as an emergency escape and opening and is provided with a bulkhead enclosure, the bulkhead enclosure shall comply with section R310.3. The net clear opening dimensions required by this section shall be obtained by the normal operation of the window or door opening from the inside. Escape and rescue window openings with a finished sill height below the adjacent ground elevation shall be provided with a window well in accordance with Section R310.2.

R310.1.1   **Minimum opening area:** All emergency escaped and rescue openings shall have minimum net clear openings of 5.7 square feet with exception to grade floor openings which may be reduced to 5.0 square feet.

R310.2    **Window Wells:** Window wells requirements for emergency escape and rescue shall have horizontal dimensions that also the door or window of the emergency escape and rescue opening to be fully opened. The horizontal dimensions of the window well shall provide a minimum net clear area of 9 square feet with a minimum horizontal projection and width of 6 inches.

R310.2.1  **Ladder and steps:** Window wells with a vertical depth greater than 44 inches below the adjacent ground level shall be equipped with a permanently affixed ladder or steps usable with the window in the fully open position. Ladder to be a minimum of 12 inches in width and project from the wall 3 inches.

R310.3    **Bulkhead enclosures:** Bulkhead enclosures shall provide direct access to the basement. The bulkhead enclosure with the door panels in the fully open position shall provide the minimum net clear opening required by the Section R310.1.1 (5.7 square feet). Bulkhead enclosure shall also comply with section R314.9. Stairways serving bulkhead enclosures not part of the required building egress and providing access from the outside grade level to the basement shall be exempt from the

PLAN REVIEW

31.5 inches where a handrail is installed on one side and 27 inches where handrails are provided on both sides.

R314        **Treads and Risers:**  The maximum riser height shall be 8 1/4" inches and the minimum tread depth shall be 9 inches.  The riser height shall be measured vertically between leading edges of the adjacent treads.  The tread depth shall be measured horizontally between the vertical planes of the foremost projection of adjacent treads, and at a right angle to the tread's leading edge.  The walking surface of treads and landings of a stairway shall be sloped no steeper than one unit vertical in 48 units horizontal.  The greatest riser height within any flight of stairs shall no exceed the smallest by more than 3/8".  The greatest tread depth within any flight of stairs shall not exceed the smallest by more than 3/8".

R314.2.1  **Profile:**  Nosing shall be provided no less than 3/4" to 1.25" for stairways having enclosed risers.

R314.3    **Head room:**  The minimum headroom in all parts of the stairway shall not be less than 6 feet 8 inches measured vertically from the sloped plane adjoining the tread nosing or from the floor surface of the landing or platform.

R314.8    **Under Stair Protection:**  Enclosed accessible space under stairs shall have walls, under stair surface and any soffits protected on the enclosed side with 1/2" gypsum board.

R315.1    **Handrails:**  Handrails having minimum and maximum heights of 34 inches and 38 inches respectively, measured vertically from the nosing of the treads shall be provided on at least one side of stairways.  All required handrails shall be continuous the full length of the stairs with 3 or more risers from a point directly above the top riser of flight to a point directly above the lowest riser of the flight.  Ends shall be returned or shall terminate in newel posts or safety terminals.  Handrails adjacent to a wall shall have a space of not less than 1.5 inches between the wall and the handrail.

R315.2    **Handrail Grip Size:**  The handgrip portion of handrails

PLAN REVIEW

R802.10.2 Wood trusses shall be designed in accordance with accepted engineering practice. The design and manufacture of metal plate connected wood trusses shall comply with ANSI/TPI 1. The truss design drawings shall be prepared by a registered professional. *These spaces shall be on site at the time of the building rough in inspection.*

R803.2.2 The maximum allowable spans for wood structural panel roof sheathing shall not exceed the values set forth in Table R503.2.1.1(1).

R806.1 Attic ventilation shall be provided at a rate of 1 square foot of ventilation for every 150 square feet of attic area. The ventilation may be reduced when both sofits and ridge vents are installed at a ration of no less than 1:300. (1 square foot of ventilation for every 300 square feet of attic area)

806.1 Access shall be provided to all roof areas having a minimum net clear height of 30 inches. The opening shall have a minimum dimension of 22 inches by 30 inches and have a minimum clear height in that area of 30 inches.

R808.1 Combustible insulation shall be separated a minimum of 3 inches for recessed lighting fixtures, fan motors and other heat-producing devices with exceptions to units that are listed for a lesser clearance.

R905.2.7 1507.4.3A double layer of underlayment shall be installed under asphalt shingles where applied to roofs having slopes under 4:12.

R905.2.7.1An ice shield shall be installed which consists of 2 layers of underlayment cemented together or an approved waterproofing membrane that extends from the eaves edge to a point at least 24 inches inside the exterior wall line of the building.

R905.2.8 Flashing shall be installed against a vertical front wall as well as soil stacks, vent pipe and chimney flashings in accordance with the manufactures specifications. Flashing against a vertical sidewall shall be by the step-flashing method.

G2406.2 *Prohibited locations.* Fuel fired appliances shall

FROM : M-51 OUTLET1          PHONE NO. : 1616 655 8396          Sep. 13 2002 02:40PM P01

7-101-98065

attn Paut Gale

Re: Building permit address change

Mr. Gale

Thank you so much for your
helpful and informative call.
Please change permit # 7-101-98065
the address should be 66598 CR 215
and not 66398 CR 215 Lawrence.
You had given me permit # 7-101-98065
but the card has the new # on it.
I am including copies of documents
you requested:
    Proof of Ownership — Deed
    Legal Description — Deed
    Diagram          — hand written
    Tax ID #          — Deed
Please mail spring ap. for shed.
We are not in any way associated
with Mr. Dion Anté other than
neighbors.

Please be advised we sincerely
submitted our applications as address
# 66398. The correct address is
66598 CR 215.

Thank you
Linda Sternes

TERESA
*

Mead

# CORRECTION NOTICE

LAWRENCE TOWNSHIP                    PERMIT DATE   8/5/2002           OWNER:   STERMER

   7   101    02052              RI-re            INSPECTION DATE: _12/8/63_

   66598 CR 215                                   INSPECTOR: _D. Hess_

NOTES:       HOUSE OPEN
MRC R3

                                                 NEW RESIDENCE/unfin existing bsmt/2 fl
                                                 36 X 50 FT/ 1800 SF MF/ 292 SF 2ND FL
                                                 1800 SF BSMT/ END OF ITEMIZATION

          TODD STERMER
          P.O. BOX 673
          LAWRENCE, MI 49064
                                        CONTRACTOR PH#:   269-674-7011

   CALL FOR RE-INSPECTION AT (269) 679-4900, extention 201 - CALL BY 3:30 PM FOR A NEXT-DAY INSPECTION

| | | | | | | |
|---|---|---|---|---|---|---|
| ☑ BUILDING | ☐ foundation | ☑ rough in | ☐ final | ☐ other _____ | ☑ APPROVED _12/8/03_ | ☐ PENDING |
| ☐ ELECTRICAL | ☐ service | ☐ rough in | ☐ final | ☐ other _____ | ☐ APPROVED _____ | ☐ PENDING |
| ☐ MECHANICAL | ☐ underground | ☐ rough in | ☐ final | ☐ other _____ | ☐ APPROVED _____ | ☐ PENDING |
| ☐ PLUMBING | ☐ underground | ☐ rough in | ☐ final | ☐ other _____ | ☐ APPROVED _____ | ☐ PENDING |

   Pursuant to Parts 4, 7, 8 & 9 of the Dept. of Labor's General Rules, the attached corrections shall be made (in the case of Plumbing,
Electrical, and Mechanical within 7 days of receipt of this notice). Please notify this office one day before reinspection is to be scheduled.

Code Section

_R.I. approved_

PRIOR INSPECTIONS ON THIS PROJECT:
3/2/03 VERIFY POSTING OF 1/8/2003 RI P

see permit 7 101 99085 under 66598

Power company to be contacted: _____

(for office use only) Power company contacted on: _____

# GENERAL AFFIDAVIT

**State of Texas**
**County of** __Bexar__

**BEFORE ME**, the undersigned Notary, _Yvonne De la Torre_ on this _7th_
day of _June_, 20_13_, personally appeared <u>Shirlene Kay Wollam</u>, known to me to be a
credible person and of lawful age, which being by me first duly sworn, on his oath, deposes and says:

In doing my own research into house fire investigations, I found numerous websites that gave information in regard to the training
required to be a fire investigator, information on how to defend an arson charge, and articles written about convictions overturned
because of faulty investigations and bad science.

These are only a few:

| | |
|---|---|
| NAFI.org | National Association of Fire Investigators<br>A website dedicated to the discussion & understanding of NFPA 921<br>Text book: 921/1033 Fire Investigation Principles & Practices |
| Interfire.org | How to conduct fire scene examination, witness interviews, & trial preparation |
| NCJRS.gov | US Department of Justice<br>Fire & Arson Scene Evidence: A Guide for Public Safety Personnel |
| NIJ.gov | National Institute of Justice<br>A Guide for Investigating Fire & Arson |
| USFA.FEMA.gov | Federal Emergency Management Agency<br>Guide to: Rural Arson Control |
| Thearsonresearchproject.org | the Arson Research Project<br>Case Studies of arson convictions based on unreliable evidence (7 listed) |
| Truthinjustice.org | Truth in Justice<br>Chicago Tribune 10/18/04 Article 'Arson Myths Fuel Errors' |

_(signature)_
Signature of Affiant

Affiant's Full Name: __Shirlene Kay Wollam__

Affiant's Address: __9626 Annandale__

__San Antonio, TX  78239__

**State of Texas**
**County of** __Bexar__

Sworn to and subscribed before me on the _7th_ day of _June_, 20 _13_, by
_Shirlene Kay Wollam_



YVONNE DE LA TORRE
MY COMMISSION EXPIRES
September 8, 2014

_(signature)_
Notary Public's Signature