# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION


LINDA STERMER,

                Petitioner,             Case Number: 2:12-CV-14013
                                          HON. ARTHUR J. TARNOW

v.

MILLICENT WARREN,

                Respondent.

_____/

## OPINION AND ORDER
## GRANTING A CONDITIONAL WRIT OF HABEAS CORPUS
## AND ORDERING PETITIONER'S RELEASE ON BOND

Linda Stermer has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging her first-degree felony murder conviction for which she is serving a life sentence. The predicate felony for the first-degree murder conviction is arson. The prosecutor committed misconduct in his closing argument by commenting on the credibility of witnesses, repeatedly labeling Petitioner, who did not testify, a liar, and misrepresenting the facts of the case. Trial counsel's failure to object to the misconduct was constitutionally ineffective as was counsel's failure to consult a fire investigation expert. To the extent that the state court denied these claims on the merits, the state court's determination to the contrary was an unreasonable application of clearly established Supreme Court precedent.

The Court grants a conditional writ of habeas corpus.

# I.    Background

## A.    Summary of Case

Petitioner's convictions arise from the death of her husband Todd Stermer.  He died from injuries suffered in a fire on January 7, 2007, at the rural home he and Petitioner shared in Lawrence Township.  Petitioner and her husband were both home when the fire started.  Petitioner was in the basement laundry room and managed to escape with no injuries.  Her husband escaped from the home's first floor, but was badly burned and died at the scene.  He also suffered blunt force injuries which were consistent with having been struck or run over by a vehicle.  Petitioner was arrested and charged on June 5, 2009 – over two years after the fire occurred.  The prosecution's theory of the case was that Petitioner intentionally set the fire, and that, when her husband escaped from the fire, Petitioner intentionally ran him over.  The defense contended that the fire was either accidentally set or intentionally set by Mr. Stermer.  The defense also argued that Petitioner accidentally struck her husband with a vehicle when she was attempting to drive to a neighbor's house for help.

No accelerants were detected inside the home.  Mr. Stermer's clothing tested positive for an accelerant (gasoline), but Petitioner's did not.  The prosecution's expert concluded that the fire was intentionally set and that Mr. Stermer had been at the center of the fire.  Petitioner argued that this evidence, when considered alongside the fact that two of Mr. Stermer's previous homes were destroyed by suspected arson fires, supported her defense.  She also argued that an oil lamp and burning candles

present in the family room might have accidentally started the fire.

**B.     Relevant Trial Testimony**

Dr. Michael Markey performed an autopsy of Todd Stermer and testified as an expert in forensic pathology.  He identified the cause of Mr. Stermer's death as burns and smoke inhalation.  He found the injuries consistent with Mr. Stermer being on fire rather than simply being present in the burning house.  Dr. Markey also found lacerations and blunt force injuries to the head which were consistent with being run over by a vehicle.  No prescription drugs or controlled substances were found in his blood, but Vicodin was found in his urine.  Vicodin remains detectable in urine longer than in blood, so it was possible that he took Vicodin several hours or days before his death, such that it was no longer detectable in his blood.

Sandra Stermer, the deceased's mother, testified that two of her son's previous homes had been destroyed by fire.  He owned the first, located in Portage, Michigan.  The second, located in Three Rivers, was destroyed by fire when he was in the process of buying the home from his grandmother.  Her son suffered significant financial problems over the years and she had loaned him tens of thousands of dollars.  Other family members had also loaned him money.

Steven Leach, who, in 2007, was the Fire Chief for Lawrence Township, lived on the same street as the Stermers and was the first emergency responder at the scene.  He testified that the amount of smoke and fire he saw were indicative of a fast-moving fire or one that had been burning for a long time.  Leach drove to the Stermers' home

and parked his vehicle on the grass in front of the home. He noted that the ground was "sloppy." Leach rendered first-aid to Todd Stermer and noted that Linda Stermer was crying and hysterical.

Van Buren Deputy Sheriff Tony Evans arrived at the Stermer house at approximately 3:30 p.m, roughly seven minutes after dispatch received the call. When he arrived, the home appeared fully engulfed in flames. He observed Linda Stermer, Steven Leach, and several neighbors on the north side of the residence. Deputy Evans also observed Mr. Stermer lying on the ground. He appeared to be badly burned and wore only a pair of grey sweatpants which were pulled down around his ankles. A number of clothing items were draped over him. In addition to burns, Deputy Evans noted that Mr. Stermer was bleeding from his head and had a laceration to the back of his head. Linda Stermer was lying over him and yelling his name repeatedly. Deputy Evans assisted others in moving Mr. Stermer to a location farther from the home and adjacent oil tank in case the oil tank became engulfed.

Deputy Evans noticed a Ford van parked behind the home. The van appeared to be running. As he approached, he saw what he thought was blood on the front driver's side.

The Stermers' neighbor Mike Matheny testified that, as he and his girlfriend Connie Calhoun were leaving their home on January 7, 2007. They noticed smoke and flames coming from the direction of the Stermers' home. Matheny drove his vehicle up the Stermers' long driveway and saw the Stermer family van backing away

from the house and then moving forward again. Petitioner stepped out of the van. She was hysterical, but managed to tell Matheny that her children were not in the home. Matheny advised Calhoun to call 911. Petitioner then pointed out her husband lying on the ground. Matheny had walked past Mr. Stermer two or three times without seeing him. He appeared to be unclothed except for boots and to be severely burned. Matheny grabbed clothing from his own vehicle and placed the clothing on top of him.

Detective Gabrielle Rought interviewed Petitioner on the day of the fire and two days later. Petitioner told Detective Rought that, on the day of the fire, her husband awoke at 10:00 a.m. feeling ill. They briefly argued. Petitioner did not want their three sons to hear the argument, so she sent them to the mall. Mr. Stermer was watching television in the living room when she went to do laundry in the basement. She heard her husband scream. She ran up the stairs and saw smoke and fire. Petitioner ran outside and got in the family van to go for help. She saw her husband on fire in the side yard. She attempted to turn the van around, then, when she did not see him anymore she exited the van and found him lying on the ground.

James Shinsky was employed as a private fire investigator in January 2007. His employer was contacted by State Farm Insurance Company to conduct a cause and origin investigation of the fire. As part of his investigation, he interviewed Petitioner on January 9 and 10, 2007. Both interviews took place in vehicles parked in the driveway of the Stermer home. The interviews were transcribed and the entire

transcript was admitted as a trial exhibit. Shinsky read from substantial portions of the transcript.

Petitioner's narrative of what occurred on the day of the fire was told to the jury during Shinsky's reading of the transcript. Petitioner told Shinsky that, on the morning of the fire, her husband was angry because she failed to record purchases in the checkbook. At some point in the morning, Petitioner went to a nearby Marathon gas station, purchased breakfast, and filled her Chevy Blazer with gasoline. She told their three sons that she would give them money so they could go to the mall because she and Mr. Stermer needed to discuss some things. After doing some chores and taking a short nap, Petitioner gave her husband medication for an ear infection and then she went to the basement to do laundry. There was a towel in the laundry that smelled like fuel or gas, which her husband had placed there. Petitioner heard her husband yelling at her and then heard him scream. She ran up the stairs and saw fire spanning from their bedroom to the living room. She could not see very well because of the smoke and flames, but saw that her husband's entire upper body was on fire. She ran out the door and jumped in the van to get help. Petitioner then saw her husband in the yard. He was completely covered in flames. Petitioner jumped out of the van and tried to get him to lie down, but he would not do so. Instead, he was trying to pull off his pants and socks. Petitioner realized that she needed help, so she jumped back in the van. The van was stuck in the mud, so Petitioner drove forward in an attempt to get a running start but was unsuccessful. Petitioner reported she jumped

out of the van again.  She found her husband lying on the ground.  Her neighbors then arrived at the home.

In addition to reading from a substantial portion of Petitioner's interview, Shinsky testified that, as part of his investigation, he took two red towels that had been in the home's washing machine.  Both towels tested positive for gasoline.

On the morning of January 7, 2007, Cindy DeLoach was working as a cashier at the Marathon gas station near the Stermer home.  She recalled Petitioner purchasing some items from the store and gasoline.  DeLoach saw Petitioner standing near the rear of her vehicle with the gas hose.  It appeared to DeLoach that Petitioner was pumping gas through the rear of the vehicle, not where the gas tank would be located.  But DeLoach could not see whether the gas was pumped into a container.

The prosecution presented two jailhouse informants: Veronica Navarro Tracy and Dardeda Gordon.  Tracy testified that in July 2009 she overheard a conversation between a woman she later said was Linda Stermer and another woman.  According to Tracy, Petitioner mumbled something about hitting her husband in the head with a frying pan and being very sorry.  On cross-examination, however, Tracy testified that she was uncertain whether the person she overheard was Petitioner and whether she had heard anything other than Petitioner repeating how sorry she was.  Tracy admitted to suffering from mental illness and being off her medication while incarcerated.

Dardeda Gordon testified that she was incarcerated with Petitioner in the Van Buren County Jail.  She heard several conflicting stories from Petitioner about Mr.

Stermer's death and the fire. Eventually, Petitioner told Gordon that she and her husband argued on the day of the fire. According to Gordon, Petitioner said she struck him in the head with something, and that she intentionally started the fire with gasoline while her husband was sleeping. On cross-examination, Gordon testified that she has been diagnosed with bipolar disorder, posttraumatic stress disorder, and panic disorder. She admitted that she had suffered and continued to suffer from memory problems because of her psychiatric disorders.

Gordon also testified that when police first contacted her in October 2009, the only thing she could remember was that Petitioner asked for forgiveness. It was only after Detective Macyauski suggested to Gordon that Petitioner may have struck her husband, perhaps with a frying pan, that Gordon remembered Petitioner saying she hit her husband with an object.

Kate Fox testified that she and Petitioner became friends in 2006 and car pooled to work together nearly every day. Petitioner confided to Fox that she was unhappy in her marriage, that her husband was physically and emotionally abusive, and that she had contacted a divorce attorney. Fox testified that Petitioner said she had spent years thinking about how to get rid of him and had considered running him over with a car. Fox also said Petitioner called Fox one night after the fire and asked if Fox had a flashlight because she needed to get into the house to remove a coffee cup with sedative before the police came to the house looking for evidence.

On cross-examination, Fox admitted that her friendship with Petitioner dissolved in February 2007 when Petitioner transferred to first shift and the two could no longer car pool. Fox was angry because the plan had been for the two of them to move to first shift together. She also admitted that, on July 31, 2007, the two argued about $5,000 Fox claimed Petitioner owed her; Fox was ultimately charged with assaulting Petitioner. Fox testified that she had mental health problems and that she was admitted to psychiatric institutions twice, including in January 2007.

Detective Sergeant Scott Leroy, who was employed by the Michigan State Police Fire Investigation Unit, testified for the prosecution as an expert in the field of determining cause and origin of fires. He investigated the Stermer house fire. Detective Leroy concluded that the fire originated in the first-floor living room and was intentionally set. Detective Leroy based these conclusions on the speed of the fire, a comparison of areas with the most damage versus areas with the least damage, the time of day, and the fact that two adults were at home. He could not determine whether accelerants were present on the living room floor because the floor was consumed by the fire. A canine search team found no ignitable liquid residue in the home.

Chris Williams testified that he and Petitioner became romantically involved in the summer of 2006. They continued their relationship after Mr. Stermer's death. At some point after the fire, Petitioner told Williams that she was downstairs when she heard her husband holler. She ran to see what was happening and found the entire

upstairs engulfed in flames. Petitioner was very upset when they discussed the fire. She told Williams she had no involvement in setting the fire or causing her husband's death.

Stephen Berry, Kate Fox's brother, testified for the defense. He characterized Fox as untrustworthy. Fox is self-centered and believes "the sun revolves around her and when it doesn't she can be very angry and very vindictive" to the point of lying about someone. (1/12/2010 Tr. at 97, ECF No. 24-11 at Pg. ID 1692.)

Seven defense witnesses attested to Petitioner's honesty and peaceable nature. Several jail inmates housed with Petitioner testified that she never discussed her case and never spoke with Dardeda Gordon.

## II.    Procedural History

Petitioner was convicted by a Van Buren Circuit Court jury of first-degree premeditated murder and felony murder. On February 8, 2010, the trial court vacated the premeditated murder conviction and sentenced Petitioner to life imprisonment on the felony-murder conviction.

Petitioner filed an appeal of right in the Michigan Court of Appeals raising the following claims:

I.    The district court abused its discretion in binding over to circuit court and the circuit court erred in refusing to quash the bindover.

II.    The trial court erred in denying the motion for a directed verdict. Defendant's convictions for first-degree murder and felony murder must therefore be vacated because the evidence is insufficient to support a finding of guilt beyond a reasonable doubt that (1) the house fire was

caused by arson, *i.e.* a deliberately set fire or (2) that it was defendant who started the fire.

III.   The trial court abused its discretion in denying the motion for a new trial because the verdict is against the great weight of the evidence.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Stermer*, No. 297057, 2011 WL 2507848 (Mich. Ct. App. June 23, 2011). The Michigan Supreme Court denied Petitioner's application for leave to appeal. *People v. Stermer*, 490 Mich. 913 (Mich. 2011).

Petitioner then filed a petition for a writ of habeas corpus. This Court held the petition in abeyance while Petitioner exhausted state court remedies. *See* ECF No. 10.

Petitoner filed a *pro se* motion for relief from judgment in the trial court, raising these claims:

I.   Defendant was denied her Fourteenth Amendment right to a fair trial when the court allowed Scott Leroy to testify as an expert on cause and origin. The court did not fulfill its role as "gate keeper" when Leroy was allowed to present unreliable testimony to the jury as an expert, which did not comport with MRE/FRE 702. The allowance of Leroy's testimony was an abuse of discretion and prejudicial to Stermer under MRE/FRE 403.

II.   The prosecutor prejudiced defendant and committed reversible error when he engaged in improper conduct:

A.   Vouching for and bolstering the credibility and testimony of seven State's witnesses during closing arguments.

B.   Offered facts not in evidence, he knew to be false, and mischaracterized facts during closing arguments.

C.      Denigrated the defendant and appealed to the passions and emotions of the jury with repeated, impermissible name calling and character assassination of Stermer during closing arguments.

D.      Eliciting known false testimony from State's witness Cory Pierce.

E.      Elicited testimonial evidence from Detective Rought, which could not be supported with documents due to destruction of evidence.

III.      Defense counsel's performance was constitutionally deficient under the Sixth Amendment and Const 1963, art 1, § 20, and precluded defendant from mounting a substantive and effective defense. This is a violation of guaranteed due process rights under the Fourteenth Amendment, and Const 1963, art 1, § 20 where counsel failed to: Challenge the theory of arson on a scientific level, investigate and prepare, to consult with an expert to rebut the prosecution's arson expert, to interview any State's witnesses or experts, to question potential witnesses and to object to improper conduct by the prosecutor, and failure to be aware of rules critical to the case.

IV.      Appellate counsel raised weak issues on appeal while ignoring stronger, more meritorious arguments. Counsel's deficient performance prejudiced Stermer and violated her Sixth Amendment due process rights.

V.      Defendant's conviction should be reversed because the evidence was legally insufficient to prove beyond a reasonable doubt that the fire was intentionally set or that defendant intentionally set the fire that resulted in the felony murder charge. The verdict was contrary to the great weight of the evidence and MRE/FRE 702.

The trial court appointed counsel to represent Petitioner and file additional papers. After appointed counsel failed to supplement the record, the trial court denied the motion for relief from judgment. *See* 2/28/14 Order, ECF No. 29-3. The trial court also denied Petitioner's motion for reconsideration. *See* 9/10/14 Order, ECF No. 29-5.

Petitioner's applications for leave to appeal were denied by the Michigan Court of Appeals, *People v. Stermer*, No. 323443 (Mich. Ct. App. Dec. 11, 2014), and the Michigan Supreme Court. *People v. Stermer*, 498 Mich. 919 (Mich. 2015).

Petitioner moved for this case to be reopened. The Court granted her request. This petition raises the following claims for relief:

I.      There was insufficient evidence to sustain petitioner's conviction of arson.

II.     Petitioner's conviction was based upon incompetent, unreliable evidence that misled the jury, supplanted jury fact finding, was manifestly unjust, and denied due process.

III.    Petitioner was denied due process and fundamental fairness by prosecutorial misconduct in vouching, bolstering, providing evidence, and deliberately misleading the jury.

IV.     Ineffective assistance of counsel denied petitioner a fair trial.

V.      Petitioner was prejudiced by ineffective assistance of counsel on appeal.

On June 28, 2018, the Court issued an Order Scheduling Evidentiary Hearing on Petitioner's claims that her trial and appellate attorneys rendered ineffective assistance and that admission of expert witness Scott Leroy's testimony violated her rights under the Due Process Clause. (ECF No. 34)

Respondent filed a motion for reconsideration on the ground that an evidentiary hearing was precluded under 28 U.S.C. § 2254(d) and *Cullen v. Pinholster*, 563 U.S. 170 (2011). (ECF No. 35) The Court deferred ruling on the motion until after the evidentiary hearing, which was held on October 24 and 25, 2018. As discussed below, the Court holds that the evidentiary hearing was proper and denies

Respondent's motion for reconsideration.

Even without the evidentiary hearing, the record supports the conclusion of this opinion. If the Sixth Circuit Court of Appeals determines that to hold an evidentiary hearing was improper, which it should not (*see infra* III.C.3.a.), the information in the state court record alone requires the granting of a conditional writ of habeas corpus.

## III. Discussion

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") establishes the standard for federal courts to review a state prisoner's habeas claims. 28 U.S.C. § 2254(d). AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' [the Supreme Court's] clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a

result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of [the] petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413). "[F]or a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. … The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409.

To obtain relief under § 2254(d)(2), the petitioner must establish an "unreasonable determination of the facts in light of the evidence presented" and "that the resulting state court decision was based on that unreasonable determination." *Rice v. White*, 600 F.3d 242, 250 (6th Cir. 2011). This means that "even if reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption of correctness only with clear and convincing evidence. *Id.* For claims that were

adjudicated on the merits in state court, habeas review is "limited to the record that was before the state court." *Cullen*, 563 U.S. at 181.

AEDPA's deferential standard of review "does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)  As the Supreme Court explained: "A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Id.* "If a state court's finding rests on thin air, the petition will have little difficulty satisfying the standards for relief under § 2254." *Mendiola v. Schomig*, 224 F.3d 589, 592 (7th Cir. 2000).

As discussed below, the Court finds that the state courts did not adjudicate any of the claims addressed herein on the merits, which warrants *de novo* review of these claims. Nevertheless, because Petitioner's prosecutorial misconduct claim and related ineffective assistance of counsel claim for failure to object have merit even under AEDPA's stringent standards, and because the Court does not rely on testimony presented at the evidentiary hearing to adjudicate these claims, the Court applies AEDPA's deferential review to these claims.

The Court discusses testimony adduced at the evidentiary hearing only for the expert-related ineffective assistance of counsel claim. For this claim, therefore, the Court applies a *de novo* standard of review, and, in the alternative, AEDPA's standard.

## B.    Prosecutorial Misconduct

Courts have struggled with policing improper prosecutorial argument and commentary.  Nearly a century ago, the prevalence of abusive tactics prosecutors employed to secure convictions compelled the Supreme Court to remind prosecutors that their duty as representatives of the State is not to win cases, but to serve the interests of justice.  In *Berger v. United States*, 295 U.S. 78 (1935), the Court laid the groundwork for identifying, and remedying, prosecutorial misconduct to ensure the protection of the rights of the accused.  The Court explained that although prosecutors "may strike hard blows," they are "not at liberty to strike foul ones."  *Id.* at 88.  In other words, "[i]t is as much [their] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."  *Id.*

The "clearly established Federal law" relevant to a habeas court's review of a prosecutorial misconduct claim is the Supreme Court's decision in *Darden v. Wainwright*, 477 U.S. 168 (1986).  *Parker v. Matthews*, 567 U.S. 37, 45 (2012).  In *Darden*, the Supreme Court clarified that "foul blows" violate defendants' constitutional rights where they "'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden*, 744 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  This Court must ask whether the Michigan Court of Appeals' decision denying Petitioner's prosecutorial misconduct claims "'was so lacking in justification that there was an error well

understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Parker*, 567 U.S. at 47 (quoting *Harrington*, 562 U.S. 86, 103 (2011)).

The Sixth Circuit uses a two-part test for determining whether prosecutorial misconduct amounts to a denial of due process. *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) (internal citations omitted).

First, the Court must determine whether the challenged statements were improper. *Id.* at 452 (noting that the prosecutor may argue reasonable inferences from the evidence but may not misstate the evidence).

Second, the Court must determine whether the prosecutor's remarks were flagrant, and thus warrant relief, based on its consideration of four factors: (1) whether the statements tended to mislead the jury or prejudice the accused; (2) whether the statements were isolated or among a series of improper statements; (3) whether the statements were deliberately or accidentally before the jury; and (4) the total strength of the evidence against the accused. *Id.*; *see also Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000) (citing *United States v. Francis*, 170 F.3d 546, 549-50 (6th Cir. 1999)).

The Court "examines the prosecutor's comments within the context of the trial to determine whether such comments amounted to prejudicial error . . . . [even] a single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated." *Simpson v. Warren*, 475 F. App'x 51, 59 (6th Cir.

2012) (internal citations omitted).  Inappropriate commentary is especially dangerous to the accused because it "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."  *United States v. Young*, 470 U.S. 1, 18-19 (1985).

Although "[c]laims of prosecutorial misconduct are reviewed deferentially on habeas review," *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (internal citation omitted), where the prosecutor "has made repeated and deliberate statements clearly designed to inflame the jury and prejudice the rights of the accused . . . [the Court] cannot allow a conviction so tainted to stand."  *Sizemore v. Fletcher*, 921 F.2d 667, 670 (6th Cir. 1990).

      1.    The prosecutor's statements in closing argument were improper

      a.    Comments on the credibility of witnesses

Petitioner argues that the prosecutor acted improperly by attacking her credibility and vouching for the credibility of other witnesses in closing argument.

"It is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying."  *Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005).  Improper remarks include "blunt comments . . . [like] 'I think he [the witness] was candid[,] I think he is honest[;]' or comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony . . . ."  *Francis*, 170 F.3d at 550 (internal citations omitted).

In this case, the prosecutor's personal belief that Petitioner was a liar pervaded the prosecutor's argument. In reference to slight inconsistencies in Petitioner's prior statements, the prosecutor told the jury:

> What I want to caution you on is as we look at this, we know she is a liar. There is no question but that she's a liar and will lie when it suits her okay. Even if we didn't know that, we have to take a cautious view of a statement by someone who is accused of a very serious crime. Might they not say things that they perceive are going to be favorable to them? But we know that she's a liar and in looking at some of those statements, the tendency and what I want you folks not to do is to adopt them as fact because if you do, they are going to be very difficult to reconcile maybe with other parts of it. So as you're looking at the evidence, keep in mind anything she says is suspect. She's a liar.

(1/12/10 Tr. at 109, ECF No. 24-11 at Pg. ID 1704.)

He continued: "But why are we getting multiple inconsistent versions? Okay. I think that's the question we have to be asking and I think the answer is because we're dealing with a liar who has things to hide." (*Id.* at 118, Pg. ID 1713.)

Additionally, as if his prior remarks were insufficient to hammer home his message to the jury, the prosecutor ended by stating: "[S]he has told lie after lie after lie . . . . I would suggest that we are dealing with a diabolical, scheming, manipulative liar and a murderer." (*Id*. at 128, 129, Pg. ID 1723, 1724.)

The Court readily acknowledges that where the defendant testifies at trial, the prosecutor may question her credibility as he would any other witness. *See Francis*, 170 F.3d at 551 (internal citations omitted). But there are limits to a prosecutor's tactics. While the prosecutor may highlight discrepancies in the defendant's

testimony, or between her testimony and other evidence, "and then draw the conclusion that [she] had lied," he may not submit his personal views to the jury "with no explanation or indication of evidentiary bases[.]" *Id*. at 552.

Here, the prosecutor's repeated attacks on Petitioner were improper because they "were not expressly based on evidence before the jury," *id*. (internal citation omitted), and "carr[ied] the strong implication that they [were] made from [the prosecutor's] personal knowledge." *Hodge*, 426 F.3d at 387. The Court is particularly concerned with the prosecutor's inflammatory remarks in light of the fact that Petitioner did not testify at trial. That the jury did not have the opportunity to watch and listen to Petitioner on the witness stand renders the prosecutor's conduct even more egregious. This is because the prosecutor shared with the jury his personal belief that Petitioner was a "diabolical, scheming, and manipulative liar," despite knowing that the jury lacked precisely the evidence it would have needed to make such a credibility determination – Petitioner's live testimony.

The Court also considers the prosecutor's commentary on the witnesses who did in fact testify. With respect to the gas station attendant, Cindy DeLoach, the prosecutor stated: "I would submit that she certainly appears to be a very credible person who has recall of the incident[.]" (1/12/10 Tr. at 113; Pg. ID 1708.) Moreover, with respect to the two jailhouse witnesses, Veronica Tracy and Dardeda Gordon, the prosecutor argued that they had "no incentive to lie" and "there is absolutely nothing in it for them to make this up." (*Id.* at 126, Pg. ID 1721.) These observations were

improper because "it is clear that the prosecutor's purpose [in making these remarks] was to enhance [the witnesses'] credibility in the eyes of the jury." *Washington v. Hofbauer*, 228 F.3d 689, 701 (6th Cir. 2000).

> b.     Misstating the facts

Petitioner further argues that the prosecutor acted improperly when he presented facts not in evidence. Two instances of alleged misconduct are noteworthy: first, when the prosecutor told the jury that Petitioner's cell phones were in the van; and second, when he stated that Mr. Stermer's previous fires were not arson.

"Prosecutors must refrain from asserting facts never admitted in evidence." *Id.* at 700. Misrepresenting facts in evidence can amount to substantial error because doing so "may profoundly impress a jury and may have a significant impact on the jury's deliberations." *Id.* (quoting *Donnelly*, 416 U.S. at 646). Likewise, it is improper for a prosecutor during closing arguments to bring to the jury any purported facts which have not been introduced into evidence and which are prejudicial. *Byrd v. Collins*, 209 F. 3d 486, 535 (6th Cir. 2000).

In his closing argument, the prosecutor stated: "Unfortunately, the lady who has two cell phones has neither one of them with her to call for help. The phones are in the van according to go [sic] her." (1/12/10 Tr. at 119, Pg. ID 1714.)

However, the State failed to present *any* evidence at trial that there was a cell phone in the van when Petitioner fled the house. The prosecutor created this significant detail out of thin air to make the argument that Petitioner consciously

chose not to call for help.

This was not an isolated incident. In an attempt to undermine perhaps the most critical evidence supporting Petitioner's defense theory – that Mr. Stermer started the fire – the prosecutor told the jury:

> One of the other things that I want to clear up right away, and Mr. Getting keeps making reference to two previous fires, two previous fires, two previous fires, the second of which Linda Stermer is living with him and even by her own version it's not an arson, nor was the first one. There is no evidence of that either. Okay. For a moment we want to start making arguments, well, hey, somebody had a prior fire. She was there too so she knows about fires, you know. But there is no evidence that it was arson, so it's nonsense.

(1/12/10 Tr. at 169, 170; ECF No. 24-11, Pg. ID 1764, 1765.)

This was a blatant mischaracterization of the testimony offered at trial. Sandra Stermer testified that, prior to the fire on January 7, 2007, her son had two other properties burn to the ground – a house he owned in Portage, and a house he was "working on" in Three Rivers. (1/5/10 Tr. at 283, ECF No. 24-7 at Pg. ID 849.)

Furthermore, Detective Gabrielle Rought testified that Petitioner had told her about a home in Three Rivers that had burned down. She explained:

> What I remember her telling me is that there was a property owned by Bertha Stermer and that Todd was in the process of purchasing that and that it burned. Prior to that that [sic] Hilmer Stermer purchased the property back and he himself was in the process of selling it but passed away prior to that sale being completed. Once that property was settled upon, Bertha Stermer received money as well as Sandy Stermer and I believe she told me that all of her children, including Todd, she gave some of the money to.

(1/8/10 Tr. at 83, ECF No. 24-10 at Pg. ID 1449.)

In addition to misstating the testimonies of Sandra Stermer and Detective Rought, the prosecutor lied to the jury when he said there was no evidence of arson in the previous two fires. A Portage Police report, which was in the State's possession at the time of trial, indicated that the fire at the house in Portage "was definitely an arson" for which the insured party, Todd Stermer, "was regarded as the suspect." Police Dep't Supp. Rep., Mar. 31, 1992, Pet.'s Ex. 10. Although not admitted into evidence at trial, the report directly contradicts the prosecutor's statement that Mr. Stermer had never been involved with suspected arson. Thus, the prosecutor acted improperly by arguing that any evidence of prior arson was "nonsense" because he not only misrepresented the testimony at trial, but also gave the jury information which he knew, or had reason to know, was false.

2. Flagrancy

Having concluded that several of the prosecutor's statements during closing argument were improper, the Court now considers whether his remarks were flagrant.

First, the Court has little trouble concluding that the prosecutor's statements prejudiced Petitioner. Just before the jury began to deliberate, Petitioner was branded a diabolical liar, while the State's witnesses were categorized as trustworthy – the prosecutor's personal beliefs were among the last words the jury heard before finding Petitioner guilty. *See Simpson*, 475 F. App'x at 63 (internal citation omitted) (noting that "the fact that the jury heard these comments shortly before deliberations is a significant factor."). Further, because trial counsel failed to object to these

statements, "the prosecutor was not admonished for the comments." *Girts v. Yanai*, 501 F.3d 743, 759 (6th Cir. 2007). Although the trial judge gave general jury instructions prior to deliberations, "routine jury instruction[s] at the conclusion of the trial [are] not sufficient to cure a prosecutor's improper comments." *Id.* (internal citation omitted).

Second, the prosecutor's "improper statements were peppered throughout the prosecutor's closing argument." *Id.* at 64. The prosecutor did not simply make "an off-hand remark in a heated trial[;]" quite the contrary, he "select[ed] inappropriate arguments and use[d] them repeatedly during summation." *Bates v. Bell*, 402 F.3d 635, 648 (6th Cir. 2005).

Third, given that the prosecutor called Petitioner a liar nearly ten times, vouched for the credibility of at least two witnesses, and grossly misstated the testimony at trial, the Court concludes that his statements were deliberate. *See Girts*, 501 F.3d at 760 (internal citation and quotation marks omitted) (noting that "[r]epeated comments [] demonstrate that the errors were not inadvertent because clearly, we are not dealing with a spontaneous comment that could be regretted but not retracted.").

The deliberateness of the prosecutor's conduct is shown not only by the frequency of his statements, but also by his strategic choices. "Appeals to racial prejudice are foul blows and the courts of this country reject them." *United States v. Grey*, 422 F.2d 1043, 1046 (6th Cir. 1970). It is a prosecutor's duty as a "servant of

the law" to tread cautiously around racial issues. The prosecutor here took no such care. He called Chris Williams, a black man from Kalamazoo, to testify about his extramarital-and interracial-affair with Petitioner, a white woman. But the prosecutor did not need to call Williams to the stand to introduce evidence of the affair; he introduced this evidence, without objection, through several other witnesses. The prosecutor mentioned Williams only once in closing, demonstrating that he did not rely on this testimony to argue his case. Ultimately, the prosecutor chose to present Williams "with no apparent justification" and with the possibility of arousing prejudice in a predominantly white jurisdiction.[1] *People v. Bahoda*, 448 Mich. 261, 266, 531 N.W.2d 659, 663 (1995); *see also People v. Springs*, 101 Mich. App. 118, 125, 300 N.W.2d 315, 318 (1980) ("The most disturbing aspect of the prosecutor's behavior was his blatant injection of race as an issue in the trial.").

Finally, where, as here, the State's evidence is not strong, "a prosecutor must be doubly careful to stay within the bounds of proper conduct." *Hofbauer*, 228 F.3d at 709. Substantial evidence pointed the finger at Mr. Stermer as the potential arsonist. He was involved in two prior fires where arson was strongly suspected and he was identified as a suspect in one. He was present at the point of origin of the fire and gasoline was detected on his clothing. The gasoline on his clothing also raised a

---

[1] At the time of Petitioner's trial, 86.7 % of Van Buren County residents were white and only 4.1% of residents were African American. *See* United States Census Bureau, Profile of General Population: 2010 Demographic Profile Data. https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=CF (last visited Dec. 18, 2018).

substantial possibility that the fire started accidentally perhaps by contact with the open flame in the living room.  Moreover, the two jailhouse informants had significant mental health issues, with Veronica Tracy's testimony almost incomprehensible.  Kate Fox provided significant incriminating evidence against Petitioner.  But her cross-examination testimony revealed troubling aspects of her testimony and relationship with Petitioner: she had been twice hospitalized for mental health issues, including once in January 2007; she dissolved her friendship with Petitioner because Petitioner changed work shifts; and she was arrested for assaulting Petitioner.  Kate Fox's brother testified that she was known to be untruthful.

"[T]he egregious and inflammatory nature of the [prosecutor's] behavior" leaves this Court with "grave doubt," at a minimum, as to whether his misconduct had "substantial and injurious effect or influence in determining the jury's verdict." *Boyle*, 201 F.3d at 718 (internal quotation marks omitted).  Indeed, the Court believes it is highly likely that the misconduct had a substantial and injurious effect upon the jury's verdict.  The state court's unreasoned decision to the contrary was an unreasonable application of clearly established federal law on prosecutorial misconduct, as determined by the Supreme Court.

## C.      Ineffective Assistance of Trial Counsel

Petitioner's attorney failed to object to the prosecutor's egregious misconduct.  He also failed to consult an expert witness in advance of trial to evaluate the prosecution's expert testimony, prepare him to cross-examine the prosecution, or

provide an alternative, potentially exculpatory analysis of the fire's cause. These errors denied Petitioner her constitutional right to the effective assistance of counsel.

1.     *Strickland v. Washington*

Until 1974, this Circuit used the following standard to evaluate an ineffective assistance of counsel claim: "[I]f a criminal defendant is to prevail on an allegation of ineffective assistance of counsel he must demonstrate that what was done or not done by his attorney made his defense a farce and mockery of justice that would be shocking to the conscience of the court." *Matthews v. Wingo*, 474 F.2d 1266, 1268 (6th Cir. 1973). In 1974, the Sixth Circuit rejected the more burdensome "farce and mockery" standard in favor of holding that "the assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance." *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974). This standard was ultimately adopted by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).

The question here is not defense counsel's *general* competence. Defense counsel was and remains an experienced, well-regarded attorney. Instead, the Court must decide whether, given the particular facts and circumstances of this case, counsel fell below the constitutional standard of competence.

An ineffective assistance of counsel claim has two components. *Strickland*, 466 U.S. at 687. A petitioner must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Id.* To establish deficient

representation, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. In order to establish prejudice, a petitioner must show that, but for the constitutionally deficient representation, there is a "reasonable probability" that the outcome of the proceeding would have been different. *Id.* at 694.

### 2.     Failure to Object to Prosecutorial Misconduct

The prosecutor committed flagrant misconduct in closing argument by improperly commenting on the credibility of witnesses, misstating the facts, and citing facts not in evidence. A defense attorney's "failure to object to prosecutorial misconduct can amount to ineffective assistance of counsel." *Walker v. Morrow*, 458 F. App'x 475, 487 (6th Cir. 2012). The Court holds that counsel was ineffective in failing to object and that Petitioner was prejudiced by counsel's failure.

### a.     Performance prong

In *Hodge*, *supra,* at p. 19, the Sixth Circuit concluded that trial counsel was ineffective for failing to object to prosecutorial misconduct and that the state court's application of *Strickland* was unreasonable. The prosecutor repeatedly commented on the credibility of witnesses, including accusing the defendant of "lying to extricate himself from what he's done" and stating that the complaining witness and her family were "absolutely believable." 426 F.3d at 386. The prosecutor misrepresented the testimony of an examining physician, and suggested, without any evidence, that the defendant was a frequent underage drinker who the jury should fear running into at

night.  *Id.*  The prosecutor's statements on credibility were "often unsupported by any rational justification other than an assumption that Hodge was guilty," thereby suggesting to the jury that the prosecutor knew something they did not.  *Id.*

The Court of Appeals further noted that, "because these statements by the prosecutor were not coupled with a more detailed analysis of the evidence actually adduced at trial, they convey an impression to the jury that they should simply trust the State's judgment that [one of its key witnesses] was a credible witness and that the defendant's witnesses were non-credible, if not perjurious."  *Id.* at 378-79.

The Sixth Circuit found the prosecutor's conduct "sufficiently egregious to warrant, at a minimum, an objection at the bench" after the prosecutor's argument.  *Id.* at 386.  The Court was "unable to articulate a sound professional reason why defense counsel did not object to [the prosecutor's] pattern of repeated misconduct" and concluded that counsel's performance was "'outside the wide range of professionally competent assistance.'"  *Id.* (quoting *Strickland*, 466 U.S. at 690).

The prosecutor's conduct in this case was at least as egregious as the conduct recounted in *Hodge*.  The Court can discern no reasonable justification for counsel's decision not to object.  Certainly, Petitioner's chance of acquittal was not increased by the prosecutor's repeatedly calling her a liar and mischaracterizing the evidence to her detriment.  Objections during the middle of a closing argument must be "approached cautiously," but, at the very least, counsel could have objected after the prosecutor's closing and outside the hearing of the jury, and "an appropriate instruction [could

have been] given." *Young*, 470 U.S. at 13-14.

        b.        Prejudice prong

The Court turns to the question of prejudice. "Unfortunately, when a prosecutor does act unfairly, there is little a defendant can do other than rely on his or her attorney to lodge an appropriate and timely objection. A failure to make such an objection can have devastating consequences for an individual defendant." *Hodge*, 462 F.3d at 377.

The consequences here for Linda Stermer were devastating. The prosecutor repeatedly branded Petitioner a liar while counsel remained a silent observer. The generic jury instructions that attorneys' comments are not evidence were not linked to the prosecutor's improper arguments, nor were they given immediately after the improper arguments. *See Hodge*, 426 F.3d at 388 n.27 (holding that generic jury instructions making no specific reference to the prosecution's misconduct were insufficient to dispel any prejudice). Further, as the Court discussed above, the evidence against Petitioner was not overwhelming. The prosecutor's unchallenged statements that Petitioner was a liar easily could have been outcome-determinative. The Court finds that the trial court's unreasoned order denying this claim was an unreasonable application of *Strickland*.

        3.        Failure to Consult or Call a Fire Investigation Expert

Petitioner argues that her attorney was ineffective in failing to consult or call a fire investigation expert. On October 24 and 25, 2018, the Court held an evidentiary

hearing on this (and other) claims.  The Court concludes that counsel was ineffective and counsel's ineffectiveness prejudiced Petitioner.

a.      *Cullen v. Pinholster*, 563 U.S. 170 (2011)

Respondent argues that the evidentiary hearing violated *Cullen*'s dictate that federal habeas review is limited to the record that was before the state court.  As explained in this section, the Court finds that an evidentiary hearing was proper under *Cullen*.  But, even assuming that it was not, and excluding consideration of testimony presented during the evidentiary hearing, habeas relief is warranted.

In *Cullen*, the Supreme Court held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."  563 U.S. at 185.  In other words, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Id.* at 180.

"Accordingly, district courts are precluded from conducting evidentiary hearings to supplement existing state court records when a state court has issued a decision on the merits with respect to the claim at issue."  *Ballinger v. Prelesnik*, 709 F.3d 558, 561 (6th Cir. 2013).  When a state court does not address a claim on the merits, as when it applies a state law procedural bar, "AEDPA deference" does not apply and the Court reviews the claim *de novo*.  *Cullen*, 563 U.S. at 185; *see also Robinson v. Howes*, 663 F.3d 819, 822-23 (6th Cir. 2011).  To determine whether Petitioner has been denied relief based on a procedural default, the Court looks to the

last "reasoned judgment rejecting the [federal] claim." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

Because the Court relies on the evidentiary hearing testimony only with respect to Petitioner's claim that counsel was ineffective in failing to consult an arson expert prior to trial and/or to present an expert at trial, the Court addresses only whether the state court adjudicated this particular claim on the merits.

Petitioner first raised this issue (and the other claims addressed in this opinion) in a motion for relief from judgment. Both the Michigan Court of Appeals and the Michigan Supreme Court denied Petitioner leave to appeal from the trial court's denial of her motion under MCR. 6.508(D). *See People v. Stermer*, 498 Mich. 919 (2015), *People v. Stermer*, No. 323443 (Mich. Ct. App. Dec. 11, 2014). Brief form orders by the Michigan appellate courts invoking Mich. Ct. R. 6.508(D) are unexplained orders within the meaning of *Ylst*, 501 U.S. at 803. Such form orders are presumed to uphold or reject the last reasoned decision below. *Guilmette*, 624 F.3d at 291-92 (citing *Ylst*, 501 U.S. at 803). When a Michigan appellate court denies review of a claim using a summary order citing Mich. Ct. Rule 6.508(D), a federal court conducting habeas review must "look to the last reasoned state court opinion to determine the basis for the state court's rejection of [the] claim." *Id.* at 291.

Under *Guilmette*, the Court looks through the decisions of the Michigan Supreme Court and Michigan Court of Appeals to the decision of state trial court, i.e., the Van Buren County Circuit Court. Petitioner filed her motion for relief from

judgment on July 31, 2013. The trial court "[a]fter receipt of the file and review of the documents . . . determin[ed] that Ms. Stermer should be appointed counsel;" counsel was appointed on September 23, 2013. *See* 2/28/2014 Trial Ct. Ord. at 1, ECF No. 24-18, Pg. ID 2102. Appointed counsel, Michael Skinner, did not file any further papers.[2] On February 28, 2014, apparently without inquiring why appointed counsel failed to file supplemental papers, the trial court denied the motion (and denied Petitioner's motion for evidentiary hearing and motion for release on bond). The trial court held:

> After review of the documentation, under MCR 6.504(B)(2) it plainly appears to this Court that the material reviewed along with the motions do not entitle Defendant to relief and therefore the Court is denying the motions without any further proceedings.
>
> ***
>
> The Court does not find any reason pursuant to M.C.R. 6.508(D) which would entitle the Defendant to relief.

2/28/14 Order at 2-3, ECF No. 29-3, Pg. ID 2813-14.

The trial court's order is ambiguous as to whether the state court denied the motion due to a procedural bar or on the merits. The Sixth Circuit Court of Appeals

---

[2] Skinner's failure to consult with Petitioner or file any papers on her behalf raises the question of his possible ineffective assistance. In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court concluded that, for purposes of procedural default, ineffective assistance of collateral counsel may constitute cause to excuse the procedural default of an ineffective assistance of trial counsel claim. *Id.* at 13-14. The same reasoning employed in *Martinez* would seem to support a finding that attorney abandonment on collateral review justifies allowing for fact development on federal habeas review. Unfortunately for Petitioner, the Sixth Circuit has rejected a petitioner's attempt to expand *Martinez* to allow factual development of an ineffective assistance of trial counsel claim on habeas review where collateral counsel was ineffective. *Moore v. Mitchell*, 708 F.3d 760, 782 (6th Cir. 2013).

has held that a denial pursuant to Rule 6.504(B)(2) may be due to a procedural bar or due to lack of merit.[3] *Henderson v. Palmer*, 730 F.3d 554, 562 (6th Cir. 2013); *Alexander v. Smith,* 311 F. App'x 875 (6th Cir. 2009). Similarly, a court's reference to Rule 6.508(D) "can refer to the petitioner's failure to establish entitlement to relief either on the merits or procedurally." *Guilmette*, 624 F.3d at 289-90.

Under *Harrington*, when a state court opinion is ambiguous as to whether the decision was based upon the merits or instead on procedural grounds, a federal habeas court may presume that the state court adjudicated the decision on the merits "in the absence of any indication or state-law procedural principles to the contrary." 562 U.S. at 99. The presumption "may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 99-100 (citing *Ylst*, 501 U.S. at 803).

Michigan law and the circumstances of this case make it more likely that the trial court did *not* address the merits of Petitioner's claims because they were not presented on direct appeal.

Rule 6.508(D) sets three bars to relief from judgment, two of which are clearly

---

[3]Rule 6.504(B)(2) permits a judge to dismiss a case:

If it plainly appears from the face of the materials described in subrule (B)(1) that the defendant is not entitled to relief, the court shall deny the motion without directing further proceedings. The order must include a concise statement of the reasons for the denial.

inapplicable to Petitioner's motion.[4]  The first bar, Rule 6.508(D)(1), precludes relief

from judgment if the motion seeks relief from a conviction that is still subject to

challenge in the Michigan Court of Appeals or Michigan Supreme Court.  No

argument can be made that Petitioner's conviction was still subject to challenge in the

Michigan appellate courts.

The second bar, Rule 6.508(D)(2), precludes relief from judgment on grounds

which were decided against the defendant in a prior appeal or prior motion for relief

from judgment.  Petitioner raised no claims which were decided against her in a prior

---

[4]  Mich. Ct. Rule 6.508(D) provides:

The defendant has the burden of establishing entitlement to the relief requested.  The court may not grant relief to the defendant if the motion

(1) seeks relief from a judgment of conviction and sentence that still is subject to challenge on appeal pursuant to subchapter 7.200 or subchapter 7.300;

(2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision;

(3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates

(a) good cause for failure to raise such grounds on appeal or in the prior motion, and

(b) actual prejudice from the alleged irregularities that support the claim for relief.

Mich. Ct. R. 6.508(D).

appeal or prior motion for relief from judgment.

This leaves the third bar.  Under Rule 6.508(D)(3), a court may not grant relief from judgment if the criminal defendant's motion "alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion" for relief from judgment.  Because the first two bars are plainly inapplicable to Petitioner's motion, the trial court's decision must have relied upon Rule 6.508(D)(3).  Rule 6.508(D)(3) has been a firmly established and regularly followed procedural rule since 1990.  *See Luberda v. Trippett*, 211 F.3d 1004, 1008 (6th Cir. 2000).  The state court's holding, therefore, was not an adjudication on the merits.[5]

Petitioner still must overcome the restrictions of 28 U.S.C. § 2254(e)(2). Except for three narrow exceptions, § 2254(e)(2) precludes a federal habeas court from holding an evidentiary hearing "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings."  A petitioner escapes the "failed to develop" clause (and thus hurdles § 2254(e)(2)) if she was diligent, *i.e.* the petitioner "made a reasonable attempt, in light of the information available at the

---

[5] The Court addresses how the trial court's failure to address the merits of these claims impacts the standard of review in section III.A, *supra*.  Further, because the state court's decision relied upon a procedural bar, this Court may not address the merits of Petitioner's expert-related ineffective assistance of counsel claim unless she shows cause for the default and that she suffered actual prejudice from the alleged constitutional violation.  *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991).  Ineffective assistance of appellate counsel may constitute cause.  *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986). The Court concludes that appellate counsel's ineffectiveness establishes cause and prejudice to excuse the default.  *See* III.D. *infra* at 50.

time, to investigate and pursue [the claim] in state court." *Williams v. Taylor*, 529 U.S. 420, 435 (2000).

The Court finds that Petitioner made a reasonable attempt to develop the factual basis for her claim in state court. In her motion for relief from judgment, Petitioner set forth the factual basis for her ineffective assistance claim and also sought an evidentiary hearing. The trial court denied the motion without granting Petitioner a hearing. In her applications for leave to appeal the trial court's decision, she asked the Michigan Court of Appeals and Michigan Supreme Court to remand for an evidentiary hearing. Those courts denied leave. Petitioner was diligent for purposes of § 2254(e)(2). *See Williams v. Burton*, 714 F. App'x 533, 558 (6th Cir. 2017) (finding that seeking an "evidentiary hearing in [a] Motion for Relief from Judgment pursuant to Michigan Court Rule 6.500" reflected the diligence required by § 2254(e)(2)).

Therefore, the Court denies Respondent's motion for reconsideration and finds that the evidentiary hearing was proper under *Cullen*.[6]

---

[6] Petitioner argues that an evidentiary hearing is appropriate because the state court failed to allow for the development of the factual record. The state court's fact-finding process was glaringly incomplete and inadequate. But, under Sixth Circuit precedent, the inadequacy of the state's fact-finding process is of no moment. When a claim is decided on the merits by the state court, "allowing a petitioner to supplement an otherwise sparse trial court record may be appealing," but is precluded by *Pinholster* and *Harrington,* even when the petitioner did not receive a full and fair hearing. *Ballinger*, 709 at 562.

The Court is bound by *Ballinger* to reject this basis for an evidentiary hearing, but notes that the state court's failure to provide Petitioner a full and fair hearing on her

b.    Evidentiary Hearing Testimony

The Court held an evidentiary hearing on October 24 and 25, 2018.  Twelve

witnesses testified.  The Court summarizes only the testimony relevant to the expert-

related ineffective assistance of counsel claim.[7]

Robert J. Trenkle was retained by Petitioner to testify as an expert in fire

science.  After reviewing Scott Leroy's preliminary examination testimony, trial

---

ineffective assistance of counsel claims, despite her diligent attempts to obtain one,
implicates the Suspension Clause.  The Suspension Clause of the United States
Constitution provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be
suspended, unless when in Cases of Rebellion or Invasion the public Safety may require
it."  U.S. Const. art. I, § 9, cl. 2.  Habeas corpus "exists, in Justice Holmes' words, to
'cu[t] through all forms and g[o] to the very tissue of the structure.  It comes in from the
outside, not in subordination to the proceedings, and although every form may have been
preserved, opens the inquiry whether they have been more than an empty shell.'"
*Boumediene v. Bush*, 553 U.S. 723, 785 (2008) (quoting *Frank v. Mangum*, 237 U.S. 309,
346 (1915) (dissenting opinion)).

Applying *Cullen* to a case where a petitioner's failure to develop a factual record
in state court is the fault only of the state court deprives the petitioner of a meaningful
opportunity to present a claim, renders the state court process nothing "'more than an
empty shell'" and amounts to a suspension of the writ.  *Id.* (quoting *Frank*, 237 U.S. at
346).  As the concurrence observed in *Gonzalez v. Wong*, 667 F.3d 965 (9th Cir. 2011):

> To hold that an improper state court denial of discovery necessary to develop
> a federal constitutional claim prevents a federal court from considering in the
> first instance evidence discovered during federal habeas unnecessarily binds
> the federal court to the inadequate factfinding of the state court.

*Id.* at 1016 (concurring opinion).  Nevertheless, because the Sixth Circuit's *Ballinger*
opinion applies *Cullen* even where a petitioner was denied a full and fair opportunity to
develop a claim in state court, the Court declines to rest its evidentiary hearing decision
on the unlawful suspension of the writ.

[7]  Scott Leroy's evidentiary hearing testimony is consistent with his trial testimony.
The Court does not rely on Leroy's evidentiary hearing testimony to decide Petitioner's
claims and, therefore, does not summarize his evidentiary hearing testimony here.

testimony, and written report, Trenkle concluded that the evidence did not support Leroy's arson determination. Trenkle testified that the evidence Leroy relied upon was insufficient to allow for a determination as to the fire's cause. He also testified that, assuming the fire was intentionally set, it was more likely set by Mr. Stermer than by Petitioner.

Trenkle pointed to a number of deficiencies in Leroy's methodology. First, Leroy incorrectly concluded that the fire's speed supported the theory that an accelerant was used. He explained that many other factors could have contributed to the fire's speed, including the exposed trusses, lack of drywall, and type of wood used in the home's construction. Second, the degree of damage to the home and the collapse of the first floor onto the basement floor rendered it impossible to eliminate every possible accidental cause, such as an electrical fire, a candle, or oil lamp. Third, Leroy failed to sample or move the debris in the basement, which was approximately two feet deep. Because the first floor fell into the basement, testing that debris would have been useful in a cause determination.

Finally, Trenkle testified that an expert would have been helpful to the defense to, at a minimum, assist in the cross-examination of the prosecution's expert.

Jack Hooker, retained by Respondent, testified as an expert in the investigation of fires.[8] He testified that he was asked to evaluate Leroy's origin and cause

---

[8] Mr. Hooker was the Respondent's expert witness, but was called to testify by Petitioner's counsel.

investigation. He agreed with Leroy's methodology, which, in his opinion, complied with industry standards. Hooker testified that he did not independently investigate the cause of the fire, but nevertheless agreed with Leroy's arson conclusion. Hooker believed Leroy's conclusion was supported both by the elimination of the living room fireplace as a possible cause and by the fact that gasoline had been in the area of origin (on Mr. Stermer's pants). He also testified that whether the fire had been set by Petitioner or Mr. Stermer, the physical evidence would appear the same to a fire investigator.

Petitioner's trial attorney, Jeffrey Getting, testified that he was retained shortly after the fire to represent Petitioner. At that time, no criminal charges had been filed. In fact, charges were not filed until June 2009, over two years after the fire. Prior to representing Petitioner, Getting had not represented a person charged with felony-murder with a predicate felony of arson.

Getting presented two defense theories: the fire was accidentally set; or Mr. Stermer intentionally set the fire to gain the insurance proceeds and accidentally killed himself in the process. He determined that he did not need to consult an expert because he believed Leroy's testimony could be used to support both defense theories, even though Leroy's testimony contradicted the defense that the fire was accidentally set. Despite his limited experience with arson prosecutions, he did not consult an expert to assist him in preparing to cross-examine Leroy.

Petitioner testified that she "begged" defense counsel on numerous occasions to hire an expert witness. (10/24/18 Tr. at 47, ECF No. 54 at Pg. ID 3193.) She assured him that the family would pay for an expert. She also asked her therapist to speak to defense counsel on her behalf about hiring an expert. Defense counsel told Petitioner he did not need an expert because he would "use the prosecutor's expert" for the defense's need. (*Id.* at 48, Pg. ID 3194.)

Petitioner also testified that, although she met with defense counsel a few times prior to trial, he was generally unavailable to her in the months preceding trial. He did not return phone calls. She was so frustrated with her inability to contact counsel that she took to visiting his office several times a week and staying for hours at a time in an attempt to meet with him.

Martee Bakhuyzen, Petitioner's mother, testified that she asked defense counsel several times to hire an expert witness, but he would not. Defense counsel told her that they did not need an expert because there was "no way" a jury would convict Petitioner. (*Id.* at 126, Pg. ID 3272.) Bakhuyzen also testified that defense counsel was unavailable to meet with her daughter or her prior to the trial. He failed to show up for several appointments with Petitioner.

Ashley Gibson, Petitioner's daughter, testified that defense counsel was asked to retain an expert witness. Defense counsel claimed an expert witness was unnecessary.

c. Application of *Strickland*

Petitioner claims that her attorney was ineffective in failing to seek information related to arson investigations, familiarize himself with applicable industry standards for fire investigation, or consult with an expert in the origin and cause of fire.

(1) Performance prong

Effective assistance of counsel includes the duty to undertake reasonable pretrial investigation or to make a reasonable, informed decision that particular investigations are unnecessary. *See Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Strickland*, 466 U.S. at 690. Strategic decisions made after less than a complete investigation are reasonable only "to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690-91. In other words, counsel does not perform competently by ignoring avenues for investigation and labeling this failure to act a "strategic decision."

In some criminal cases, "the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Harrington*, 562 U.S. at 106. This was such a case.

Petitioner's trial attorney, Jeffrey Getting, knew the fire's cause and origin were central to, if not dispositive of, the prosecution's case. His opening statement identified three plausible causes of the fire: arson by Mr. Stermer, arson by Petitioner, or an accidental fire. (1/5/10 Tr. at 264, ECF No. 24-7, Pg. ID 831.) Getting argued

that "the evidence in this case is going to support all of those theories.  For that reason, there is a reasonable doubt."  (*Id.* at 265, Pg. ID 272.)  Nevertheless, he failed to consult a single expert witness to ascertain the likelihood of each of these three possibilities or to assist him in preparing to cross-examine the prosecution's expert. Other than his own argument, defense counsel presented no evidence that the fire could have been accidental or that the fire was more likely to have been started by Mr. Stermer than Petitioner.

In *Couch v. Booker*, 632 F.3d 241 (6th Cir. 2011), the Sixth Circuit considered defense counsel's failure to investigate a cause of death defense in a second-degree murder case.  Defense counsel was aware of a fire department report which could have served as the basis for a defense that the victim of a beating died from a drug overdose and not from choking on blood, but failed to obtain the report.  *Id.* at 246. The Court held that "[t]o make a reasoned judgment about whether evidence is worth presenting, one must know what it says."  *Id.*  The Court went on to note, "[w]hile the point of the Sixth Amendment is not to allow Monday-morning quarterbacking of defense counsel's strategic decisions, a lawyer cannot make a protected strategic decision without investigating the potential bases for it."  *Id.*

In *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007), the Sixth Circuit considered a case where a defendant was convicted of aggravated felony murder in connection with the death of a two-year old who perished in a fire allegedly set by the defendant.  "[S]cientific evidence of arson was [ ] fundamental to the State's case"

and was presented through expert testimony. *Id.* at 362. In *Richey*, defense counsel hired an expert to review the prosecution's arson evidence, but the expert ultimately concurred with the State's experts. *Id.* The Court held that counsel rendered ineffective assistance because he failed to "conduct the investigation that a reasonably competent lawyer would have conducted" in order to evaluate whether a not-arson defense remained viable. *Id.* at 362-64. On federal habeas review, two experts provided testimony that "would have severely undermined the State's case." *Id.* at 364. The new experts would have: attacked the prosecution expert's analysis as "unsound and out of step with prevailing scientific standards;" rejected the prosecution's contention that the fire's speed indicated arson, because "modern furnishings cause fires to burn more rapidly;" and testified that the most likely cause of the fire was a cigarette left smoldering in couch cushions. *Id.*

The Sixth Circuit held that counsel was deficient for failing to conduct adequate investigation and that the deficiency prejudiced the defense. *Id.* at 363-64; *see also Dugas v. Coplan*, 428 F.3d 317, 328 (1st Cir. 2005) (holding that where defense counsel visually inspected the fire scene himself, talked with the state's experts, did some limited reading, and talked with other defense attorneys, he nonetheless failed to adequately investigate an available "no arson" defense). The Court explained that it could "discern no strategic reason" why counsel would have abandoned the not-arson defense without further investigation. *Richey*, 498 F.3d at 363.

Although the decisions of trial counsel receive great deference under *Strickland*, "there must be some limit to this deference." *Ege v. Yukins*, 485 F.3d 364, 378 (6th Cir. 2007). "[T]he investigation leading to the choice of a so-called trial strategy must itself have been reasonably conducted lest the 'strategic' choice erected upon it rest on a rotten foundation." *Ramonez v. Berghuis*, 490 F.3d 482, 488 (6th Cir. 2007).

In this case, any so-called strategy eliminating consultation with an expert was a choice erected upon no foundation. The cause of the fire was central to the prosecution's case. Defense counsel failed to effect any reasonable investigation into the basis and validity of the prosecution expert's conclusions. Counsel was aware that the prosecution's case relied upon Leroy's finding that the fire was intentionally set. Rather than consulting an expert, he chose to rely on his experience and cross-examination of Leroy to present his defense, in part because he believed Leroy's testimony was consistent with the defense, but it was not. Leroy's testimony contradicted the defense that the fire could have been accidental.

No reasonable argument can be made that counsel satisfied his "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see also Richey*, 498 F.3d at 362 (characterizing a situation where lawyers "altogether fail to hire an expert" as the "most egregious type" of failure to investigate). Counsel rendered inadequate

assistance.[9]

(2)    Prejudice prong

The Court turns to the prejudice prong and concludes that Petitioner has established a "'substantial' likelihood of a different result" absent counsel's errors. *Cullen*, 563 U.S. at 189 (quoting *Richter*, 562 U.S. at 112).

If counsel conducted an adequate pretrial investigation and offered Robert J. Trenkle's testimony at trial, the jury would have been presented with two expert witnesses: the prosecution's expert (Leroy), who testified that the fire was arson, but did not identify the likely arsonist; and the defense's expert, (Trenkle), who would

---

[9] Even if the Court does not consider the evidence adduced at the evidentiary hearing and accords the trial court's conclusory decision AEDPA deference, the Court reaches the same conclusion and holds that the trial court's decision that counsel was not deficient is an unreasonable application of *Strickland.* The Court is able to conclude that counsel failed to consult an expert witness based upon the unrebutted affidavits of Petitioner and her mother. *See* 9/3/2014 Linda Stermer Affidavit, ECF No. 20-15, Pg. ID 316 ("To my best knowledge and belief, attorney Getting never retained a defense expert."); 7/9/2013 Martee Bakhuyzen Affidavit, ECF No. 29-1, Pg. ID 2760-61 ("We begged Mr. Getting to hire an expert. Mr. Getting assured us that an expert in the firld [sic] of arson or fire investigation was a waste of money and he would use the prosecutors ecperts [sic] to his own means.").

Second, Leroy's trial testimony was clearly harmful to the defense because it directly contradicted Petitioner's not-arson defense. Leroy's conclusion that the fire was intentionally set was known to counsel well before trial. Counsel was inadequate in failing to, at the very least, consult an expert to evaluate Leroy's methodology and conclusion and to assist in crafting cross-examination of Leroy. *See Duncan v. Ornoski*, 528 F.3d 1222, 1235-36 (9th Cir. 2008) (holding defense attorney ineffective in consulting a serology expert where counsel "did not have the personal expertise in serology to make strategic decisions about how to handle the blood evidence on his own and . . . was not qualified to undermine the State's case by simply cross-examining its experts without obtaining expert assistance himself.")

have testified that the cause of the fire (accidental or intentional) could not be determined based upon industry fire investigation standards, and that, if the fire was intentionally set, Mr. Stermer was more likely to have started the fire.

The prosecution's case was not overwhelming. Even assuming the jury believed that the fire was intentionally set, significant evidence pointed the finger of suspicion at Mr. Stermer. He may have been motivated by money, by anger at Petitioner, and/or by a desire for revenge over Petitioner's suspected infidelity. He arguably also had experience with arson fires because two of his previous homes were destroyed by fire and he was identified as the suspect in one of those fires. His pants also tested positive for gasoline, while Petitioner's clothes did not.

Additionally, as previously discussed, three key prosecution witnesses – Dardeda Gordon, Veronica Tracy, and Kate Fox – suffered from mental health problems and all had criminal convictions. Gordon admitted that bipolar disorder, posttraumatic stress disorder, and panic disorder cause her significant and long-standing memory problems. Tracy provided remarkably confused and rambling testimony, at the end of which, she was uncertain whether the person she overheard making incriminating statement was Petitioner or whether the person said anything incriminating at all. And although Fox's testimony was incriminating, she also revealed prior arguments with Petitioner, one of which led to Fox's arrest for assault.

Given the substantial weaknesses in the prosecution's case, there is a reasonable likelihood that the result of the proceeding would have been different had

the defense presented expert testimony.

Even if the Court excludes consideration of the evidentiary hearing testimony and accords the state court decision AEDPA deference, Petitioner nonetheless satisfies *Strickland*'s prejudice prong.  Respondent argues that Petitioner cannot establish prejudice because she failed to present an expert affidavit in state court to show what a defense expert would have said.  In many instances, such an omission is fatal to an expert-related ineffective assistance of counsel claim.  In this instance, however, it is not.  The Court is able to assess prejudice absent an expert affidavit.

Counsel's cross-examination of Leroy would have been more effective had counsel consulted an expert, who almost certainly would have examined whether Leroy's methodology complied with Nat'l Fire Prot. Ass'n, NFPA 921: Guide for Fire and Explosion Investigations (NFPA 921).  At the time of Petitioner's trial, NFPA 921 was recognized as "a benchmark for the training and expertise of everyone who purports to be an expert in the origin and cause determination of fires."  U.S. Dep't of Justice, Fire and Arson Scene Evidence: A guide for Public Safety Personnel 6 (2000).[10]  If counsel had cross-examined Leroy using NFPA 921, he could have called

_____

[10]  Courts across the country recognized NFPA 921 as setting the standard for fire investigations.  *See Fireman's Fund v. Cannon United States*, 394 F.3d 1054, 1058 (8th Cir. 2005) (excluding expert witnesses who failed to follow NFPA 921's guidelines); *United States v. Hebshie*, 754 F. Supp. 2d 89, 109 n.39 (D.Mass. 2010) ("NFPA 921 ... is widely accepted as the standard guide in the field of fire investigation."); *Butcher v. Allstate Ins. Co.*, No. 06-423, 2009 WL 301822, at *3 (S.D. Miss. Feb. 5, 2009) ("It is well recognized that [NFPA 921] is the most generally accepted standard for methodology for [fire scene investigation]."); *Travelers Prop. & Cas. Corp. v. Gen. Elec. Co.*, 150 F. Supp. 2d 360, 366 (D. Conn. 2001) (noting that NFPA 921 is "a peer

into question Leroy's methodologies and, consequently, his conclusions.

For example, Leroy explained how he determined the point of origin as follows:

> To determine cause and origin, I would obviously inspect the entire structure and the basic term, especially with this structure, what I was examining is looking – is comparing most damage versus least damage and specifically of fire damage. The theory behind that is that the longer the fire burns, the more damage it's going to create and the more – the longer it burns, is where the fire starts. That's where the fire first starts, it burns the longest, it's going to create the most damage.

(1/7/2010 Tr. at 186, ECF No. 24-9, Pg. ID 1317.)

He excluded certain areas as potential sites of origin based upon the level of damage. (*Id*. at 191-92, Pg. ID 1322-23.) This methodology appears at odds with NFPA 921's standards which caution that "the rate and pattern of fire development depend on a complex relationship between the burning fuel and the surrounding environments." NFPA 921 5.10.1.1.

For the reasons previously explained, the relative weakness of the prosecution's case makes it likely that counsel's failure to consult an expert when preparing for trial prejudiced the defense. The trial court's conclusion to the contrary – to the extent there was a conclusion at all – is an unreasonable application of *Strickland.*

---

reviewed and generally accepted standard in the fire investigation community.").

### D.   Appellate Counsel's Failure to Raise Meritorious Claims

Finally, the Court finds that appellate counsel was ineffective in failing to raise Petitioner's prosecutorial misconduct and ineffective assistance of counsel claims on direct appeal. Appellate counsel's failure to do so undoubtedly prejudice Petitioner.

A criminal defendant has no constitutional right to demand that appellate counsel raise *every* possible colorable issue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). "'[W]innowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy," *Smith v. Murray*, 477 U.S. 527, 536 (1986), and may be "the best type of performance." *Jones*, 801 F.3d at 562 (emphasis in original). "In the appellate context, 'to establish deficient performance, [petitioner] must demonstrate that his appellate counsel made an objectively unreasonable decision by choosing not to raise other issues instead of [the challenged issue], meaning that issue 'was clearly stronger than issues that counsel did present.'" *Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013) (quoting *Webb v. Mitchell*, 586 F.3d 383, 399 (6th Cir. 2009)).

#### 1.   Performance prong

In this case, the omitted issues were "significant and obvious" and "clearly stronger" than at least one (if not all) of the issues presented on direct appeal. *McFarland v. Yukins*, 356 F.3d 688, 710-11 (6th Cir. 2004). Counsel presented three claims on direct appeal: (i) the district court abused its discretion in binding over to

circuit court and the circuit court erred in refusing to quash the bindover; (ii) insufficient evidence presented to show that the house fire was deliberately set or that Petitioner started the fire; and (iii) the verdict is against the great weight of the evidence. Two of these issues focus on the sufficiency of the State's evidence. Because the State's case was weak, appellate counsel should have recognized that the prosecutor's glaring misconduct and counsel's errors were all the more detrimental to the defense.

Counsel's decision to present a bindover claim instead of obviously stronger claims was seriously flawed. The bindover claim is subsumed by the sufficiency of the evidence claim because, under Michigan law, if a magistrate judge erroneously concluded that sufficient evidence was presented at the preliminary examination to support a bindover, the error is rendered harmless by conviction at trial on the basis of sufficient evidence. *People v Meadows*, 175 Mich. App. 355, 359 (1989).

Counsel's decision to omit the prosecutorial misconduct and ineffective assistance of counsel claims was well outside the wide range of professionally competent assistance. Petitioner has satisfied *Strickland*'s first prong.

2. Prejudice prong

Furthermore, the failure of appellate counsel "to raise an issue on appeal is ineffective assistance only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005) (citing *Greer v. Mitchell*, 264 F.3d 663 (6th Cir. 2001)). The

prosecutorial misconduct and ineffective assistance of counsel claims were obvious and strong. Had counsel raised these claims on direct appeal, they almost certainly would have succeeded. Thus, Petitioner has established a reasonable probability that the outcome of her appeal would have been different had these claims been raised. Petitioner has satisfied the *Strickland* standard for ineffective assistance of appellate counsel. The trial court's contrary holding is an unreasonable application of *Strickland*.

## IV. Petitioner's Motion for Bond

Petitioner seeks release on bond. Rule 23(c) of the Federal Rules of Appellate Procedure provides that when a decision ordering the release of a prisoner is on appeal, the prisoner must be released unless the court orders otherwise. This rule creates "a presumption of release pending appeal where a petitioner has been granted habeas relief." *O'Brien v. O'Laughlin*, 557 U.S. 1301 (2009) (citing *Hilton v. Braunskill*, 481 U.S. 770, 774 (1987)); Fed. Rule App. Proc. 23(c)). "The presumption favoring release may be overcome if the judge rendering the decision orders otherwise." *Hilton*, 481 U.S. at 777. In determining whether to release a successful habeas petitioner pending appeal, federal courts may consider the petitioner's risk of flight, the risk that petitioner would pose a danger to the public if released, the state's interest in continuing custody and rehabilitation of the petitioner, the interest of the habeas petitioner in her release pending appeal, and the likelihood of the state's success on the merits of the appeal. *Id.*

The relevant factors support Petitioner's release on bond.

## V.    Order

The Court **GRANTS** a conditional writ of habeas corpus.  Unless a date for new trial is scheduled within 120 days, Petitioner must be unconditionally released.

The Court **GRANTS** Petitioner's Motion for Bond (ECF No. 47) with conditions set forth by separate order.

**SO ORDERED**.


## EPILOGUE

This case represents a failure on the part of each of those responsible for a fair trial: the trial judge, the prosecutor, and the defense attorney.  The judge, who did nothing to prevent the prosecutor from crossing the line and chose not to intervene when counsel ignored their duties to their respective clients; the prosecutor, who undertook improper methods calculated to produce a wrongful conviction; and the defense attorney, who sat idle while the prosecutor disparaged his client. Unfortunately, this tripartite failure is too often overlooked by the appellate courts at the expense of the liberty, and dignity, of individual defendants.

The practices on display in this case have become so widely used that the participants, who are presumed to be competent as counsel, largely consider the

practices tolerable.[11]  To prevent this pattern of misconduct, and ensure protection of

the rights of the accused, all participants must recognize that the common is not

acceptable.  The Bench and the Bar bear the responsibility for taking action against

these threats to the administration of justice.


                                       s/Arthur J. Tarnow
                                       Arthur J. Tarnow
                                       United States District Judge

Dated: December 20, 2018

---

[11]  For two multi-part investigations on prosecutorial misconduct, *see* Maurice Possley & Ken Armstrong, *Trial & Error*, CHI. TRIB. (Jan. 11-14, 1999), https://www.chicagotribune.com/chi-020103trial-gallery-storygallery.html; and Bill Moushey, *Win at All Costs*, PITT. POST-GAZETTE (Nov. 22-Dec. 13, 1998), http://www.usa-the-republic.com/items%20of%20interest/Win_At_All_Cost/Win_at_all_costs.htm.